1  Christopher J. Lovrien (State Bar No. 230546)
   Email: cjlovrien@JonesDay.com
2  Brian Hershman (State Bar No. 168175)
   Email: bhershman@JonesDay.com
3  JONES DAY
   555 South Flower St.
4  Fiftieth Floor
   Los Angeles, CA  90071
5  Telephone:  (213) 489-3939
   Facsimile:   (213) 243-2539
6
7  Attorneys for Defendants
   AHMED AL-RUMAIHI & AYMAN SABI

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  BIG3 LLC, a limited liability company;     CASE NO.2:18-cv-3466
    O'Shea Jackson a/k/a Ice Cube, an
13  individual; and Jeff Kwatinetz, an
    individual;                                 **NOTICE OF REMOVAL OF**
14                                              **CIVIL ACTION PURSUANT TO**
                                                **28 U.S.C. §§ 1332, 1441, AND 1446**
15                  Plaintiffs,
                                                FAC Filed: April 6, 2018
16          v.
                                                Hearing Date:
17  Ahmed Al-Rumaihi, an individual;
    Faisal Al-Hamadi, an individual;            Time:
18  Ayman Sabi, an individual; Sheikh
    Abdullah bin Mohammed bin Sau Al
19  Thani, an individual and as CEO of
    Qatar Investment Authority; DOES 1-
20  100
21                  Defendants.

22

23

24

25

26

27

28

**TO PLAINTIFFS BIG3 LLC, O'SHEA JACKSON A/K/A ICE CUBE, AND JEFF KWATINETZ, ALL ATTORNEYS OF RECORD, AND THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, defendants Ahmed Al-Rumaihi and Ayman Sabi (collectively, the "Removing Defendants"), hereby remove the above-referenced action of BIG3 LLC, Jeff Kwatinetz, and O'Shea Jackson a/k/a Ice Cube (collectively, "Plaintiffs"), from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division.  In support of removal, the Removing Defendants state as follows:

## PROCEDURAL HISTORY

1.     On April 5, 2018, Plaintiffs filed a complaint (the "Complaint") for damages in the Superior Court of the State of California in the County of Los Angeles captioned as follows: *BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual v. Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; and Sheik Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority*, Case Number BC700897 ("Superior Court Action").

2.     On April 6, 2018, Plaintiffs filed a first amended complaint ("FAC") with the same caption.  In the FAC, Plaintiffs seek damages for Defamation (Civil Code §§ 44), Defamation *per se*  §§ 35-81, *et seq*. (Civil Code §§ 46), Trade Libel, and Intentional Interference with Contractual Relations.

3.     The Complaint and FAC are the only pleadings that have been filed in the Superior Court Action.  Plaintiffs have not properly served any of the Defendants with a Summons, the Complaint, or the FAC.[1]

---

[1] On April 16, 2018, an individual attempted to insert a package containing a summons, Complaint, and the FAC into the mailbox of a California rental property

4.     Pursuant to 28 U.S.C. § 1446(a), Removing Defendants have attached as Exhibit "A" copies of all process, pleadings, and orders electronically available in the Superior Court Action.

### TIMELINESS OF REMOVAL AND CONSENT TO REMOVAL

5.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it has been filed within 30 days of the Removing Defendants' first receipt of the Complaint.  Although Plaintiffs have not properly served any Defendants with the Complaint or FAC, a notice of removal may be filed prior to service of the initial pleading.  *Sherman v. Haynes & Boone*, No. 5:14-CV-01064-PSG, 2014 WL 4211118, at *1 (N.D. Cal. Aug. 22, 2014); *see also Novak v. Bank of New York Mellon Trust Co., NA.*, 783 F.3d 910, 911 (1st Cir. 2015).

6.     Each of the Removing Defendants consents to removal of the Superior Court Action to federal court.  Sabi Decl. ¶ 20; Declaration of Ahmed Al-Rumaihi ("Al-Rumaihi Decl.") ¶ 16.  Because Plaintiffs have not properly served any defendants, no other party's consent or joinder is necessary to remove.  *See* 28 U.S.C. § 1446(b).

### VENUE AND INTRADISTRICT ASSIGNMENT

7.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(a) and 1441(a) because the Complaint was filed in this District.  Pursuant to 28 U.S.C. § 1441(a), this case may properly be removed to the Western Division of the Central District of California because Plaintiffs filed this case in the Superior Court of the State of California, County of Los Angeles, Central Division.

---

leased by Defendant Ahmed Al-Rumaihi (who is a Qatari citizen). The individual was approached by a housekeeper at the property, who was given the summons, the Complaint, and the FAC by the individual.  The housekeeper thereafter provided the documents to Defendant Ayman Sabi.  Declaration of Ayman Sabi ("Sabi Decl.") ¶ 18.  The Removing Defendants understand that Plaintiffs have not properly served the other defendants.

NOTICE OF REMOVAL OF CIVIL
ACTION PURSUANT TO 28 U.S.C.
§§ 1332, 1441 & 1446

1

## BASIS FOR JURISDICTION

2     8.     This Court has original jurisdiction over this action under 28 U.S.C. §

3     1332, because this is a civil action involving a dispute between citizens of different

4     states in which citizens of a foreign state are additional parties.  28 U.S.C. §

5     1332(a).  None of the defendants who are citizens of the foreign state are lawful

6     permanent residents of the United States or domiciled in the same state as any

7     plaintiff.  *Id.*  Finally, the matter in controversy exceeds $75,000, exclusive of

8     interest and costs.  Accordingly, the case is removable to this Court pursuant to 28

9     U.S.C. §§ 1441(a) and 1446(d).

10    **Diversity of Citizenship**

11    9.     The defendants are each diverse from each plaintiff for purposes of

12    diversity jurisdiction.

13    10.     <u>Defendant Sabi.</u>  The FAC alleges that defendant Ayman Sabi was

14    born in Tripoli, Libya, is a citizen of the United States, and resides in Miami,

15    Florida.  FAC ¶ 13.  While it is correct that Sabi was a U.S. citizen at the time of

16    the FAC, in fact he resided in Pompano Beach, Florida (not Miami), and he was

17    *domiciled* in the state of Florida at that time.  Sabi Decl. ¶¶ 4-10.  Sabi's residence,

18    domicile, and citizenship have not changed since Plaintiffs filed the FAC.  *Id.*

19    Plaintiffs previously admitted in court filings in another lawsuit that Sabi is

20    domiciled in Florida.  *See* Supp. to Am. Notice of Removal ("BIG3 NOR"),

21    *Champions Basketball Inc. v. BIG3 Basketball, LLC*, No. 17-cv-07389 (LTS)

22    (S.D.N.Y. Sept. 10, 2017) ("New York Action"), attached as Exhibit "A" to the

23    Declaration of Brian Hershman ("Hershman Decl.").

24    11.     <u>Defendants Al-Hamadi, Sheikh Al Thani, and Al Baker.</u>  Aside from

25    Sabi, all of the Defendants are foreign citizens of Qatar.  Sabi Decl. ¶ 3; Al-

26    Rumaihi Decl. ¶¶ 3-4.  A foreign citizen's presence in an action does not affect

27    diversity of citizenship, *unless* he or she is "lawfully admitted for permanent

28    residence in the United States" ***and*** is "domiciled" in the same state as a plaintiff.

28 U.S.C. § 1332(a)(2).  As discussed below, at the time the FAC and/or Notice of Removal were filed, none of the foreign-citizen defendants were lawful permanent residents of the United States, and thus could not have been domiciled anywhere in the United States.  *See* Sabi Decl. ¶ 3; Al-Rumaihi Decl. ¶¶ 3-4.

12.    Plaintiffs allege in the FAC that defendant Faisal Al-Hamadi and defendant Sheikh Abdullah bin Mohammed bin Sau Al Thani are citizens of Qatar. FAC ¶ 11-12.  In the FAC, Plaintiffs also purport to add as a "Doe" defendant Akbar Al Baker, who is the Chief Executive Officer of Qatar Airways.  FAC ¶ 15. When the FAC and Notice of Removal were filed, defendants Al-Hamadi, Sheikh Al Thani, and Al Baker all were Qatari citizens, were not lawful permanent residents of the United States, and were not domiciled anywhere in the United States.  Sabi Decl. ¶ 3.; Al-Rumaihi Decl. ¶ 3.[2]

13.    Defendant Al-Rumaihi.  As to the final defendant, Ahmed Al-Rumaihi, Plaintiffs correctly allege that he is a citizen of Qatar.  FAC ¶ 10.  But Plaintiffs incorrectly allege that Al-Rumaihi is currently *domiciled in Los Angeles, California*.  FAC ¶ 10.  Al-Rumaihi is neither (1) a lawful permanent resident of the United States, nor (2) domiciled in California.  Al-Rumaihi Decl. ¶¶ 5-6; Sabi Decl. ¶ 3.  Plaintiffs recently admitted as much in the New York Action, so their contrary allegation in the Superior Court Action appears disingenuous and should be disregarded.  Hershman Decl., Ex. A ¶ 16 (". . . Ahmed Al-Rumahii . . . [is] domiciled in Qatar.").

14.    Although Al-Rumaihi holds a B-1 visa, (Al-Rumaihi Decl. ¶ 6), federal courts have repeatedly held that visa holders are not "lawful permanent residents" for diversity-jurisdiction purposes.  *See Kuruwa v. Turner Const. Co.*, No. 13-Civ-5256-PKC, 2013 WL 5798982, at *2 (S.D.N.Y. Oct. 18, 2013); *Vujasin v. Chef Vincent, Inc.*, No. 08-22048-Civ., 2009 WL 800153 (S.D. Fla.

---

[2] In the BIG3 NOR, Plaintiffs admitted that Al-Hamadi was domiciled in Qatar.  Hershman Decl., Ex. A ¶ 16.

NOTICE OF REMOVAL OF CIVIL ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441 & 1446

Mar. 25, 2009); *Vasarhelyi v. Rojas*, No. 09-C-6256, 2010 WL 737589 (N.D. Ill. Feb. 26, 2010) *Kedia v. Jamal*, No. 06-6054-GEB, 2007 WL 1147059, at *3 (D.N.J. Apr. 18, 2007).  Accordingly, Al-Rumaihi *cannot* be domiciled in California (or any state) for purposes of removal.

15.    Even if Al-Rumaihi were a lawful permanent resident (which he is not), his domicile would not be in California.  *Amerault v. Intelcom Support Servs., Inc.*, 16 F. App'x 724, 725 (9th Cir. 2001) (holding a domicile is where a person "has established a fixed habitation or abode . . . and [intends] to remain . . . permanently or indefinitely.").  Although Al-Rumaihi and his family have recently leased rental properties in California, Al-Rumaihi typically stays in *New York or in Washington D.C.* when visiting and working in the United States. Al-Rumaihi Decl. ¶ 7.  Thus, contrary to the FAC, Al-Rumaihi was not "domiciled" in California at the time of the FAC or Notice of Removal.  *See* Al-Rumaihi Decl. ¶ 4-8; Sabi Decl. ¶ 3.

16.    Plaintiffs Jackson and Kwatinetz.  In the FAC, Plaintiffs allege that plaintiffs Jackson and Kwatinetz are both "individual[s] residing in Los Angeles, California."  FAC ¶¶ 8-9.  Allegations that a party "resides" in a particular state have long been considered *prima facie* evidence that the party is a citizen and is domiciled in that state.  *Anderson v. Watts*, 138 U.S. 694, 706 (1891) ("The place where a person lives is taken to be his domicile until facts adduced establish the contrary; and a domicile, when acquired, is presumed to continue until it is shown to have been changed.").

17.    In the New York Action, Kwatinetz signed an affidavit, dated November 1, 2017, stating the following under penalty of perjury:

I am a citizen and resident of the State of California and have been so

since I graduated high school and moved directly to Los Angeles,

NOTICE OF REMOVAL OF CIVIL
ACTION PURSUANT TO 28 U.S.C.
§§ 1332, 1441 & 1446

California in the Summer of 1991.  Since then, I have worked and lived

in Los Angeles, California continuously and without break.

*See* Hershman Decl., Ex. B ¶ 2.  Kwatinetz further averred that "O'Shea

Jackson (also known as 'Ice Cube') . . . . is a California resident and citizen

as well." *Id.* ¶ 12.

18.     Kwatinetz's sworn affidavit establishes that plaintiffs Jackson and

Kwatinetz were U.S. citizens and domiciled in California at the time the FAC and

Notice of Removal were filed.  *Mondragon v. Capital One Auto Fin.*, 736 F.3d

880, 885 (9th Cir. 2013) ("[A] party with the burden of proving citizenship may

rely on the presumption of continuing domicile, which provides that, once

established, a person's state of domicile continues unless rebutted with sufficient

evidence of change.").  Because neither Jackson nor Kwatinetz were ever

domiciled in Florida (where Sabi is domiciled), they are diverse from each of the

defendants.

19.     Plaintiff BIG3 LLC.  BIG3 LLC is also diverse from the defendants.

As an initial matter, the FAC names "BIG3 LLC" as a plaintiff (rather than *BIG3*

*Basketball LLC*).  Specifically, Plaintiffs allege that "BIG3 LLC is a Delaware

Limited Liability Company with its principal place of business in Los Angeles,

California."  FAC ¶ 7.  The Removing Defendants have never been affiliated with

BIG3 LLC.  Sabi Decl. ¶¶ 11-13; Al-Rumaihi Decl. ¶¶ 9-11.  Nor is any defendant

domiciled in California or Delaware, which, according to the FAC, appear to be

the domicile(s) of BIG3 LLC.  FAC ¶ 7.  The Court may determine diversity based

on these pleaded facts alone.  *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d

1136, 1141 (9th Cir. 2013) (recognizing the law "forces plaintiffs to assume the

costs associated with their own indeterminate pleadings").

20.     In any event, the parties would still be diverse even if the FAC had

identified BIG3 Basketball LLC as a plaintiff.  As a limited liability company,

BIG3 Basketball LLC's citizenship and domicile is dependent on the citizenship and domicile of its members. *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). According to Plaintiffs' allegations in the FAC, no current member of BIG3 Basketball LLC—including its members which are themselves unincorporated entities—share domicile with any defendant.

21.    In its removal papers in the New York Action, BIG3 Basketball LLC made the following allegations about the domicile of its members:

22.    Amy Trask is an individual who is domiciled in California.

23.    O'Shea Jackson is an individual who is domiciled in California.

24.    Roger Mason is an individual who is domiciled in New Jersey.

25.    Mark Geragos is an individual who is domiciled in California.

26.    Sam Wald is an individual who is domiciled in California.

27.    James Todd Smith is an individual who is domiciled in California.

28.    Mike Kwatinetz is an individual who is domiciled in California.

29.    BEK, LLC is a California limited liability company with its principal place of business in California. The sole member of BEK, LLC is Jeff Kwatinetz who is domiciled in California.

30.    Cube Vision, LLC is a California limited liability company with its principal place of business in California. Cube Vision, LLC has two members, Jeff Kwatinetz and O'Shea Jackson (also known as "Ice Cube"), both of whom are domiciled in California.

31.    Eden Investment Limited c/o Denton Canada is a citizen of Quebec, Canada. Its sole member, Mohamed Al Raffi, is domiciled in Dubai [United Arab Emirates].[3]

32.    Ziffren Brittenham, LLP is a California limited liability [partnership] with its principal place of business in California. Ziffren Brittenham, LLP has the

---

[3] It appears that Eden Investments Limited's actual domicile is Dubai, UAE, traced back to its sole individual member. This also would not spoil diversity between the parties.

NOTICE OF REMOVAL OF CIVIL
ACTION PURSUANT TO 28 U.S.C.
§§ 1332, 1441 & 1446

following ten equity partners:  Ken Ziffren who is domiciled in Bel Air, California, Harry Brittenham who is domiciled in Santa Monica, California, John Branca who is domiciled in Beverly Hills, California, Sam Fischer who is domiciled in Los Angeles, California, Cliff Gilbert-Luriem who is domiciled in Los Angeles, California, Melanie Cook who is domiciled in Beverly Hills, California, David Lande who is domiciled in Los Angeles, California, Bryan Wolf who is domiciled in Pacific Palisades, California, Matthew Johnson who is domiciled in Sherman Oaks, California, and PJ Shapiro who is domiciled in Encino, California.  Hershman Decl., Ex. A ¶¶ 6-15, 17-18.

33.     Notably, Plaintiffs (represented by the law firm of Geragos & Geragos) made no mention in its removal petition in the New York Action of three original members of BIG3 Basketball LLC—Steven Fishman, Rafe Fogel and Carolyn Rafaelian.  *See id.*; Sabi Decl., Ex. A.  Thus, it appears that Fishman, Fogel, and Rafaelian are no longer members of BIG3 Basketball LLC and their citizenship and domicile are not relevant for diversity jurisdiction purposes.  Even if those individuals were members at the time the FAC was filed, they are diverse from each defendant: Fishman is a U.S. citizen domiciled in California; Fogel is a U.S. citizen domiciled in New York; and Rafaelian is a U.S. citizen domiciled in Rhode Island.[4]  Sabi Decl. ¶ 19.  The citizenship and domicile of Fishman, Fogel, and Rafaelian have not changed since the filing of the Complaint.  *Id.*

34.     Because none of BIG3 Basketball LLC's members, as alleged by Plaintiffs, shared a domicile with any defendant at the time of the FAC or Notice of Removal, the parties are diverse.  *See Mondragon*, 736 F.3d at 885.

35.     <u>Sport Trinity.</u>  The Removing Defendants are members of Sport Trinity, LLC ("Sport Trinity"), which made a substantial investment in BIG3 Basketball LLC on July 14, 2017 to obtain a 15.03% membership interest in the

_____

[4] Fishman's membership interest was redeemed in full in December 2017.  Sabi Decl. ¶ 19.

NOTICE OF REMOVAL OF CIVIL
ACTION PURSUANT TO 28 U.S.C.
§§ 1332, 1441 & 1446

company.  Sabi Decl. ¶¶ 2, 14; Al-Rumaihi Decl. ¶¶ 2, 12.  Plaintiffs allege in the FAC, however, that Sport Trinity did not have any membership interests in BIG3 Basketball LLC at the time of the FAC.  *See* FAC at ¶ 4 ("Plaintiffs . . . removed Defendants from any connection with the league . . . ."); *id.* (stating that Removing Defendants were "remov[ed] from BIG3"); *id.* ¶ 71 & Ex. C (Sport Trinity "has no interest" in BIG3 Basketball LLC).

36.     Plaintiffs continue to maintain in litigation, legal correspondence, and by their actions that the Removing Defendants are no longer affiliated with BIG3 Basketball LLC.  Sabi Decl. ¶ 15; Al-Rumaihi Decl. ¶ 13.  On April 6, 2018, Sport Trinity served on Plaintiffs a demand for books and records pursuant to Delaware law, which outlined a litany of grievances against the BIG3 Basketball LLC, including the gross mismanagement and erratic behavior of plaintiff Jeff Kwatinetz.  Sabi Decl. ¶ 16, Ex. A; Al-Rumaihi Decl. ¶ 14.  On April 11, 2018, BIG3 Basketball LLC refused Sport Trinity's request to access books and records of the company claiming that Sport Trinity "(1) owns no Class A Units in BIG3 and (2) is not a member of BIG3."  Sabi Decl. ¶ 17, Ex. B; Al-Rumaihi Decl. ¶ 15.  Accordingly, based on the face of the FAC and Plaintiffs' actions, Removing Defendants' domicile is not attributed to BIG3 Basketball LLC.

37.     In sum, each defendant is diverse from each plaintiff for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

**Amount in Controversy**

38.     According to Plaintiffs' FAC, the amount in controversy in this action, exclusive of interest and costs, exceeds the $75,000 minimum required by 28 U.S.C. § 1332(a).  FAC at 5.  Plaintiffs also seek "punitive" damages in its prayer for relief, which should be considered in determining the amount in controversy. *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240, (1943); *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995); *see also Klepper v. First Am. Bank*, 916 F.2d 337 (6th Cir. 1990) (where allegations could give rise to

award of punitive damages, court assumed jurisdictional minimum amount was proven).

39.     Removing Defendants do not concede that Plaintiffs will prevail on any of their claims, that Sport Trinity forfeited any membership interests in BIG3 Basketball LLC, nor that Plaintiffs have been damaged in any amount or at all. Removing Defendants specifically deny all such allegations.  However, if Plaintiffs were to prevail on their claims, the damages that could be awarded exceed the $75,000 jurisdictional minimum.

## NOTICE PROVIDED TO STATE COURT

40.     Pursuant to 28 U.S.C. § 1446(d), the Removing Defendants will promptly notify the Superior Court of the State of California for the County of Los Angeles of the filing of this Notice of Removal by filing a document entitled "Notice to Adverse Party and State Court of Removal of Civil Action to Federal Court," a copy of which (without exhibits) is attached to this Notice as Exhibit "B."

Dated:          April 25, 2018              Jones Day


                                            By:/s/ Brian Hershman
                                               Brian Hershman

                                            Attorneys for Defendants
                                            AHMED AL-RUMAIHI & AYMAN
                                            SABI

# EXHIBIT A

TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 04/24/2018**

**Current Date:** 4/24/2018
**Source:**      SUPERIOR COURT, LOS ANGELES COUNTY, CALIFORNIA
DISCLAIMER

This Data is provided for informational purposes only and it is not the official record.
For copies of the official record (of an incarceration, conviction or court filing record)
contact the source agency or court. In addition to any obligations under your Subscriber
Agreement, your use of this data may be governed by the Supplier Additional Terms (see
Footer).

**CASE INFORMATION**

| | |
|---|---|
| Case Title: | BIG3 LLC ET AL v. AHMED AL-RUMAIHI ET AL |
| Court: | SUPERIOR COURT, LOS ANGELES COUNTY |
| Division: | CENTRAL DISTRICT |
| Case Number: | BC700897 |
| Case Type: | CIVIL |
| Case Subtype: | DEFAMATION (SLANDER/LIBEL) (GENERAL JURISDICTION) |
| Date Filed: | 04/05/2018 |
| Case Status: | PENDING |

**PARTICIPANT INFORMATION**

**BIG3 LLC**

Type:                          PLAINTIFF/PETITIONER

**ICE CUBE**

Type:                          PLAINTIFF/PETITIONER'S AKA

**JACKSON O'SHEA**

Type:                          PLAINTIFF/PETITIONER

**KWATINETZ JEFF**

Type:                          PLAINTIFF/PETITIONER

**WESTLAW** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 013

## AKBAR AL BAKER

**Type:**                                          DEFENDANT/RESPONDENT

## AL-HAMADI FAISAL

**Type:**                                          DEFENDANT/RESPONDENT

## AL-RIMAIHI AHMED

**Type:**                                          DEFENDANT/RESPONDENT

## SABI AYMAN

**Type:**                                          DEFENDANT/RESPONDENT

## THANI SHEIKH ABDULLAH BIN MOHAMMED BIN

**Type:**                                          DEFENDANT/RESPONDENT

## ICE CUBE

**Type:**                                          PLAINTIFF/PETITIONER'S AKA

**ATTORNEY INFORMATION**

## MARK J. GERAGOS

**Attorney Status:**                          ATTORNEY FOR PLAINTIFF/PETITIONER

**CALENDAR INFORMATION (1)**

| **Date/Time:** | **Description:** | **Location:** | **Judge:** |
|---|---|---|---|
| 09/19/2018 09:00 AM | **Event:** CONFERENCE-CASE MANAGEMENT(OSC RE P.O.S.) | **Department:** 16 **Court Location:** 111 NORTH HILL STREET | |

**FILING INFORMATION (5)**

| **Date:** | **Description:** | **Party:** |
|---|---|---|
| 04/06/2018 | **Document Description:** AMENDMENT TO COMPLAINT | **Filing Party:** FILED BY ATTORNEY FOR PLAINTIFF/PETITIONER |

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 014

BIG3 LLC ET AL V. AHMED AL-ROMAIHI ET AL, BC700897 (2018)

| 04/06/2018 | **Document Description:** FIRST AMENDED COMPLAINT (FOR DAMAGES ) | **Filing Party:** FILED BY ATTORNEY FOR PLAINTIFF/PETITIONER |
| 04/06/2018 | **Document Description:** NOTICE-CASE MANAGEMENT CONFERENCE | **Filing Party:** FILED BY CLERK |
| 04/05/2018 | **Document Description:** COMPLAINT | |
| 04/05/2018 | **Document Description:** EXHIBIT (IN SUPPORT OF COMPLAINT ) | **Filing Party:** FILED BY ATTORNEY FOR PLAINTIFF/PETITIONER |

**CALENDAR INFORMATION**

**View Calendar Information**

**DOCKET PROCEEDINGS (6)**

| Date: | Entry #: | Description: | Date Docketed: | Party: | |
|---|---|---|---|---|---|
| 04/06/2018 | | **Document Description:** AMENDMENT TO COMPLAINT | | | ViewBatch Download |
| 04/06/2018 | | **Document Description:** FIRST AMENDED COMPLAINT FOR DAMAGES: 1. DEFAMATION [CIV. CODE ? 44] 2. DEFAMATION PER SE [CIV. CODE ?46]; ETC | | | ViewBatch Download |
| 04/06/2018 | | **Document Description:** NOTICE OF CASE MANAGEMENT CONFERENCE | | | ViewBatch Download |
| 04/05/2018 | | **Document Description:** COMPLAINT FOR DAMAGES | | | ViewBatch Download |
| 04/05/2018 | | **Document Description:** EXHIBITS IN SUPPORT OF COMPLAINT | | | ViewBatch Download |
| 04/05/2018 | | **Document Description:** SUMMONS | | | ViewBatch Download |

TO ORDER COPIES OF ANY DOCUMENTS LISTED
ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual;
Ayman Sabi, an individual; (See SUM 200a)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube,
an individual; and Jeff Kwatinetz, an individual;

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**FILED**
Superior Court of California
County of Los Angeles

**APR 05 2018**

Sherri R. Carter, Executive Officer/Clerk

By _____ Deputy
Marion Gomez

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court - Central

**CASE NUMBER:**
*(Número del Caso):* **BC700897**

111 North Hill Street
Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark Geragos, Ben Meiselas, Geragos & Geragos, APC 644 S. Figueroa St. Los Angeles, CA 90017

SHERRI R. CARTER

DATE: 4/5/2018   **APR 05 2018**
*(Fecha)*

Clerk, by _____ , Deputy
*(Secretario)*   Marion Gomez   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

---

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 016

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al. | |

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority.

Page __2__ of __2__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 017

🗋 **ORIGINAL**

**FILED**
Superior Court of California
County of Los Angeles

**APR 05 2018**

Sherri R. Carter, Executive Officer/Clerk

By_____ Deputy
    Marion Gomez

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

MARK J. GERAGOS      SBN 108325
BEN J. MEISELAS      SBN 277412
Attorneys for Plaintiff BIG3 BASKETBALL, LLC, O'SHEA JACKSON
AKA ICE CUBE, AND JEFF KWATINETZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual;<br><br>Plaintiffs.<br><br>vs.<br><br>Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority.<br><br>Defendants. | Case No.   **BC700897**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **DEFAMATION [Civ. Code § 44]**<br>2. **DEFAMATION *PER SE* [Civ. Code § 46]**<br>3. **TRADE LIBEL**<br>4. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**UNLIMITED CIVIL JURISDICTION**<br><br>**DEMAND FOR JURY TRIAL** |

## SUMMARY

Plaintiffs Big3 Basketball LLC, O'Shea Jackson a/k/a Ice Cube, and Jeff Kwatinetz bring this action against Defendants Ahmed Al-Rumaihi, Faisal Al-Hamadi, Ayman Sabi, and Sheikh Abdullah bin Mohammed bin Sau Al Thani as an individual and Chief Executive Officer of the Qatari Investment Authority ("Defendants") for Defamation, Defamation *Per Se*, Trade Libel, and Intentional Interference with Contractual Relations.

The BIG3 was the brainchild of founders and Plaintiffs, Ice Cube and Mr. Kwatinetz

- 1 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 018

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

16

CIT/CASE:   BC700897
LEA/DEF#:

RECEIPT #:   CCH621759010
DATE PAID:   04/05/18   08:34 AM
PAYMENT:   $435.00              310
RECEIVED:
          CHECK:              $435.00
          CASH:                 $0.00
          CHANGE:               $0.00
          CARD:                 $0.00

1   who had worked together on the format, rules, and strategy for the league for over a year

2   before ever discussing the BIG3 with anyone outside of their company.

3          The league was to take the most popular played sport in the world, 3 on 3 basketball,

4   from the playground to the professional setting of NBA style arenas and broadcast games on

5   international and domestic television in a unique "festival" format. Ice Cube and Mr.

6   Kwatinetz each deployed significant capital and resources, worked tirelessly turning down

7   numerous other lucrative opportunities, and drew on their vast array of relationships and

8   experiences in the live entertainment, legal, television, and other media fields to set up BIG3

9   as a rare opportunity. It would not be an overstatement to say BIG3 was the culmination of

10  their total lives' work.

11         They then set up to execute their dream and began to raise additional capital and

12  began staffing the league from Commissioner on down to ball boys. Much to their delight

13  and to the surprise of many in the sports world, the league's initial games in June 2017 were

14  a resounding success. Now that Ice Cube and Mr. Kwatinetz's vision was vindicated, BIG3

15  immediately attracted many new sources of financing to expand on the league.

16         Touting their love of basketball and familial connections and relationships with the

17  royal Al-Thani Family in the State of Qatar, and thus access to vast resources and capital,

18  Defendants were brought to the BIG3 as passive investors and introduced by the league's

19  former president and commissioner, himself just hired less than a year before.

20         Counter to expectations regarding these passive investors, to agreements signed and

21  promises made, and certainly an aberration from the decent behavior of BIG3's initial

22  investment group, the Al-Thani "Royal" Defendants quickly started to insinuate themselves

23  into the affairs of BIG3 despite failing to live up to even their most basic obligation to fully

24  fund their investment.

25         Although constantly boasting of the Al Thani's and their individual "massive wealth

26  and power," Defendant's aberrant behavior continued throughout the 10-week season

27  culminating in Mr. Al-Rumaihi single-handedly losing $700,000 in cash gambling after the

28  Las Vegas league finals in a mere few hours at casino tables in the presence of the Big3 staff,

- 2 -

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1   investors and players all the while Defendants still refused to pay the millions of dollars they

2   indisputably owed and admitted to owing the Big3.

3     These members and associates of the royal family made excuse after excuse for not

4   paying, all of which is documented in text messages and emails, where the blame for their

5   failure to fund the millions they owed the BIG3 ran the gamut from their **"sinuses,"**

6   **"hiking,"** it being a **"long day bro,"** and to bad press regarding Qatar associations with

7   alleged funding of terrorism.  Also, like a simple debtor in hiding from a collection agency,

8   these Defendants with their purported links to the Qatar royal family, would go into hiding

9   and refused to return phone calls and ignore Plaintiffs.

10    Later, Defendants made their true intentions clear when they stated they would only

11  pay what they owed if they were given a substantially larger equity position along with

12  operating entitlements in the company, instead of the small, passive, minority stake they were

13  required, but failed to fund.

14    Through subsequent investigation, Plaintiffs learned that Defendants were falsely

15  bragging about "operating the league," and how they were friends with Big3 celebrity

16  investors as well as Big3 and NBA basketball stars and legends.  Oddly, following the

17  season, the Qatari Defendants even rented three mansions in the Los Angeles area, in Venice,

18  Malibu and Beverly Hills, so they could be near the Big3 founders and employees to further

19  insinuate themselves into their lives.

20    To maintain the façade of involvement with the league, and to increase their influence,

21  Defendants targeted certain, now former, Big3 employees with gifts including trips to St.

22  Tropez and Ibiza, parties on Yachts, expensive meals, use of their exotic cars, invitations to

23  parties at their Los Angeles mansions, and investments in personal business projects

24  unrelated to the Big3.

25    As it turns out, Defendants were deeply concerned with the rapidly escalating political

26  pressure and public relations crisis facing their country, including the military blockade

27  against Qatar by its neighbors based on purportedly supporting extremism.  There was also

28  more focus on controversy and accusations of bribes surrounding the Qatar 2022 World Cup,

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 3 -

1  the firing of a head of the Qatar owned BeIN Sports, and controversy related to its purchase

2  and operation of French soccer club PSG and the huge payment it made to sign star Neymar.

3  Also not brought to Plaintiffs attention by former commissioner and president was

4  Defendants history of scandal surrounding its basketball programs.  Defendants believed

5  their relationship with the BIG3 and the celebrities, entertainers, and basketball stars

6  associated with the league would improve the public perception of Qatar in the United States

7  as well as its standing in the arena of sports on a global level.  Unfortunately for the Al-Thani

8  family and associates, Plaintiffs operated the league for the benefit of its players and fans and

9  to maximize shareholder value, not to do the bidding of the needs solely of Qatar.

10  Defendants conduct knew no bounds when it came to their intention to wrest control

11  of the league from its founders, players and all the other well-intentioned investors.  First

12  using non-payment to create leverage to shamelessly demand increased ownership as well as

13  the attempted installment of Defendant Sabi as COO despite no experience in sports or

14  entertainment, then employing means of bribery and influence peddling to exert pressure on

15  league leadership.

16  However, on or around February 14, 2018, after giving Defendants multiple chances

17  to pay the millions they indisputably owed and admitted to owing, Plaintiffs moved swiftly

18  and decisively and initiated legal action against a corporate shell operated by Defendants and

19  removed Defendants from any connection with the league for their failure to pay.  It would

20  later be discovered the additional embarrassment such action taken on that particular day

21  against the Al-Thani's would create for Defendants.

22  Finding that their efforts to obtain operating control had failed and the humiliation

23  Defendants felt being notified of their removal from BIG3 amidst their yearly Qatar National

24  Sports Day in which the Al-Thani's display to the world their success and importance in

25  sports, Defendants retaliated with a campaign of disinformation and by making outrageous

26  defamatory statements against all Plaintiffs and interfering with Plaintiffs existing and

27  prospective contractual relations, to harm the league and attempt to destabilize it for one last

28  desperate shot at control.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 4 -

COMPLAINT FOR DAMAGES

1    The conduct by Defendants is documented in text messages, emails, photographs,

2    letters, declarations, and other evidence which was obtained by Plaintiffs.  Further,

3    compromised employees refused to cooperate with an additional independent investigation

4    initiated by Plaintiffs to determine the extent of the Defendant's wrongdoings.  Some of that

5    evidence is contained in, and attached to this Complaint. Additionally, the conduct by

6    Defendants reflects a cautionary tale of doing business with affiliates and proxies sent by the

7    Qatar Investment Authority to do business in the United States.

8    Ironically, when Ice Cube and Jeff Kwatinetz pursued their lifelong dream of starting

9    a basketball league from the ground up, and invested their personal assets and time in doing

10   so, the last thing on their list of plausible concerns and impediments would be the malicious

11   and reckless conduct of foreign actors and compromised agents and actors working on their

12   behalf.  Nonetheless, Plaintiffs and the players of the Big3 who are heavily invested in the

13   success of the league, have united to confront this challenge and protect their American

14   dream.

15   Plaintiffs, and all players in the Big3 have been severely damaged by the conduct of

16   Defendants, and collectively seek $1.2 billion in consequential damages, or approximately

17   $20 million per player in the Big3.

18                                   **INTRODUCTION**

19

20   1.    This action is brought by Plaintiff BIG3 LLC, a three-on-three professional

21   basketball league, on its behalf as a limited liability company.

22   2.    This action is also brought by Plaintiff O'Shea Jackson, a/k/a Ice Cube and Jeff

23   Kwatinetz, each who suffered significant damages and reputational harm based on the

24   wanton, willful, and malicious defamatory statements made by and/or aided and abetted by

     Defendants, and each of them.

25   3.    Defendants are individuals who reside in and/or maintain substantial contacts

26   with the United States and who used their purported relationship with the royal family in

27   Qatar and their control and/or influence over the Qatari Sovereign Fund to conduct business

28   in the United States, and to engage in the tortious conduct as set forth below.

- 5 -

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

4.     As alleged below, and in the accompanying exhibits, Defendants individually, and/or collectively, engaged in malicious, tortious, and/or reckless conduct causing substantial damage to all Plaintiffs.

5.     Defendants, in their individual and personal capacity, and using corporate shells including Sport Trinity LLC (currently a Respondent in a pending JAMS arbitration, *Big3LLC v. Sport Trinity, LLC)* attempted to seize operational control over Big3 LLC by, among other conduct, (1) fraudulently inducing Big3 to enter into a Unit Purchase Agreement whereby Defendants never intended to pay the millions they owed to extract more equity, (2) bribing and/or attempting to bribe former employees of the Big3 with money, gifts, and vacations to gain more influence in the league, (3) investing and/or promising to invest in business ventures of now former employees in the Big3 as a means of improper influence and control, (4) maliciously and wantonly defaming Big3, Ice Cube, and Jeff Kwatinetz to players and making false representations about the league and its operations to foment discord and disunity against the Big3 and its founders, and (5) defaming Plaintiffs, and aiding and abetting and causing others to make defamatory and malicious statements about and against Plaintiffs, as retaliation for Big3 filing a lawsuit against Defendants for failing to pay the money they owed.

6.     Plaintiffs stand united against Defendants.  Plaintiffs have been severely damaged and suffered reputational harm and other consequential damages from Defendants' conduct, in an amount no less than $1.2 billion, accounting for approximately $20 million in damages per player, in addition to other damages.

## THE PARTIES

7.     The Big3 LLC is a Delaware Limited Liability Company with its principal place of business in Los Angeles, California.  The Big3 is in its second season which starts in June 2018.

8.     O'Shea Jackson, aka Ice Cube, is an individual residing in Los Angeles, California.

9.     Jeff Kwatinetz, is an individual residing in Los Angeles, California.

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 024

10.     Defendant Ahmed Al-Rumaihi is a citizen of Qatar, who is currently domiciled in Los Angeles, California.

11.     Defendant Faisal Al-Hamadi is a citizen of Qatar, who conducts substantial business and has sufficient and substantial contacts with this jurisdiction.

12.     Sheikh Abdullah bin Mohammed bin Sau Al Thani, is a citizen of Qatar, who conducts substantial business and has sufficient and substantial contacts with this jurisdiction.

13.     Ayman Sabi, born in Tripoli, Libya, is a citizen of the United States, resides in Miami, Florida, and has sufficient and substantial contacts with this jurisdiction.

## JURISDICTION AND VENUE

14.     The acts that caused Plaintiff's damages as alleged herein primarily occurred in the County of Los Angeles within the jurisdiction of the Superior Court of Los Angeles County

15.     This Court has jurisdiction over the present matter because, as delineated within this Complaint, the nature of the claims and amounts in controversy meet the requirements for the unlimited jurisdiction in the Superior Court of Los Angeles County.

## FACTS

### Qatar Investment Authority

16.     . The State of Qatar is located on a small peninsula bordering Saudi Arabia and is backed by the world's third-largest natural gas reserves.  The country has the highest per capita income in the world.  Qatar is a monarchy ruled by the Al-Thani royal family.  The current Emir is Sheikh Tamim bin Hamad Al Thani.

17.     The Emir's relative is Defendant Sheikh Abdullah bin Mohammed bin Sau Al Thani, who heads the Qatari sovereign fund known as the Qatar Investment Authority.

18.     Qatar has recently been placed under a military blockade from its Middle East neighbors including Egypt, Bahrain, the United Arab Emirates and Saudi Arabia because of concerns regarding financial support for terrorism, a view that Qatar disputes.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 7 -

19.     Recently, the Al-Thani Royal Family, through the Qatar Investment Authority, announced plans to invest hundreds of billions of dollars overseas, with a strong emphasis on United States investments, through an entity called "Qatar Investments." It appears to be an aim of the Al-Thani Royals to sway public opinion of U.S. citizens towards Qatar through employing this investment strategy.

20.     Defendant Al-Rumaihi, himself a member of the Qatar royal family, holds himself out as one of the heads of Qatar Investments.  Defendant Al-Rumaihi is the same former diplomat who is responsible for an aborted attempt, resulting in litigation, surrounding the purchase of a $100 million townhouse at 19 E. 64th Street, New York City – in what would have been the most expensive townhouse purchase in the history of New York City at the time.  Six months after agreeing to buy the property, and the day before the closing of the transaction, Qatar backed out of the deal.



Al-Rumaihi (right) with his spurned broker, March 2014, NYC

21.     Upon recent investigation, it has been uncovered that in the lawsuit filed against the Consulate of the State of Qatar in connection with this failed $100 million real estate transaction, *1964 Realty LLC v. Consulate of the State of Qatar (1:14-cv-06429-ER, SDNY)*, Defendant Qatar tried getting out of the deal by arguing that Defendant Al-Rumaihi misrepresented his credentials and did not have authority to enter into the deal on behalf of Qatar.  From the Court's Order to Deny Qatar's Motion to Dismiss:

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 8 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

1964 REALTY LLC,

   Plaintiff,

   – against –

CONSULATE OF THE STATE OF QATAR-
NEW YORK,

   Defendant,

NEW YORK LAND SERVICES INC.,

   Stakeholder Defendant.

**OPINION AND ORDER**

14 Civ. 6429 (ER)

Plaintiff maintains that it "has done what the law requires," specifically, "it pled that the Consul General . . . signed the Agreement on behalf of Defendant; that the Agreement was legally binding, constituted a commercial transaction, and explicitly waived sovereign immunity; and that Defendant breached the Agreement to Plaintiff's detriment." Pl.'s Mem. L. Opp., Doc. 25 at 1. In turn, Defendant argues that: (1) Al-Rumaihi lacked the authority to enter into the Agreement on behalf of the foreign state of Qatar; and (2) since Al-Rumaihi was neither authorized to engage in the commercial transaction of purchasing the Property or waive sovereign immunity by signing the Agreement, neither exception applies. Def.'s Mem. L. Supp. Mot. Dismiss, Doc. 22 at 9-11.

22.     Recently, Mr. Rumaihi's Wikipedia page reflects frequent edits removing negative history about this and other transactions.  Under a cloud of this and other allegations, Mr. Rumaihi was recalled back to Doha, Qatar.  But he would soon resurface.

23.     Qatar Investments claims it is capable of deploying $35-100 billion overseas in investments.   However, its interactions with the Big3, which appears to be an exemplar of how it conducts business overseas, is a cautionary tale for others looking to do business with Qatar.  Specifically, Defendants did not fund their obligations to the Big3 to the sum of a mere 5 million dollars, delaying payments in an effort to extract control of the league.  When those efforts failed, they attempted other improper and coercive means of influence peddling to achieve their goals.  When that failed, and Defendants conduct was exposed, Defendants sought to defame the Big3 leadership with ludicrous charges in order to destabilize the league so that their proxies could be installed instead.

24.     Whether by design or otherwise, Defendants' constant excuses for not paying – literally blaming their **"sinuses," "going on hikes,"** or that it had been a **"long day bro,"** in text messages – reflects an amateurish, undignified approach to business which is hard to believe is countenanced by a royal family such as the Al-Thani's.  While Mr. Rumaihi flaunted his resources losing over $700,000 in a few hours of gambling after the BIG3 championship in Las Vegas last August, he somehow was still unable to muster up the $5 million that at that time was already two months overdue to BIG3.

25.     At a time when Defendants boast of hosting the 2022 World Cup, their tortious and reckless conduct directed at the Big3 and the basketballs stars and legends affiliated with the league, is potentially an ominous foreshadowing of what is to come.

- 9 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 027

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

### Ayman Sabi:

26.     Defendant Ayman Sabi is not a relative of the Qatari royal family, although he made claims to be a board member of the Qatar Investment Authority.  He also bragged of being a board member of an Abu Dhabi government fund, a claim he even acknowledged as putting him in a "strange" position since that would make him an advisor and agent to two countries on opposing sides of the blockade.  BIG3 former President and Commissioner, supported these claims as did Mr. Rumaihi.  Defendant Sabi indeed had at least a previously established business relationship with Defendants Al-Rumaihi and Al-Hamadi; two months after they were assigned to Vice Chairman and Chairman positions respectively in March 2017 of two Qatari food companies registered in Australia, they made Mr. Sabi a director.

27.     To the surprise of BIG3 executives who understood Mr. Sabi to be a Qatari national as told to them by the former BIG3 Commissioner and President, by Mr. Rumaihi, and by Mr. Sabi himself, Defendant Ayman Sabi is an *American citizen* who lives in Miami.  In fact, although born in Tripoli, Libya in 1963, Defendant Sabi migrated to the United States and has been a resident here since at least the early 1980's.  He studied at North Carolina State University and in 1989 founded a company "Sabi International Developments Inc" in Raleigh, North Carolina which he then merged with "Medvast Inc" in 1993 and interestingly based its headquarters in Cyprus.

28.     Mr. Sabi later became the chief executive of a barbeque restaurant chain known as "Roadhouse Grill," which was the subject of a federal securities class action and was forced into involuntary bankruptcy in 2002.



- 10 -

29.     Mr. Sabi claims to be connected with the rich and powerful internationally, but it appears his most substantial connection was his fortuitous encounter, following the bankruptcy of Roadhouse Grill, with Defendant Al-Rumaihi. Although the circumstances of how Defendants met are unclear, Mr. Sabi had a fellowship with Shlomy Alexander also from Miami. More interestingly, Shlomy is the father of Oren and Tal Alexander, the same brokers who "sold" the $100m townhouse to Defendant Al-Rumaihi in 2014.

30.     In another unexplained stroke of "luck," Defendant Sabi connected with Big3's former President and Commissioner who would vouch for him and bring him and his partners to the league as accomplished businessmen with international connections, stating that their involvement with the league would be critical for the Big3's expansion.

31.     His partners included the aforementioned Defendants Al-Rumaihi and Al-Hamadi, and they stated they also spoke for Defendant Sheikh Al Thani, half-brother of the Emir of Qatar himself, who would be able to provide capital and connections to greatly expand the Big3. While the league had just debuted successfully to an unexpectedly large audience of over 15,000 at New York's Barclay's Center and experienced more than three times the expected ratings on Fox Sports, the Qatari group made large promises including the ability to move quickly. What the former Commissioner and Mr. Sabi failed to disclose is that Mr. Sabi was in a secret, romantic relationship with the former Commissioner's sister.

32.     The former disgraced Commissioner emailed other Big3 executives following their successful debut: **"Ayman [Sabi] and his partner are seriously interested in taking the remaining equity available for BIG3. They add an incredible amount of value and would be strategic in the growth internationally."** Shortly thereafter, the Commissioner and President demanded (and received) a substantial "finder's fee" from Defendants for introducing these individuals to the league.

33.     And while Mr. Sabi boasted of his vast connections and promised he would deliver international sponsors and develop international media relationships for Big3 with a focus on the Middle East and China, he failed to deliver on any of his claims. In fact, Defendant Sabi was not even permitted to revisit China recently based on "issues" with his Visa. It has also been uncovered that despite holding himself as an agent of Qatar, Defendant Sabi is not registered under the Foreign Agents Registration Act (FARA).

- 11 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 029

34.     Instead of delivering value to the Big3, it is now clear that the Qatari group was unitarily focused on procuring influence in the United States for the Al-Thani regime through controlling a league made up of NBA stars and legends such as Clyde Drexler, Chauncey Billups, Corey Maggette, Jermaine O'Neal, and Dr. J among many others affiliated with the Big3.

### "Sport Trinity"

35.     Defendant Sabi introduced his partners to the Big3, including Defendant Al-Rumaihi and Defendant Al-Hamadi. Defendant Sabi explained that Defendant Al-Rumaihi, Defendant Al-Hamadi, and their benefactor Defendant Sheikh Mohammed bin Sau Al Thani were members of the Qatar royal family and ran Qatar Investments.

36.     Defendant Sabi explained that he also represented Qatar and was an agent on their behalf, and that his partners were in direct discussions with other members of the royal family, the Qatar Investment Authority, and the Emir himself about their potential investment in the Big3. Defendant Sabi stated that he and his partners loved basketball, especially the Emir. Defendant Sabi stated that he and his partners wanted to invest in a successful sports league in its infancy, and to assist with the international growth of the league.

37.     In truth, it turned out that Defendants involvement with the Big3 was more about perceived influence in America and Defendants seeking to get positive public relations for Qatar.

38.     During the Big3 summer season and then beyond, it became apparent that Defendants were focused on improving the image of Qatar in light of the blockade and the now desperate need to improve rapidly deteriorating international relations beginning to create an existential threat to the small Gulf nation. They also believed BIG3 could distract from Qatar's controversies surrounding it's 2022 World Cup. Qatar has also experienced controversies surrounding its own basketball programs. In 2011 amidst charges it "imported" players resulting in FIBA Asia suspending five of its players, Sheikh Saud bin Ali Al Thani was forced to resign from his post as Qatar Basketball Federation (QBF) President. Defendants saw involvement in BIG3 as an opportunity to be heroes to the Emir for restoring prestige to Qatar and the Al Thani family in the sport of basketball.

- 12 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 030

39.     Going back to on or around July 7, 2017, Defendant Sabi sent the Big3 a term sheet for the purchase of equity in the company and requested a 30 percent stake in the Big3. The Big3 rejected, out of hand, the request for 30 percent of the company, but ultimately agreed to a much smaller, passive, minority stake in the company.  Thereafter, Defendants formed Sport Trinity LLC in Delaware, and entered into a Unit Purchase Agreement on or around July 14, 2017.  The terms of the Unit Purchase Agreement were simple.  Sport Trinity was to pay Big3 $11.5 million upon the signing of the Agreement.  Separately, Sport Trinity was to pay the Big3 an additional $9 million in sponsorship money over three years which Sport Trinity claimed it could easily obtain from sources such as airlines and media owned and controlled by the Al-Thani family.

40.     Instead of paying the full $11.5 million, Sport Trinity only paid $6.5 million and an additional $1 million in December 2017 and claimed that the rest of the money was "on its way" but was delayed due to certain transfer restrictions on Qatar.

41.     Big3 has since learned that Defendants intentionally failed to fully fund the Big3 as a part of a business strategy it deploys wherein it partially funds a company, withholds the remaining funds to deprive the company of critical operational support, and demands larger equity stakes and operational control in exchange for money it already owes – all the while seeking influence within the company by attempting to lavish others with gifts and bribes.  Alternatively, it is quite possible the wealth Defendants boast of is a mere façade.

### The Big3 Season

42.     The inaugural BIG3 season took place June 2017 through August 2017. Games were held across the United States.  Upon entering into the Unit Purchase Agreement, Defendants began attending games and demanded courtside seats for themselves, relatives, and friends.  As seen below, Defendants Al-Rumaihi and Defendant Sabi were frequently photographed courtside and invited the Big3 staff and players to party with them after games.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 031



43.     Over time, the BIG3 investors and founders became uncomfortable with the assertive and in-your-face presence of these small minority stakeholders at games and at the hotels where players and staff stayed. Yet, efforts were made by Plaintiffs to do their best, at first, to be accommodating and cordial in the interest of maintaining a positive relationship with individuals originally perceived as legitimate investors.

44.     Following the season, in another bizarre turn of events, Defendant Al-Rumaihi moved his residence to Los Angeles, California, and rented two mansions – one in Venice peculiarly close (just blocks away) from where the founders of the BIG3 lived - and one in Beverly Hills where he would host parties for employees of BIG3 along with imploring the founders to attend "out of respect." (The founders rejected invitations to Defendant Al-Rumaihi's Beverly Hills mansion, although other employees including the former Commissioner frequently attended).  Defendant Sabi also rented a Malibu residence where he and his girlfriend, Adrienne Mason (sibling and affiliate of former BIG3 commissioner) also took up residence.

### Collection Efforts and Failure to Pay

45.     During the season, and immediately thereafter, consistent and persistent efforts were made by Big3 founder and Plaintiff Jeff Kwatinetz to collect on the remaining millions of dollars owed. Mr. Kwatinetz attempted to balance being polite to Defendants and to avoid

- 14 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 032

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

the implication that the royal family could not afford to pay, with the need to protect the BIG3 and its investors who all fully funded their obligations.

46.     By way of just one, of many, examples of emails sent by Plaintiff Kwatinetz, on or around August 30, 2017, Plaintiff Kwatinetz emailed Defendant Al-Rumaihi that he was **"getting a little nervous"** that Defendants had not fully funded their contractual commitment.

> On Aug 30, 2017, at 1:33 AM, Kwatinetz, Jeff <jek@thefirm.la> wrote:
>
> Ok fly safe and I hope your deal works out.
>
> I realized this am that we still haven't gotten the last 5m funded either sol we really need that to happen. Getting a little nervous since we keep telling everyone NO when it comes to additional funding.
>
> Had a great time hanging. We are going to finish the China deck tomorrow and get that going and Im working on getting the players all signed up for the next season and that is going well. Hitting the ground running!
>
> From: Ahmed Al-Rumaihi [mailto:chi974@icloud.com]
> Sent: Tuesday, August 29, 2017 3:30 PM
> To: Kwatinetz, Jeff <jek@thefirm.la>
> Subject: Re:
>
> Hey bro,
>
> I just boarded my flight to Doha, but I will be back by next Tuesday to NYC or LA. Please let me know if you want or need anything from Doha.
>
> Sent from my iPhone

47.     Throughout the Fall 2017, Defendant Al-Rumaihi and Defendant Sabi continued to make excuses why they couldn't pay.  Defendant Al-Rumaihi repeatedly blamed Defendant Sabi for the failure to pay; Defendant Sabi repeatedly blamed political issues affecting the Qatar Investment Authority for not being able to get access to the money.

48.     At all times, Defendants continued their flattery, congratulating the Big3 founders in emails and text messages about the remarkable success of the league. Defendants sent nothing but positive emails and messages about the leadership of the league.

49.     On or around November 2017, Defendant Al-Rumaihi made a final personal appeal to Defendant Kwatinetz to pay if Defendant Sabi couldn't: **"Look me in the eyes. I swear on my children's lives I will pay you personally by mid to end of January if Ayman [Sabi] doesn't pay."**

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 15 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 033

50.     In fact, Defendant Al-Rumaihi claimed that he would get the money directly from the Qatar royal family and Qatar Investments if Defendant Sabi and Sport Trinity were unable to pay. However, Defendant Sabi did not pay and Defendant Al-Rumaihi did not keep his word, despite his bizarre and gratuitous appeal on the lives of his children.

51.     Instead, Plaintiff Kwatinetz had to continue chasing down Defendants for payment until Plaintiffs simply had enough and refused to be victims of what was clearly a premeditated scam, or frankly, an inability of the Defendants to afford the share purchases or to make good on the $9 million  in sponsorship money.

52.     Defendant Al-Rumaihi also began to demand that, despite the short window for planning such a major event, that BIG3 arrange for the 12-15 best BIG3 players to play exhibition games in Doha, Qatar specifically in mid-February.  Plaintiffs explained that players would not all be available and ready in training and to play but he would attempt to make it happen if a written offer was made, but also explained holding a one-off event would be a huge financial risk and that with more time several other locations could be secured making it financially worthwhile and logistically viable for the player and coaches.  It was painfully clear that Defendants had no understanding of the logistics such an event would require.  To no surprise given that Defendants still owed millions to BIG3 and had exhibited a clear pattern of lies to get what they wanted, no such written offer ever came.

53.     Plaintiffs Kwatinetz and Defendant Al-Rumaihi continued exchanging a series of text messages which show the varying, and at times peculiar and embarrassing, excuses made by Defendant Rumaihi (a purported member of the Qatar royal family) to avoid paying the BIG3.  Notably, in the text messages, Defendant Al-Rumaihi concedes that he owed the BIG3 money since July 2017, that he clearly remembers his discussions promising to pay, but instead makes excuse after excuse.

54.     Specifically, on or around December 10 and 11, 2017, Mr. Kwatinetz attempted to set up a meeting with Defendant Al-Rumaihi who instead of substantively responding sent a picture of his teeth being worked on, apparently to conjure sympathy.

- 16 -

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411



GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

That works

Dec 10, 2017 at 5:48 PM from Ahmed La

What day?

Dec 11, 2017 at 12:44 PM to Ahmed La

[illegible]

Dec 11, 2017 at 3:50 PM to Ahmed La

[illegible]

Dec 11, 2017 at 4:29 PM from Ahmed La

For sure

Dec 11, 2017 at 4:29 PM from Ahmed La

Time?

Dec 11, 2017 at 4:30 PM to Ahmed La

[illegible]

Dec 11, 2017 at 4:31 PM from Ahmed La

Perfect

Dec 11, 2017 at 5:45 PM from Ahmed La

Finishing up

Dec 11, 2017 at [illegible] PM from Ahmed La

Dec 11, 2017 at [illegible] PM to Ahmed La

Dec 11, 2017 at [illegible] PM to Ahmed La

[illegible]

Dec 11, 2017 at [illegible] PM from Ahmed La

I can be there by 7:30

Dec 11, 2017 at [illegible] PM from Ahmed La

And tomorrow works as well

Dec 11, 2017 at [illegible] PM to Ahmed La

[illegible]

55. Further, instead of paying what he owed, Defendant Al-Rumaihi would send Mr. Kwatinetz news articles regarding political issues facing Qatar and would respond to important meeting requests by saying, **"long day bro. . ."**

Jan 18, 2018 at [illegible] PM from Ahmed La

Called you back

Jan [illegible], 2018 at [illegible] PM from Ahmed La

Hey bro,
Joe is in DC would you like to meet with him to see if you think he would be good as our in house council?

Jan 22, 2018 at [illegible] PM to Ahmed La

[illegible] literally [illegible] and out makes it hard today

Jan 22, 2018 at 1:18 PM from Ahmed La

https://www.nytimes.com/2018/01/22/world/middleeast/qatar-saudi-emir-boycott.html

Jan 22, 2018 at 1:19 PM from Ahmed La

https://www.haaretz.com/amp/us-news/.premium-qatar-doubles-down-on-pr-campaign-appealing-to-u-s-jews-d-c-bigwigs-1.5748073

Jan 22, 2018 at 5:20 PM from Ahmed La

https://intpolicydigest.org/2018/01/21/gulf-crisis-turns-qatar-into-the-region-s-israel/

Jan 22, 2018 at [illegible] PM to Ahmed La

Will read these on the plane

Feb 1, 2018 at [illegible] PM from Ahmed La

In a meeting

Feb 1, 2018 at [illegible] PM to Ahmed La

very important I talk to you today please call me after your meeting

Feb 1, 2018 at 1:19 PM from Ahmed La

Will do

Feb 1, 2018 at 6:32 PM from Ahmed La

Long day bro. Going to cat an will call you as soon as I'm done

Feb 1, 2018 at 6:12 PM to Ahmed La

Bro, this is not good. I can't even get you or Ayman on the phone all week. We need to immediately discuss, this is not what was promised or contracted. We are going to have to figure out a solution.

Feb 1, 2018 at 6:15 PM from Ahmed La

We talked to Rafe about getting 25% total he said there's away to get there. We need The budget and the projections.

Feb 1, 2018 at 6:15 PM from Ahmed La

I'll call you by 7:30

Feb 1, 2018 at 6:27 PM to Ahmed La

He did not say that and I was clear with Ayman. We are going to need to go out and replace it. You personally promised me that you would have it by end of January. Ayman hasnt called me back in a week. I was promised end of September then end of October then by year-end and then when I had the personal conversation with you you promised me that if I wasn't in by mid January you would get it to me personally by end of January and now it's February. The company is worth twice what it was in the end of the summer. You guys have put me in a very precarious spot

Feb 1, 2018 at 6:34 PM from Ahmed La

Yes I remember. As of last week or so Ayman and I discussed this and we agreed that the company is going to need cash and it's best for us that it comes from within, he's on board with me to do the 25%. Let me fish and I'll call you.

56. In addition to these excuses, Defendant Al-Rumaihi also frequently boasted of his friendship to Senator John McCain and throughout these months blamed not being able to have time to get the funds because he was purportedly busy visiting Senator McCain in the hospital.

57.     Further, on or around February 2, 2018, when Plaintiff Kwatinetz confronted Defendant Al-Rumaihi about how "disappointed" he was over Defendants failure to pay and how Plaintiff Kwatinetz **"was made to look really stupid with all the others as I gave my word to everyone [because] you gave me your word . . . and you and Ayman just disappeared,"** Defendant Al-Rumaihi responded *at 2:36 PM in the afternoon*, **"Literally just woke up. My sinuses are so bad. . ."**



58.     Again, on or around February 3, 2018, when Mr. Kwatinetz explained, **"I need to hear from you immediately or I am assuming that we are not resolving this. . ."** Defendant Al-Rumaihi emphasized that he was **"hiking,"** and that he was going to get ready for the memorial for the death of BIG3 player Rasual Butler he knew Mr. Kwatinetz was attending so they could speak there.  Defendant Al-Rumaihi responded, **"When we last spoke I told you we were resolving this."**

COMPLAINT FOR DAMAGES

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 036



59.     Mr. Al-Rumaihi did not enter the memorial but instead waited in his Bentley until it was over and Mr. Kwatinetz and the other grieving attendees began to exit. Mr. Al-Rumaihi exited the car and approached Mr. Kwatinetz on the sidewalk in view of grieving friends and relatives to inform him all "would be worked out." When Mr. Kwatinetz asked if the remaining millions would be wired in to the BIG3 account by the following Monday as outlined in the legal correspondence, Mr. Al-Rumaihi said no and that he needed 25% of the league and Ayman to be COO and that Mr. Kwatinetz should show him "respect as a royal family member." Mr. Kwatinetz informed him that respect came with paying monies owed now over six months and refraining from constant lies. Al-Rumaihi became incensed and loudly screamed at Mr. Kwatinetz and threatened his life and his family noting "You don't know who I know in LA and what they're capable of. You should think of your safety and the safety of you and your family." Kai Henry intervened as many mourners started glaring at Mr. Al-Rumaihi, although Kai claimed to others not to have heard the content of the threats. Mr. Kwatinetz immediately left and drove home employee Angelica Cobb who he immediately told of the threats. Mr. Kwatinetz then called his wife as well as Ice Cube to inform them of the threats on his and his families lives. His wife was especially nervous at home with a newborn as Mr. Al-Rumaihi had maintained a residence a mere two blocks away from them. Mr. Kwatinetz hired security to protect himself, his family and his employees. He later learned that Mr. Rumaihi started to employ the services of numerous armed "security" who were seen on the premises of his Beverly Hills estate.

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 037

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

60.     In short, Defendant Al-Rumaihi never fulfilled his promise and contractual obligations.  Defendant Sabi's communications with Plaintiff Kwatinetz are similar.

61.     Up until the BIG3 filed Arbitration and initiated its independent corruption investigation into the conduct by Defendants, Defendant Sabi's emails and text messages all included over-the-top, indulgent, praise about much he "loved" and "admired" Plaintiff Kwatinetz and Ice Cube.

62.     Defendant Sabi would frequently ask Plaintiff Kwatinetz how "daddyhood" was going as Plaintiff Kwatinetz's wife recently had a baby.

63.     Defendant Sabi would also tell Plaintiff Kwatinetz that he was going to Qatar, or as he called it "Q," to meet with his "best friends" from the royal family where he would get the money they owed the BIG3 and where and when he would also get sponsors for the BIG3 – neither of which actually ever took place.

64.     For example, in text messages from November 1, 2017, Mr. Sabi stated in reference to his trip to Qatar: **"I'm heading to Q to wrap all shit up.  From all indications that should b done with all this coming week."**



EXHIBIT A TO NOTICE OF REMOVAL
PAGE 038

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

65.    After exchanging pleasantries during Christmas 2017, Defendant Sabi then took the approach of ignoring phone calls and avoiding meetings and encounters with Plaintiff Kwatinetz.

66.    Between January 17, 2018, and February 1, 2018, Defendant Sabi ignored repeated phone calls from Plaintiff Kwatinetz to avoid paying what he owed the Big3.

67.    On or around February 1, 2018, when Plaintiff Kwatinetz expressed his frustration for being childishly ignored, Defendant Sabi responded with **"Hola Bro . . .Sorry for the delay, I have had overseas guests and family all this week.  I will call you soon."**

68.    After Plaintiff Kwatinetz stated that this was **"starting to get to a bad place,"** Defendant Sabi did not respond further. The following exchange took place:



## Big3 Initiates Legal Action Against Sport Trinity

69.    To protect their legal rights under the Unit Purchase Agreement, and to protect the rights of all of its other investors who fully funded and conducted themselves professionally and with dignity, Plaintiffs retained the services of a law firm which sent a demand letter to Defendants on February 2, 2018.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 21 -

70.     Despite being repeatedly lied to, Plaintiffs in their February 2, 2018 letter still gave Defendants the opportunity to cure their breach and make the payment they owed since July 2017.  Plaintiffs provided wiring instructions to Defendant. Attached hereto as Exhibit "A" is a true and correct copy of the letter.

71.     Defendants, through their attorneys responded by letter on February 5, 2018, and brazenly requested a further extension of time, claiming that Defendants were in discussions with individuals at the BIG3.  Attached hereto as Exhibit "B" is a true and correct copy of the letter.

72.     On February 11, 2018, Plaintiff responded through counsel, providing the history of nonpayment by Defendants, stating that the BIG3 was not in fact in communication with Defendants, and that Plaintiffs were now compelled to file legal action against Defendants.  Attached hereto as Exhibit "C" is a true and correct copy of the letter.

73.     On or around February 14, 2018, Big3 commenced an Arbitration in JAMS against Sport Trinity LLC, *In the Matter of Big3 LLC v. Sport Trinity LLC*, JAMS Case No. 1100089671.

**Investigation of Defendants**

74.     After commencing Arbitration, the founders of BIG3 reached out to its then commissioner to inform him about the Arbitration and the indisputable evidence supporting it.  The since fired Commissioner stated he was "friends" with Defendant Sabi and Defendant Al-Rumaihi and thus "did not want to get in the middle of it."

75.     This statement by an employee getting the highest salary in the league plus stock was unsettling and raised significant alarm at the league offices, as the commissioner and highest paid employee of the BIG3 should not have had a conflicted allegiance when Defendants were refusing to pay and attempting to shakedown the league which, among other things, paid the commissioner's salary.

76.     Worse yet, with knowledge that the BIG3 was in Arbitration against Defendants, the since fired Commissioner took to Instagram in February and March 2018 to post images of himself with Defendants at the Beverly Hills Mansion they recently rented

- 22 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 040

and to post selfies at the mansion, with hashtags such as **"More life less stress," "#family,"** and **"#makingmoneymoves"**

77.    Here are just some of the photos posted on Instagram:





78.    As a result of the Arbitration filed by the BIG3 against Sport Trinity, the photographs posted on social media after the Arbitration, and the statements made by the BIG3's former commissioner, the BIG3 initiated an independent investigation.

79.    The purpose of the independent investigation was so that the BIG3 could gather facts and provide staff and employees a fair process to explain and discuss their conduct and relationship with Defendants and the State of Qatar. On or around February 22, 2018, the investigator sent the following letter to various executives and employees, including former Commissioner:

COMPLAINT FOR DAMAGES
EXHIBIT A TO NOTICE OF REMOVAL
PAGE 041

1



February 22, 2018

**VIA ELECTRONIC MAIL**
rmason0@gmail.com

Mr. Roger Mason
166 Alpine Drive
Closter, New Jersey, 07624

Re:   Independent Investigation

Dear Mr. Mason:

Macias Counsel, Inc. has been recently retained by Big3 LLC (the "Company") to conduct an independent investigation into potential conflicts of interest by and between certain employees and affiliates of the Company and certain outside entities and individuals with interests adverse to the Company. Based on your relationship with the Company, it is your obligation to provide complete and expeditious cooperation as we conduct our investigation. We will be conducting interviews in the next two weeks in Los Angeles, California. Please provide me with preferred dates and times so that we may schedule an interview with you. The interviews will be recorded by audio and/or by a certified stenographer. We estimate that the interview will take no more than five (5) hours to conclude.

We additionally request that you preserve all email communication, text message communication, social media communication, and any other form of communication by and between yourself and the following: (1)Sport Trinity LLC, (2) Qatar Investment Authority,(3) Ahmed Al-Rumaihi, (4) Ayman Sabi, (5) Faisal Al Hamadi, (6) Ali Al-Thawadi, (7) Khalifa Al-Jaldih, and (8) Adrienne Mason. I look forward to meeting with you soon.

Very truly yours,

MACIAS COUNSEL, INC.

Sean E. Macias, Esq.

201 West Colorado Blvd., Pasadena, California 91105
Main (626) 844-7777  Fax (626) 844-7707
www.maciascounsel.com

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

80.     Although certain individuals declined interviews including Roger Mason and Kai Henry, it  was later learned that Defendants sought improper influence in the league by (1) investing and attempted to invest in personal projects of now former employees, (2) sought to bribe former employees, (3) providing former employees with gifts including trips to St. Tropez and Ibiza, (4) providing the use of their $800,000 Bentley, (5) and using their Beverly Hill mansions for lavish parties.

### **Defamation and Trade Libel Against Big3, its Founders, and its Players:**

81.     Following the Big3 filing Arbitration and initiating an independent investigation, Defendants were removed from all rights and privileges in the league. Regardless, Defendants continued to communicate with the now former employees, and sought to use these individuals (wittingly or unwittingly) to undermine the existing leadership in the league.

82.     Through its own investigation, the BIG3 obtained email records reflecting efforts to undermine the league.  During the week the independent investigator was intending on conducting interviews, it was learned that the former Commissioner took a trip to China for business that was not related to the BIG3.  He did not inform any of the executives at the

- 24 -

COMPLAINT FOR DAMAGES

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    BIG3, some of who had spoken to him while he was in China, of his whereabouts. While in

2    China, he was in close communication with Defendant Sabi.

3        83.    The BIG3 also came to learn that a player in the league named Jerome

4    Williams was also in China.  At that time, Jerome Williams was an informal leader among

5    the BIG3 players and communicated on behalf of the interests of players to management.

6    Unlike the former Commissioner, Mr. Williams had no formal management role with the

     BIG3. Mr. Williams considered himself to be a good friend of the Commissioner at that time.

7        84.    On around March 7, 2018, while in China, the former Commissioner set up a

8    phone call between Jerome Williams and Defendant Sabi.

9        85.    On the call, Defendant Sabi falsely claimed (1) he and his partners were the

10   lead investors in the Big3, (2) he and his partners had already paid $21.5 million to the Big3,

11   (3) he and his partners wanted to give millions of dollars more to the BIG3 and to charities

12   affiliated with players, but that BIG3 and Jeff Kwatinetz and Ice Cube were preventing this

13   from happening, (4) they had offered BIG3 $1.5 in additional funds for free to help promote

14   the league during the All-Star weekend, and (5) he and his partners were now forced to sue

15   the Big3 which could destroy the league. Defendant Sabi did not disclose that he and his

16   partners actually owed the BIG3 millions of dollars and that, in fact, BIG3 had already filed

17   an Arbitration based on the nonpayment against Defendant Sabi and his partners.

18       86.    In addition, Defendant Sabi (and, upon information and belief, with the

19   support of his co-conspirator Defendants) having found himself with no influence in the

20   league other than his connection to former Commissioner and other employees who were

     given gifts, sought to retaliate against the BIG3.

21       87.    Specifically, Defendant Sabi aided and abetted in the former Commissioner

22   making the false allegation that Plaintiff Kwatinetz referred to African American players in

23   the league *according to a former employee* as "Rich Nigg*s."  Defendant Sabi and former

24   Commissioner recognized that such a statement was clearly false and defamatory, and thus

25   they claimed that although *they never heard such a statement*, a "former employee" did.

26       88.    The former employee they credited with hearing this was Kai Henry, who was

27   plied with gifts and vacations by Defendants, rode around in Defendant's Bentley, and was a

28   frequent visitor to Defendants Beverly Hills mansion. Further, after being terminated, former

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 25 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 043

Commissioner and President repeated the allegation in a widely distributed press release where he claimed a "former employee" heard the statement.

89.     After his call with Defendant Sabi, Jerome Williams was instructed by former Commissioner that they needed to call Chauncey Billups, a very influential retired NBA player who plays in the BIG3.

90.     Like Mr. Williams, Mr. Billups had an important informal role in communicating concerns between players and management in the BIG3.  The purpose of this call was to communicate all the false and defamatory information that Defendant Sabi had just told Jerome Williams to Mr. Billups, with the intent by Defendant Sabi to remove Plaintiff Kwatinetz and Ice Cube from their leadership roles.

91.     Because Mr. Billups was busy, he requested that Jerome Williams send him an email of what Defendant Sabi had stated.  Former Commissioner asked that he be blind-copied on the email to confirm what was stated was true, which he subsequently confirmed (falsely) to Jerome Williams after the email was sent.

92.     Plaintiffs obtained a copy of the email during their investigation.  Plaintiffs also obtained a declaration from Jerome Williams stating why he wrote that email and what former Commissioner and Mr. Sabi told him.  Attached hereto as Exhibit "D" is a true and correct copy of the declaration of Jerome Williams, confirming the defamatory statements made to him by Defendants

93.     Attached hereto as Exhibit "E" is a second declaration from Jerome Williams, wherein Jerome Williams – a friend of former Commissioner – confirms that he told him in China that **Kai Henry** was the "former employee" who heard Plaintiff Kwatinetz call the BIG3 players "Rich Nigg*s."

94.     Plaintiff Kwatinetz never had and never would make such a statement; he is married to a woman who is half black, and he has devoted his life to civil rights and equal rights for all. Further, Mr. Kwatinetz has been a manager and trusted advisor to Ice Cube for decades who would not tolerate any form of intolerance.  Indeed, Defendant Sabi intended for the false allegations to do maximum damage and create a leadership vacuum in the league.

- 26 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 044

95.     However, in addition to the sheer absurdity of the allegations to everyone in the league and everyone who knows Plaintiff Kwatinetz, apparently Defendants and the former commisioner were not aware that Kai Henry denied he heard Mr. Kwatinetz make this statement.

96.     In fact, in text messages obtained between Kai Henry and Ice Cube, Kai Henry states, **"I never said that!!!"**   Here is the text message exchange between Ice Cube and Mr. Henry:



97.     Kai Henry did indeed have a conversation with Mr. Kwatinetz defending Mr. Al-Rumaihi and saying he was a "good guy" and that he was simply being lied to repeatedly by his partner Defendant Sabi so it wasn't Defendant Al-Rumaihi's fault.  At this time, not knowing Mr. Henry had been compromised by Defendants, Mr. Kwatinetz couldn't understand why a marketing employee not involved in BIG3 investor dealings would be inserting himself in to the conflict and asked him why Mr. Henry was doing so.

98.     Mr. Henry replied that Mr. Al-Rumaihi thought he had been pushed out because he was an Arab.  Mr. Kwatinetz explained that was absurd, that he had nothing against people of Arabic background (or any for that matter) and that in fact other investors in the BIG3 were of Arabic heritage and that Mr. Kwatinetz constantly defended one of his well-known friends, Roger Waters, for his pro-Arabic views and negative ones regarding Israel because he supported people's rights to have diverse views of all kinds.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

99.     Mr. Kwatinetz did say to Mr. Henry that Defendants were "bad people" but only because they failed to pay the millions they owed Big3, harmed players and the league, and then lied about paying on the lives of their children.

100.    Mr. Henry blamed the non-payment on lies perpetuated by Mr. Sabi, but Mr. Kwatinetz then ended the conversation letting Mr. Henry know they expected to find out the truth as an independent investigation had just been opened and everyone would be questioned on their relationships with the Defendants.

101.    The very next day, Mr. Henry suddenly and suspiciously quit, blaming anti-Arab sentiments (falsely) of Mr. Kwatinetz.  Mr. Henry informed the independent investigator he would not be answering any questions.

102.    Mr. Henry was not only a 12 year friend, but had worked with, and around, Mr. Kwatinetz during that time. Mr. Henry had always been complimentary and positive about Mr. Kwatinetz, and attended Mr. Kwatinetz's wedding where he witnessed Mr. Kwatinetz's wife being walked down the aisle by her black father, and Mr. Henry had witnessed Mr. Kwatinetz fight on behalf of minorities for over a decade.

103.    In any event, it is clear that Mr. Henry and Mr. Mason were so compromised, they could not even get their story straight about which absurd and defamatory remark to make, without realizing the paper trail undermining the defamatory claims that was created.

104.    The defamatory statements not only damaged Plaintiff Kwatinetz, but were intended to and did in fact, cause severe and substantial damages to Ice Cube and all players of the league who were also referred to as being racist and hostile, which was sadly repeated in the media. Thus, each Plaintiff, including all players of the BIG3, maintain causes of action against all Defendants for defamation.

## FIRST CAUSE OF ACTION
### Defamation
### (On Behalf of Ice Cube, Jeff Kwatinetz, and Players Against All Defendants )

105.    Plaintiffs claim that Defendants harmed them by making harmful and offensive statements that they were "racist," "hostile," and that Plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and

- 28 -

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what it owed under the Unit Purchase Agreement.

106.    The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were racist, hostile, and used racial slurs.

107.    Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and the Big3, in that the Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities.  The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

108.    Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages. Plaintiff Kwatinetz specifically has represented minorities and diverse clients for his entire life and such defamation was intended to harm his ability to continue to do so.

## SECOND CAUSE OF ACTION
### Defamation Per Se
### (On Behalf of Ice Cube, Jeff Kwatinetz, and Players Against All Defendants )

109.    Plaintiffs claim that Defendants harmed them by making harmful and offensive statements that they were "racist," "hostile," and that Plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what it owed under the Unit Purchase Agreement.

110.    The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were racist, hostile, and use racial slurs.

111.    Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and

- 29 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 047

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1
2
3
4

the Big3, in that the Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities.  The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

5
6
7

112.    Defendants conduct constitutes "Defamation Per Se," in that the defamatory statements related to matters incompatible with the business, trade, profession, or office of Plaintiffs. Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

8
9
10

### THIRD CAUSE OF ACTION
### Trade Libel
### (On Behalf of The Big3 Against All Defendants)

11
12

113.    Plaintiffs claims that Defendants defamatory statements, as alleged above, would be clearly and necessarily understood to disparage the league and the services and products associated with the league.

13
14
15
16

114.    Specifically, Defendants and each of them, in the effort to undermine the current Big3 leadership, falsely and absurdly told players and third-parties that the league was not being managed properly and not accepting their money, which is belied by the contemporaneous messages and records.

17
18

115.    Defendants published said defamatory statements to individuals and for mass consumption with a coordinated defamatory public relations campaign.

19
20

116.    Defendants intended to cause and did in fact cause financial harm with respect to Plaintiffs business relationships with third-parties.

21
22

117.    Defendants knew the statements they made and caused to be made were false and defamatory.

23
24

118.    Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the right of all Plaintiffs, thus giving rise to punitive damages.

25
26
27
28

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 30 -

## FOURTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relations

### (On Behalf of All Plaintiffs Against All Defendants)

119.    Defendants were aware of numerous contractual relationships Plaintiffs entered and/or intended to enter, including contracts with its former commissioner, investors, media contracts, and sponsorship opportunities with third-parties.

120.    Defendants made or aided and abetted in the making of defamatory statements of and concerning Plaintiffs with the intent of interfering and causing disruption with existing and prospective contracts entered by Plaintiffs, to which Defendants knew that disruption in the contractual relations was certain or substantially certain to occur.

121.    Plaintiffs were damaged in the disruption of their contractual relationships.

122.    Defendants were a substantial factor in causing Plaintiffs' harm.

COMPLAINT FOR DAMAGES

123.   Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.   For general damages in an amount to be determined by proof at trial;

2.   For special damages in an amount to be determined by proof at trial;

3.   For punitive and exemplary damages against the defendants;

4.   For pre- and post-judgment interest according to proof;

5.   For costs of suit, including reasonable attorneys' fees, statutory fees, and costs as provided by statute;

6.   Injunctive relief;

7.   For all other relief as this Court may deem just and proper.

DATED:  April 5, 2018                                         GERAGOS & GERAGOS, APC

By: _____
MARK J. GERAGOS
BEN J. MEISELAS
Attorney for Plaintiffs

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 32 -

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a jury trial.

3

4    DATED:  April 5, 2018                              GERAGOS & GERAGOS, APC

5

6                                                          By:
7                                                              MARK J. GERAGOS
                                                             BEN J. MEISELAS
8                                                             Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 33 -

COMPLAINT FOR DAMAGES

ORIGINAL

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

— Mark J. Geragos (SBN 108325); Ben J. Meiselas (SBN 277412)
Geragos & Geragos, APC
644 South Figueroa Street, Los Angeles, CA 90017

TELEPHONE NO.: 213.625.3900    FAX NO.: 213.2323255
ATTORNEY FOR *(Name):* Plaintiffs, Big3 LLC, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS: 111 N. Hill St.
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

**FILED**
Superior Court of California
County of Los Angeles

APR 05 2018

Sherri R. Carter Executive Officer/Clerk
By _____ Deputy
Marion Gomez

CASE NAME:
Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al.

CASE NUMBER: **BC700897**

| CIVIL CASE COVER SHEET | | Complex Case Designation | | |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[✓] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[✓] punitive
4. Number of causes of action *(specify):* Four (4)
5. This case [ ] is [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 4/5/2018

Ben Meiselas
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 *www.courtinfo.ca.gov* |
|---|---|---|

| SHORT TITLE: Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al. | CASE NUMBER **BC700897** |
| --- | --- |

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> **This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

> ### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
| --- | --- | --- |
| **Auto Tort** Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 053

| SHORT TITLE: Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☑ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer- Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 054

| SHORT TITLE: Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al. | CASE NUMBER |
| --- | --- |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
| --- | --- | --- | --- |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not<br>Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 055

| SHORT TITLE: Big3 LLC, et al., v. Ahmed Al-Rumaihi, et al. | CASE NUMBER | BC700897 |
|---|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: ☐ 1. ☐ 2. ☒ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS: 644 S. Figueroa St. |
|---|---|

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90017 | |
|---|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: __4/5/2018__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5.  Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 056

GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

FILED
Superior Court of California
County of Los Angeles

APR 05 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Shaunya Bolden

MARK J. GERAGOS       SBN 108325
BEN J. MEISELAS       SBN 277412
Attorneys for Plaintiff BIG3 BASKETBALL, LLC, O'SHEA JACKSON
AKA ICE CUBE, AND JEFF KWATINETZ

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual;<br><br>Plaintiffs<br><br>vs.<br><br>Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority.<br><br>Defendants. | Case No. BC700897<br><br>**EXHIBITS IN SUPPORT OF COMPLAINT** |

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 057

# Exhibit "A"

# Morgan Lewis

**Benjamin P. Smith**
Partner
+1.415.442.1289
benjamin.smith@morganlewis.com

February 2, 2018

**VIA FEDEX AND ELECTRONIC MAIL**

Philip B. Schwartz, Esq.
Akerman LLP
350 East Las Olas Boulevard, Suite 1600
Fort Lauderdale, FL 33301
philip.schwartz@akerman.com

Re:   BIG3 Basketball, LLC Unit Purchase Agreement

Dear Mr. Schwartz:

We represent BIG3 Basketball, LLC ("BIG3"). We write to you pursuant to Section 7.3 of the BIG3 Basketball, LLC Unit Purchase Agreement ("Agreement") by and between BIG3 and Sports Trinity, LLC ("Trinity") dated July 14, 2017.

As Trinity knows, Trinity is in breach of Section 2 of the Agreement given its failure to pay BIG3 the complete up-front purchase price of $11,500,000 USD for Purchased Units in BIG3 by July 14, 2017 (exclusive of the "Additional Revenue Guarantee"). Instead, to date, Trinity has paid just $7.5 million of the required amount. Despite repeated promises that Trinity's $4,000,000 USD shortfall would be forthcoming, including by wire transfer prior to January 31, 2018, no monies have been received.

Accordingly, BIG3 demands that Trinity remedy the shortfall by wiring the $4,000,000 past due and owing no later than midnight Eastern Time on Monday, February 5, 2018. BIG3 reserves all rights, and makes this demand without waiver of any rights or remedies.

Sincerely,

Benjamin P. Smith

cc:   Mark Geragos (via email)
      Jeff Kwatinetz (via email)
      O'Shea Jackson, Sr. (via email)
      Scott Karchmer (via email)

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA 94105-1596    ☎ +1.415.442.1000
United States                  🖷 +1.415.442.1001

DB1/ 95627922.1

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 059

# Exhibit "B"

# akerman

Philip B. Schwartz

Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999

T: 954 463 2700
F: 954 463 2224

February 5, 2018

**VIA E-MAIL AND FEDERAL EXPRESS**
Benjamin P. Smith, Partner
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105

RE: BIG3 Basketball, LLC ("BIG3")
Investment by Sport Trinity, LLC ("Sport Trinity")

Dear Mr. Smith,

I am in receipt of your letter of February 2, 2018. I have consulted with representatives of Sport Trinity, who have advised me of their ongoing discussions with BIG3 representatives regarding this investment and the future operation of BIG3. In order to allow that discussion to come to a conclusion, Sport Trinity requests that BIG3 agree to forbear on seeking to exercise any remedies with respect to the matter raised in your letter until Friday, March 9, 2018.

Please let me know if that is acceptable.

Sincerely,

Philip B. Schwartz

cc: Ayman Sabi (*by e-mail*)
Ahmed Al-Rumaihi (*by e-mail*)

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 061

# Exhibit "C"

# Morgan Lewis

**Benjamin P. Smith**
Partner
+1.415.442.1289
benjamin.smith@morganlewis.com

February 11, 2018

**VIA FEDEX AND ELECTRONIC MAIL**

Philip B. Schwartz, Esq.
Akerman LLP
350 East Las Olas Boulevard, Suite 1600
Fort Lauderdale, FL 33301
philip.schwartz@akerman.com

Re:   BIG3 Basketball, LLC Unit Purchase Agreement

Dear Mr. Schwartz:

I am in receipt of your February 5, 2018 letter requesting yet another extension of time for
Sport Trinity LLC ("Trinity") to address its admitted and ongoing breach of contract, this
time seeking a further extension of time until at least March 9, 2018 to simply *discuss*
(rather than cure) Trinity's breach. BIG3 Basketball, LLC ("BIG3") is perplexed by this
response given BIG3's demand that Trinity's breach be cured, following multiple
extensions, no later than February 5, 2018. BIG3 cannot and will not grant yet another
extension; it is done playing games.

Contrary to your letter, Trinity is not in communication with BIG3 or its authorized agents,
and has no basis in law or fact to request a further extension of time to pay monies due and
owing as of July 14, 2017. BIG3 graciously and in good faith granted Trinity nearly seven
months of opportunity to cure its breach. BIG3 did so based upon numerous promises of
Trinity representatives after July 14, 2017 that monies due and owing would be received.
But, over and over again those promises were broken. BIG3 detrimentally relied on
Trinity's repeated false representations.

Ultimately, in or around November 2017, and in response to BIG3 Member Jeff
Kwatinetz's demand for payment from Trinity before year end, and during an in-person
meeting with Trinity's Ahmed Al-Rumaihi, Mr. Al-Rumaihi said to Mr. Kwatinetz, "Look
me in the eyes. I swear on my kid's lives that you will have your money by mid-January
to late-January [2018] at the latest." Mr. Al-Rumaihi then proceeded to blame Trinity's
Ayman Sabi for Trinity's failure to fund, but promised to do so himself if Mr. Sabi did not.
Based on Mr. Al-Rumaihi's representations and pleading, Mr. Kwatinetz, although stating

Morgan, Lewis & Bockius LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596
United States

☎ +1.415.442.1000
🖶 +1.415.442.1001

Philip B. Schwartz, Esq.
February 11, 2018
Page 2

that BIG3 had no legal obligation to further extend Trinity's funding deadline, graciously (albeit reluctantly) agreed to do so. However, Mr. Kwatinetz made it clear that January 31, 2018 would be the final deadline. Mr. Kwatinetz also reminded Mr. Al-Rumaihi of Trinity's obligation to secure $9 million in sponsorship deals, a separate obligation of Trinity under the Unit Purchase Agreement.

Despite these representations, Trinity again failed to pay on or before January 31, 2018, causing further substantial harm to BIG3. Thus, on February 2, 2018, BIG3 again notified Trinity, through my letter, of its material breach and warned that if amounts due and owing were not wired and received by BIG3 by midnight EST Monday, February 5, 2018, BIG3 would pursue all available remedies. Rather than wire the overdue amounts, Trinity's representatives made unconscionable demands for additional BIG3 Units, as well as operating changes. Specifically, on February 3, 2018, at the memorial for a deceased friend of Mr. Kwatinetz and player in the BIG3 league, Mr. Al-Rumaihi made still more demands of Mr. Kwatinetz, contradicting other demands made by Mr. Sabi to BIG3's CFO, and screamed at Mr. Kwatinetz in front of mourners and threatened that "you don't know who I know and what I'm capable of." BIG3 takes these threats seriously.

As noted in my prior correspondence, Trinity has left BIG3 no choice but to pursue all rights and remedies under its contract with Trinity, including but not limited to termination of Trinity's claimed interest in BIG3 given its failure to pay for that interest (it has no interest), and pursuit of all amounts remaining due under the contract, including sponsorship monies. Please let us know if you will accept service of BIG3's Notice of Initiation and Demand for Arbitration. Again, BIG3 reserves all rights and waives no rights.

Sincerely,

Benjamin P. Smith

cc:    Mark Geragos (via email)
       Jeff Kwatinetz (via email)
       O'Shea Jackson, Sr. (via email)
       Scott Karchmer (via email)

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 064

# Exhibit "D"

I JEROME WILLIAMS, DECLARE:

I am a retired professional NBA player and I am currently a player with the Big3.

On, or around March 7, 2018, I was in China with Roger Mason Jr. On this date, and previously, Mason told me that Ayman Sabi was the lead investor in Big3, that Ayman Sabi and his investment group invested and paid $21 million to the Big3 and that the Sabi investment group was the lead investor in the Big3.

Mason told me that the Sabi investment group, which included Ahmed Al-Rumaihi, offered to pay charity $1.5 million and Big 3 interfered with and prevented this donation from being made. I suggested Shooting For Peace and they said yes. Mason told me that the Sabi investment group offered $1.5 million in addition to the $21 million they already paid for public relations around the 2018 NBA All Star Game but that the Big3 refused to take this money. Mason also told me that the Sabi investment group had made a lucrative deal for players (approximately 2.5m total, $80,000 minimum each player) in Dubai but that the Big3 prevented this from happening.

Mason also told me that individuals from the Big3 were wasting Big3 player money by, among other things, taking private jets.

Mason had me call Sabi who confirmed what Mason told me about Sabi and the Sabi investment group's position as lead investors in Big3 and all of the statements Mason made, including their financial contributions to the league.

Mason told me that Sabi and his investment group owed the Big3 money and wouldn't pay because the BIG3 weren't running the business right. Mason never told me that the Big3 filed for an Arbitration against Sabi and his investment group. Mason told me that the only legal claims that existed was that Sabi was going to sue Big3 and that this would destroy the league.

Rather, Mason told me that Sabi and the Sabi Investment group were planning to sue the Big3 and that the Sabi lawsuit would destroy the league. Mason told me we needed to do something immediately to save the league.

On or around March 7, 2018, Mason told me that we needed to speak with Chauncey Billups, who is a friend, and a retired professional NBA player who plays in the Big3 who I understood to have an informal leadership role (as I myself have) in communicating important information between players and the Big3 management.

On or around March 7, 2018, Mason, myself, and Mr. Billups had a three-way conference call so that Mason and I could convey the information about the Sabi investment group that Mason told me as well as the other issues outlined above in this declaration that Mason told me. Mason told me if we did not act fast and convey this information to other players, the Big3 would be destroyed.

On the call Mr. Billups said he was busy and asked that we put everything we were saying in writing.  This is why I sent the email to Mr. Billups on March 7, 2018, which is attached to this declaration as Exhibit "A."  I blind copied Mason on the email to make sure that I had accurately conveyed all of the facts that Mason told me about Sabi and the Big3.

After I sent the email I spoke with Mason to confirm that my email was accurate.  Mason stated that the email was completely accurate but stated that I should not have blind copied him using his Big3 email account.

I DECLARE THE FOREGOING TO BE TRUE AND CORRECT UNDER PENALTY OF PERJURY

DATED: MARCH 13, 2018

JEROME WILLIAMS

**EXHIBIT "A"**

**From:** Jerome Williams [mailto:jyd1313@yahoo.com]
**Sent:** Wednesday, March 07, 2018 4:33 PM
**To:** Chauncey Billups
**Cc:** Jerome "JYD" Williams
**Subject:** BIG3 Issues: That need Answers

CB,
Here is what needs to be addressed with Jeff & Cube!! Let's coordinate a time that works best in the next couple of days..

BIG3 Issues: That need Answers



1. Jeff needs to step aside from business operations of Big3 or the league will go down in law suits!!



- I spoke to Ayman (BIG3 lead Investor $21 Million) (as I do every so often) and I touched base with him & he asked me about how I felt about Roger being Commissioner of Big3?? He then expressed that the investors wanted to contribute $1.5 Million to our Shooting for Peace efforts for 2018 and was told not right now by Jeff that they needed it for operations?? Then he said that he had setup a sponsored AllStar game in Dubai that would have paid players $80,000 minimum for 2-days and it was turned down?? Then He also said Kai was let go from BIG3 and he might have something with Iverson?? Then he said that they were only going to continue on with BIG3 if Jeff steps aside....???

So things with BIG3 are at a Crossroad
Players & Coaches have heard bad things about their colleagues and feel used & not compensated for their brand equity!!

- Commissioner Roger Mason has to be involved with day to day operations. The players are losing trust for Jeff & Ice Cube based on their playoff checks arriving late and now jersey royalty checks still haven't arrived. And now Ayman's situation could be real bad for the league. Allen Iverson Jersey sold out and is the only player to receive a check. Need to see financials for this???
- BIG3 BOD?? What players represent us on the Board; who is responsible for approving all basketball related decisions? Players are requesting that there will always be Roger, Chauncey, Jerome and another Captain be named to the BOD. This would need to be done ASAP with a follow up BOD meeting done to inform us of all protocol, business process and operations. In addition to financial updates with regards to royalties, sponsors, salaries, budgets 2018 etc. for approval.
- BIG3 Community initiative: Shooting for Peace in schools program partnered with NBRPA was started and there hasn't been any correspondence to teams with this regard?? AllStar weekend launched



and P/R follow up was lack. $1.5 Million for initiative was proposed by investors...

Sent from my iPhone

*wrong*
*Emoji's*
*JW*

# Exhibit "E"

I, JEROME WILLIAMS, DECLARE:

I am a retired professional NBA player and I am currently a professional player with the Big3.

It was Roger Mason Jr. that told me Kai had told him that Jeff referred to the BIG3 players as "Rich niggers." He said this when I was in China with him the week of March 7, 2018.

I declare the foregoing to be true and correct under penalty of perjury.

Dated:  March 13, 2018

_____

Jerome Williams

 **ORIGINAL**

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Mark Geragos/Ben Meiselas<br>Geragos & Geragos, APC<br>644 S. Figueroa St. Los Angeles, CA 90017<br>213.625.3900 geragos@geragos.com | STATE BAR NUMBER<br>108325/277412 | *Reserved for Clerk's File Stamp*<br>**FILED**<br>**Superior Court of California**<br>**County of Los Angeles**<br>**APR 0 6 2018**<br>Sherri R. Carter, Executive Officer/Clerk<br>By _M. Sula_, Deputy<br>**Moses Soto** |
|---|---|---|
| ATTORNEY FOR (Name): Plaintiffs, Big3 LLC, et al. | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS:<br>111 N. Hill Street, Los Angeles CA 90012 | | |
| PLAINTIFF:<br>Big3 LLC et al. | | |
| DEFENDANT:<br>Ahmed Al-Rumaihi, et al. | | |
| **AMENDMENT TO COMPLAINT**<br>**(Fictitious /Incorrect Name)** | CASE NUMBER:<br>BC700897 | |

☑ **FICTITIOUS NAME** *(No order required)*

Upon the filing of the complaint, the plaintiff, being ignorant of the true name of the defendant and having designated the defendant in the complaint by the fictitious name of:

| FICTITIOUS NAME |
|---|
| DOE 1 |

and having discovered the true name of the defendant to be:

| TRUE NAME |
|---|
| Akbar Al Baker |

amends the complaint by substituting the true name for the fictitious name wherever it appears in the complaint.

| DATE | TYPE OR PRINT NAME | SIGNATURE OF ATTORNEY |
|---|---|---|
| 4/6/2018 | Ben Meiselas | |

☐ **INCORRECT NAME** *(Order required)*

The plaintiff, having designated a defendant in the complaint by the incorrect name of:

| INCORRECT NAME |
|---|
| |

and having discovered the true name of the defendant to be:

| TRUE NAME |
|---|
| |

amends the complaint by substituting the true name for the incorrect name wherever it appears in the complaint.

| DATE | TYPE OR PRINT NAME | SIGNATURE OF ATTORNEY |
|---|---|---|
| | | |

## ORDER

THE COURT ORDERS the amendment approved and filed.

_____ Dated

_____ Judicial Officer

**AMENDMENT TO COMPLAINT**
**(Fictitious / Incorrect Name)**

Code Civ. Proc., §§ 471.5,
472, 473, 474

⬛ **ORIGINAL**

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

**FILED**
Superior Court of California
County of Los Angeles

APR 06 2018

Sherri R. Carter, Executive Officer/Clerk
By _M. Suto_ , Deputy
Moses Soto

MARK J. GERAGOS        SBN 108325
BEN J. MEISELAS        SBN 277412
Attorneys for Plaintiff BIG3 BASKETBALL, LLC, O'SHEA JACKSON
AKA ICE CUBE, AND JEFF KWATINETZ

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual; <br><br> Plaintiffs <br><br> vs. <br><br> Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority; DOES 1-100 <br><br> Defendants. | Case No. BC700897 <br> *(Assigned to Hon. Rita Miller Dept. 16)* <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES:** <br><br> 1. **DEFAMATION [Civ. Code § 44]** <br> 2. **DEFAMATION *PER SE* [Civ. Code § 46]** <br> 3. **TRADE LIBEL** <br> 4. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** <br><br> **UNLIMITED CIVIL JURISDICTION DEMAND FOR JURY TRIAL** |

## SUMMARY

Plaintiffs Big3 Basketball LLC, O'Shea Jackson a/k/a Ice Cube, and Jeff Kwatinetz bring this action against Defendants Ahmed Al-Rumaihi, Faisal Al-Hamadi, Ayman Sabi, and Sheikh Abdullah bin Mohammed bin Sau Al Thani as an individual and Chief Executive Officer of the Qatari Investment Authority ("Defendants") for Defamation, Defamation *Per Se*, Trade Libel, and Intentional Interference with Contractual Relations.

The BIG3 was the brainchild of founders and Plaintiffs, Ice Cube and Mr. Kwatinetz

- 1 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 072

1   who had worked together on the format, rules, and strategy for the league for over a year
2   before ever discussing the BIG3 with anyone outside of their company.

3       The league was to take the most popular played sport in the world, 3 on 3 basketball,
4   from the playground to the professional setting of NBA style arenas and broadcast games on
5   international and domestic television in a unique "festival" format.  Ice Cube and Mr.
6   Kwatinetz each deployed significant capital and resources, worked tirelessly turning down
7   numerous other lucrative opportunities, and drew on their vast array of relationships and
8   experiences in the live entertainment, legal, television, and other media fields to set up BIG3
9   as a rare opportunity.  It would not be an overstatement to say BIG3 was the culmination of
10  their total lives' work.

11      They then set up to execute their dream and began to raise additional capital and
12  began staffing the league from Commissioner on down to ball boys.  Much to their delight
13  and to the surprise of many in the sports world, the league's initial games in June 2017 were
14  a resounding success.  Now that Ice Cube and Mr. Kwatinetz's vision was vindicated, BIG3
15  immediately attracted many new sources of financing to expand on the league.

16      Touting their love of basketball and familial connections and relationships with the
17  royal Al-Thani Family in the State of Qatar, and thus access to vast resources and capital,
18  Defendants were brought to the BIG3 as passive investors and introduced by the league's
19  former president and commissioner, himself just hired less than a year before.

20      Counter to expectations regarding these passive investors, to agreements signed and
21  promises made, and certainly an aberration from the decent behavior of BIG3's initial
22  investment group, the Al-Thani "Royal" Defendants quickly started to insinuate themselves
23  into the affairs of BIG3 despite failing to live up to even their most basic obligation to fully
24  fund their investment.

25      Although constantly boasting of the Al Thani's and their individual "massive wealth
26  and power," Defendant's aberrant behavior continued throughout the 10-week season
27  culminating in Mr. Al-Rumaihi single-handedly losing $700,000 in cash gambling after the
28  Las Vegas league finals in a mere few hours at casino tables in the presence of the Big3 staff,

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    investors and players all the while Defendants still refused to pay the millions of dollars they

2    indisputably owed and admitted to owing the Big3.

3        These members and associates of the royal family made excuse after excuse for not

4    paying, all of which is documented in text messages and emails, where the blame for their

5    failure to fund the millions they owed the BIG3 ran the gamut from their **"sinuses,"**

6    **"hiking,"** it being a **"long day bro,"** and to bad press regarding Qatar associations with

7    alleged funding of terrorism.  Also, like a simple debtor in hiding from a collection agency,

8    these Defendants with their purported links to the Qatar royal family, would go into hiding

9    and refused to return phone calls and ignore Plaintiffs.

10       Later, Defendants made their true intentions clear when they stated they would only

11   pay what they owed if they were given a substantially larger equity position along with

12   operating entitlements in the company, instead of the small, passive, minority stake they were

13   required, but failed to fund.

14       Through subsequent investigation, Plaintiffs learned that Defendants were falsely

15   bragging about "operating the league," and how they were friends with Big3 celebrity

16   investors as well as Big3 and NBA basketball stars and legends.  Oddly, following the

17   season, the Qatari Defendants even rented three mansions in the Los Angeles area, in Venice,

18   Malibu and Beverly Hills, so they could be near the Big3 founders and employees to further

19   insinuate themselves into their lives.

20       To maintain the façade of involvement with the league, and to increase their influence,

21   Defendants targeted certain, now former, Big3 employees with gifts including trips to St.

22   Tropez and Ibiza, parties on Yachts, expensive meals, use of their exotic cars, invitations to

23   parties at their Los Angeles mansions, and investments in personal business projects

24   unrelated to the Big3.

25       As it turns out, Defendants were deeply concerned with the rapidly escalating political

26   pressure and public relations crisis facing their country, including the military blockade

27   against Qatar by its neighbors based on purportedly supporting extremism.  There was also

28   more focus on controversy and accusations of bribes surrounding the Qatar 2022 World Cup,

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1   the firing of a head of the Qatar owned BeIN Sports, and controversy related to its purchase

2   and operation of French soccer club PSG and the huge payment it made to sign star Neymar.

3   Also not brought to Plaintiffs attention by former commissioner and president was

4   Defendants history of scandal surrounding its basketball programs.  Defendants believed

5   their relationship with the BIG3 and the celebrities, entertainers, and basketball stars

6   associated with the league would improve the public perception of Qatar in the United States

7   as well as its standing in the arena of sports on a global level.  Unfortunately for the Al-Thani

8   family and associates, Plaintiffs operated the league for the benefit of its players and fans and

9   to maximize shareholder value, not to do the bidding of the needs solely of Qatar.

10  Defendants conduct knew no bounds when it came to their intention to wrest control

11  of the league from its founders, players and all the other well-intentioned investors.  First

12  using non-payment to create leverage to shamelessly demand increased ownership as well as

13  the attempted installment of Defendant Sabi as COO despite no experience in sports or

14  entertainment, then employing means of bribery and influence peddling to exert pressure on

15  league leadership.

16  However, on or around February 14, 2018, after giving Defendants multiple chances

17  to pay the millions they indisputably owed and admitted to owing, Plaintiffs moved swiftly

18  and decisively and initiated legal action against a corporate shell operated by Defendants and

19  removed Defendants from any connection with the league for their failure to pay.  It would

20  later be discovered the additional embarrassment such action taken on that particular day

21  against the Al-Thani's would create for Defendants.

22  Finding that their efforts to obtain operating control had failed and the humiliation

23  Defendants felt being notified of their removal from BIG3 amidst their yearly Qatar National

24  Sports Day in which the Al-Thani's display to the world their success and importance in

25  sports, Defendants retaliated with a campaign of disinformation and by making outrageous

26  defamatory statements against all Plaintiffs and interfering with Plaintiffs existing and

27  prospective contractual relations, to harm the league and attempt to destabilize it for one last

28  desperate shot at control.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 075

The conduct by Defendants is documented in text messages, emails, photographs, letters, declarations, and other evidence which was obtained by Plaintiffs.  Further, compromised employees refused to cooperate with an additional independent investigation initiated by Plaintiffs to determine the extent of the Defendant's wrongdoings.  Some of that evidence is contained in, and attached to this Complaint. Additionally, the conduct by Defendants reflects a cautionary tale of doing business with affiliates and proxies sent by the Qatar Investment Authority to do business in the United States.

Ironically, when Ice Cube and Jeff Kwatinetz pursued their lifelong dream of starting a basketball league from the ground up, and invested their personal assets and time in doing so, the last thing on their list of plausible concerns and impediments would be the malicious and reckless conduct of foreign actors and compromised agents and actors working on their behalf.  Nonetheless, Plaintiffs and the players of the Big3 who are heavily invested in the success of the league, have united to confront this challenge and protect their American dream.

Plaintiffs, and all players in the Big3 have been severely damaged by the conduct of Defendants, and collectively seek $1.2 billion in consequential damages, or approximately $20 million per player in the Big3.

## INTRODUCTION

1.     This action is brought by Plaintiff BIG3 LLC, a three-on-three professional basketball league, on its behalf as a limited liability company.

2.     This action is also brought by Plaintiff O'Shea Jackson, a/k/a Ice Cube and Jeff Kwatinetz, each who suffered significant damages and reputational harm based on the wanton, willful, and malicious defamatory statements made by and/or aided and abetted by Defendants, and each of them.

3.     Defendants are individuals who reside in and/or maintain substantial contacts with the United States and who used their purported relationship with the royal family in Qatar and their control and/or influence over the Qatari Sovereign Fund to conduct business in the United States, and to engage in the tortious conduct as set forth below.

- 5 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 076

4.     As alleged below, and in the accompanying exhibits, Defendants individually, and/or collectively, engaged in malicious, tortious, and/or reckless conduct causing substantial damage to all Plaintiffs.

5.     Defendants, in their individual and personal capacity, and using corporate shells including Sport Trinity LLC (currently a Respondent in a pending JAMS arbitration, *Big3LLC v. Sport Trinity, LLC)* attempted to seize operational control over Big3 LLC by, among other conduct, (1) fraudulently inducing Big3 to enter into a Unit Purchase Agreement whereby Defendants never intended to pay the millions they owed to extract more equity, (2) bribing and/or attempting to bribe former employees of the Big3 with money, gifts, and vacations to gain more influence in the league, (3) investing and/or promising to invest in business ventures of now former employees in the Big3 as a means of improper influence and control, (4) maliciously and wantonly defaming Big3, Ice Cube, and Jeff Kwatinetz to players and making false representations about the league and its operations to foment discord and disunity against the Big3 and its founders, and (5) defaming Plaintiffs, and aiding and abetting and causing others to make defamatory and malicious statements about and against Plaintiffs, as retaliation for Big3 filing a lawsuit against Defendants for failing to pay the money they owed.

6.     Plaintiffs stand united against Defendants.  Plaintiffs have been severely damaged and suffered reputational harm and other consequential damages from Defendants' conduct, in an amount no less than $1.2 billion, accounting for approximately $20 million in damages per player, in addition to other damages.

## THE PARTIES

7.     The Big3 LLC is a Delaware Limited Liability Company with its principal place of business in Los Angeles, California.  The Big3 is in its second season which starts in June 2018.

8.     O'Shea Jackson, aka Ice Cube, is an individual residing in Los Angeles, California.

9.     Jeff Kwatinetz, is an individual residing in Los Angeles, California.

10. Defendant Ahmed Al-Rumaihi is a citizen of Qatar, who is currently domiciled in Los Angeles, California.

11. Defendant Faisal Al-Hamadi is a citizen of Qatar, who conducts substantial business and has sufficient and substantial contacts with this jurisdiction.

12. Defendant Sheikh Abdullah bin Mohammed bin Sau Al Thani, is a citizen of Qatar, who conducts substantial business and has sufficient and substantial contacts with this jurisdiction.

13. Defendant Ayman Sabi, born in Tripoli, Libya, is a citizen of the United States, resides in Miami, Florida, and has sufficient and substantial contacts with this jurisdiction.

14. Plaintiffs are unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 100, inclusive, and therefore, pursuant to section 474 of the Code of Civil Procedure, sues these Defendants by such fictitious names. Defendants DOES 1 through 100 are responsible in some manner for the activities alleged herein and each was acting as an agent for the others. Plaintiffs will amend this Complaint to add the true names of DOES 1 through 100 once they are ascertained.

15. After further investigation, Plaintiffs identify Akbar Al Baker Chief Executive Officer of Qatar Airways as Defendant DOE 1.

## JURISDICTION AND VENUE

16. The acts that caused Plaintiff's damages as alleged herein primarily occurred in the County of Los Angeles within the jurisdiction of the Superior Court of Los Angeles County

17. This Court has jurisdiction over the present matter because, as delineated within this Complaint, the nature of the claims and amounts in controversy meet the requirements for the unlimited jurisdiction in the Superior Court of Los Angeles County.

## FACTS

### Qatar Investment Authority

18. The State of Qatar is located on a small peninsula bordering Saudi Arabia and is backed by the world's third-largest natural gas reserves. The country has the highest per

- 7 -

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 078

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

04/10/2018

capita income in the world.  Qatar is a monarchy ruled by the Al-Thani royal family.  The current Emir is Sheikh Tamim bin Hamad Al Thani.

19.     The Emir's relative is Defendant Sheikh Abdullah bin Mohammed bin Sau Al Thani, who heads the Qatari sovereign fund known as the Qatar Investment Authority.

20.     Qatar has recently been placed under a military blockade from its Middle East neighbors including Egypt, Bahrain, the United Arab Emirates and Saudi Arabia because of concerns regarding financial support for terrorism, a view that Qatar disputes.

21.     Recently, the Al-Thani Royal Family, through the Qatar Investment Authority, announced plans to invest hundreds of billions of dollars overseas, with a strong emphasis on United States investments, through an entity called "Qatar Investments." It appears to be an aim of the Al-Thani Royals to sway public opinion of U.S. citizens towards Qatar through employing this investment strategy.

22.     Defendant Al-Rumaihi, himself a member of the Qatar royal family, holds himself out as one of the heads of Qatar Investments.  Defendant Al-Rumaihi is the same former diplomat who is responsible for an aborted attempt, resulting in litigation, surrounding the purchase of a $100 million townhouse at 19 E. 64th Street, New York City – in what would have been the most expensive townhouse purchase in the history of New York City at the time.  Six months after agreeing to buy the property, and the day before the closing of the transaction, Qatar backed out of the deal.



Al-Rumaihi (right) with his spurned broker, March 2014, NYC

23.     Upon recent investigation, it has been uncovered that in the lawsuit filed against the Consulate of the State of Qatar in connection with this failed $100 million real

estate transaction, _1964 Realty LLC v. Consulate of the State of Qatar (1:14-cv-06429-ER, SDNY)_, Defendant Qatar tried getting out of the deal by arguing that Defendant Al-Rumaihi misrepresented his credentials and did not have authority to enter into the deal on behalf of Qatar. From the Court's Order to Deny Qatar's Motion to Dismiss:

Case 1:14-cv-06429-ER   Document 32   Filed 09/04/15   Page 1 of 29

Case 1:14-cv-06429-ER   Document 32   Filed 09/04/15   Page 9 of 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

1964 REALTY LLC,

Plaintiff,

– against –

CONSULATE OF THE STATE OF QATAR-
NEW YORK,

Defendant.

NEW YORK LAND SERVICES INC.,

Stakeholder Defendant.

OPINION AND ORDER

14 Civ. 6429 (ER)

Plaintiff maintains that it "has done what the law requires," specifically, "it pled that the Consul General . . . signed the Agreement on behalf of Defendant; that the Agreement was legally binding, constituted a commercial transaction, and explicitly waived sovereign immunity; and that Defendant breached the Agreement to Plaintiff's detriment." Pl.'s Mem. L. Opp., Doc. 25 at 1. In turn, Defendant argues that: (1) Al-Rumaihi lacked the authority to enter into the Agreement on behalf of the foreign state of Qatar; and (2) since Al-Rumaihi was neither authorized to engage in the commercial transaction of purchasing the Property or waive sovereign immunity by signing the Agreement, neither exception applies. Def.'s Mem. L. Supp. Mot. Dismiss, Doc. 22 at 9-11.

24.     Recently, Mr. Rumaihi's Wikipedia page reflects frequent edits removing negative history about this and other transactions. Under a cloud of this and other allegations, Mr. Rumaihi was recalled back to Doha, Qatar. But he would soon resurface.

25.     Qatar Investments claims it is capable of deploying $35-100 billion overseas in investments. However, its interactions with the Big3, which appears to be an exemplar of how it conducts business overseas, is a cautionary tale for others looking to do business with Qatar. Specifically, Defendants did not fund their obligations to the Big3 to the sum of a mere 5 million dollars, delaying payments in an effort to extract control of the league. When those efforts failed, they attempted other improper and coercive means of influence peddling to achieve their goals. When that failed, and Defendants conduct was exposed, Defendants sought to defame the Big3 leadership with ludicrous charges in order to destabilize the league so that their proxies could be installed instead.

26.     Whether by design or otherwise, Defendants' constant excuses for not paying – literally blaming their **"sinuses," "going on hikes,"** or that it had been a **"long day bro,"** in text messages – reflects an amateurish, undignified approach to business which is hard to believe is countenanced by a royal family such as the Al-Thani's. While Mr. Rumaihi flaunted his resources losing over $700,000 in a few hours of gambling after the BIG3

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 080

championship in Las Vegas last August, he somehow was still unable to muster up the $5 million that at that time was already two months overdue to BIG3.

27.     At a time when Defendants boast of hosting the 2022 World Cup, their tortious and reckless conduct directed at the Big3 and the basketballs stars and legends affiliated with the league, is potentially an ominous foreshadowing of what is to come.

### Ayman Sabi:

28.     Defendant Ayman Sabi is not a relative of the Qatari royal family, although he made claims to be a board member of the Qatar Investment Authority.  He also bragged of being a board member of an Abu Dhabi government fund, a claim he even acknowledged as putting him in a "strange" position since that would make him an advisor and agent to two countries on opposing sides of the blockade.  BIG3 former President and Commissioner, supported these claims as did Mr. Rumaihi.  Defendant Sabi indeed had at least a previously established business relationship with Defendants Al-Rumaihi and Al-Hamadi; two months after they were assigned to Vice Chairman and Chairman positions respectively in March 2017 of two Qatari food companies registered in Australia, they made Mr. Sabi a director.

29.     To the surprise of BIG3 executives who understood Mr. Sabi to be a Qatari national as told to them by the former BIG3 Commissioner and President, by Mr. Rumaihi, and by Mr. Sabi himself, Defendant Ayman Sabi is an *American citizen* who lives in Miami. In fact, although born in Tripoli, Libya in 1963, Defendant Sabi migrated to the United States and has been a resident here since at least the early 1980's.  He studied at North Carolina State University and in 1989 founded a company "Sabi International Developments Inc" in Raleigh, North Carolina which he then merged with "Medvast Inc" in 1993 and interestingly based its headquarters in Cyprus.

30.     Mr. Sabi later became the chief executive of a barbeque restaurant chain known as "Roadhouse Grill," which was the subject of a federal securities class action and was forced into involuntary bankruptcy in 2002.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 081

31.     Mr. Sabi claims to be connected with the rich and powerful internationally, but it appears his most substantial connection was his fortuitous encounter, following the bankruptcy of Roadhouse Grill, with Defendant Al-Rumaihi. Although the circumstances of how Defendants met are unclear, Mr. Sabi had a fellowship with Shlomy Alexander also from Miami. More interestingly, Shlomy is the father of Oren and Tal Alexander, the same brokers who "sold" the $100m townhouse to Defendant Al-Rumaihi in 2014.

32.     In another unexplained stroke of "luck," Defendant Sabi connected with Big3's former President and Commissioner who would vouch for him and bring him and his partners to the league as accomplished businessmen with international connections, stating that their involvement with the league would be critical for the Big3's expansion.

33.     His partners included the aforementioned Defendants Al-Rumaihi and Al-Hamadi, and they stated they also spoke for Defendant Sheikh Al Thani, half-brother of the Emir of Qatar himself, who would be able to provide capital and connections to greatly expand the Big3. While the league had just debuted successfully to an unexpectedly large audience of over 15,000 at New York's Barclay's Center and experienced more than three times the expected ratings on Fox Sports, the Qatari group made large promises including the ability to move quickly. What the former Commissioner and Mr. Sabi failed to disclose is that Mr. Sabi was in a secret, romantic relationship with the former Commissioner's sister.

34.     The former disgraced Commissioner emailed other Big3 executives following their successful debut: **"Ayman [Sabi] and his partner are seriously interested in taking the remaining equity available for BIG3. They add an incredible amount of value and would be strategic in the growth internationally."** Shortly thereafter, the Commissioner and President demanded (and received) a substantial "finder's fee" from Defendants for introducing these individuals to the league.

- 11 -
FIRST AMENDED COMPLAINT FOR DAMAGES
EXHIBIT A TO NOTICE OF REMOVAL
PAGE 082

35.     And while Mr. Sabi boasted of his vast connections and promised he would deliver international sponsors and develop international media relationships for Big3 with a focus on the Middle East and China, he failed to deliver on any of his claims.  In fact, Defendant Sabi was not even permitted to revisit China recently based on "issues" with his Visa. It has also been uncovered that despite holding himself as an agent of Qatar, Defendant Sabi is not registered under the Foreign Agents Registration Act (FARA).

36.     Instead of delivering value to the Big3, it is now clear that the Qatari group was unitarily focused on procuring influence in the United States for the Al-Thani regime through controlling a league made up of NBA stars and legends such as Clyde Drexler, Chauncey Billups, Corey Maggette, Jermaine O'Neal, and Dr. J among many others affiliated with the Big3.

### "Sport Trinity"

37.     Defendant Sabi introduced his partners to the Big3, including Defendant Al-Rumaihi and Defendant Al-Hamadi.  Defendant Sabi explained that Defendant Al-Rumaihi, Defendant Al-Hamadi, and their benefactors Defendant Sheikh Mohammed bin Sau Al Thani were members of the Qatar royal family and ran Qatar Investments.

38.     Defendant Sabi explained that he also represented Qatar and was an agent on their behalf, and that his partners were in direct discussions with Defendant Akbar Al Baker and, members of the royal family, the Qatar Investment Authority, and the Emir himself about their potential investment in the Big3.  Defendant Sabi stated that he and his partners loved basketball, especially the Emir.  Defendant Sabi stated that he and his partners wanted to invest in a successful sports league in its infancy, and to assist with the international growth of the league.

39.     In truth, it turned out that Defendants involvement with the Big3 was more about perceived influence in America and Defendants seeking to get positive public relations for Qatar.

40.     During the Big3 summer season and then beyond, it became apparent that Defendants were focused on improving the image of Qatar in light of the blockade and the now desperate need to improve rapidly deteriorating international relations beginning to create an existential threat to the small Gulf nation.  They also believed BIG3 could distract

- 12 -
EXHIBIT A TO NOTICE OF REMOVAL
PAGE 083

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

from Qatar's controversies surrounding it's 2022 World Cup.  Qatar has also experienced controversies surrounding its own basketball programs.  In 2011 amidst charges it "imported" players resulting in FIBA Asia suspending five of its players, Sheikh Saud bin Ali Al Thani was forced to resign from his post as Qatar Basketball Federation (QBF) President.  Defendants saw involvement in BIG3 as an opportunity to be heroes to the Emir for restoring prestige to Qatar and the Al Thani family in the sport of basketball.

41.     Going back to on or around July 7, 2017, Defendant Sabi sent the Big3 a term sheet for the purchase of equity in the company and requested a 30 percent stake in the Big3. The Big3 rejected, out of hand, the request for 30 percent of the company, but ultimately agreed to a much smaller, passive, minority stake in the company.  Thereafter, Defendants formed Sport Trinity LLC in Delaware, and entered into a Unit Purchase Agreement on or around July 14, 2017.  The terms of the Unit Purchase Agreement were simple.  Sport Trinity was to pay Big3 $11.5 million upon the signing of the Agreement.  Separately, Sport Trinity was to pay the Big3 an additional $9 million in sponsorship money over three years which Sport Trinity claimed it could easily obtain from sources such as airlines and media owned and controlled by the Al-Thani family.  Specifically, Defendant Sabi and Al-Rumaihi stated that Defendant Akbar Al Baker, as CEO of Qatar Airways, and in his personal capacity, was a source of funding for Sport Trinity and was involved in its decisions. Further, Defendant Sabi and Al-Rumaihi had the Big3 prepare investment material, including an "investor deck" which Defendants stated was needed to lock in the Qatar Airways sponsorship they promised.  Defendants stated that Defendant Mr. Al Baker had personally requested the investment material.  Here is the front page of the deck that Mr. Al Baker requested:



EXHIBIT A TO NOTICE OF REMOVAL
PAGE 084

42.     Instead of paying the full $11.5 million, Sport Trinity only paid $6.5 million and an additional $1 million in December 2017 and claimed that the rest of the money was "on its way" but was delayed due to certain transfer restrictions on Qatar.

43.     Big3 has since learned that Defendants intentionally failed to fully fund the Big3 as a part of a business strategy it deploys wherein it partially funds a company, withholds the remaining funds to deprive the company of critical operational support, and demands larger equity stakes and operational control in exchange for money it already owes – all the while seeking influence within the company by attempting to lavish others with gifts and bribes.  Alternatively, it is quite possible the wealth Defendants boast of is a mere façade.

### The Big3 Season

44.     The inaugural BIG3 season took place June 2017 through August 2017. Games were held across the United States.  Upon entering into the Unit Purchase Agreement, Defendants began attending games and demanded courtside seats for themselves, relatives, and friends.   As seen below, Defendants Al-Rumaihi and Defendant Sabi were frequently photographed courtside and invited the Big3 staff and players to party with them after games.

  

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 085

45.     Over time, the BIG3 investors and founders became uncomfortable with the assertive and in-your-face presence of these small minority stakeholders at games and at the hotels where players and staff stayed. Yet, efforts were made by Plaintiffs to do their best, at first, to be accommodating and cordial in the interest of maintaining a positive relationship with individuals originally perceived as legitimate investors.

46.     Following the season, in another bizarre turn of events, Defendant Al-Rumaihi moved his residence to Los Angeles, California, and rented two mansions – one in Venice peculiarly close (just blocks away) from where the founders of the BIG3 lived - and one in Beverly Hills where he would host parties for employees of BIG3 along with imploring the founders to attend "out of respect."  (The founders rejected invitations to Defendant Al-Rumaihi's Beverly Hills mansion, although other employees including the former Commissioner frequently attended).  Defendant Sabi also rented a Malibu residence where he and his girlfriend, Adrienne Mason (sibling and affiliate of former BIG3 commissioner) also took up residence.

### Collection Efforts and Failure to Pay

47.     During the season, and immediately thereafter, consistent and persistent efforts were made by Big3 founder and Plaintiff Jeff Kwatinetz to collect on the remaining millions of dollars owed.  Mr. Kwatinetz attempted to balance being polite to Defendants and to avoid the implication that the royal family could not afford to pay, with the need to protect the BIG3 and its investors who all fully funded their obligations.

48.     By way of just one, of many, examples of emails sent by Plaintiff Kwatinetz, on or around August 30, 2017, Plaintiff Kwatinetz emailed Defendant Al-Rumaihi that he was **"getting a little nervous"** that Defendants had not fully funded their contractual commitment.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 15 -
FIRST AMENDED COMPLAINT FOR DAMAGES

On Aug 30, 2017, at 1:33 AM, Kwatinetz, Jeff <jek@thefirm.la> wrote:

Ok fly safe and I hope your deal works out.

I realized this am that we still haven't gotten the last 5m funded either sol we really need that to happen. Getting a little nervous since we keep telling everyone NO when it comes to additional funding.

Had a great time hanging. We are going to finish the China deck tomorrow and get that going and Im working on getting the players all signed up for the next season and that is going well. Hitting the ground running!

From: Ahmed Al-Rumaihi [mailto:chi974@icloud.com]
Sent: Tuesday, August 29, 2017 3:30 PM
To: Kwatinetz, Jeff <jek@thefirm.la>
Subject: Re:

Hey bro,

I just boarded my flight to Doha, but I will be back by next Tuesday to NYC or LA. Please let me know if you want or need anything from Doha.

Sent from my iPhone

49.     Throughout the Fall 2017, Defendant Al-Rumaihi and Defendant Sabi continued to make excuses why they couldn't pay. Defendant Al-Rumaihi repeatedly blamed Defendant Sabi for the failure to pay; Defendant Sabi repeatedly blamed political issues affecting the Qatar Investment Authority for not being able to get access to the money.

50.     At all times, Defendants continued their flattery, congratulating the Big3 founders in emails and text messages about the remarkable success of the league. Defendants sent nothing but positive emails and messages about the leadership of the league.

51.     On or around November 2017, Defendant Al-Rumaihi made a final personal appeal to Plaintiff Kwatinetz to pay if Defendant Sabi couldn't: **"Look me in the eyes. I swear on my children's lives I will pay you personally by mid to end of January if Ayman [Sabi] doesn't pay."**

52.     In fact, Defendant Al-Rumaihi claimed that he would get the money directly from the Qatar royal family and Qatar Investments if Defendant Sabi and Sport Trinity were unable to pay. However, Defendant Sabi did not pay and Defendant Al-Rumaihi did not keep his word, despite his bizarre and gratuitous appeal on the lives of his children.

53.     Instead, Plaintiff Kwatinetz had to continue chasing down Defendants for payment until Plaintiffs simply had enough and refused to be victims of what was clearly a premeditated scam, or frankly, an inability of the Defendants to afford the share purchases or to make good on the $9 million in sponsorship money.

54.     Defendant Al-Rumaihi also began to demand that, despite the short window for planning such a major event, that BIG3 arrange for the 12-15 best BIG3 players to play

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 087

exhibition games in Doha, Qatar specifically in mid-February. Plaintiffs explained that players would not all be available and ready in training and to play but he would attempt to make it happen if a written offer was made, but also explained holding a one-off event would be a huge financial risk and that with more time several other locations could be secured making it financially worthwhile and logistically viable for the player and coaches. It was painfully clear that Defendants had no understanding of the logistics such an event would require. To no surprise given that Defendants still owed millions to BIG3 and had exhibited a clear pattern of lies to get what they wanted, no such written offer ever came.

55.     Plaintiffs Kwatinetz and Defendant Al-Rumaihi continued exchanging a series of text messages which show the varying, and at times peculiar and embarrassing, excuses made by Defendant Rumaihi (a purported member of the Qatar royal family) to avoid paying the BIG3. Notably, in the text messages, Defendant Al-Rumaihi concedes that he owed the BIG3 money since July 2017, that he clearly remembers his discussions promising to pay, but instead makes excuse after excuse.

56.     Specifically, on or around December 10 and 11, 2017, Mr. Kwatinetz attempted to set up a meeting with Defendant Al-Rumaihi who instead of substantively responding sent a picture of his teeth being worked on, apparently to conjure sympathy.



EXHIBIT A TO NOTICE OF REMOVAL
PAGE 088

57.     Further, instead of paying what he owed, Defendant Al-Rumaihi would send Mr. Kwatinetz news articles regarding political issues facing Qatar and would respond to important meeting requests by saying, **"long day bro. . ."**



58.     In addition to these excuses, Defendant Al-Rumaihi also frequently boasted of his friendship to Senator John McCain and throughout these months blamed not being able to have time to get the funds because he was purportedly busy visiting Senator McCain in the hospital.

59.     Further, on or around February 2, 2018, when Plaintiff Kwatinetz confronted Defendant Al-Rumaihi about how "disappointed" he was over Defendants failure to pay and how Plaintiff Kwatinetz **"was made to look really stupid with all the others as I gave my word to everyone [because] you gave me your word . . . and you and Ayman just disappeared,"** Defendant Al-Rumaihi responded *at 2:36 PM in the afternoon,* **"Literally just woke up. My sinuses are so bad. . ."**

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 18 -
FIRST AMENDED COMPLAINT FOR DAMAGES

60.    Again, on or around February 3, 2018, when Mr. Kwatinetz explained, **"I need to hear from you immediately or I am assuming that we are not resolving this. . ."** Defendant Al-Rumaihi emphasized that he was **"hiking,"** and that he was going to get ready for the memorial for the death of BIG3 player Rasual Butler he knew Mr. Kwatinetz was attending so they could speak there.  Defendant Al-Rumaihi responded, **"When we last spoke I told you we were resolving this."**

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 090

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

61.     Mr. Al-Rumaihi did not enter the memorial but instead waited in his Bentley until it was over and Mr. Kwatinetz and the other grieving attendees began to exit. Mr. Al-Rumaihi exited the car and approached Mr. Kwatinetz on the sidewalk in view of grieving friends and relatives to inform him all "would be worked out." When Mr. Kwatinetz asked if the remaining millions would be wired in to the BIG3 account by the following Monday as outlined in the legal correspondence, Mr. Al-Rumaihi said no and that he needed 25% of the league and Ayman to be COO and that Mr. Kwatinetz should show him "respect as a royal family member." Mr. Kwatinetz informed him that respect came with paying monies owed now over six months and refraining from constant lies. Al-Rumaihi became incensed and loudly screamed at Mr. Kwatinetz and threatened his life and his family noting "You don't know who I know in LA and what they're capable of. You should think of your safety and the safety of you and your family." Kai Henry intervened as many mourners started glaring at Mr. Al-Rumaihi, although Kai claimed to others not to have heard the content of the threats. Mr. Kwatinetz immediately left and drove home employee Angelica Cobb who he immediately told of the threats. Mr. Kwatinetz then called his wife as well as Ice Cube to inform them of the threats on his and his families lives. His wife was especially nervous at home with a newborn as Mr. Al-Rumaihi had maintained a residence a mere two blocks away from them. Mr. Kwatinetz hired security to protect himself, his family and his employees. He later learned that Mr. Rumaihi started to employ the services of numerous armed "security" who were seen on the premises of his Beverly Hills estate.

62.     In short, Defendant Al-Rumaihi never fulfilled his promise and contractual obligations. Defendant Sabi's communications with Plaintiff Kwatinetz are similar.

63.     Up until the BIG3 filed Arbitration and initiated its independent corruption investigation into the conduct by Defendants, Defendant Sabi's emails and text messages all included over-the-top, indulgent, praise about much he "loved" and "admired" Plaintiff Kwatinetz and Ice Cube.

64.     Defendant Sabi would frequently ask Plaintiff Kwatinetz how "daddyhood" was going as Plaintiff Kwatinetz's wife recently had a baby.

65.     Defendant Sabi would also tell Plaintiff Kwatinetz that he was going to Qatar, or as he called it "Q," to meet with his "best friends" from the royal family where he would

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 091

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

get the money they owed the BIG3 and where and when he would also get sponsors for the BIG3 – neither of which actually ever took place.

66.     For example, in text messages from November 1, 2017, Mr. Sabi stated in reference to his trip to Qatar: **"I'm heading to Q to wrap all shit up.  From all indications that should b done with all this coming week."**



67.     After exchanging pleasantries during Christmas 2017, Defendant Sabi then took the approach of ignoring phone calls and avoiding meetings and encounters with Plaintiff Kwatinetz.

68.     Between January 17, 2018, and February 1, 2018, Defendant Sabi ignored repeated phone calls from Plaintiff Kwatinetz to avoid paying what he owed the Big3.

69.     On or around February 1, 2018, when Plaintiff Kwatinetz expressed his frustration for being childishly ignored, Defendant Sabi responded with **"Hola Bro . . .Sorry for the delay, I have had overseas guests and family all this week.  I will call you soon."**

70.     After Plaintiff Kwatinetz stated that this was **"starting to get to a bad place,"** Defendant Sabi did not respond further. The following exchange took place:

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 092

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

Greetings bro, wishing you ▇▇, and ▇▇ a very Merry Christmas and Happy Holidays

Dec 26, 2017 at 3:52 PM to Ayman Sabi

Same to you my friend  I look forward to getting to know you more and more

Jan 17, 2018 at 11:07 AM from Ayman Sabi

Good luck at Dr's. My love to family. R u free for us to get together over coffee or drinks this evening or tomorrow ?

Jan 17, 2018 at 11:47 AM to Ayman Sabi

I have a premiere tonite for Cube's son.

Jan 17, 2018 at 11:50 AM from Ayman Sabi

K. Let me know about tomorrow

Feb 1, 2018 at 1:18 PM to Ayman Sabi

Bro really need to talk to you  Call me

Feb 1, 2018 at 1:30 PM from Ayman Sabi

Hola bro. Will do. Sorry for delay. I have had overseas guests and family all this week. Will call you soon.

Feb 1, 2018 at 6:13 PM to Ayman Sabi

This is starting to get to a bad place.  Not even getting a callback for a week  given the circumstances

Feb 1, 2018 at 8:26 PM to Ayman Sabi

Ok, I'm assuming you aren't calling tonight

## Big3 Initiates Legal Action Against Sport Trinity

71.     To protect their legal rights under the Unit Purchase Agreement, and to protect the rights of all of its other investors who fully funded and conducted themselves professionally and with dignity, Plaintiffs retained the services of a law firm which sent a demand letter to Defendants on February 2, 2018.

72.     Despite being repeatedly lied to, Plaintiffs in their February 2, 2018 letter still gave Defendants the opportunity to cure their breach and make the payment they owed since July 2017.  Plaintiffs provided wiring instructions to Defendant. Attached hereto as Exhibit "A" is a true and correct copy of the letter.

73.     Defendants, through their attorneys responded by letter on February 5, 2018, and brazenly requested a further extension of time, claiming that Defendants were in discussions with individuals at the BIG3.  Attached hereto as Exhibit "B" is a true and correct copy of the letter.

74.     On February 11, 2018, Plaintiff responded through counsel, providing the history of nonpayment by Defendants, stating that the BIG3 was not in fact in communication with Defendants, and that Plaintiffs were now compelled to file legal action against Defendants.  Attached hereto as Exhibit "C" is a true and correct copy of the letter.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 22 -
FIRST AMENDED COMPLAINT FOR DAMAGES

75.     On or around February 14, 2018, Big3 commenced an Arbitration in JAMS against Sport Trinity LLC, *In the Matter of Big3 LLC v. Sport Trinity LLC*, JAMS Case No. 1100089671.

### Investigation of Defendants

76.     After commencing Arbitration, the founders of BIG3 reached out to its then commissioner to inform him about the Arbitration and the indisputable evidence supporting it.  The since fired Commissioner stated he was "friends" with Defendant Sabi and Defendant Al-Rumaihi and thus "did not want to get in the middle of it."

77.     This statement by an employee getting the highest salary in the league plus stock was unsettling and raised significant alarm at the league offices, as the commissioner and highest paid employee of the BIG3 should not have had a conflicted allegiance when Defendants were refusing to pay and attempting to shakedown the league which, among other things, paid the commissioner's salary.

78.     Worse yet, with knowledge that the BIG3 was in Arbitration against Defendants, the since fired Commissioner took to Instagram in February and March 2018 to post images of himself with Defendants at the Beverly Hills Mansion they recently rented and to post selfies at the mansion, with hashtags such as **"More life less stress," "#family,"** and **"#makingmoneymoves"**

79.     Here are just some of the photos posted on Instagram:


434 likes
moneymase8 More life less stress....⚡
View all 12 comments
FEBRUARY 17


365 likes
lewisfamily9 Good Vibes With Good Friends.
#NbaAllStar #NbaAllStarWeekend
View all 8 comments
moneymase8 #family
FEBRUARY 18


139 likes
vinayvirmani_ A business man and an actor walk into a bar... #makingmoneymoves #basketball #nba #business #acting #springbreak #2018
View 1 comment
MARCH 8

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 23 -
FIRST AMENDED COMPLAINT FOR DAMAGES

80.     As a result of the Arbitration filed by the BIG3 against Sport Trinity, the photographs posted on social media after the Arbitration, and the statements made by the BIG3's former commissioner, the BIG3 initiated an independent investigation.

81.     The purpose of the independent investigation was so that the BIG3 could gather facts and provide staff and employees a fair process to explain and discuss their conduct and relationship with Defendants and the State of Qatar. On or around February 22, 2018, the investigator sent the following letter to various executives and employees, including former Commissioner:

82.     Although certain individuals declined interviews including Roger Mason and Kai Henry, it was later learned that Defendants sought improper influence in the league by (1) investing and attempted to invest in personal projects of now former employees, (2) sought to bribe former employees, (3) providing former employees with gifts including trips to St. Tropez and Ibiza, (4) providing the use of their $800,000 Bentley, (5) and using their Beverly Hill mansions for lavish parties.

### Defamation and Trade Libel Against Big3, its Founders, and its Players:

83.     Following the Big3 filing Arbitration and initiating an independent investigation, Defendants were removed from all rights and privileges in the league.

Regardless, Defendants continued to communicate with the now former employees, and sought to use these individuals (wittingly or unwittingly) to undermine the existing leadership in the league.

84.     Through its own investigation, the BIG3 obtained email records reflecting efforts to undermine the league.  During the week the independent investigator was intending on conducting interviews, it was learned that the former Commissioner took a trip to China for business that was not related to the BIG3.  He did not inform any of the executives at the BIG3, some of who had spoken to him while he was in China, of his whereabouts. While in China, he was in close communication with Defendant Sabi.

85.     The BIG3 also came to learn that a player in the league named Jerome Williams was also in China. At that time, Jerome Williams was an informal leader among the BIG3 players and communicated on behalf of the interests of players to management. Unlike the former Commissioner, Mr. Williams had no formal management role with the BIG3. Mr. Williams considered himself to be a good friend of the Commissioner at that time.

86.     On around March 7, 2018, while in China, the former Commissioner set up a phone call between Jerome Williams and Defendant Sabi.

87.     On the call, Defendant Sabi falsely claimed (1) he and his partners were the lead investors in the Big3, (2) he and his partners had already paid $21.5 million to the Big3, (3) he and his partners wanted to give millions of dollars more to the BIG3 and to charities affiliated with players, but that BIG3 and Jeff Kwatinetz and Ice Cube were preventing this from happening, (4) they had offered BIG3 $1.5 in additional funds for free to help promote the league during the All-Star weekend, and (5) he and his partners were now forced to sue the Big3 which could destroy the league. Defendant Sabi did not disclose that he and his partners actually owed the BIG3 millions of dollars and that, in fact, BIG3 had already filed an Arbitration based on the nonpayment against Defendant Sabi and his partners.

88.     In addition, Defendant Sabi (and, upon information and belief, with the support of his co-conspirator Defendants) having found himself with no influence in the league other than his connection to former Commissioner and other employees who were given gifts, sought to retaliate against the BIG3.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 096

89. Specifically, Defendant Sabi aided and abetted in the former Commissioner making the false allegation that Plaintiff Kwatinetz referred to African American players in the league *according to a former employee* as "Rich Nigg\*s." Defendant Sabi and former Commissioner recognized that such a statement was clearly false and defamatory, and thus they claimed that although *they never heard such a statement*, a "former employee" did.

90. The former employee they credited with hearing this was Kai Henry, who was plied with gifts and vacations by Defendants, rode around in Defendant's Bentley, and was a frequent visitor to Defendants Beverly Hills mansion. Further, after being terminated, former Commissioner and President repeated the allegation in a widely distributed press release where he claimed a "former employee" heard the statement.

91. After his call with Defendant Sabi, Jerome Williams was instructed by former Commissioner that they needed to call Chauncey Billups, a very influential retired NBA player who plays in the BIG3.

92. Like Mr. Williams, Mr. Billups had an important informal role in communicating concerns between players and management in the BIG3. The purpose of this call was to communicate all the false and defamatory information that Defendant Sabi had just told Jerome Williams to Mr. Billups, with the intent by Defendant Sabi to remove Plaintiff Kwatinetz and Ice Cube from their leadership roles.

93. Because Mr. Billups was busy, he requested that Jerome Williams send him an email of what Defendant Sabi had stated. Former Commissioner asked that he be blind-copied on the email to confirm what was stated was true, which he subsequently confirmed (falsely) to Jerome Williams after the email was sent.

94. Plaintiffs obtained a copy of the email during their investigation. Plaintiffs also obtained a declaration from Jerome Williams stating why he wrote that email and what former Commissioner and Mr. Sabi told him. Attached hereto as Exhibit "D" is a true and correct copy of the declaration of Jerome Williams, confirming the defamatory statements made to him by Defendants

95. Attached hereto as Exhibit "E" is a second declaration from Jerome Williams, wherein Jerome Williams – a friend of former Commissioner – confirms that he told him in

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

China that **Kai Henry** was the "former employee" who heard Plaintiff Kwatinetz call the BIG3 players "Rich Nigg*s."

96.     Plaintiff Kwatinetz never had and never would make such a statement; he is married to a woman who is half black, and he has devoted his life to civil rights and equal rights for all. Further, Mr. Kwatinetz has been a manager and trusted advisor to Ice Cube for decades who would not tolerate any form of intolerance.  Indeed, Defendant Sabi intended for the false allegations to do maximum damage and create a leadership vacuum in the league.

97.     However, in addition to the sheer absurdity of the allegations to everyone in the league and everyone who knows Plaintiff Kwatinetz, apparently Defendants and the former commisioner were not aware that Kai Henry denied he heard Mr. Kwatinetz make this statement.

98.     In fact, in text messages obtained between Kai Henry and Ice Cube, Kai Henry states, **"I never said that!!!"**   Here is the text message exchange between Ice Cube and Mr. Henry:



99.     Kai Henry did indeed have a conversation with Mr. Kwatinetz defending Mr. Al-Rumaihi and saying he was a "good guy" and that he was simply being lied to repeatedly by his partner Defendant Sabi so it wasn't Defendant Al-Rumaihi's fault.  At this time, not knowing Mr. Henry had been compromised by Defendants, Mr. Kwatinetz couldn't

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 098

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

04/10/2018

understand why a marketing employee not involved in BIG3 investor dealings would be inserting himself in to the conflict and asked him why Mr. Henry was doing so.

100.    Mr. Henry replied that Mr. Al-Rumaihi thought he had been pushed out because he was an Arab.  Mr. Kwatinetz explained that was absurd, that he had nothing against people of Arabic background (or any for that matter) and that in fact other investors in the BIG3 were of Arabic heritage and that Mr. Kwatinetz constantly defended one of his well-known friends, Roger Waters, for his pro-Arabic views and negative ones regarding Israel because he supported people's rights to have diverse views of all kinds.

101.    Mr. Kwatinetz did say to Mr. Henry that Defendants were "bad people" but only because they failed to pay the millions they owed Big3, harmed players and the league, and then lied about paying on the lives of their children.

102.    Mr. Henry blamed the non-payment on lies perpetuated by Mr. Sabi, but Mr. Kwatinetz then ended the conversation letting Mr. Henry know they expected to find out the truth as an independent investigation had just been opened and everyone would be questioned on their relationships with the Defendants.

103.    The very next day, Mr. Henry suddenly and suspiciously quit, blaming anti-Arab sentiments (falsely) of Mr. Kwatinetz.  Mr. Henry informed the independent investigator he would not be answering any questions.

104.    Mr. Henry was not only a 12 year friend, but had worked with, and around, Mr. Kwatinetz during that time. Mr. Henry had always been complimentary and positive about Mr. Kwatinetz, and attended Mr. Kwatinetz's wedding where he witnessed Mr. Kwatinetz's wife being walked down the aisle by her black father, and Mr. Henry had witnessed Mr. Kwatinetz fight on behalf of minorities for over a decade.

105.    In any event, it is clear that Mr. Henry and Mr. Mason were so compromised, they could not even get their story straight about which absurd and defamatory remark to make, without realizing the paper trail undermining the defamatory claims that was created.

106.    The defamatory statements not only damaged Plaintiff Kwatinetz, but were intended to and did in fact, cause severe and substantial damages to Ice Cube and all players of the league who were also referred to as being racist and hostile, which was sadly repeated

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 099

in the media. Thus, each Plaintiff, including all players of the BIG3, maintain causes of action against all Defendants for defamation.

## FIRST CAUSE OF ACTION
### Defamation
### (On Behalf of Ice Cube, Jeff Kwatinetz, and Players Against All Defendants )

107.   Plaintiffs claim that Defendants harmed them by making harmful and offensive statements that they were "racist," "hostile," and that Plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what it owed under the Unit Purchase Agreement.

108.   The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were racist, hostile, and used racial slurs.

109.   Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and the Big3, in that the Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities.  The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

110.   Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages. Plaintiff Kwatinetz specifically has represented minorities and diverse clients for his entire life and such defamation was intended to harm his ability to continue to do so.

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 100

## SECOND CAUSE OF ACTION
### Defamation Per Se
**(On Behalf of Ice Cube, Jeff Kwatinetz, and Players Against All Defendants )**

111.     Plaintiffs claim that Defendants harmed them by making harmful and offensive statements that they were "racist," "hostile," and that Plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what it owed under the Unit Purchase Agreement.

112.     The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were racist, hostile, and use racial slurs.

113.     Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and the Big3, in that the Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities.  The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

114.     Defendants conduct constitutes "Defamation Per Se," in that the defamatory statements related to matters incompatible with the business, trade, profession, or office of Plaintiffs. Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

## THIRD CAUSE OF ACTION
### Trade Libel
**(On Behalf of The Big3 Against All Defendants)**

115.     Plaintiffs claims that Defendants defamatory statements, as alleged above, would be clearly and necessarily understood to disparage the league and the services and products associated with the league.

116.     Specifically, Defendants and each of them, in the effort to undermine the current Big3 leadership, falsely and absurdly told players and third-parties that the league

- 30 -
FIRST AMENDED COMPLAINT FOR DAMAGES

was not being managed properly and not accepting their money, which is belied by the contemporaneous messages and records.

117.   Defendants published said defamatory statements to individuals and for mass consumption with a coordinated defamatory public relations campaign.

118.   Defendants intended to cause and did in fact cause financial harm with respect to Plaintiffs business relationships with third-parties.

119.   Defendants knew the statements they made and caused to be made were false and defamatory.

120.   Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the right of all Plaintiffs, thus giving rise to punitive damages.

## FOURTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relations

### (On Behalf of All Plaintiffs Against All Defendants)

121.   Defendants were aware of numerous contractual relationships Plaintiffs entered and/or intended to enter, including contracts with its former commissioner, investors, media contracts, and sponsorship opportunities with third-parties.

122.   Defendants made or aided and abetted in the making of defamatory statements of and concerning Plaintiffs with the intent of interfering and causing disruption with existing and prospective contracts entered by Plaintiffs, to which Defendants knew that disruption in the contractual relations was certain or substantially certain to occur.

123.   Plaintiffs were damaged in the disruption of their contractual relationships.

124.   Defendants were a substantial factor in causing Plaintiffs' harm.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 102

125.    Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.    For general damages in an amount to be determined by proof at trial;

2.    For special damages in an amount to be determined by proof at trial;

3.    For punitive and exemplary damages against the defendants;

4.    For pre- and post-judgment interest according to proof;

5.    For costs of suit, including reasonable attorneys' fees, statutory fees, and costs as provided by statute;

6.    Injunctive relief;

7.    For all other relief as this Court may deem just and proper.


DATED:  April 6, 2018                              GERAGOS & GERAGOS, APC

                                                   By:_____
                                                      MARK J. GERAGOS
                                                      BEN J. MEISELAS
                                                      Attorney for Plaintiffs

1

2                                  **<u>DEMAND FOR JURY TRIAL</u>**

3          Plaintiffs hereby demand a jury trial.

4

5    DATED:  April 6, 2018                          GERAGOS & GERAGOS, APC

6

7                                             By:_____

8                                                 MARK J. GERAGOS
                                                  BEN J. MEISELAS
9                                                 Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "A"

04/10/2018

# Morgan Lewis

**Benjamin P. Smith**
Partner
+1.415.442.1289
benjamin.smith@morganlewis.com

February 2, 2018

**VIA FEDEX AND ELECTRONIC MAIL**

Philip B. Schwartz, Esq.
Akerman LLP
350 East Las Olas Boulevard, Suite 1600
Fort Lauderdale, FL 33301
philip.schwartz@akerman.com

Re:   BIG3 Basketball, LLC Unit Purchase Agreement

Dear Mr. Schwartz:

We represent BIG3 Basketball, LLC ("BIG3").  We write to you pursuant to Section 7.3 of the BIG3 Basketball, LLC Unit Purchase Agreement ("Agreement") by and between BIG3 and Sports Trinity, LLC ("Trinity") dated July 14, 2017.

As Trinity knows, Trinity is in breach of Section 2 of the Agreement given its failure to pay BIG3 the complete up-front purchase price of $11,500,000 USD for Purchased Units in BIG3 by July 14, 2017 (exclusive of the "Additional Revenue Guarantee").  Instead, to date, Trinity has paid just $7.5 million of the required amount.  Despite repeated promises that Trinity's $4,000,000 USD shortfall would be forthcoming, including by wire transfer prior to January 31, 2018, no monies have been received.

Accordingly, BIG3 demands that Trinity remedy the shortfall by wiring the $4,000,000 past due and owing no later than midnight Eastern Time on Monday, February 5, 2018. BIG3 reserves all rights, and makes this demand without waiver of any rights or remedies.

Sincerely,

Benjamin P. Smith

cc:   Mark Geragos (via email)
      Jeff Kwatinetz (via email)
      O'Shea Jackson, Sr. (via email)
      Scott Karchmer (via email)

**Morgan, Lewis & Bockius LLP**

One Market
Spear Street Tower
San Francisco, CA  94105-1596        +1.415.442.1000
United States                        +1.415.442.1001

DB1/ 95627922.1

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 106

# Exhibit "B"

04/10/2018

# akerman

Philip B. Schwartz

Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999

T: 954 463 2700
F: 954 463 2224

February 5, 2018

**VIA E-MAIL AND FEDERAL EXPRESS**
Benjamin P. Smith, Partner
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105

RE:    BIG3 Basketball, LLC ("BIG3")
       Investment by Sport Trinity, LLC ("Sport Trinity")

Dear Mr. Smith,

I am in receipt of your letter of February 2, 2018. I have consulted with representatives of Sport Trinity, who have advised me of their ongoing discussions with BIG3 representatives regarding this investment and the future operation of BIG3. In order to allow that discussion to come to a conclusion, Sport Trinity requests that BIG3 agree to forbear on seeking to exercise any remedies with respect to the matter raised in your letter until Friday, March 9, 2018.

Please let me know if that is acceptable.

Sincerely,

Philip B. Schwartz

cc:    Ayman Sabi (*by e-mail*)
       Ahmed Al-Rumaihi (*by e-mail*)

04/10/2018

akerman.com
44018198;1

# Exhibit "C"

04/10/2018

# Morgan Lewis

**Benjamin P. Smith**
Partner
+1.415.442.1289
benjamin.smith@morganlewis.com

February 11, 2018

**VIA FEDEX AND ELECTRONIC MAIL**

Philip B. Schwartz, Esq.
Akerman LLP
350 East Las Olas Boulevard, Suite 1600
Fort Lauderdale, FL 33301
philip.schwartz@akerman.com

Re:   BIG3 Basketball, LLC Unit Purchase Agreement

Dear Mr. Schwartz:

I am in receipt of your February 5, 2018 letter requesting yet another extension of time for Sport Trinity LLC ("Trinity") to address its admitted and ongoing breach of contract, this time seeking a further extension of time until at least March 9, 2018 to simply *discuss* (rather than cure) Trinity's breach. BIG3 Basketball, LLC ("BIG3") is perplexed by this response given BIG3's demand that Trinity's breach be cured, following multiple extensions, no later than February 5, 2018. BIG3 cannot and will not grant yet another extension; it is done playing games.

Contrary to your letter, Trinity is not in communication with BIG3 or its authorized agents, and has no basis in law or fact to request a further extension of time to pay monies due and owing as of July 14, 2017. BIG3 graciously and in good faith granted Trinity nearly seven months of opportunity to cure its breach. BIG3 did so based upon numerous promises of Trinity representatives after July 14, 2017 that monies due and owing would be received. But, over and over again those promises were broken. BIG3 detrimentally relied on Trinity's repeated false representations.

Ultimately, in or around November 2017, and in response to BIG3 Member Jeff Kwatinetz's demand for payment from Trinity before year end, and during an in-person meeting with Trinity's Ahmed Al-Rumaihi, Mr. Al-Rumaihi said to Mr. Kwatinetz, "Look me in the eyes. I swear on my kid's lives that you will have your money by mid-January to late-January [2018] at the latest." Mr. Al-Rumaihi then proceeded to blame Trinity's Ayman Sabi for Trinity's failure to fund, but promised to do so himself if Mr. Sabi did not. Based on Mr. Al-Rumaihi's representations and pleading, Mr. Kwatinetz, although stating

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596     ☎ +1.415.442.1000
United States     ☎ +1.415.442.1001

DB1/ 95659748.2

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 110

Philip B. Schwartz, Esq.
February 11, 2018
Page 2

that BIG3 had no legal obligation to further extend Trinity's funding deadline, graciously (albeit reluctantly) agreed to do so. However, Mr. Kwatinetz made it clear that January 31, 2018 would be the final deadline. Mr. Kwatinetz also reminded Mr. Al-Rumaihi of Trinity's obligation to secure $9 million in sponsorship deals, a separate obligation of Trinity under the Unit Purchase Agreement.

Despite these representations, Trinity again failed to pay on or before January 31, 2018, causing further substantial harm to BIG3. Thus, on February 2, 2018, BIG3 again notified Trinity, through my letter, of its material breach and warned that if amounts due and owing were not wired and received by BIG3 by midnight EST Monday, February 5, 2018, BIG3 would pursue all available remedies. Rather than wire the overdue amounts, Trinity's representatives made unconscionable demands for additional BIG3 Units, as well as operating changes. Specifically, on February 3, 2018, at the memorial for a deceased friend of Mr. Kwatinetz and player in the BIG3 league, Mr. Al-Rumaihi made still more demands of Mr. Kwatinetz, contradicting other demands made by Mr. Sabi to BIG3's CFO, and screamed at Mr. Kwatinetz in front of mourners and threatened that "you don't know who I know and what I'm capable of." BIG3 takes these threats seriously.

As noted in my prior correspondence, Trinity has left BIG3 no choice but to pursue all rights and remedies under its contract with Trinity, including but not limited to termination of Trinity's claimed interest in BIG3 given its failure to pay for that interest (it has no interest), and pursuit of all amounts remaining due under the contract, including sponsorship monies. Please let us know if you will accept service of BIG3's Notice of Initiation and Demand for Arbitration. Again, BIG3 reserves all rights and waives no rights.

Sincerely,

Benjamin P. Smith

cc:   Mark Geragos (via email)
      Jeff Kwatinetz (via email)
      O'Shea Jackson, Sr. (via email)
      Scott Karchmer (via email)

04/10/2018

DB1/ 95659748.2

# Exhibit "D"

04/10/2018

I JEROME WILLIAMS, DECLARE:

I am a retired professional NBA player and I am currently a player with the Big3.

On, or around March 7, 2018, I was in China with Roger Mason Jr. On this date, and previously, Mason told me that Ayman Sabi was the lead investor in Big3, that Ayman Sabi and his investment group invested and paid $21 million to the Big3 and that the Sabi investment group was the lead investor in the Big3.

Mason told me that the Sabi investment group, which included Ahmed Al-Rumaihi, offered to pay charity $1.5 million and Big 3 interfered with and prevented this donation from being made. I suggested Shooting For Peace and they said yes. Mason told me that the Sabi investment group offered $1.5 million in addition to the $21 million they already paid for public relations around the 2018 NBA All Star Game but that the Big3 refused to take this money. Mason also told me that the Sabi investment group had made a lucrative deal for players (approximately 2.5m total, $80,000 minimum each player) in Dubai but that the Big3 prevented this from happening.

Mason also told me that individuals from the Big3 were wasting Big3 player money by, among other things, taking private jets.

Mason had me call Sabi who confirmed what Mason told me about Sabi and the Sabi investment group's position as lead investors in Big3 and all of the statements Mason made, including their financial contributions to the league.

Mason told me that Sabi and his investment group owed the Big3 money and wouldn't pay because the BIG3 weren't running the business right. Mason never told me that the Big3 filed for an Arbitration against Sabi and his investment group. Mason told me that the only legal claims that existed was that Sabi was going to sue Big3 and that this would destroy the league.

Rather, Mason told me that Sabi and the Sabi Investment group were planning to sue the Big3 and that the Sabi lawsuit would destroy the league. Mason told me we needed to do something immediately to save the league.

On or around March 7, 2018, Mason told me that we needed to speak with Chauncey Billups, who is a friend, and a retired professional NBA player who plays in the Big3 who I understood to have an informal leadership role (as I myself have) in communicating important information between players and the Big3 management.

On or around March 7, 2018, Mason, myself, and Mr. Billups had a three-way conference call so that Mason and I could convey the information about the Sabi investment group that Mason told me as well as the other issues outlined above in this declaration that Mason told me. Mason told me if we did not act fast and convey this information to other players, the Big3 would be destroyed.

On the call Mr. Billups said he was busy and asked that we put everything we were saying in writing.  This is why I sent the email to Mr. Billups on March 7, 2018, which is attached to this declaration as Exhibit "A."  I blind copied Mason on the email to make sure that I had accurately conveyed all of the facts that Mason told me about Sabi and the Big3.

After I sent the email I spoke with Mason to confirm that my email was accurate.  Mason stated that the email was completely accurate but stated that I should not have blind copied him using his Big3 email account.

I DECLARE THE FOREGOING TO BE TRUE AND CORRECT UNDER PENALTY OF PERJURY

DATED: MARCH 13, 2018

JEROME WILLIAMS

04/10/2018

## EXHIBIT "A"

**From:** Jerome Williams [mailto:jyd1313@yahoo.com]
**Sent:** Wednesday, March 07, 2018 4:33 PM
**To:** Chauncey Billups
**Cc:** Jerome "JYD" Williams
**Subject:** BIG3 Issues: That need Answers

CB,
Here is what needs to be addressed with Jeff & Cube!! Let's coordinate a time that works best in the next couple of days..

BIG3 Issues: That need Answers



1.  Jeff needs to step aside from business operations of Big3 or the league will go down in law suits!!



- I spoke to Ayman (BIG3 lead Investor $21 Million) (as I do every so often) and I touched base with him & he asked me about how I felt about Roger being Commissioner of Big3?? He then expressed that the investors wanted to contribute $1.5 Million to our Shooting for Peace efforts for 2018 and was told not right now by Jeff that they needed it for operations?? Then he said that he had setup a sponsored AllStar game in Dubai that would have paid players $80,000 minimum for 2-days and it was turned down?? Then He also said Kai was let go from BIG3 and he might have something with Iverson?? Then he said that they were only going to continue on with BIG3 if Jeff steps aside....???

So things with BIG3 are at a Crossroad
Players & Coaches have heard bad things about their colleagues and feel used & not compensated for their brand equity!!

- Commissioner Roger Mason has to be involved with day to day operations. The players are losing trust for Jeff & Ice Cube based on their playoff checks arriving late and now jersey royalty checks still haven't arrived. And now Ayman's situation could be real bad for the league. Allen Iverson Jersey sold out and is the only player to receive a check. Need to see financials for this???
- BIG3 BOD?? What players represent us on the Board; who is responsible for approving all basketball related decisions? Players are requesting that there will always be Roger, Chauncey, Jerome and another Captain be named to the BOD. This would need to be done ASAP with a follow up BOD meeting done to inform us of all protocol, business process and operations. In addition to financial updates with regards to royalties, sponsors, salaries, budgets 2018 etc. for approval.
- BIG3 Community initiative: Shooting for Peace in schools program partnered with NBRPA was started and there hasn't been any correspondence to teams with this regard?? AllStar weekend launched

and P/R follow up was lack. $1.5 Million for initiative was proposed by investors...

Sent from my iPhone

# Exhibit "E"

I, JEROME WILLIAMS, DECLARE:

I am a retired professional NBA player and I am currently a professional player with the Big3.

It was Roger Mason Jr. that told me Kai had told him that Jeff referred to the BIG3 players as "Rich niggers."  He said this when I was in China with him the week of March 7, 2018.

I declare the foregoing to be true and correct under penalty of perjury.

Dated:  March 13, 2018

_____

Jerome Williams

04/10/2018

NOTICE SENT TO:

Geragos, Mark J., Esq.
Geragos & Geragos, APC
644 S. Figueroa Street
Los Angeles,     CA  90017-3411

FILE STAMP **FILED**
Superior Court of California
County of Los Angeles

APR 06 2018

Sherri R. Carter, Executive Officer/Clerk
By_____Deputy

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | CASE NUMBER |
|---|---|---|
| BIG3 LLC ET AL | Plaintiff(s), | BC700897 |
| VS. | | |
| AHMED AL-RUMAIHI ET AL | Defendant(s). | **NOTICE OF CASE MANAGEMENT CONFERENCE** |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for  September 19, 2018  at  9:00 am  in  Dept. 16  at 111 North Hill Street, Los Angeles, California  90012.

**NOTICE TO DEFENDANT:**     **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date:  April 6, 2018 

**Rita Miller**
_____
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[X] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing the complaint.

Date:  April 6, 2018 

Sherri R. Carter, Executive Officer/Clerk

by _____, Deputy Clerk
**CEDRIC CATERIO**

LACIV 132 (Rev. 07/13)                                          Cal. Rules of Court, rule 3.720-3.730

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 118

## Order Setting Order To Show Cause

In addition to the Case Management Conference, this matter is set on the same date for an **Order To Show Cause Re Compliance With Requirements For Proof Of Service And Obtaining Entry Of Default and Default Judgment Pursuant To California Rule Of Court 3.110.**

Please note that Rule 3.110 requires that the complaint be served within 60 days after filing, that the cross-complaint be served on new parties within 30 days after filing, that a request for entry of default be filed within 10 days after the time for service of a responsive pleading has elapsed, and that a request for entry of default judgment be filed within 45 days of entry of default. The court will not impose sanctions at the hearing.

However, the parties will be required to show cause at the hearing why they have not complied with the foregoing deadlines, if they have not.

If the parties have complied with the foregoing deadlines, thank you and please disregard this notice.

# EXHIBIT B

1   Christopher Lovrien (State Bar No. 230546)
    Brian D. Hershman (State Bar No. 168175)
2   JONES DAY
    555 South Flower Street
3   Fiftieth Floor
    Los Angeles, CA  90071.2300
4   Telephone:   +1.213.489.3939
    Facsimile:    +1.213.243.2539
5   Email:          bhershman@JonesDay.com

6   Attorneys for Defendants
    AHMED AL-RUMAIHI AND AYMAN SABI
7

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10

| | |
|---|---|
| 11  BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual, | **CASE NO. BC700897** |
| 12 | |
| 13              Plaintiffs, | Assigned for all purposes to Hon. Rita Miller Dept. 16 |
| 14        v. | **NOTICE TO ADVERSE PARTY AND STATE COURT OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT** |
| 15  Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority; Does 1-100, | |
| 16 | |
| 17 | |
| 18              Defendants. | Complaint Filed: April 5, 2018 FAC Filed: April 6, 2018 |

19

20           <u>**NOTICE TO ADVERSE PARTY AND STATE COURT OF REMOVAL OF CIVIL**</u>
                          <u>**ACTION TO FEDERAL COURT**</u>
21
                Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants Ahmed Al-Rumaihi and
22
     Ayman Sabi hereby give notice of the removal of the above-captioned action to the United States
23
     District Court for the Central District of California.   A copy of the Notice of Removal is attached
24
     hereto as Exhibit 1.
25

26

27

28

1    Dated: April 25, 2018

2

3                                    JONES DAY

4                                    By: _____
                                           Brian D. Hershman

5                                    Attorneys for Defendants
                                     AHMED AL-RUMAIHI AND AYMAN SABI

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    2

EXHIBIT B TO NOTICE OF REMOVAL
PAGE 122