Christopher Lovrien (State Bar No. 230546)
Email: cjlovrien@jonesday.com
Brian D. Hershman (State Bar No. 168175)
Email: bhershman@jonesday.com
Erica L. Reilley (State Bar No. 211615)
Email: elreilley@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: +1.213.489.3939
Facsimile: +1.213.243.2539

Attorneys for Defendants
AHMED AL-RUMAIHI and AYMAN SABI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG3 LLC, a limited liability company; O'SHEA JACKSON A/K/A ICE CUBE, an individual; and JEFF KWATINETZ, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>AHMED AL-RUMAIHI, an individual; FAISAL AL-HAMADI, an individual; AYMAN SABI, an individual; SHEIKH ABDULLAH BIN MOHAMMED BIN SAU AL THANI, an individual and as CEO of Qatar Investment Authority; and DOES 1 - 100,<br><br>Defendants. | No. 2:18−cv−3466 DMG (SKx)<br><br>Assigned for all purposes to Hon. Dolly M. Gee<br><br>**EXHIBITS A – P TO DECLARATION OF BRIAN D. HERSHMAN IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16**<br><br>Hearing Date: June 1, 2018<br>Hearing Time: 9:30 a.m.<br>Courtroom: 8C |

---

**INDEX OF EXHIBITS TO DECLARATION OF BRIAN D. HERSHMAN**

## INDEX OF EXHIBITS

| Document Description | Exhibit |
|---|:---:|
| Email Exchange with Plaintiffs' Counsel Regarding Meet and Confer | A |
| Demand for Inspection of Books and Records of BIG3 Basketball, LLC | B |
| Complaint, *Roger Mason v. BIG3 Basketball, LLC*, Case No. 2018-0263 | C |
| VIBE, "Checkmate: Ice Cube Calls Out Trump & Qatar Big3 Investors In Full-Page Ad" | D |
| TMZ Sports, "Ice Cube Stunts on Rich Qataris He's Suing 'Stay Out of American Sports'" | E |
| IMDb Biography on Ice Cube | F |
| Ice Cube's Twitter feed and Facebook page | G |
| Deadline, "'Straight Outta Compton' Producer Ice Cube on Making Of An Unlikely Oscar Contender" | H |
| Variety, "'Straight Outta Compton' Tops $200 Million in Worldwide Box Office" | I |
| News section of Ice Cube's website | J |
| Billboard, "Jason Sudeikis & Ice Cube Hang on 'Corden,' 30 Years After N.W.A. Landed the Actor in Detention" | K |
| ESPN, "Ice Cube excited for BIG3's second season" | L |
| ET Canada, "Ice Cube Talks New Music, Says He Would Never Run For Office On 'Ellen'" | M |
| The Washington Post, "Ice Cube has a grand wish list for the Big3 next year: Kobe Bryant" | N |
| ESPN Radio, "Rapper Ice Cube chats with Terrika Foster-Brasby about Big 3, a 3-on-3 professional basketball league for former NBA players" | O |
| Billboard, "Ice Cube Talks BIG3, 'Death Certificate' Turning 25 & Kanye's 'Jesus Walks' Being 'One of the Most Radical Songs in Hip | P |

| | |
|---|---|
| Hop'" | |
| IMDb Biography on Jeff Kwatinetz | Q |
| Variety, "The Firm Founder and CEO Jeff Kwatinetz Seeks $10 Million for One-Bedroom Lower Manhattan Loft" | R |
| Ranker, "Famous Friends of Jeff Kwatinetz" | S |
| The Hollywood Reporter, "Steve Bannon's Former Hollywood Partner Breaks Silence: 'He's Not a Racist'" | T |
| brandchannel, "A League of Their Own: 5 Questions with Big3 Co-CEO Jeff Kwatinetz" | U |
| New York Times, "Departures Cool Off Agency's Hot Start" | V |
| Los Angeles Times, "Soap opera producer Prospect Park files for bankruptcy protection" | W |
| Variety, "Firm backs down on Sillerman suit" | X |
| The Washington Post, "Firm Believer" | Y |
| Vanity Fair, "Ovitz Agonistes" | Z |
| New York Daily News, "Hollywood madam Michelle Braun cozies up to federal agents" | AA |
| Variety, "Talent Manager Jeff Kwatinetz Lists Malibu Manse" | BB |
| News section on BIG3's webpage | CC |
| BIG3's Twitter | DD |
| Forbes, "Commissioner Roger Mason Jr.'s Wish List for BIG3 Includes Kobe Bryant, Tim Duncan, Tray McGrady" | EE |
| The Washington Post, "Roger Mason Jr. says Big3 co-owner made him a 'scapegoat for his own wrongdoing'" | FF |
| New York Times, "Clyde Drexler Named Commissioner of Big3 League" | GG |
| USA Today, "Big3 Draft: Every round, every pick and what each player | HH |

| | |
|---|---|
| brings to the 3-on-3 league" | |
| CBSSports.com, "2018 BIG3 rosters: Latest NBA players who have committed to play this summer" | II |
| New York Post, "Ousted commissioner says BIG3 founder fostered racist culture" | JJ |
| TMZ, "Roger Mason Big3 is Hostile, Racist … Big3 Calls BS," | KK |
| Denver Post, "Roger Mason Jr. calls Big3 "hostile and racist" after being fired for alleged corruption" | LL |
| Business Insider, "Ice Cube's intriguing new 3-on-3 league built on former NBA players may face 2 simple problems" | MM |
| New York Post, "Calls for Texans owner's removal from NFL: 'Donald Sterling-esque'" | NN |
| USA Today, "Facing misconduct investigation, Panthers owner selling team" | OO |
| Sports Illustrated, "Red Sox Petition Boston to Remove Racist Former Owner's Name from Fenway's Street" | PP |
| Star-Telegram, "Mavericks suspend team's general manager of gaming for racist tweet" | QQ |
| The Guardian, "LA Clippers owner allegedly says: 'Don't bring black people to my games'" | RR |
| New York Post, "The Big3 is shutting its lips and slapping Iverson on the wrist" | SS |
| USA Today, "Fox Sports extends agreement with Big3 to next season" | TT |
| Complex, "Ice Cube's Big3 Faces $250 Million Lawsuit for Allegedly Stealing Players and Ideas From Similar League" | UU |
| Black and Teal, "Jacksonville Jaguars: Too far mismanaged for greatness?" | VV |

INDEX OF EXHIBITS TO DECLARATION OF BRIAN D. HERSHMAN

| | |
|---|---|
| Bleacher Report, "The 10 Worst-Run NFL Franchises" | WW |
| Fanrag Sports Network, "Mismanagement and time have made Blackhawks a poor team" | XX |
| The Washington Post, "In the NHL lockout, the owners have it all wrong" | YY |
| Cleveland Cavaliers, "LeBron James paints picture of Cavs' roster mismanagement" | ZZ |
| CBS, "The Mismanagement of the Knicks Franchise" | AAA |
| The Wall Street Journal, "Major League Baseball: A Case Study in Mismanagement" | BBB |
| Rolling Stone, "The 15 Worst Owners in Sports" | CCC |
| ESPN home page | DDD |
| Fox Sports home page | EEE |
| Sports Illustrated home page | FFF |
| CBSSports.com home page | GGG |

# EXHIBIT A

**Collymore, Stephanie J.**

**Subject:** FW: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

**From:** Ben Meiselas <meiselas@geragos.com>
**Sent:** Saturday, April 28, 2018 10:28 AM
**To:** Hershman, Brian D. <bhershman@JonesDay.com>
**Cc:** Gaby Preciado <Gaby@geragos.com>; Lovrien, Christopher <cjlovrien@jonesday.com>; Mark Geragos <mark@geragos.com>
**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Thanks Brian look forward to meeting and conferring on the date I suggested. Talk then. Have a great weekend.

On Sat, Apr 28, 2018 at 10:21 AM Hershman, Brian D. <bhershman@jonesday.com> wrote:

Ben,

Once again your recitation of the "facts" is objectively and verifiably inaccurate.

1. The defendants removed the case to federal court on *Wednesday (April 25, 2018),* not Thursday as you assert. *See* Dkt. Entry #1. On that same day (April 25), I reached out by phone to meet and confer on our intended responsive pleadings, and, when I did not receive a response, sent a detailed email which satisfied our meet and confer obligations under Local Rule 7-3. *See Masimo Corp. v. Mindray DS USA, Inc.*, No. SACV1202206CJCJPRX, 2013 WL 12131174, at *2 (C.D. Cal. Nov. 15, 2013) (concluding that anti-SLAPP motion was not procedurally barred for failure to meet and confer prior to filing of motion because an email exchange satisfied Local Rule 7-3's "meet and confer" requirement.). Nevertheless, I offered to make myself available at your convenience to discuss our intended motions.

2. I did not "demand" that you meet and confer with me on Friday night at 9 p.m. I did "offer" to meet and confer with you at that time. I *also* offered to meet and confer with you at your convenience on April 25, April 26, April 27, April 28, and April 30. It is not acceptable, nor consistent with your good faith obligation, for plaintiffs' counsel to refuse to meet and confer at *any time* in a one week period, and thereby attempt to artificially delay defendants' ability to accomplish dismissal of a patently deficient pleading. That is particularly true where, as here, the meritless lawsuit seeks to chill a defendant's constitutionally protected speech, and is subject to the Anti-SLAPP statute (California Code of Civil Procedure section 425.16, et seq.).

3. You are uniquely positioned to resolve this dispute (and narrow the issues) by dismissing your clients' meritless lawsuit. Your reference to the removal date is both inaccurate and a red herring. The relevant dates are April 5 and 6, when plaintiffs filed their complaint and first amended complaint. At that time, you should have known that the lawsuit was meritless and a publicity stunt to give cover to the defamatory statements about our clients. You should

have done due diligence before filing the lawsuit. Nevertheless, in the meet and confer email we sent on April 25 we clarified for you the numerous deficiencies in your operative pleading. I have yet to hear *any* substantive response. If you do not voluntarily dismiss your lawsuit, we will move to have the Court dismiss it next week.

4.    With respect to plaintiffs' intended remand/discovery motion, I have explained why that motion is invalid in my April 27, 2018 email. Again, I have not heard any substantive response or explanation from plaintiffs as to why they have a good faith basis for such motion given the legal analysis I outlined. Nevertheless, you control when you choose to file such a motion, if that is the way you wish to proceed. I will make myself available on May 2 (as you request), or before or after if that is your preference.

Thank you.

**From:** Ben Meiselas <meiselas@geragos.com>
**Sent:** Friday, April 27, 2018 9:47 PM

**To:** Hershman, Brian D. <bhershman@JonesDay.com>
**Cc:** Gaby Preciado <Gaby@geragos.com>; Lovrien, Christopher <cjlovrien@jonesday.com>; Mark Geragos <mark@geragos.com>
**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Brian. Your clearly don't want to meaningfully meet and confer.

Here are the facts;

You removed the case YESTERDAY to federal court (4/26/18);

TODAY (4/27/18), 1 day after the case was removed to Federal Court, I have responded with my availability next week to meet in person or schedule a call, and requested we also meet and confer on our request for limited jurisdictional discovery and motion for remand.

You are demanding I meet and confer with you now on Friday night at 9:00 PM, instead which I am not going to do since I am with my family now for the first time in a few weeks. So I have reserved  next Wednesday (following my depositions on Monday / Tuesday) to devote appropriate and meaningful time to a meet and confer with you. If you have alternative time on Thursday I can meet and confer then although I will be in Texas. I will not be available next Friday since I am in a depositions.

My suggested meet and confer schedule would have us in compliance with the local rules within 7 days of your removal which is appropriate and exceedingly expeditious

I do not believe in a "check the box" meet and confer, nor do the rules countenance that approach. I take my meet and confer obligations seriously and have thus made this proposal in good faith. Hopefully we can narrow issues for the court. To the extent you want to operate outside the rules, we will respond accordingly.

Thank you.

On Fri, Apr 27, 2018 at 8:59 PM Hershman, Brian D. <bhershman@jonesday.com> wrote:

Ben – your characterization is highly inaccurate.  I called on Wednesday April 25, 2018 to meet and confer on our motions, but received no response.  I then sent an email later on April 25, 2018 detailing our position and offering to meet and confer at your convenience – again no response.  I received no response on Thursday, and so Friday reached out yet again.  I finally received an email on Friday afternoon, but you failed to address our intended motions (instead suggesting that we meet and confer on a motion that *plaintiffs* intended to bring).  The entire purpose behind California Code of Civil Procedure section 425.16, et seq. is to empower defendants to expeditiously dispose of meritless lawsuits based on constitutionally protected speech so as to avoid a chill on such speech.  Your continued refusal to engage on this issue and instead seek to delay resolution is not consistent with the Legislative purpose.  *See Masimo Corp. v. Mindray DS USA, Inc*., No. SACV1202206CJCJPRX, 2013 WL 12131174, at *2 (C.D. Cal. Nov. 15, 2013) (concluding that anti-SLAPP motion was not procedurally barred for failure to meet and confer prior to filing of motion because an email exchange satisfied Local Rule 7-3's "meet and confer" requirement.).  Instead of wasting time writing inaccurate emails, I would encourage you to pick up the phone and call me tonight, tomorrow or Monday.  I will provide a phone number for you to do so.  If you choose not to do so, we request that you include this correspondence in any frivolous motion to strike.

With respect to your intended motion, I have not declined to meet and confer.  Rather, I have explained our position (something the plaintiffs have never done), expressed a willingness to meet and confer further to the extent you believe it is necessary, but expressed the defendants' view that further discussion was not necessary given plaintiffs' inability to address threshold issues.  I encourage you to re-read my email as our position was  clear (and so you don't misstate it again).  As I indicated feel free to call me at your convenience.

**From:** Ben Meiselas <meiselas@geragos.com>
**Sent:** Friday, April 27, 2018 8:35 PM

**To:** Hershman, Brian D. <bhershman@JonesDay.com>

**Cc:** Gaby Preciado <Gaby@geragos.com>; Lovrien, Christopher <cjlovrien@jonesday.com>; Mark Geragos <mark@geragos.com>

**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Thanks Brian we will take this as you have rejected our request to meet and confer pursuant to the rules.

Once again, we reiterate that we are available for a call or in person Wednesday to meet and confer. We think it is prudent that the parties engage meaningfully by phone or in person as the rules require.

Howver, to the extent you file before then, please note we will seek to strike the pleading you file for failing to meet and confer.

I have never dealt with an opposing counsel who refuses to meet and confer and accommodate an opposing connsels schedule for a few days.

But if you are refusing to meaningfully meet and confer and reject the local rules, so noted and we will notify the Court of your approach.

Thank you sir.

On Fri, Apr 27, 2018 at 8:23 PM Hershman, Brian D. <bhershman@jonesday.com> wrote:

> Ben,
>
> For the reasons identified in our removal petition including (1) BIG3 itself identified Mr. Al-Rumaihi as domiciled in Qatar in its pleading in the *Champions* action; (2) Mr. Al-Rumaihi's B-1 Visa status means that his residence in the US

does not affect diversity, even if Mr. Al-Rumaihi did reside in California; and (3) Mr. Al-Rumaihi does not, in any event, reside in California, the defendants do not believe any jurisdictional challenge by plaintiffs gets off the ground, nor do we believe jurisdictional discovery is warranted. To the extent plaintiffs seek to challenge removal (or seek discovery), you can consider this our meet and confer on the issue and move forward with any pleadings you believe are warranted. To the extent you would like to discuss this further, I am available tomorrow or all day Monday; however I do not believe further discussions are necessary or would be fruitful.

With respect to defendants' motion to strike under California Code of Civil Procedure section 425.16, et seq., and motion to dismiss under Rule 12(b)(6) for failure to state a claim, my email of Wednesday set forth in detail the basis of our motions. Plaintiffs have not engaged on the issue, nor have they identified any issue that they wish to discuss further. Therefore, we intend to move forward with both motions next week. To the extent you would like to discuss the plaintiffs' position, I am available tomorrow or all day Monday.

Thank you.

**From:** Ben Meiselas <meiselas@geragos.com>
**Sent:** Friday, April 27, 2018 2:00 PM

**To:** Hershman, Brian D. <bhershman@JonesDay.com>

**Cc:** Lovrien, Christopher <cjlovrien@jonesday.com>; Mark Geragos <mark@geragos.com>; Gaby Preciado <Gaby@geragos.com>

**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Why don't we schedule a call early next week where we can meet and confer regarding our jurisdictional challenge, as well as what is you want to file. We believe the case has not been properly removed with respect to Mr. Al-Rumaihi. We can set out those issues on our call. Obviously, jurisdiction needs to be addressed first.

Since the Complaint, and First Amended Complaint were just filed, it is still out for service with respect to the other Defendants, which we hope to have next week. We could aim to streamlining the responsive pleadings for the Court to ensure judicial efficiency.

I've copied Gaby to arrange the call. The best day for me is probably Wednesday in the AM given the other depositions I have that week. '

Let's coordinate the best time we can all get on a call to ensure an efficient and comprehensive meet and confer.

Thank you Brian.

On Fri, Apr 27, 2018 at 1:46 PM, Ben Meiselas <meiselas@geragos.com> wrote:

Thanks Brian. We think the case is improperly removed so we intend to challenge the removal and will file a request for jurisdictional discovery. Would you be agreeable to limited jurisdictional discovery? Thank you.

On Fri, Apr 27, 2018 at 1:42 PM Hershman, Brian D. <bhershman@jonesday.com> wrote:

We did. And now we are planning to file our responsive pleading. And are attempting to meet and confer in accordance with the local rules before we do so. Please let us know your availability. Thank you.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Ben Meiselas <meiselas@geragos.com>

**Date:** Friday, Apr 27, 2018, 1:38 PM

**To:** Hershman, Brian D. <bhershman@JonesDay.com>

**Cc:** Lovrien, Christopher <cjlovrien@jonesday.com>, Mark Geragos <mark@geragos.com>

**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Thanks Brian. Brian didn't you just remove to federal court?

On Fri, Apr 27, 2018 at 1:16 PM Hershman, Brian D. <bhershman@jonesday.com> wrote:

Counsel,

I am once again inquiring about your availability to meet and confer per local rule 7-3. Please provide your availability. Thank you.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Hershman, Brian D. <bhershman@JonesDay.com>

**Date:** Wednesday, Apr 25, 2018, 5:48 PM

**To:** Mark Geragos <mark@geragos.com>, Ben Meiselas (meiselas@geragos.com) <meiselas@geragos.com>

**Cc:** Lovrien, Christopher <cjlovrien@jonesday.com>

**Subject:** RE: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

Mark,

In accordance with Local Rule 7-3, I first attempted to reach your firm by telephone to conduct the required meet and confer, and followed up with the below email. While you appear to take offense at the "missive," the email: (1) complies with Local Rule 7-3; and (2) explains in greater detail the deficiencies in the FAC to facilitate a more productive meet and confer exchange. As indicated in the email, I am available to discuss the defendants' position so please let me know when you are available. Thank you.

**From:** Mark Geragos <mark@geragos.com>
**Sent:** Wednesday, April 25, 2018 4:43 PM
**To:** Ben Meiselas (meiselas@geragos.com) <meiselas@geragos.com>; Hershman, Brian D. <bhershman@JonesDay.com>
**Cc:** Lovrien, Christopher <cjlovrien@jonesday.com>
**Subject:** Re: Big3 LLC et al. v. Ahmed Al-Rumaihi et al., 2:18-cv-03466: Meet and Confer on Motion to Dismiss and Motion to Strike

You called 90 minutes ago and haven't received a call back so you send this missive?

On Wed, Apr 25, 2018 at 7:33 PM Hershman, Brian D. <bhershman@jonesday.com> wrote:

Counsel:

I write on behalf of defendants Ahmed Al-Rumaihi and Ayman Sabi ("Defendants") to meet and confer regarding Defendants anticipated responsive pleadings to Plaintiffs' First Amended Complaint ("FAC"). The FAC alleges causes of action for defamation, defamation per se, trade libel and intentional interference with prospective economic relations. These causes of action purport to arise from allegations that a non-party-defendant (Roger Mason) attributed racially inflammatory statements to plaintiff Jeff Kwatinetz based on information purportedly received from another non-party-defendant (Kai Henry) and conveyed to yet another non-party-defendant (Jerome Williams). Defendants do not believe these allegations state any actionable claim against them for multiple reasons.

Absent a resolution through our meet and confer process, therefore, Defendants intend to file two motions attacking the allegations of the FAC: (1) a motion to strike under California Code of Civil Procedure section 425.16, et seq., and (2) a motion to dismiss under Rule 12(b)(6) for failure to state a claim. Defendants' motion to strike (or "anti-SLAPP") motion will assert that the allegations constitute protected activity under the anti-SLAPP statute as they were statements made in a public forum and concerning a matter of public interest. Moreover, Defendants will assert that there is no probability that Plaintiffs will prevail on their four causes of action because they cannot demonstrate that the alleged statements (a) were even made by Defendants (or about each of the purported plaintiffs), much less actionably false or made with actual malice, as necessary for defamation or defamation per se, (b) were disparaging to the league's quality of goods or services, as necessary for trade libel, or (c) satisfy any of the elements of an intentional interference claim. Defendants motion to dismiss under Rule 12(b)(6) will independently allege that Plaintiffs' allegations fail to state a claim under any of the asserted causes of action for all the same reasons detailed in connection with the anti-SLAPP motion. Note that, as provided for under the anti-SLAPP statute, Defendants will seek recovery of their fees and costs as the prevailing party.

I attempted to reach you at 3:14 p.m. today by telephone in order to meet and confer, but was informed that you were not available. I provided my name, contact information, and the nature of the issue to the receptionist and requested that I receive a call back to discuss. As of the time of this email, I have not heard from either of you and therefore am following up with this email. I am available to discuss in detail at your convenience. Thank you.

Brian Hershman
Partner
**JONES DAY® - One Firm Worldwide<sup>SM</sup>**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Office +1.213.243.2445
bhershman@jonesday.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Geragos & Geragos

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--


Sincerely--

BEN MEISELAS, ESQ.



GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION

HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
WWW.GERAGOS.COM


------------------------------------------------

This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--


Sincerely--

BEN MEISELAS, ESQ.



GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION

HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
WWW.GERAGOS.COM

-------------------------------------------------

This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

--

Sincerely--

BEN MEISELAS, ESQ.



GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION

HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
WWW.GERAGOS.COM

-------------------------------------------------

This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Sincerely--

Ben Meiselas, Esq.



Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, California 90017-3411
Telephone (213) 625-3900
Facsimile (213) 625-1600
www.Geragos.Com

------------------------------------------------

This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Sincerely--

Ben Meiselas, Esq.



Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, California 90017-3411
Telephone (213) 625-3900
Facsimile (213) 625-1600
www.Geragos.Com

-------------------------------------------------

This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Sincerely--
BEN MEISELAS, ESQ.



GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
WWW.GERAGOS.COM

-------------------------------------------------
This e-mail, including attachments, contains information that is confidential and it may be protected by the attorney/client and other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments and notify me by return mail or e-mail, or call me at (213) 625-3900.

# EXHIBIT B

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071.2300

TELEPHONE: +1.213.489.3939 • FACSIMILE: +1.213.243.2539

Direct Number: (213) 243-2445
BHERSHMAN@JONESDAY.COM

April 6, 2018

## VIA OVERNIGHT DELIVERY & EMAIL

BIG3 Basketball, LLC
c/o Mark Geragos
Geragos & Geragos
644 South Figueroa Street
Los Angeles, CA 90017
Geragos@Geragos.com

Jeff Kwatinetz
BIG3 Basketball, LLC
c/o Benjamin P. Smith
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
benjamin.smith@morganlewis.com

Amy Trask
BIG3 Basketball, LLC
c/o Benjamin P. Smith
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
benjamin.smith@morganlewis.com

BIG3 Basketball, LLC
c/o Benjamin P. Smith
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
benjamin.smith@morganlewis.com

O'Shea Jackson, Sr. (a/k/a Ice Cube)
BIG3 Basketball, LLC
c/o Benjamin P. Smith
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
benjamin.smith@morganlewis.com

Eden Investment Ltd.
c/o Dentons Canada LLP
Attn: Joey Mastrogiuseppe
1 Place Ville-Marie, Suite 3900
Montreal, Quebec
H3B 4M7
joey.mastrogiuseppe@dentons.com

Re: Demand for Inspection of Books and Records of BIG3 Basketball, LLC;
Notice of Breaches of Agreements and Violations of Fiduciary Duties.

Dear Messrs. Geragos, Smith, and Mastrogiuseppe:

As you are aware, Sport Trinity, LLC ("Sport Trinity") is a holder ██████████ ██ of BIG3 Basketball, LLC ("BIG3" or the "Company"), a Delaware limited liability company. Since July 2017, Sport Trinity has contributed $7.5 million to the BIG3, which is more than 3.5 times the second largest capital contribution from any single member, and comprises

NAI-1503567346

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 024

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 2

nearly half of the total funds invested by all other investors in BIG3 combined. Nevertheless, at the misguided direction of Jeff Kwatinetz and O'Shea Jackson, Sr. (a/k/a Ice Cube) (together the "Co-Founders"), the BIG3 and its Board of Managers ("Board"), have unlawfully attempted to oust Sport Trinity from the Company. Moreover, the Co-Founders and other Board members have expelled from the Board (1) Ahmed Al-Rumaihi, Sport Trinity's designated Board member, and (2) Ayman Sabi, Sport Trinity's designated Board observer. In doing so, the Co-Founders and Board members have violated their fiduciary duties, including their duty of undivided loyalty.

The purpose of this letter is threefold: First, it serves as Sport Trinity's demand for books and records pursuant to Delaware law and the LLC Agreement. Second, it provides notice to BIG3 and its Board members that they are in active breach of the LLC Agreement and Delaware law by preventing Sport Trinity from exercising its rights as a member of BIG3, particularly while retaining Sport Trinity's $7.5 million contribution. Third, it notifies BIG3's Board members, including the Co-Founders, that they are actively violating their fiduciary duties by excluding Al-Rumaihi and Sabi from Board participation, including attendance at BIG3's Board meeting scheduled for April 11, 2018. Al-Rumaihi and Sabi demand to exercise their right to participate in the April 11 meeting and to participate in, and receive agendas, notices, and all other materials, for all future meetings.

1.      **Sport Trinity's Purposes In Demanding Books and Records.**

Pursuant to Section 18-305 of the Delaware Limited Liability Company Act ("LLC Act"), Delaware common law, and Article VI of the BIG3 Basketball, LLC Second Amended and Restated Limited Liability Company Agreement, dated as of July 14, 2017 ("LLC Agreement"), Sport Trinity and Messrs. Al-Rumaihi and Sabi hereby demand, under oath, that within five (5) business days from service of this Notice, BIG3 make available complete books and records of the Company, including all categories of documents identified in part C of this letter. Appended as Attachment A is a true and correct copy of LLC Agreement, which provides proof of Sport Trinity's status as a member of BIG3 and entitlement to make this demand. Sport Trinity demands access to BIG3's books and records for the following purposes:

(a)      To determine the value of Sport Trinity's ownership interests and determine the status of the business and financial condition of the Company;

(b)      To determine the extent of non-compliance with Delaware law and the LLC Agreement on the part of the Company, its Co-Founders, and its current and former officers and Board members;

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 025

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 3

(c)     To investigate potential wrongdoing and mismanagement by the Company's current and former officers and members of the Board or committees of the Board, including the potential wrongdoing and mismanagement of the Co-Founders;

(d)     To investigate allegations of improper conduct by Jeff Kwatinetz ("Kwatinetz") that is detrimental to the Company, including allegations that Kwatinetz, among other things, (1) commingles Company funds and, without Board approval, unilaterally authorizes related-party transactions involving other companies under his control, (2) makes use of private jets that are expensed to BIG3's accounts and Company credit cards, and (3) uses racial slurs and engages in racially motivated and erratic behavior detrimental to BIG3;

(e)     To investigate allegations that the Co-Founders used Company funds to sponsor a documentary film featuring a BIG3 basketball player, Allen Iverson, although it is unclear what percentage of proceeds from the documentary, if any, were to be shared by BIG3;

(f)     To investigate the basis for, and circumstances surrounding, the Company's termination of Roger Mason, Jr., who is the former President and Commissioner of the BIG3 league;

(g)     To investigate the basis for, and circumstances surrounding, the resignation of Rafael Fogel, who is the Company's former Chief Financial Officer ("CFO");

(h)     To investigate the basis for, and circumstances surrounding, the resignation of Kai Henry, who is the Company's former Chief Creative Officer ("CCO");

(i)     To prevent the Company, the Co-Founders, and other Board members from continuing to violate their fiduciary duties by expelling Sport Trinity's designated Board member (Mr. Al-Rumaihi) and observer (Mr. Sabi) from the Board and blocking their participation in BIG3 management, thereby preventing Messrs. Al-Rumaihi and Sabi from carrying out their fiduciary duties;

(j)     To prevent the Company, the Co-Founders, and other Board members from continuing to unlawfully maintain that Sport Trinity no longer holds any membership interest in the BIG3, although BIG3 accepted and spent $7.5 million of capital contributed by Sport Trinity;

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 4

(k)    To prevent the Company, the Co-Founders, and other Board members from continuing to unlawfully prevent Sport Trinity from exercising any of their rights as members of the Company;

(l)    To investigate statements of the Company, the Co-Founders, and other Board members that defames current and former BIG3 officers, as well as Sport Trinity and its representatives;

(m)    To investigate allegations of corporate waste by the Co-Founders;

(n)    To investigate allegations of the Co-Founders' lack of independence and disinterestedness;

(o)    To further investigate the wrongdoing and mismanagement of BIG3 identified in section B of this letter.

## 2. Overview of Misrepresentations, Wrongdoing, Mismanagement, and Governance Failures.

On July 14, 2017 ("Closing Date"), Sport Trinity invested in BIG3, agreeing to contribute $11.5 million, and received a 15.03% stake pursuant to a Unit Purchase Agreement ("UPA"). Sport Trinity's investment was made at a valuation that was more than twice as high as any other investor in BIG3. To date, Sport Trinity has contributed $7.5 million to BIG3, which is 3.5 times more than any other member's contribution. Sport Trinity's contribution also comprises nearly half of the total funds invested by all other BIG3 members combined. As Sport Trinity has made clear to BIG3 and the Co-Founders, Sport Trinity is prepared to invest an additional $4 million (and more funds beyond that amount, as described below), but only if:

(a)    BIG3 remedies its repeated breaches and agrees to abide by the terms of the LLC Agreement, which requires the Board to govern the BIG3 pursuant to specific corporate governance procedures; and

(b)    BIG3's Co-Founders agree that the league will hire a qualified, professional, full-time management team to run the league's operations, and that Kwatinetz will step away from and no longer be involved in the day-to-day management of the league.

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 027

       (i)    <u>Sport Trinity's Initial Investment, the LLC Agreement, and Kwatinetz's Misrepresentations in Diligence</u>.

On the Closing Date, in addition to entering into the UPA, Sport Trinity entered into the amended LLC Agreement with BIG3's members and managers. Under the LLC Agreement, Kwatinetz and Ice Cube were designated as two of three managers of BIG3's Board ("Managers"). Al-Rumaihi was designated by Sport Trinity as the third and final Manager. Under the LLC Agreement, Sport Trinity also designated a Board observer, Ayman Sabi, who is entitled to, among other things, (1) receive reasonable written notice of Board meetings, (2) receive all information provided to Managers, and (3) attend Board meetings.[1]

Prior to the Closing Date, BIG3 was obligated to provide Sport Trinity with complete and accurate financial information about the BIG3. As BIG3 has repeatedly acknowledged, it did not live up to this obligation. BIG3's Co-Founders provided projections indicating that the league would receive ██████████ in revenue in its first year of operation and would incur total losses of ██████████. Kwatinetz also provided Sport Trinity's principals with overall valuations for the BIG3 ranging from ██████████████. But BIG3 generated ███████████ in revenues in 2017 (more than 80% less than projected) and the first-year losses totaled ████████████████████). As of the Closing Date, when Kwatinetz was providing inflated projections and valuations to Sport Trinity, the BIG3 was halfway through its inaugural season.[2] BIG3 and Kwatinetz thus knew by the Closing Date that the projections and valuations provided to Sport Trinity were not achievable.

Even without full information, Sport Trinity's diligence team identified problems with BIG3's financial information. For example, BIG3 initially provided Sport Trinity with an outdated general ledger, from April 2017, which did not align with BIG3's projections and valuations or account for investments purportedly made in BIG3. Sport Trinity did not receive an updated general ledger until July 2017, at which time the BIG3 admitted that the updated ledger was also inaccurate. Because the fledgling league was in dire need of a cash injection, BIG3 and Kwatinetz

---

[1] Messrs. Sabi and Al-Rumaihi are Sport Trinity's founders and have substantial and successful managerial experience in a number of ventures. Further, Al-Rumaihi has served as the Counsel General for the government of Qatar in their New York Consulate. They have excellent reputations in the business community.

[2] The BIG3 league's regular season began on June 25, 2017 and ended on August 13, 2017. The league's post-season ran through August 26, 2017, only one month after Sport Trinity made its investment.

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 6

intentionally provided Sport Trinity with dated financial information it knew was inaccurate *when it was provided.*

In addition, before the Closing Date, Sport Trinity was provided a list of material contracts involving BIG3. This disclosure was to enable Sport Trinity to determine how funds were being used by BIG3 and any obligations that would impact its finances. (See Ex. C to UPA). Sport Trinity later learned, however, that BIG3 and its Co-Founders had not disclosed all material contracts, including related-party transactions. These omitted transactions included an agreement involving Cubevision, a production company owned by Ice Cube and managed by Kwatinetz. Pursuant to the agreement, Cubevision was to film and produce a documentary about Allen Iverson, a former NBA player, which ultimately resulted in nearly ███████ in expenses on BIG3's balance sheet. Although BIG3 has borne all of the costs of the project, it is not clear what proceeds, if any, BIG3 would be entitled to receive. BIG3 thus provided misleading information to Sport Trinity about its finances, including balance sheets, general ledgers, projections, and material contracts—including related-party transactions involving Kwatinetz and Ice Cube.

As a result of various issues, including BIG3's inability to provide a full and accurate picture of its finances, Sport Trinity contributed $6.5 million (of its $11.5 million commitment) on the Closing Date, and an additional $1 million in November 2017. BIG3, its Co-Founders, and its existing members understood that Sport Trinity's immediate cash injection was necessary to ensure BIG3's survival; the season was advancing full-throttle and expenses were mounting. BIG3 never indicated that Sport Trinity's membership interests were less than ███████ until shortly before BIG3 filed a Demand for Arbitration on February 14, 2018.

After the season, it became apparent that BIG3's financial issues and omissions were far more troubling than they first appeared. Recognizing these shortcomings, Kwatinetz emailed Sport Trinity in October 2017—after the Closing Date—stating that the accounting firm "*fuc\*ed up a lot of stuff*" and that "*all of the accounts are mush, totals wrong, no tracking of cash dollars.*" Kwatinetz further admitted that an "'*unbalanced' balance sheet and getting revenue wrong <u>created red flags</u> . . . [and] <u>cost us 5m from [Sport Trinity's investors]</u> for the moment*[]." Ice Cube also apologized for the mishaps and assured Sport Trinity that it would not happen again. The Co-Founders' admissions are inconsistent with BIG3's current litigation position that Sport Trinity breached the UPA and lost all membership interests by paying $7.5 million of an $11.5 million commitment, a reduction that resulted directly from BIG3's admitted deficiencies.

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 7

        (ii)     <u>BIG3's Misrepresentations Concerning Management</u>.

       Sport Trinity later discovered that, in addition to faulty financial information, the BIG3 misrepresented during diligence that BIG3 had a legitimate management structure in place. One of the key representations made to Sport Trinity's principals before the Closing Date was that BIG3 would be professionally managed by a competent management team. Messrs. Sabi and Al-Rumaihi had been introduced to BIG3's Co-Founders through Roger Mason, Jr., the commissioner of the league. Mason is a former NBA player and previously acted as deputy director of the NBA Players Association. In his latter role, Mason had negotiated new benefits, including league-sponsored healthcare, for players. Mason thus had strong rapport with the BIG3's players and inspired confidence in investors, including Sport Trinity.

       The Co-Founders further represented to Sport Trinity that Amy Trask was CEO of the BIG3. Sport Trinity understood that day-to-day management of the league would be handled by Trask. This was a material issue for Sport Trinity, which viewed Trask's managerial ability as vital to the success of the BIG3: Trask had previously served as president of the Oakland Raiders, a franchise associated with the National Football League ("NFL"). Trask had also purportedly been considered to become the NFL's commissioner. Sport Trinity relied on BIG3's assurances that experienced executives would play an active role in managing the upstart league. This was particularly important to Sport Trinity because it recognized that BIG3 would need to be well-managed to grow properly.

       For similar reasons, and because the Co-Founders would control a majority of BIG3's Board, Sport Trinity ensured that BIG3's LLC Agreement had a governance structure with robust checks and balances and appropriate oversight of the league's operations. In particular, the Board was to hire an executive team to run the day-to-day operations of the league. The LLC Agreement also required that related-party transactions would need the approval of the disinterested members of the Board to ensure that all such transactions were at arm's length and made on terms fair to BIG3.

       Soon after the Closing Date, Sport Trinity began to realize that BIG3's promised corporate and executive management structure was a sham. The BIG3's executives held empty titles, they had no decision-making authority, and they were forced to cede to Kwatinetz's every demand. Specifically, throughout the fall of 2017 and into early 2018, Sport Trinity became increasingly concerned that the Co-Founders were not abiding by their promises to hire a qualified full-time management team to operate BIG3. Instead, Kwatinetz usurped officers' roles by running the Company's day-to-day business operations. By the fall of 2017, it had become clear that

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 8

Kwatinetz, not Amy Trask, was running the business as *de facto* CEO. Kwatinetz's diminishment of Ms. Trask's role lacked any Board input. This was particularly troubling because Kwatinetz was clearly unqualified and unable to run the business effectively. Further, Sport Trinity believed that certain reputational issues relating to Kwatinetz made it imperative that he not be the face of the league or the person running the league.[3]

Compounding these issues, BIG3's Co-Founders have ignored the structural protections set forth in the LLC Agreement. The Co-Founders have done so by, among other things, engaging in related-party transactions involving various entities in which the Co-Founders have interests. The transactions appear, on their face, not to have been negotiated at arm's length or in the best interest of BIG3. The Co-Founders never sought approval for any such transactions from the Board, and Sport Trinity's principals were never able to "get detailed financial information about the terms of these transactions, despite repeated requests to Kwatinetz. Sport Trinity has learned that BIG3's then-CFO had been instructed by Kwatinetz not to provide any such information to Sport Trinity, notwithstanding Sport Trinity's status as a member and its contractual right to access this information through its designated Manager. Likewise, the Co-Founders ignored calls for special meetings on at least two occasions: once from Eden Investment, Ltd.'s designated Board observer and once from Sport Trinity.

In addition, the UPA requires that Sport Trinity introduce certain sponsorships ("Purchaser Generated Activities") to BIG3, such as live events that originate in the Middle East, and media and sponsorships that are derived from any part of the world. Sport Trinity has brought a number

[3] Kwatinetz has mismanaged several businesses in the past, resulting in their ultimate demise or bankruptcy. The Firm, for example, a company co-founded by Kwatinetz, failed in 2008 after a number of executives departed *en masse*. Jeff Leeds & James Ulmer, "Departures Cool Off Agency's Hot Start," THE NEW YORK TIMES, August 11, 2005. Following The Firm's collapse, Kwatinetz was criticized for his lack a business plan and "overly ambitious projections." *See* Michael Fleming, "Firm departure for its founder," DAILY VARIETY, November 11, 2008. Kwatinetz then founded another company, Prospect Park. Not long thereafter, Prospect Park filed for bankruptcy, reportedly due to a lack of funding and logistical issues. *See* Meg James, "Prospect Park files for bankruptcy; The production firm tried to revive two canceled ABC soap operas online." LOS ANGELES TIMES, March 11, 2014; *see also* Justin Oppelaar, "Firm backs down on Sillerman suit," DAILY VARIETY, August 16, 2001 (detailing the collapse of a proposed merger involving The Firm as a result of Kwatinetz's reportedly erratic behavior); Sharon Waxman, "Firm Believer," THE WASHINGTON POST, July 8, 2002 (same). Indeed, Kwatinetz alleged mismanagement, erratic behavior and drug use is well documented in published articles about his failed business ventures. *See* Sharon Waxman, "Firm Believer," THE WASHINGTON POST, July 8, 2002; Bryan Burrough, "Ovitz Agonistes," VANITY FAIR, August 2002; "Hollywood madam Michelle Braun cozies up to federal agents" NEW YORK DAILY NEWS, May 9, 2009.

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 9

of deals to BIG3 to satisfy its obligation; deals that are in line with BIG3's business goals and strategies and would provide a substantial financial benefit to BIG3. Although the Company is obligated to negotiate such deals in good faith, Kwatinetz has unilaterally rejected all such deals, without any input from the Board. In so doing, Kwatinetz has caused BIG3 to breach its obligations under the the LLC Agreement. Sport Trinity also spent a significant amount of its own funds to assist BIG3's management in developing business opportunities in China, only to have Kwatinetz unreasonably reject deals that would have been favorable to BIG3 and in the best interest of its business.

<div align="center">(iii)      <u>Post-Season Negotiations Regarding Management Structure</u>.</div>

Throughout the fall of 2017, as these concerns mounted, Sport Trinity's principals engaged in discussions with Kwatinetz and certain BIG3 executives, including its then-CFO, Rafael Fogel. These discussions centered on the financial and structural needs of the organization. From a financial perspective, it was clear that BIG3 would need to raise additional capital from new investors, or seek additional contributions from current investors, to fund its future operations. Structurally, there was an urgent need to hire a professional management team to manage the league properly without Kwatinetz's interference and dominion.

Chief among Sport Trinity's concerns was that certain investors, including sovereign funds, would not invest money in Sport Trinity to fund the investment in BIG3 without assurances that the BIG3 would (1) begin to comply with its corporate governance commitments, and (2) provide full and accurate financial information. Sport Trinity offered an amicable resolution: it made clear to BIG3 that it would not only fulfill the remaining $4 million outlay, but that it was also prepared to substantially increase its contribution, provided BIG3 changed its management structure to address the foregoing issues and provided full books and records. These measures were also critical to reassure new investors that their investments were safe.

During these discussions, in early January 2018, Sport Trinity learned the full extent of BIG3's losses in 2017 (although it had requested such financial records for months). The heavy losses were so far afield from the information the Co-Founders had provided that Sport Trinity's principals began to believe that BIG3's Co-Founders (particularly Kwatinetz) had fraudulently induced them into making the investment. Sport Trinity nevertheless continued to attempt to resolve the issues in good faith.

On February 2, 2018, BIG3 served a letter alleging that Sport Trinity was in breach of the UPA for failure to pay BIG3 the full $11.5 million commitment and demanded payment of the

JONES DAY

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 10

outstanding $4 million by February 5, 2018. Sport Trinity responded on February 5, 2018 requesting that BIG3 delay pursuing any remedies until March 9, 2018. On February 11, 2018, BIG3 refused to grant Sport Trinity an extension. BIG3 stated that Sport Trinity had left BIG3 "no choice but to pursue all rights and remedies under its contract with Trinity, including but not limited to termination of Trinity's claimed interest in BIG3 given its failure to pay for that interest (it has no interest), and pursuit of all amounts remaining due under the contract, including sponsorship monies." BIG3 submitted a Demand for Arbitration on February 14, 2018.

(iv)     BIG3 Officers' Terminations and Resignations Further Demonstrate that Kwatinetz Is Unfit to Manage BIG3.

As detailed below, the full extent of Kwatinetz's erratic behavior has come to light since the Demand for Arbitration: (1) he has improperly attempted to expel Sport Trinity, BIG3's largest investor, and its designated Board member; (2) he has fired the BIG3's commissioner, Roger Mason, Jr.; (3) the BIG3's CCO, Kai Henry, has resigned; and (4) the BIG3's CFO, Rafael Fogel, has resigned. Each of these executives are talented, highly qualified, and exhibited a high degree of professionalism during their time at BIG3.

Perhaps most disturbing is Kwatinetz firing of Mason, the league's commissioner, on or about March 12, 2018. Kwatinetz claimed that he had fired Mason in retaliation for Mason purportedly defaming him (Kwatinetz). In fact, the defamatory conduct was *by Kwatinetz* against Mason and the principals of Sports Trinity. Specifically, Kwatinetz falsely alleged that Mason and Sport Trinity were involved in a scandal to deprive the BIG3 of millions of dollars to extract control over the league, and that Sport Trinity had engaged in conflicting business against league interests and lavished employees with improper gifts. As Kwatinetz knows, there is absolutely no truth to this scurrilous allegation. Indeed, it appears Kwatinetz is attempting to deflect attention from Kwatinetz's own racially motivated behavior and racially charged remarks about BIG3 players that was observed by Mason. Similarly, the resignation of BIG3's CCO, Kai Henry, on February 26, 2018 raises another red flag about Kwatinetz' behavior and ability to manage the league. In his letter of resignation, Henry cites numerous concerns, including among other things, BIG3's mismanagement and Kwatinetz's racially charged remarks about BIG3 players and Sport Trinity's principals, echoing the concerns raised by Mason. Finally, in March 2017, BIG3's CFO, Rafael Fogel, resigned as a result of purported mismanagement issues involving Kwatinetz.

NAI-1503567346

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 11

    (v)    <u>BIG3 and the Co-Founders File a Public Suit and Engage in Smear Campaigns in Violation of Agreements to Arbitrate and Contrary to BIG3's Interests</u>.

    Additional recent developments further demonstrate that Kwatinetz is unfit to continue operating the day-to-day affairs of BIG3. On April 5, 2018, for example, the Co-Founders and BIG3 publicly filed a baseless lawsuit against, among others, Messrs. Al-Rumaihi and Sabi in California Superior Court. *BIG3 LLC, O'Shea Jackson a/k/a Ice Cube, and Jeff Kwatinetz v. Ahmed Al-Rumaihi, Faisal Al-Hamadi, Ayman Sabi, and Sheikh Abdullah bin Mohammed bin Su Al Thani*, BC700897 (Cal. Super. Ct. Apr. 5, 2018). The complaint is littered with false and defamatory accusations about Sabi, Al-Rumahi, and BIG3's former executives. It also makes assertions against individuals who have no relation to Sport Trinity or BIG3.

    In addition to being unlawful, engaging in this type of smear campaign is detrimental to BIG3's interest and illustrates Kwatinetz incompetence.[4] BIG3 and the Co-Founders are contractually obligated to arbitrate disputes related to either the UPA or LLC Agreement. This serves the salutary purpose of keeping business disputes confidential, thereby avoiding negative publicity about the league during its infancy. Publicly airing disputes among investors and executives, as Kwatinetz has done, undermines the young league's legitimacy, jeopardizes its future, and, ultimately, negatively impacts its bottom line. Yet, rather than privately resolving these business disputes, the Co-Founders have thrust them into the public sphere while espousing inflammatory and false statements.

    (vi)    <u>BIG3's Improper Expulsion of Sport Trinity Is Unlawful</u>.

    Further exacerbating its errors, BIG3 has also publicly stated that Sport Trinity no longer has any interest in BIG3, purportedly because Sport Trinity failed to satisfy its initial financial commitment. As discussed at length above, Sport Trinity was excused from providing further funds until BIG3 and its Co-Founders complied with the terms of the LLC Agreement, including removing Kwatinetz as *de facto* CEO and allowing a qualified management team to handle daily operations. In any event, BIG3's attempt to expel Sport Trinity from BIG3, take its equity, and

---

[4] Kwatinetz has exhibited a pattern and practice of sabotaging his own companies by engaging in public confrontations with investors and driving his companies into bankruptcy. *See supra*, note 3; Justin Oppelaar, "Firm backs down on Sillerman suit," DAILY VARIETY, August 16, 2001 (detailing Kwatinetz's buyback of The Firm's shares from an investor and his public admission that a lawsuit he had filed against the investor alleging misappropriation of Kwatinetz's business plan was "without merit and a mistake"). Through this action, Sport Trinity seeks to prevent the same demise for BIG3.

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 12

remove its designated Manager and observer from the Board, is in clear violation of the LLC Agreement and Delaware law.

Under Delaware law (the choice of law in the UPA and the LLC Agreement), a party's membership interest is not eliminated or even reduced as a result of alleged withholding of a capital contribution unless the written agreement *explicitly* provides for such a remedy. *See* 6 Del. Code Ann. § 18-502. Thus, the law is exactly opposite of what BIG3 contends; Sport Trinity's membership interests remain wholly intact because the LLC Agreement does not explicitly provide otherwise.

In particular, Sport Trinity's membership interests vested as of the Closing Date, without limitation. LLC Agreement, Sec. 4.2.1 (providing that all membership interests "have the rights set forth in the [LLC] Agreement, [and] *have been duly authorized and validly issued by the Company*" (emphasis added)). Moreover, the LLC Agreement is silent as to any remedies for a member's partial withholding of committed capital. Accordingly, Sport Trinity did not forfeit *any* of its rights or interests, nor did its designated Manager and Board observer lose their positions. *Grove*, 2013 WL 4041495, at *5-7 (holding that an LLC member's interest was not reduced, although it failed to contribute an initial capital contribution, because section 18-502 of the LLC Act is permissive and the LLC agreement did not expressly provide for such a remedy); *see also Kaufman v. HLK, LLC*, 2013 WL 5230797 (Nev. 2013) (same).

Tellingly, for seven months after the Closing Date, the BIG3, its Co-Founders, and its members continued to operate as if Sport Trinity's membership interests were wholly intact. Moreover, BIG3 demanded that Sport Trinity pay the remaining $4 million contribution in February, 2018. This constitutes an admission that Sport Trinity remains a member of the BIG3. *See Grove*, 2013 WL 5230797, at *5-7 (holding that the LLC's treatment of the nonpaying member as a full member, including by later demanding the member's remaining contribution, indicated that the nonpaying member did not forfeit any interests).

Even after its attempt to improperly expel Sport Trinity seven months after the Closing Date, BIG3 sent a letter to players, coaches, and employees, stating that Sport Trinity is still obligated under the UPA to bring certain foreign sponsorships to the BIG3. This is true although BIG3 has not returned *any* of Sport Trinity's $7.5 million contribution. That BIG3 accepted and used Sport Trinity's $7.5 million contributions, continued to treat Sport Trinity as a member, and demanded its full contribution further demonstrates that Sport Trinity retains its entire membership interest. *See id.* Notably, BIG3 asserts that Sport Trinity did not just forfeit a pro rata share of its interest representing the purported $4 million shortfall, but that Sport Trinity has somehow

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 035

JONES DAY

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 13

forfeited *all* of its rights, interests and money.  This is directly contrary to Delaware's longstanding policy disfavoring forfeiture.  *See Hindman v. Salt Pond Assocs.*, No. CIV. A. 1536, 1992 WL 396304, at *4 (Del. Ch. Dec. 21, 1992).

<div align="center">

(vii)  Exclusion of Sport Trinity's Designated Manager and Board Observer Violates Other Managers' Fiduciary Duties.

</div>

Given that Sport Trinity retains its rights under the LLC Agreement, it also retains its right to seat a member on BIG3's Board and designate a Board observer.  Under the LLC Agreement, Al-Rumaihi, Sport Trinity's designated Manager, can only be removed without Sport Trinity's consent if (1) BIG3 goes public, or (2) if he commits a fraud or felony *and* the majority of Class A members vote to remove him.  None of these events have occurred.  In addition, Mr. Sabi is entitled notices of all Board meetings and materials, and is authorized to attend Board meetings.

Ignoring these mandates, BIG3 and the Co-Founders have unlawfully excluded Mssrs. Al-Rumaihi and Sabi from receiving notices of meetings—including a meeting to be held on April 11, 2018—and expelled them from Board participation.  In doing so, the current BIG3 Board members have violated their fiduciary duties.  The LLC Agreement imposes on officers and Managers the same fiduciary duties of care and loyalty imposed on directors of Delaware corporations.  Specifically, under the LLC Agreement, officers owe to members the "duties of loyalty and due care of the type owed by the officers of a corporation" under Delaware law.  LLC Agreement, Sec. 5.5(c).  Likewise, Managers must "perform their managerial duties in good faith . . . and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." *Id.*, Sec. 5.6.

The Delaware Supreme Court has made clear that a corporate board member is entitled to participate in board deliberations. *OptimisCorp v. Waite*, 137 A.3d 970 (Del. 2016) ("[I]t has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information.").  Accordingly, excluding board members from meetings and failing to provide notices of meetings or agendas prevents those managers from exercising their fiduciary duties. *See id.*  In *Waite*, for example, the Delaware Supreme Court admonished a controlling faction of board members for establishing "cliques" and operating to "sandbag a fellow director" by excluding the director from agenda notices.  *Id.*  Such actions, the Court found, may violate the non-excluded board members' duties of loyalty, which cannot be waived and subjects them to personal liability. *Id.*; *see Kalisman v. Friedman*, 2013 WL 1668205, at *4, 7 (Del. Ch. Apr. 17, 2013) ("A director's right to

NAI-1503567346

JONES DAY

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 14

information is 'essentially unfettered in nature,'" and the director sustains a direct injury by being "froze[n] out of the deliberative process" (citations omitted)).

Accordingly, BIG3's current Board members are in jeopardy of violating their fiduciary duties by preventing Sport Trinity's designated Manager and observer from participating on the Board. In doing so, each Board member is exposed to *personal* liability. Sport Trinity and Messrs. Al-Rumaihi and Sabi thus demand access to the BIG3 Board meeting scheduled for April 11, 2018. They further demand the right to participate in all future meetings and to receive all future notices, agendas, and other materials provided to the Board. Sport Trinity and its representatives intend to seek full recovery for all injuries resulting from the unlawful expulsion.

(viii)    <u>Conclusion</u>.

Sport Trinity was deceived by the Co-Founders from the outset: they misled Sport Trinity before the Closing Date about BIG3's finances, leadership, and corporate governance. BIG3 and the Co-Founders also did not disclose material contracts prior to Sport Trinity's investment, which included related-party transactions involving businesses operated by the Co-Founders. Rather than resolve these issues privately and amicably, the Co-Founders have engaged in a public smear campaign, making unfounded and defamatory remarks about investors and departing executives, all to the detriment of BIG3. Moreover, BIG3, its Co-Founders, and its Managers are actively violating the LLC Agreement and Delaware law by unlawfully expelling Sport Trinity. Worse still, each Manager is violating his or her fiduciary duties by excluding Sport Trinity's designated Manager and Board observer from Board participation. Sport Trinity intends to take decisive action against all parties and individuals for all injuries sustained from these ongoing violations.

3.    **Categories of Books and Records Demanded.**

For the purposes identified above, and based the facts set forth herein, Sport Trinity demands access to all the books and records identified below (including any communications between the Board and its legal counsel) within five (5) business days:

(a)    Complete books of account of the Company's business;

(b)    All financial statements of the Company for each fiscal year and each interim period during the Company's existence, including, without limitation, balance sheets and income statements, profit and loss statements, statements of capital accounts, statements of changes in financial condition, and/or statements of cash flow;

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 037

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 15

(c)     All budgets setting forth any expected expenditures of the Company prepared for any time period, including a copy of the Company's most recent operating budget;

(d)     A current list of the full name and last known business or residence address of each member, each member of the Board, and each holder of a membership interest in the Company, together with the capital contribution and share in profits and losses of each member and holder of a membership interest;

(e)     A copy of the Company's Certificate of Formation and any amendments thereto;

(f)     Copies of the Company's federal, state, and local income tax returns, any information returns, and any related reports for each year of the Company's existence;

(g)     Executed counterparts of the LLC Agreement and all amendments thereto;

(h)     Any powers of attorney under which the Certificate of Formation or any amendments were executed;

(i)     All financial statements audited, reviewed, and/or compiled by the Company's accounting firm(s), and any report(s) prepared by the Company's accounting firm(s) related to such financial statements;

(j)     Any documents, communications, or other information that has been provided to managers of the Company, including pursuant to section 6.6 of the LLC Agreement, during the Company's existence, including, without limitation, financial information, information about any contracts, correspondence to or from regulatory authorities, and information about pending or threatened litigation;

(k)     All documents related to any lawsuits, including mediations and arbitrations, to which the Company has been a party during the existence of the Company;

(l)     All documents and communications, including as they relate to any Board approvals, related to the BIG3's decisions (1) to file a Demand for Arbitration against Sport Trinity, and (2) to commence the following action: *BIG3 LLC, O'Shea Jackson a/k/a Ice Cube, and Jeff Kwatinetz v. Ahmed Al-Rumaihi, Faisal Al-Hamadi, Ayman Sabi, and Sheikh Abdullah bin Mohammed bin Su Al Thani*, BC700897 (Cal. Super. Ct. Apr. 5, 2018);

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 16

(m)     Pursuant to Section 6.7 of the LLC Agreement, (i) all solicitation materials developed by the Company, its representatives, and/or its agents, including materials sent to Sport Trinity at any time, or to third parties or current investors or members to seek additional investments or to discuss the Company's potential future investment and divestment plans, and (ii) all other information that the Company has provided to other current or former members of the Company;

(n)     All documents related to fundraising efforts before or after the formation of BIG3, including sponsorship solicitations and communications, and/or investor solicitations and communications, including, without limitation, all presentations, pitch materials, slide decks, talking points, notes, and/or preparation materials;

(o)     All documents and communications related to any registration materials, including, without limitation, any materials prepared pursuant to local, state, or federal securities laws, that were prepared by, or on behalf of, the Company before or after its formation;

(p)     All documents and communications related to any requests for loans prepared before or after the formation of BIG3, including, without limitation, all materials prepared for any presentations to potential lenders;

(q)     All documents and communications before or after the formation of BIG3 related to potential sponsors, promoters, broadcasters, venue owners, vendors, licensors, licensees, players, coaches, agents, and/or advertisers, including, without limitation, all materials prepared for any presentations to such entities or individuals;

(r)     All other true and full information regarding the status of the business and financial condition of the Company;

(s)     True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member;

(t)     All documents and communications related to the Company's revenues for each year, and each quarter of each year, during the Company's existence, including revenue from merchandise and sponsorships;

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 17

(u)     The Company's general ledger for each year, and each quarter of each year, during the Company's existence, including all bank statements supporting the information in each general ledger;

(v)     Copies of all operating agreements and unit purchase agreements entered into between the Company and its members, including all amendments thereto;

(w)     All documents and communications related to a list of any warrants, rights, profits, interests and/or any other instrument that grants a person the right to become a member and/or acquire membership interests in the Company;

(x)     All documents and communications related to any securities or other contracts convertible into membership interests in the Company;

(y)     All documents and communications related to the identity of all current and former members of the Company's Board, including the dates on which each former member of the Board was elected and/or appointed, the dates on which each member of the Board ceased being a Manager of the Company, and the business address of each such member, or former member, of the Board;

(z)     All documents and communications related to the election, appointment, termination, resignation, or any other change in status, of all current and former members of the Board, including, without limitation, all notes or minutes of the meetings or actions by written consent with respect to such election or appointment;

(aa)    All documents and communications related to the identity of all current and former officers of the Company, including the dates on which each officer was elected and/or appointed, and the dates on which each former officer ceased being an officer of the Company, as well as the business address of each such officer or former officer;

(bb)    All documents and communications related to the election, appointment, termination, resignation, employment, or any other change in status, of all current and former officers of the Company, including, without limitation, all minutes of the Board of Managers or actions by written consent of the Board of Managers with respect to such election or appointment;

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 18

    (cc)    All documents and communications related to all insurance policies, including but not limited to insurances policies related to Directors and Officers, Errors and Omissions, and General Liability;

    (dd)    All documents and communications related to any meetings or special meetings requested and/or held during the Company's existence, including all demands for meetings, notices, agendas, and/or notes from such meetings;

    (ee)    All documents and communications related to any actions by written consent of the Board of the Company during the Company's existence;

    (ff)    All documents and communications related to any related-party transactions or arrangements between the Company, on the one hand, and any person that is a member of the Company, a member of the Board of the Company, an officer of the Company, and/or an employee or independent contractor of the Company, on the other hand, including any amounts paid and the nature of the services rendered;

    (gg)    All documents and communications related to proposals from service providers and/or product providers, including, without limitation, proposals, scopes of work, invoices, work orders, and/or any modification thereto;

    (hh)    All documents and communications related to transactions between the Company, on the one hand, and Mark Geragos and/or any individuals or entities that are affiliated or have a relationship with Mark Geragos, on the other hand;

    (ii)    All documents and communications related to transactions between the Company, on the one hand, and O'Shea Jackson, Sr. (a/k/a Ice Cube) and/or any individuals or entities that are affiliated or have a relationship with O'Shea Jackson, Sr. (a/k/a Ice Cube), on the other hand;

    (jj)    All documents and communications related to transactions between the Company, on the one hand, and Cubevision Film Productions, LLC and/or any individuals or entities that are affiliated or have a relationship with Cubevision Film Productions, LLC, including Jeff Kwatinetz, O'Shea Jackson, Sr. and/or Kelvin Wu, on the other hand;

    (kk)    All documents and communications related to transactions between the Company, on the one hand, and Jeff Kwatinetz and/or any individuals or entities that are

JONES DAY

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 19

        affiliated or have a relationship with Jeff Kwatinetz, on the other hand, including without limitation BEK LLC; Prospect Park; The Firm Entertainment, Inc.; GSO Business Management; Cubevision Film Productions, LLC; and/or Mike Kwatinetz or affiliates of Mike Kwatinetz;

(ll)    All documents and communications related to any reports, background checks, and/or investigations commissioned by the Company, the Board, or any committee thereof, related to Jeff Kwatinetz;

(mm)  All documents and communications related to any accusations, reports, background checks, or investigations related to the alleged use of racial slurs and/or racist behavior by Jeff Kwatinetz;

(nn)  All documents and communications related to identity of all current and former employees of the Company (whether full or part time) and of each current and former independent contractor of the Company, during the existence of the Company;

(oo)  All documents and communications related to the relationship between the Company, Jeff Kwatinetz, and/or O'Shea Jackson, Sr., on the one hand, and each former and current employee, on the other hand;

(pp)  All documents and communications related to the relationship between the Company, Jeff Kwatinetz, and/or O'Shea Jackson, Sr., on the one hand, and each former and current independent contractor, on the other hand;

(qq)  All documents and communications related to information technology systems of the Company, including, without limitation, any alterations or deletions of transaction records, financial documents, and/or correspondence.

(rr)    All documents and communications related to all expense reports for all officers or managers of the Company during the existence of the Company;

(ss)   All documents and communications related to any compensation, loans, and/or benefits of any kind to current and former Board members, officers, employees, and independent contractors of the Company, and any of their affiliated entities, during the Company's existence;

NAI-1503567346

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 042

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 20

(tt)     All documents and communications related to any non-disclosure agreements, confidentiality agreements, non-disparagement agreements, and/or other similar agreements, between the Company and/or one of its affiliates, on the one hand, and any of the Company's current or former members, Board members, officers, employees, independent contractors, and/or any other persons;

(uu)     All documents and communications related to the resignation and/or termination of Kai Henry as the Company's Chief Creative Officer, including documents identifying the reasons for Henry's resignation and/or termination;

(vv)     All documents and communications related to the resignation and/or termination of Rafael Fogel as the Company's Chief Financial Officer, including documents identifying the reasons for Fogel's resignation and/or termination;

(ww)     All documents and communications related to the resignation and/or termination of Roger Mason, Jr. as President and Commissioner of the Big3 League, including documents identifying the reasons for Mason's resignation and/or termination;

(xx)     All documents and communications related to any Company debt, including copies of all agreements related to such debt;

(yy)     All documents and communications related to any properties or other assets in which the Company currently holds or formerly held any interests;

(zz)     All documents and communications related to any disbursements to current and former members of the Company and/or its current and former Board members, officers, employees, and/or independent contractors;

(aaa)     All documents and communications related to any sponsorship opportunities offered to, considered by, rejected by, and/or accepted by the Company and/or any sponsorship agreements entered into by the Company during the Company's existence;

(bbb)     All documents and communications concerning any investigation related to any purported conflict of interest between Sport Trinity and/or its members, on the one hand, and Big3, on the other hand;  and

NAI-1503567346

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 21

    (ccc)   All documents and communications related to any investigation performed by any entity or person on behalf of the Company, and/or performed at a cost to the Company, including any Board approval for the investigation, the purpose of the investigation, and any information, reports, and/or communications related to any investigation;

    (ddd)   All documents and communications regarding purported wrongful conduct by Sport Trinity, Ayman Sabi, or Ahmed Al-Rumaihi.

Each of the categories of documents identified above are subject to a legal hold at BIG3 and should be retained by all members, Managers, and employees as they are kept in the ordinary course of business. Sport Trinity agrees to incur all expenses necessary for the inspection and copying of the books and records identified above. Sport Trinity and Messrs. Sabi and Al-Rumaihi hereby designate attorneys with the firm of Jones Day as its agents for the inspection and copying requested herein. If the Company contends that this demand is incomplete or is otherwise deficient in any respect, please immediately notify in writing the Jones Day attorneys listed below, setting forth the facts that the Company contends support its position and specifying any additional information believed to be required:

    Jones Day
    555 South Flower Street
    Fiftieth Floor
    Los Angeles, CA 90071

    Christopher J. Lovrien
    cjlovrien@jonesday.com

    Brian Hershman
    bhershman@jonesday.com

    David A. Ciarlo
    dciarlo@jonesday.com

    Kelly Ozurovich
    kozurovich@jonesday.com

NAI-1503567346

Mark Geragos
Joey Mastrogiuseppe
Benjamin Smith
April 6, 2018
Page 22

    In the absence of such prompt notice, Sport Trinity and Messrs. Sabi and Al-
Rumaihi will assume that the Company agrees that this demand complies in all respects
with the requirements of the Delaware LLC Act and that the Company will immediately
produce all of the requested books and records. Sport Trinity hereby reserves the right to
withdraw or modify this demand. Please advise as promptly as practicable where and when
the items demanded above will be made available. If the Company has not responded
within five (5) business days of the date of this demand, Sport Trinity will assume the
Company does not intend to comply and will proceed accordingly.


                                        Best regards,

                                        Brian Hershman

                                        Brian Hershman

I affirm the foregoing statements to be true to the fullest extent of my knowledge and belief under penalty of perjury under the laws of the United States or any State.

_____

SPORT TRINITY, LLC
By: Ayman Sabi as Principal of Sport Trinity, LLC


_____

AHMED AL-RUMAIHI, in his capacity as
Board Member and Manager of BIG3 Basketball, LLC


_____

AYMAN SABI, in his capacity as
Board Observer of BIG3 Basketball, LLC


SWORN TO AND SUBSCRIBED
Before me this 6th day of April, 2018
By Ayman Sabi who presented a Florida D.L. as identification

_____
Notary Public

PAULA STONE
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF184456
Expires 12/18/2018

I affirm the foregoing statements to be true to the fullest extent of my knowledge and belief under penalty of perjury under the laws of the United States or any State.

SPORT TRINITY, LLC
By: Ayman Sabi as Principal of Sport Trinity, LLC

AHMED AL-RUMAIHI, in his capacity as
Board Member and Manager of BIG3 Basketball, LLC

AYMAN SABI, in his capacity as
Board Observer of BIG3 Basketball, LLC

SWORN TO AND SUBSCRIBED
Before me this _____ day of April, 2018

_____
Notary Public

# ATTACHMENT A

## BIG3 BASKETBALL, LLC
## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

This second amended and restated limited liability company agreement (this "**Agreement**") is entered into as of July 14, 2017, by and among BIG3 Basketball, LLC, a Delaware limited liability company (the "**Company**") and each party set forth on Exhibit A attached hereto (each, a "**Member**" and collectively, the "**Members**"), with reference to the following facts:

## RECITALS

A.      The Company was formed pursuant to the Delaware Limited Liability Company Act (the "**Act**") and the laws of the State of Delaware.

B.      The Members entered into the Amended and Restated Limited Liability Company Operating Agreement of the Company dated June 12, 2017 (the "**Prior Agreement**") to set forth the respective rights, powers and interests of the Members with respect to the Company and to provide for the governance of the Company and the conduct of the business and the operations of the Company.

C.      The parties hereto desire to amend and restate the Prior Agreement, as set forth herein, to set forth their respective rights, powers, duties and obligations as Members, and the management, operations and activities of the Company, be governed by this Agreement.

## AGREEMENT

Now, therefore, in consideration of the mutual promises, covenants, and undertakings specified herein with the intent to be obligated both legally and equitably, the parties agree as follows:

## ARTICLE I: DEFINITIONS

The following capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in the Act.

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)      Credit to such Capital Account any amounts which such Person is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the next to the last sentence of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations after taking into account any changes during such year in Company Minimum Gain and Member Minimum Gain; and

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 049

(b)     Debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Adjusted Capital Account.

"**Affiliate**" means with respect to a specified Person: (a) any Person that directly or indirectly through one or more intermediaries, alone or through an affiliated group, controls, is controlled by, or is under common control with, such specified Person, (b) any Person that is an officer, director, partner, manager, trustee, or employee of, or serves in a similar capacity with respect to, such specified Person (or an Affiliate of such specified Person), (c) any Person that, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a comparably substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 50% or more of any class of equity securities of such Person or in which the specified Person has a comparably substantial beneficial interest, (d) any Person who is a member of the specified Person's Immediate Family or a trust established for the benefit of, or the estate of, the specified Person or any member(s) of the specified Person's Immediate Family, or (e) if the specified Person is a trust or estate, any trustor, trustee, executor or beneficiary of such Person, or a trust established for the benefit of any such trustor or beneficiary.

"**Agreement**" means this limited liability company agreement, as originally executed and as amended from time to time.

"**Available Cash**" shall mean the gross cash proceeds from the Company's operations or the sale, license or other exploitation of its assets, less the portion thereof used to pay or establish reserves for the Company's expenses, debt payments, and contingencies, all as determined by the Board in its sole and absolute discretion.

"**Board**" has the meaning set forth in Section 5.1(a).

"**Book Adjustments**" means, for any item of Company property for a given fiscal year, adjustments with respect to the book value for depreciation, cost recovery, or other amortization deduction or gain or loss computed in accordance with Regulations §1.704-1(b)(2)(iv)(g), including Book Depreciation.

"**Book Depreciation**" means, for any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for that item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Gross Asset Value of that item at the beginning of the fiscal year (or the acquisition date during the fiscal year) by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax

2

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 050

basis of an item is zero, the Company may determine Book Depreciation, using any reasonable method selected by the Board.

"**Capital Account**" means, for any Member, a separate account maintained and adjusted in accordance with Article III.

"**Capital Contribution**" means, with respect to any Member, the amount of money and the fair market value of any property contributed to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take "subject to" under Code §752). A Capital Contribution shall not be deemed a loan.

"**Certificate of Formation**" means the Certificate of Formation originally filed with the Delaware Secretary of State the purpose of forming the Company and as may be amended from time to time.

"**Class A Major Decision**" has the meaning set forth in Section 5.2(c).

"**Class A Majority Interest**" means the holders of a majority of the outstanding Class A Units.

"**Class A Membership Interests**" means the Membership Interests of the Company designated as Class A Membership Interests.

"**Class A Percentage Interest**" means, with respect to any Member that holds Class A Units, the percentage representing the number of Class A Units held by such Member divided by the total number of outstanding Class A Units.

"**Class A Units**" means the Units of Class A Membership Interests.

"**Class B Membership Interests**" means the Membership Interests of the Company designated as Class B Membership Interests.

"**Class B Units**" means the Units of Class B Membership Interests.

"**Code**" means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

"**Company Minimum Gain**" has the meaning ascribed to the term "partnership minimum gain" in the Regulations Section 1.704-2(d).

"**Core Governance Functions**" means those decisions that are customarily made by and reserved to the board of directors of a Delaware corporation.

"**Economic Interest**" "means a Person's right to only share in income, gains, losses, deductions, credit or similar items, and to receive distributions from the Company, but does not include: (a) any other rights of a Member, including the right to vote or to participate in the

3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 051

management of the Company; or (b) except as provided under applicable law, any right to information concerning the business and affairs of the Company.

"**Economic Risk of Loss**" shall have the meaning specified in Regulations Section 1.752-2.

"**Encumber**" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

"**Encumbrance**" means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

"**Exempt Transfer**" means (a) Transfers to an Affiliate, so long as the Affiliate becomes a party to this Agreement, (b) if the Member is an individual, Transfers pursuant to applicable laws of descent and distribution to members of such Member's Immediate Family, or Transfers during the lifetime of such Member to such Member's spouse, adult children or to a trust whose beneficiaries are such members of such Member's Immediate Family, so long as the transferees remain subject to the terms of this Agreement, (c) if a Member is a partnership or limited liability company, a distribution to its partners or members or any of their respective Affiliates, so long as each of the Affiliates become a party to this Agreement, (d) if a Member is a corporation, a distribution or dividend to such corporation's shareholders or any of its respective Affiliates, so long as each such Affiliate become a party to this Agreement; (e) Transfers to any other Member, (f) Transfers to a third party in connection with a Transfer in which the right of first refusal contained in Section 7.2 is not exercised, and (f) Transfers to any party following a Qualified Initial Public Offering.

"**Final Preemption Period**" has the meaning set forth in Section 7.5.

"**Founder Major Decision**" has the meaning set forth in Section 5.2(a).

"**Gross Asset Value**" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a)     The Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of that property, as mutually agreed by the contributing Member and the Company;

(b)     The Gross Asset Value of any Company asset shall be adjusted upon the events and in the manner specified in Regulations Section 1.704-1(b)(2)(iv)(f);

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be the fair market value of the asset on the date of distribution;

(d)     The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted tax basis of the assets under Code §734(b) or §743(b), subject to the limitations imposed by Code §755 and only to the extent that the

4

adjustments are taken into account in determining Capital Accounts under Regulations §1.704-1(b)(2)(iv)(m), and if the Gross Asset Value of an asset has been determined or adjusted under paragraph (a), (b), or (d) of this definition, the Gross Asset Value shall thereafter be adjusted by the Book Adjustments, if any, taken into account with respect to the asset for purposes of computing Profits and Losses.

"**Immediate Family**" means any Person's spouse, parent, grandparent, brother, sister or lineal descendant.

"**Involuntary Transfer**" means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

"**Liquidation Transaction**" means one transaction or a series of related transactions pursuant to which (a) the Company shall (i) sell, convey, exclusively license or otherwise dispose of all or substantially all of its property or business, or (ii) merge with or into or consolidate with any other limited liability company, corporation or other entity (other than a wholly-owned subsidiary of the Company) or (b) the Members holding a majority of all outstanding Units sell or otherwise dispose of Units; provided, that none of the following shall be considered a Liquidation Transaction: (A) a merger effected exclusively for the purpose of changing the domicile of the Company, (B) an equity financing in which the Company is the surviving company, (C) a transaction in which the Members immediately prior to the transaction own 50% or more of the voting power of the surviving entity following the transaction, or (D) a consolidation with a wholly-owned subsidiary of the Company, so long as in each such case the parties remain subject to this Agreement. The determination of whether a proposed transaction will be a Liquidation Transaction shall be made by the Board.

"**Major Decision**" means a Founder Major Decision, a Trinity Major Decision or a Class A Major Decision.

"**Manager**" means a Person designated as a member of the Board pursuant to the provisions of this Agreement.

"**Member**" means a Person who acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

"**Member Minimum Gain**" has the meaning ascribed to the term "partner nonrecourse debt minimum gain" in Regulations Section 1.704-2(i)(2).

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(b) expenditures that are attributable to Member Nonrecourse Debt within the meaning of Regulations Section 1.704-2(i).

5

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 053

"**Membership Interest**" means a Member's rights in the Company, collectively, including a Person's right to share in the income, gains, losses, deductions, credit or similar items of, or receive distributions from the Company, any right to vote or participate in the management of the Company, and any right to information concerning the business and affairs of the Company, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"**Notice**" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by "electronic transmission by or to the Company"; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

"**Observer**" has the meaning set forth in Section 5.3(f).

"**Officers**" means each person designated as an officer of the Company to whom authority and duties have been delegated pursuant to Section 5.5, subject to any resolution of the Board appointing such person as an officer or relating to such appointment.

"**Percentage Interest**" means the percentage of a Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, representing the number of Units held by each Member divided by the total number of outstanding Units, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

"**Person**" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"**Preemption Period**" has the meaning set forth in Section 7.5.

"**Preemptive Holder**" has the meaning set forth in Section 7.5.

"**Profits and Losses**" means, for each fiscal year or other period as specified in this Agreement, an amount equal to the Company's taxable income or loss for the year or period, determined in accordance with Code §703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations

6

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 054

Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from Profits or Losses;

(c)     Gains or losses resulting from any disposition of Company asset with respect to which gains or losses are recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the Company asset disposed of, notwithstanding the fact that the adjusted tax basis of such Company asset differs from its Gross Asset Value;

(d)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Book Depreciation;

(e)     If the Gross Asset Value of any Company asset is adjusted pursuant to the definition of "Gross Asset Value," the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits or Losses; and

(f)     Notwithstanding any other provision of this subsection, any items of income, gain, loss or deduction that are specially allocated shall not be taken into account in computing Profits or Losses.

"**Priority Return**" means, as to each Member, the mathematical equivalent of interest at the rate of six percent (6%) per annum, cumulative but non-compounding, on the positive balance from time to time of such Member's Unreturned Capital, on the basis of a three hundred sixty (360)-day year for the actual number of days elapsed (not to exceed three hundred sixty (360) in a given year), in arrears, which return shall start accruing with respect to any Capital Contribution by such Member as of the date such Capital Contribution is funded.

"**Proposed Securities**" has the meaning set forth in Section 7.5.

"**Qualified Initial Public Offering**" means the first underwritten public offering of equity securities of the Company on a firm commitment basis in which the implied enterprise value of the Company immediately following the consummation of such public offering is equal to or greater than Two Hundred Million Dollars ($200,000,000).

"**Qualified Transaction**" means a proposed Liquidation Transaction approved by (a) the Board and (b) the affirmative vote or written consent of the Class A Majority Interest.

"**Regulations**" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

"**Strike Price**" means, with respect to any Class B Unit, the amount designated as the "Strike Price" for such Class B Unit by the Board, which amount (except with respect to Class B Units issuable upon the exercise of an option with an option exercise price at least equal to the

fair market value of the Class B Units at the time of exercise) shall at least be equal to the net equity value of the Company immediately prior to the grant of such Class B Unit, as reasonably determined in good faith by the Board, increased from time to time by the amount of cash and the Gross Asset Value of other property contributed to the capital of the Company between the date of grant of such Class B Unit and the date of any distribution thereon. The Strike Price applicable to any Class B Units issued pursuant to Section 3.3 shall be specified by the Board in its good faith and reasonable discretion at the time of the issuance of such Class B Units.

"**Tag Along Member**" has the meaning set forth in Section 7.6.

"**Tag Along Transfer Member**" has the meaning set forth in Section 7.6.

"**Tag Selling Member**" has the meaning set forth in Section 7.6.

"**Transfer**" means any assignment, conveyance, lease, sale, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

"**Transferring Member**" means a Member who plans to Transfer his Membership Interest pursuant to the terms hereof.

"**Trinity Major Decision**" has the meaning set forth in Section 5.2(b).

"**Unit**" means a Class A Unit and/or a Class B Unit.

"**Unreturned Capital**" means, with respect to each Member, the excess, if any, of (i) the amount of any Capital Contributions made by such Member over (ii) the aggregate amount of distributions received by such Member under Section 4.4(b).

"**Unpaid Priority Return**" means, for each Member, such Member's aggregate Priority Return reduced, but not below zero, by any amounts distributed to such Member pursuant to Section 4.4(a).

"**Voting Interest**" means, with respect to a Member, the right to vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II: ORGANIZATIONAL MATTERS

2.2     Formation. The Company has been organized as a Delaware limited liability company by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware on October 26, 2016, under and pursuant to the Act, and shall be continued in accordance with this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any

8

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 056

Members are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement, to the extent not prohibited by the Act, shall control over the Act. This Agreement shall constitute the "limited liability company agreement" for purposes of the Act.

2.3     Name. The name of the LLC shall be "BIG3 Basketball, LLC". The Board shall operate the business of the Company under such name or use such other or additional names as the Board may deem necessary or desirable. The Board shall cause such name to be registered under assumed or fictitious name statutes or similar laws of the states in which the Company operates, if required. The phrase "LLC" shall always appear as part of the name of the Company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by the Company, and as otherwise required by the Act. Notification of any name change shall be given to all Members.

2.4     Principal Office. The principal executive office and mailing address of the Company shall be located at 16830 Ventura Blvd., Encino, CA 91436 c/o Fishman, Block + Diamond LLP, or any other place or places determined by the Board from time to time.

2.5     Registered Office. The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 or any other place as may be designated by the Board from time to time.

2.6     Purpose. The purpose and business of the Company shall be to engage in any lawful act or activity which may be conducted by a limited liability company formed pursuant to the Act and to engage in all activities necessary or incidental to the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

2.7     Term. The term of existence of the Company commenced on the effective date of filing of Certificate of Formation with the Delaware Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

## ARTICLE III: CAPITALIZATION AND MEMBERSHIP INTERESTS

3.1     The initial Capital Contribution of each Member is set forth on Exhibit A hereto. Each Member has a corresponding credit to his, her or its Capital Account. Subject to Section 5.2, the Board shall have the unfettered authority to admit additional Persons as Members of the Company and to unilaterally amend Exhibit A from time to time as appropriate to reflect the Capital Contributions of such additional Members. Each Member has been issued that number of Units as set forth in Exhibit A.

3.2     Each of the Class A Units shall entitle the holder thereof to a single vote on all matters presented to the Members (or required to be presented to the Members) hereunder or under the Act, and the Class B Units shall be non-voting and shall not entitle the holders thereof to vote with respect to any matters presented to the Members (or required to be presented to the

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 057

Members). Each Class A Unit shall be entitled to receive a Priority Return, as that term is defined in Article I.

3.3     Class B Units may be issued to employees, consultants, managers, advisors or other service providers of the Company for the purpose of attracting or retaining qualified individuals or otherwise providing compensation for services to the Company. The Class B Units may be issued pursuant to a plan, or outside of any plan, by the Board, without the consent of the Members or amendment of this Agreement. The price paid, if any, and the Strike Price, which may be zero, for the Class B Units issued pursuant to this Section 3.3 shall be determined by the Board after adjusting Gross Asset Value of the Company in the manner described in subsection (b) of the definition of "Gross Asset Value". The Strike Price of each Class B Unit shall be subject to adjustment pursuant to this Agreement. The initial Capital Account balance of the Class B Members attributable to a grant of Class B Units that are issued without cost shall be zero. It is intended that the issuance of such Class B Units shall be characterized for federal income tax purposes as a "profits interest" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343. Neither the Company nor any Member shall perform any act or take any position inconsistent with the treatment of such Class B Units as "profits interests" for tax purposes. **EACH MEMBER WHO MAY FILE AN ELECTION UNDER SECTION 83(b) OF THE CODE WITH RESPECT TO ANY CLASS B UNITS ACKNOWLEDGES THAT IT IS SUCH MEMBER'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE TIMELY SUCH ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF SUCH MEMBER REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON SUCH MEMBER'S BEHALF.** The Class B Units may be subject to vesting pursuant to a separate agreement. A Person who receives one or more Class B Units in connection with the performance of services to or for the benefit of the Company that is not substantially vested (within the meaning of Regulations Section 1.83-3(b)) shall timely file an election under Section 83(b) of the Code with respect to the substantially non-vested portion of such Class B Units. Exhibit A shall set forth the number of Class B Units granted to the Class B Members and the Strike Price (if any) applicable to the Class B Units. To the extent provided by applicable final Regulations or Internal Revenue Service guidance, the Members elect to have the "safe harbor" (the "Safe Harbor Election") described in the proposed Revenue Procedure set forth in Internal Revenue Service notice 2005-43 (the "Notice") apply to any Class B Units issued pursuant to this Section 3.3, and authorize and direct the Company to make the Safe Harbor Election, and the Company and each Member agrees to comply with the requirements of the safe harbor with respect to all Class B Units issued in connection with the performance of services while the Safe Harbor Election remains effective. For purposes of making the Safe Harbor Election, the Tax Representative is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor Election by the Tax Representative constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the Notice. In accordance with Revenue Procedure 2001-43, 2001-2 C.B. 191, the Members will be treated as the owner of the Class B Units subject to vesting from the date of issuance during the period of time in which the Member holds the Class B Units, and will be allocated Profits and Losses associated with the Class B Units during the period of time in which the Class B Member holds the Class B Units. Except as otherwise required by law, neither the Members nor the Company will deduct any amount as wages, compensation, or otherwise for the fair market value of the Class B Units (or any portion

10

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 058

thereof) when issued, upon vesting or otherwise. The Board may amend this Agreement to the extent the Board determines is reasonably necessary to comply with the Regulations as they may he amended so that, to the extent possible, the receipt or vesting of Class B Units is not taxable to the service provider, including provisions relating to the use of liquidation values and forfeiture allocations, provided, that such amendment does not adversely affect the Members (other than the loss of a compensation deduction) unless otherwise required by the Code, the Regulations or other applicable law.

3.4     No Member shall be required to make any additional Capital Contributions. To the extent determined by the Board, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Board determines that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business. Each Member shall receive a credit to his, her or its Capital Account in the amount of any additional capital which he, she or it contributes to the Company.

3.5     An individual Capital Account shall be established and maintained for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member Transfers all or a part of its Membership Interest in accordance with this Agreement, the Capital Account attributable to the Transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(l).

3.6     A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.7     A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1     Allocation of Profits and Losses. Subject to Section 4.2, the Profits or Losses for each fiscal year of the Company shall be allocated to the Members in such a manner that, at the end of such fiscal year, the Adjusted Capital Account balance of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a Hypothetical Liquidation as of the end of the last day of such fiscal year. For this purpose, a "Hypothetical Liquidation" means that all assets of the Company are disposed of in a taxable disposition for the Gross Asset Value of such assets (but in the case of assets subject to the rules in the Regulations governing the chargeback of Company Minimum Gain and Member Minimum Gain, such provisions would apply), the liabilities of the Company are fully satisfied in accordance with their terms, and the remaining amounts are distributed to the Members pursuant to Section 8.2.

4.2     Regulatory Allocations. Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

42325377;3

(a) <u>Minimum Gain Chargeback</u>. If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.2(a) is intended to comply with the "minimum gain chargeback" requirements of Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) <u>Chargeback Attributable to Member Nonrecourse Debt</u>. If there is a net decrease in Member Minimum Gain during any fiscal year, each Member with a share of Member Minimum Gain at the beginning of such fiscal year shall be specially allocated items of income and gain for such fiscal year (and, if necessary, for subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(4) and (5). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2)(i). This Section 4.2(b) is intended to comply with the "partner minimum gain chargeback" requirements of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) <u>Qualified Income Offset</u>. If any Member unexpectedly receives any adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which results in an Adjusted Capital Account Deficit for the Member, such Member shall be allocated items of income and book gain in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided, that an allocation pursuant to this Section 4.2(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this Article IV have been tentatively made as if this Section 4.2(c) were not in the Agreement. This Section 4.2(c) is intended to constitute a "qualified income offset" as provided by Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) <u>Member Nonrecourse Deductions</u>. Member Nonrecourse Deductions shall be allocated among the Members who bear the Economic Risk of Loss for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in the ratio in which they share Economic Risk of Loss for such Member Nonrecourse Debt. This provision is to be interpreted in a manner consistent with the requirements of Regulations Section 1.704-2(b)(4) and (i)(1).

(e) <u>Nonrecourse Deductions</u>. Any Nonrecourse Deductions (as defined in Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in accordance with their Percentage Interests.

(f) <u>Regulatory Allocations</u>. The allocations set forth in this Section (the "Regulatory Allocations") are intended to comply with certain requirements of the

12

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 060

applicable Regulations promulgated under Code Section 704(b). Notwithstanding any other provision of this Article IV, the Regulatory Allocations shall be taken into account in allocating other operating Profits, Losses and other items of income, gain, loss and deduction to the Members for Capital Account purposes so that, to the extent possible, the net amount of such allocations of Profits, Losses and other items shall be equal to the amount that would have been allocated to each Member if the Regulatory Allocations had not occurred.

    4.3    <u>Allocation for Income Tax Purposes.</u>

    (a)    <u>Allocation in General.</u>  Except as otherwise provided in this Agreement, for each fiscal year (or portion thereof), items of Company income, gain, deduction and expense, shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the Profits (and the items thereof) or Losses (and the items thereof) of which such items are components were allocated pursuant to Section 4.1 and Section 4.2.

    (b)    <u>Section 704(c) Items.</u>  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value. If the Gross Asset Value of a Company asset is adjusted pursuant to clause (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such Company asset for tax purposes shall take account of any variation between the adjusted basis of such Company asset for Federal income tax purposes and its Gross Asset Value in a manner which will comply with Code Section 704(b), Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Board.

    (c)    <u>Allocations Solely for Tax Purposes.</u>  Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits and Losses or other items or distributions pursuant to any provision of this Agreement.

    4.4    <u>Distributions.</u> Available Cash shall be distributed to the Members, as and when determined by the Board:

    (a) first, ratably, to the Members in accordance with their respective balances of accrued but Unpaid Priority Return, until each Member's Unpaid Priority Return is reduced to zero;

    (b) second, to the Members, pari passu, in proportion to and to the extent of their respective Unreturned Capital balances at the time of such distribution until each Member's Unreturned Capital balance has been reduced to zero; and

    (c) thereafter, to the Members, pari passu in accordance with their respective Percentage Interests at the time of such distribution.

13

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 061

4.5     Allocations of Net Profits and Net Losses in Respect of a Transferred Interest.  If any Membership Interest is Transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, Profits or Losses for such fiscal year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon its respective Percentage Interest at the close of such day; provided, however, that the Company's taxable year shall be segregated into two or more segments in order to account for Profits or Losses attributable to any extraordinary non-recurring items of the Company.

4.6     Withholding Taxes.

(a)     Notwithstanding any other provision of this Agreement, each Member authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Company with respect to such Member or as a result of such Member's participation in the Company; and if and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution with respect to such Member's interest in the Company.  To the extent that such deemed distribution to such Member (or any successor to such Member) for any taxable period exceeds the distributions that such Member would have received for such period but for such withholding, such excess shall be treated as an interest free loan to such Member.  Amounts so treated as loaned to any Member shall be repaid by such Member to the Company within thirty (30) days after the Company delivers a written request to such Member for such repayment; provided, however, that if any such repayment is not made, the Company may (without prejudice to any other rights of the Company) collect such unpaid amounts from any subsequent Company distributions that otherwise would be made to such Member.

(b)     Any withholdings referred to in this Section 4.6 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Board shall have received an opinion of counsel or other evidence, satisfactory to the Board, to the effect that a lower rate is applicable, or that no withholding is applicable.

(c)     If the Company receives a distribution from or in respect of which tax has been withheld, the Company shall be treated as having received cash in an amount equal to the amount of such withheld tax, and each Member shall be treated as having received as a distribution the portion of such amount that is attributable to such Member's interest in the Company as equitably determined by the Board.

4.7     Reporting Obligations.  The Members are aware of the income tax consequences of the allocations made by this Article IV and hereby agree to be bound by the provisions of this Article IV in reporting their Membership Interest of Company income and loss for income tax purposes.

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 062

4.8     Tax Distributions. Notwithstanding anything in this Agreement to the contrary, so long as either Jeff Kwatinetz or O'Shea Jackson Sr. or their respective spouse or children are Members of the Company (each an "**Original Member**"), any Original Member may cause the Company to distribute to each and every Member an amount equal to such Member's Tax Amount for each fiscal year prior to any other distributions. Sport Trinity, LLC may also cause the Company to distribute to each and every Member an amount equal to such Member's Tax Amount for each fiscal year prior to any other distributions. Tax Distributions shall be paid to Members Pro Rata based on Membership Interests owned at the date of distribution such that Members do not have to bear out of pocket cash expenses for tax liabilities associated with income derived from their investment in the Company. Tax Distribution shall be treated as an advance of distributions of Available Cash under Section 4.4. For purposes of the foregoing, a Member's "**Tax Amount**" is the amount of Profits allocated to the Member for such fiscal year multiplied by the sum of (i) the highest marginal federal income tax rate applicable to individuals as of the last day of such fiscal year and (ii) the highest marginal state income tax rate applicable to individuals in any state in which a Member resides as of the last day of such fiscal year.

## ARTICLE V: BOARD OF MANAGERS; OFFICERS

5.1     Authority of Board of Managers.

(a) Except for situations in which the approval of the Members is otherwise required by this Agreement (including Section 5.2) or under the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of Managers (the "**Board**"). All decisions out of the ordinary course of business and all decisions that constitute Core Governance Functions shall be within the purview of the Board, including, without limitation, the following:

(i)     entering into, making and performing contracts, agreements and other undertakings binding the Company and making all decisions and waivers thereunder;

(ii)     opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(iii)     to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(iv)     acquiring, utilizing for Company purposes and disposing of any asset of the Company;

(v)     hiring and employing executives, Officers, supervisors and other personnel (including for the avoidance of doubt individuals who are members of the Board) and setting their respective salaries;

15

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 063

(vi)     selecting, removing and changing the authority and responsibility of lawyers, accountants and other advisers and consultants;

(vii)     obtaining insurance for the Company; and

(viii)     establishing reserves for commitments and obligations (contingent or otherwise) of the Company.

(b) The Board may act (A) by resolutions adopted at a meeting and by written consents pursuant to Section 5.4, or (B) by delegating power and authority to any Officer pursuant to Section 5.5; provided, however, that Core Governance Functions may not be delegated to a committee of the Board or to an Officer.

(c) Each Member acknowledges and agrees that no Manager shall, solely as a result of being a Manager, be bound to devote all of his business time to the affairs of the Company, and that he and his Affiliates do and will continue to engage for their own account and for the accounts of others in other business ventures.

(d) Each Member acknowledges and agrees that the Managers may designate compensation for Officers of the Company (including Officers which are also Managers) provided that the relevant Manager does not determine his or her own compensation.

5.2     <u>Major Decisions.</u>

(a)     Notwithstanding the provisions of Section 5.1, neither the Board nor the Company shall take any action or incur any obligation which would be or result in a Founder Major Decision without the prior written consent of Jeff Kwatinetz (so long as Jeff Kwatinetz (individually or through BEK, LLC), his spouse or his children continue to own in the aggregate at least 1,140,625 Class A Units), and O'Shea Jackson, Sr. (so long as O'Shea Jackson, Sr., his spouse, or his children continue to own at least 1,140,625 Class A Units).  For purposes hereof, the term "<u>Founder Major Decision</u>" shall mean any of the following:

(i)     The material change of the Company's business activities as conducted, or the entry into the ownership, active management, or operation of any business that is not related to the Company's business activities, or the taking of any other act which would make it impossible or impractical to carry on the Company's business;

(ii)     Any merger, consolidation, dissolution, transfer or winding up of the Company, or reorganization, recapitalization or similar event with respect to the Company;

(iii)     The sale, lease, exchange, or other disposition of all or substantially all of the assets of the Company or any subsidiary or affiliate thereof, or the sale, lease, exclusive license, exclusive sub-license, or permanent disposition of any of the Company's material intellectual property rights;

(iv)     The admission of any additional Class A Members, the creation of any new class of equity interest, or the issuance of any Class B Units or other equity interest in the Company;

16

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 064

(v)     Any act that incurs, creates, assumes, or suffers to exist any lien, encumbrance, pledge, or mortgage on any of the Company's revenue streams, property, or assets, whether now owned or hereafter acquired, other than in the ordinary course of the Company's business;

(vi)    Any act that causes the Company to incur any indebtedness for borrowed money or assume, guarantee, endorse or take other responsibility for the obligations of any other Person, in each case, except for indebtedness that is incurred in the ordinary course of business;

(vii)   The Company entering into, amending, modifying, or supplementing any agreement, transaction, commitment, or arrangement with any Member, Manager, or affiliate thereof, or with any person related by blood, marriage, or adoption to any such person, or any entity in which any of the foregoing owns a material beneficial interest;

(viii)  Any amendment to this Agreement and/or the Certificate of Formation of the Company;

(ix)    The Company (i) filing for or consenting to the filing of a bankruptcy proceeding against the Company; (ii) making a general assignment of the assets or property of the Company for the benefit of creditors; or (iii) appointing, or acquiescing in the appointment of, a custodian or receiver;

(x)     The Company directly or indirectly making any distribution upon any Membership Interests (other than tax distributions pursuant to the provisions of Section 4.8 above);

(xi)    Any change to the tax status of the Company or any change to the tax accounting policies of the Company in a manner that would have a material effect on income or distributions to the Members, or causing the Company to file any tax returns or other required government or public filings; and

(xii)   The Company taking any action to pay, collect, compromise, litigate, arbitrate, or otherwise adjust or settle any and all claims or demands of or against the Company.

(b)     Notwithstanding the provisions of Section 5.1, neither the Board nor the Company shall take any action that would constitute a Trinity Major Decision without the prior written consent of Sport Trinity, LLC so long as the Trinity Group continue to own in the aggregate at least ██████████████████ For purposes hereof "Trinity Major Decision" shall mean any of the following:

(i)     Increasing the size of the Board of Managers (not including any Observer) to a number in excess of seven (7) members.

(ii)    Entering into any equity or convertible debt capital raising transaction in which the enterprise valuation of the Company implied by such financing is less than ████████████████████████████;

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 065

(iii) The initiation of a proceeding by the Company seeking the protection of the bankruptcy laws of the United States or causing of the Company to voluntarily initiate a proceeding under which the Company would seek the protection afforded to a debtor under the United States Bankruptcy Code;

(iv) Any transaction with or involving the Company, on the one hand, and any Member of the Company or Affiliate of any Member of the Company, on the other hand, involving more than ███████████████████ in the aggregate;

(v) Changing materially the business of the Company or conducting any material activities which are not a part of, or incidental to, the business of the Company as then conducted; or

(vi) Committing to take any of the foregoing actions or taking any such action in respect of a subsidiary of the Company in the event a subsidiary is created which controls and maintains the key operating assets and capital of the Company in its current form.

(c) Notwithstanding the provisions of Section 5.1, neither the Board nor the Company shall take any action or incur any obligation which would be or result in a Class A Major Decision without the consent of a Class A Majority Interest. For purposes hereof "Class A Major Decision" shall mean any of the following:

(i) Any merger, consolidation, dissolution, transfer or winding up of the Company or similar event with respect to the Company;

(ii) The sale, lease, exchange, or other disposition of all or substantially all of the assets of the Company, or the sale, lease, exclusive license, exclusive sub-license, or permanent disposition of any of the Company's material intellectual property rights; and

(iii) Entering into any transaction between the Company and its management with requires the consent of a majority of the Members pursuant to the Act.

(d) On the completion of a Qualified Initial Public Offering, the consent requirements in Section 5.2(a) and (b) shall be cancelled and shall be of no further force and effect.

(e) If Jeff Kwatinetz or O'Shea Jackson, Sr. should die, to the extent that their spouse or children continue to have the rights to approve major decisions under Section 5.2(a), their spouse or children shall not have the right to use those rights to override a decision of the Board as to the selection of Officers and employees of the Company who are overseeing the Company's business activities.

5.3    Composition and Election of the Board of Managers.

(a) Election of Managers. The Company shall initially have three (3) Managers. The number of Managers of the Company may be fixed from time to time by the affirmative vote or written consent of Members holding a Class A Majority Interest (which must

18

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 066

include Jeff Kwatinetz and O'Shea Jackson Sr.), provided that in no instance shall there be less than three Managers. Unless a Manager resigns, each Manager shall hold office until a successor shall have been elected and qualified. The Managers shall be elected as follows:

(i) So long Jeff Kwatinetz, individually or through BEK, LLC, his spouse or his children continue to own at least ██████████████ one Manager shall be appointed by BEK, LLC, who shall initially be Jeff Kwatinetz;

(ii) So long O'Shea Jackson Sr., his spouse or his children continue to own individually at least ██████████ one Manager shall be appointed by O'Shea Jackson, Sr., who shall initially be O'Shea Jackson Sr.;

(iii) One Manager shall be appointed by Sport Trinity, LLC. The Manager selected by Sport Trinity, LLC shall be reasonably acceptable to the Board. The initial manager appointed by Trinity Group shall be Ahmed Al-Rumaihi, and the Board and Company agree that both Ahmed Al-Rumaihi and Ayman Sabi shall be reasonably acceptable designees of Sport Trinity to serve as Managers; and

(iv) All remaining Managers of the Board shall be appointed pursuant to an affirmative vote of Members holding a Class A Majority Interest.

It is understood and agreed that the rights of Jeff Kwatinetz, O'Shea Jackson Sr., and Sport Trinity, LLC to appoint a Manager under this Section 5.3(a) shall automatically be terminated upon the occurrence of a Qualified Initial Public Offering.

(b) Resignation. Any Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which such Manager is a party. The resignation of such Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(c) Removal. A Manager may be removed at any time, by the parties entitled to appoint such Manager, or upon the occurrence of fraud or upon the indictment for any felony on the part of such Manager (by the affirmative Vote of a Class A Majority Interest); provided that (i) so long as Jeff Kwatinetz (either individually or through BEK, LLC), his spouse or his children continue to own at least a ████████████ Jeff Kwatinetz may not be removed without his prior written consent, and (ii) so long as O'Shea Jackson Sr., his spouse or his children continue to individually own at least ██████████ O'Shea Jackson Sr. may not be removed without his prior written consent. Any removal shall be without prejudice to the rights, if any, of the Manager under any employment contract and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member.

(d) Reimbursement. The Company shall pay all reimbursable out-of-pocket costs and expenses incurred by each member of the Board (and by each Board Observer)

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 067

incurred in the course of their service hereunder, including in connection with attending regular and special meetings of the Board.

(e) Reliance by Third Parties. Any Person dealing with the Company, may rely on the authority of the Board (or any Officer authorized by the Board) in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by the Board (or any Officer authorized by the Board) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (i) at the time of the execution or delivery thereof, this Agreement was in full force and effect, (ii) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company and (iii) the Board or such Officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.

(f) Board Observers. Sport Trinity, LLC and Eden Investment Limited shall each be entitled to appoint one observer, reasonably approved by the Board, to attend and observe meetings of the Board. The initial observer on behalf of Trinity Group will be Ayman Sabi, and Ayman Sabi and Ahmed Al- Rumaihi are approved as Board Observers. Board Observers (i) shall be given reasonable advance written notice of each meeting of the Board, (ii) shall receive all information provided to Board members, (iii) shall be entitled to attend such meetings as an invitee or via electronic means, and (iv) shall be entitled to participate at such meeting (but shall not be entitled to any vote with respect to matters presented to the Board), provided, however, that each such Observer shall agree to hold in confidence and trust and act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely after the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest, or if such Observer is a competitor of the Company; provided further that all rights under this Section 5.3(f) shall cease upon the occurrence of a Qualified Initial Public Offering.

5.4    Board Meetings and Actions by Written Consent.

(a) Quorum; Voting. A majority of the total number of Managers then serving on the Board (i.e., excluding any vacancies on the Board) must be present in order to constitute a quorum for the transaction of business of the Board, and except as otherwise provided in this Agreement, the act of the Managers holding a majority of the total votes present at a meeting of the Board at which a quorum is present shall be the act of the Board. If a quorum shall not be present during a meeting of the Board, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. A Manager who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent

42325377;3

shall not apply to a Manager who voted in favor of such action. Each Manager shall be entitled to one vote on all matters voted on by the Board.

(b) <u>Place; Attendance</u>. Meetings of the Board may be held at such place or places as shall be determined from time to time by resolution of the Board. At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) <u>Meeting In Connection With Member Meeting</u>. In connection with any meeting of Members, the Board may, if a quorum is present, hold a meeting for the transaction of business immediately after and at the same place as such meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) <u>Time, Place and Notice</u>. Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board. Notice of such meetings shall not be required. At any regular meeting of the Board, if the Manager designee of Sport Trinity, LLC is not available, the Board Observer selected by Sport Trinity, LLC may participate in the Board meeting and act in the place of the Manager designee, including the right to vote at that meeting.

(e) <u>Special Meetings</u>. Special meetings of the Board may be called by any Manager on at least twenty-four (24) hours' notice to each other Manager. Such notice shall state the topics to be considered at such special meeting. At any special meeting of the Board, if the Manager designee of Sport Trinity, LLC is not available, the Board Observer selected by Sport Trinity, LLC may participate in the Board meeting and act in the place of the Manager designee, including the right to vote at that meeting.

(f) <u>Action by Written Consent or Telephone Conference</u>. Subject to Section 5.2, any action permitted or required by the Act, the Certificate of Formation or this Agreement to be taken at a meeting of the Board may be taken without a meeting, without notice and without a vote if consent in writing, setting forth the action to be taken, is signed by all of the Managers then serving. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board. Subject to the requirements of the Act, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, the Managers may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 069

5.5    Officers.

(a) Appointment of Officers. In order to carry on the day-to-day affairs of the Company, the Board may appoint such Officers and delegate to them such powers, duties and responsibilities (other than Core Governance Functions), including, without limitation, the power to enter into contracts, obligations and liabilities on behalf of the Company in the ordinary course of the Company's business and in accordance with this Agreement, all subject to the supervision and control of the Board; provided, further, that such Officers shall not have the power to make any decisions on behalf of the Company not delegated to them, not in the ordinary course of the Company's business or not in accordance with this Agreement. The Officers shall serve at the pleasure of the Board, subject to all rights, if any, of any Officer under any contract of employment. Any individual may hold any number of offices. The Officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Board. No person dealing with the Officers need inquire into the validity, propriety, or due authorization of any document or instrument executed in the name of the Company by any Officer, or as to the authority of any Officer in executing the delivering the same.

(b) Resignation; Removal; Vacancies. Subject to the rights, if any, of any Officer under a contract of employment, any Officer may be removed, either with or without cause, by the Board at any time. Any Officer may resign at any time by giving written notice to the Board. Any resignation shall take effect at the date of the receipt of such notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the Officer is a party. Any vacancy occurring in any office of the Company may be filled by the Board and shall remain vacant until filled by the Board.

(c) Duties of Officers. The Officers, in the performance of their duties as such, shall owe to the Members duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

5.6    The Managers shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. Managers shall have the duties of persons who serve as directors of a Delaware corporation. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

5.7    No Manager or Officer is obligated to devote all of his time or business efforts to the affairs of the Company solely by reason of their acting as a Manager or an Officer. Each Manager and each Officer shall devote whatever time, effort, and skill as he deems appropriate for the operation of the Company. Subject to Section 12.1, it is expressly understood and acknowledged that the Managers and Officers are not obligated to devote their services exclusively to the Company. Notwithstanding the foregoing, any Manager or Officer of the Company who is also an employee of the Company shall be required to devote such time and

22

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 070

business efforts to the Company as would reasonably be expected from such an employee in that position.

5.8     Subject to Section 5.2, and notwithstanding that it may constitute a conflict of interest, the Board may, and may cause their Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment or the reimbursement for overhead) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction are approved by the disinterested members of the Board, acting in good faith, as being at "arm's length."

5.9     No person who is a Manager or Officer or both a Manager and Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or Officer or both a Manager and Officer of the Company.

5.10    The Members shall have no voting rights except as required by applicable law and as otherwise set forth in this Agreement. If a vote is required, the Company shall follow the Act with respect to the procedures for member meetings and written consents.

5.11    All assets of the Company, whether real or personal, shall be held in the name of the Company. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Board. Withdrawal from those accounts shall require the signature of the person or persons designated by the Board.

## ARTICLE VI: ACCOUNTS AND RECORDS

6.1     Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours. The costs of inspection and copying shall be borne by the Member.

6.2     Beginning with the first fiscal year of the Company, a balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.

6.3     By June 1 of each year, beginning in the year 2018, the Board of Managers shall prepare a budget setting forth the expected expenditures for twelve month period commencing from June 15th of such year.

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 071

6.4     At all times during the term of existence of the Company, and beyond that term if the Managers deem it necessary, the Manager shall keep or cause to be kept the books of account referred to in Section 6.1, and the following:

(1)     A current list of the full name and last known business or residence address of each Member and of each holder of a Membership Interest in the Company, set forth in alphabetical order, together with the Capital Contribution and the share in Profits and Losses of each Member and holder of a Membership Interest;

(2)     A copy of the Certificate of Formation, as amended;

(3)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(4)     Executed counterparts of this Agreement and all amendments thereto;

(5)     Any powers of attorney under which the Certificate of Formation or any amendments were executed;

(6)     Financial statements of the Company, if any, for the six most recent fiscal years; and

(7)     The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Managers deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Managers.

6.5     The Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for that year in the time period required under applicable law.

6.6     The Company shall provide Managers with material information typically and reasonably provided to members of the board of directors of a Delaware corporation so that such Managers can properly perform their oversight duties as a Manager (including, without limitation, the following categories of material information: material financial information, information about material contracts, material correspondence from regulatory authorities, and material information about pending or threatened litigation), and shall also provide to a Manager all such information that is reasonably requested by the Manager, from time to time.

6.7     To the extent that Sport Trinity, LLC continues to own in the aggregate at least ████████████████ the Company shall provide Sport Trinity, LLC with copies of (i) all solicitation materials developed by the Company which are sent to third parties to seek additional investments or discuss the Company's potential future investment and divestment plans, and (ii) all other material information that the Company provides to other Members (including Members

24

who become Members in the future), to the extent not already provided to Sport Trinity, LLC in the ordinary course.

6.8     Tax Matters.

(a) Tax Matters for the Company Handled by Tax Representative. The Board shall designate a "Tax Representative," who shall be the "tax matters partner" for the Company pursuant to Section 6231(a)(7) of the Code, and, with respect to the Company's taxable years beginning on or after January 1, 2018, shall be the "partnership representative" of the Company within the meaning of Section 6223(a) of the Code. If any state or local tax law provides for a tax matters partner/partnership representative or person having similar rights, powers, authority or obligations, the Tax Representative shall also serve in such capacity. The Tax Representative shall have all of the rights, authority and power, and shall be subject to all of the obligations, of a tax matters partner/partnership representative to the extent provided in the Code and the Regulations, and the Members hereby agree to be bound by any actions taken by the Tax Representative in such capacity. The Tax Representative shall represent the Company in all tax matters to the extent allowed by law.  Without limiting the foregoing, the Tax Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Any decisions made by the Tax Representative, including, without limitation, whether or not to settle or contest any tax matter, and the choice of forum for any such contest, and whether or not to extend the period of limitations for the assessment or collection of any tax, shall be made in the Tax Representative's sole discretion. Without limiting the generality of the foregoing, the Tax Representative (i) shall have the sole and absolute authority to make any elections on behalf of the Company permitted to be made pursuant to the Code or the Regulations promulgated thereunder and (ii) without limiting the foregoing, may, in its sole discretion, make an election on behalf of the Company under Sections 6221(b) or 6226 of the Code as in effect for the first Fiscal Year beginning after December 31, 2017 and thereafter, and (iii) may take all actions the Tax Representative deems necessary or appropriate in connection with the foregoing. The Tax Representative will have the authority and responsibility to arrange for the preparation, and timely filing, of the Company's tax returns.  The Board hereby designates Jeff Kwatinetz as the initial Tax Representative.

(b) Information Provision and Covenants.  Each Member agrees to provide promptly and to update as necessary at any times requested by the Tax Representative, all information, documents, self-certifications, tax identification numbers, tax forms, and verifications thereof, that the Tax Representative deems necessary in connection with (1) any information required for the Company to determine the scope of Sections 6221-6235 of the Code; (2) an election by the Company under Section 6221(b) or 6226 of the Code, and (3) an audit or a final adjustment of the Company by a taxing authority. Each Member covenants and agrees to take any action reasonably requested by the Company in connection with an election by the Company under Section 6221(b) or 6226 of the Code, or an audit or a final adjustment of the Company by a taxing authority (including, without limitation, promptly filing amended tax returns and promptly paying any related taxes, including penalties and interest).

42325377;3

(c) <u>Audits</u>. The Members acknowledge and agree that the Tax Representative may cause the Company to elect out of the application of Section 6221(a) of the Code for each taxable year beginning after December 31, 2017, to the extent the Company is eligible to make such election. If the Company is not eligible to make such election, the Members acknowledge that the Company may elect the application of Section 6226 of the Code for its first taxable year after December 31, 2017 and for each fiscal year thereafter. This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment. In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the United States Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b), whether or not the Member owns any interest in the Company at such time. Any Member that fails to report its share of such adjustments on the Member's tax return for the taxable year including the date of the Company's statement described immediately above shall indemnify and hold harmless the Company, the Managers, the Tax Representative, and each of their Affiliates from and against any and all liabilities related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction. In addition, each Member agrees and covenants to indemnify and hold the Company, the Managers, the Tax Representative, and each of their Affiliates harmless from and against any and all liabilities related to taxes (including penalties and interest) imposed on the Company (i) pursuant to Section 6221 of the Code, which liabilities relate to adjustments that would have been made to the tax items allocated to such Member had such adjustments been made for a tax year beginning prior to January 1, 2018 (and assuming that the Company had not made an election to have Section 6221 of the Code apply for such earlier tax years) and (ii) resulting from or attributable to such Member's failure to comply with clause (b) of this Section 6.5. Each Member acknowledges and agrees that no Member shall have any claim against the Company, the Managers, the Tax Representative, or any of their Affiliates for any tax, penalties or interest resulting from the Company's election under Section 6226 of the Code.

(d) <u>Indemnification</u>. The Company shall indemnify, defend, and hold the Tax Representative harmless for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with its serving in that capacity, provided that the Tax Representative shall not be entitled to indemnification for such costs and expenses if the Tax Representative has not acted in good faith for a purpose which the Tax Representative reasonably believes to be in, or not opposed to, the best interests of the Company.

(e) <u>Survival of Obligations</u>. The provisions contained in this Section 6.5 shall survive the termination of the Company, the termination of this Agreement and, with respect to any Member, the transfer or assignment of any portion of such Member's interest in the Company.

## ARTICLE VII: TRANSFERS OF MEMBERSHIP INTERESTS; PREEMPTIVE RIGHT

7.1 A Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or later acquired, unless (1) such Transfer complies with the provisions of this Article VII and (2) the Membership Interest to be Transferred, when added to

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 074

the total of all other Membership Interests Transferred in the preceding 12 months, shall not cause the termination of the Company under Code §708(b)(1)(B). No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless the Encumbrance has been approved in writing by the Board, other than to the extent set forth in this Agreement. Any Transfer or Encumbrance of a Membership Interest not complying with this Article VII shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member may transfer its Membership Interest in an Exempt Transaction.

      7.2    <u>Right of First Refusal</u>.

      (a) Subject to the provisions of Section 7.1, at any time prior to the initiation of a Qualified Public Offering, each Class A Member shall have a right of first refusal if any other member (a "**Transferring Member**") has received a bona fide offer in writing from an unaffiliated third party that the Transferring Member desires to accept to purchase any or all portion of the Class A Membership Interests owned by the Transferring Member (the "**Offered Membership Interest**"), the Offering Member shall first make an offering of the Offered Membership Interest to the other Members in accordance with this Section 7.2 prior to a Transfer of the Offered Membership Unit to the unaffiliated third party (other than Exempt Transfers).

      (b) The Offering Member shall, within five (5) days of the receipt of the offer from the unaffiliated third party, give written notice (the "**Transferring Member Notice**") to the Company and the other Class A Members stating that it has received a bona fide offer from an unaffiliated third party and specifying (i) the name of the person or entity that has offered to purchase such Offered Membership Interest, (ii) the price per Class A Membership Interest and other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, and (iii) the proposed date, time, and location of the closing of the Transfer, which shall not be less than thirty (30) days from the date of the Transferring Member Notice. The Transferring Member Notice shall constitute the Transferring Member's offer to Transfer the Offered Membership Interest to the other Members, which shall be irrevocable until the end of the ROFR Notice Period. By delivering the Transferring Member Notice, the Transferring Member represents and warrants to the Company and to each other Class A Member that (i) the Transferring Member has full right, title and interest in and to the Transferred Units, (ii) the Transferring Member has all the necessary power and authority and has taken all necessary action to sell such Transferred Units as contemplated by this Section 7.2, and (iii) the Transferred Units are free and clear of any and all liens.

      (c)    Upon receipt of the Transferring Member Notice, the Company shall have twenty (20) days (the "**Company ROFR Notice Period**") to purchase all (and not less than all) of the Transferred Units by delivering a written notice (a "**Company ROFR Offer Notice**") to the Transferring Member stating that it offers to purchase such Offered Units on the terms specified in the Transferring Member Notice. Should the Company not purchase the Transferred Units upon the end of the Company ROFR Notice Period, any Class A Member shall have ten (10) days (the "**Member ROFR Notice Period**", and together with the Company ROFR Notice Period, the "**ROFR Notice Period**") to purchase all (but not less than all) of the

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 075

Transferred Units by delivering a written notice (the **"Member ROFR Offer Notice"**, and together with the Company ROFR Offer Notice, the **"ROFR Offer Notice"**) Any ROFR Offer Notice shall be binding upon delivery and irrevocable by the applicable Member. If more than one Class A Member delivers a ROFR Offer Notice, each such Class A Member (the **"Purchasing Member"**) shall be allocated its Pro Rata based on the total Membership Interests owned at the time of the ROFR Offer Notice, unless otherwise agreed by such Members. Each Member that does not deliver a ROFR Offer Notice during the ROFR Notice Period shall be deemed to have waived all of such Member's rights to purchase the Offered Units under this Section 7.2, and the Transferring Member shall thereafter, subject to the rights of any Purchasing Member, be free to sell the Transferred Units to the unaffiliated third parties specified in the Offer Notice without any further obligation to such Class A Member pursuant to this Section 7.2.

(d) **Consummation of Sale.** If no Member delivers a ROFR Notice in accordance with Section 7.2(c), the Offering Member may, during the ninety (90) day period immediately following the expiration of the ROFR Notice Period (the **"ROFR Transfer Period"**), Transfer all of the Transferred Units to the unaffiliated third party on terms and conditions no more favorable to the unaffiliated third party than those set forth in the Offering Member Notice. If the Transferring Member does not Transfer the Transferred Units within such period or, if such Transfer is not consummated within the ROFR Transfer Period, the rights provided hereunder shall be deemed to be revived and the Offered Units shall not be Transferred to the Independent Third Party unless the Offering Member sends a new Offering Member Notice in accordance with, and otherwise complies with, this Section 7.2.

(e) **Closing.** At the closing of any sale and purchase pursuant to this Section 7.2, the Transferring Member shall deliver to the Purchasing Member(s) certificate or certificates representing the Transferred Units to be sold (if any), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefore from such Purchasing Member(s) by certified or official bank check or by wire transfer of immediately available funds.

7.3 <u>Reserved.</u>

7.4 <u>Drag-Along Rights.</u>

(a) If, at any time members holding a Class A Majority Interest receive a bona fide third-party offer from a party not affiliated with such Members to purchase all (but not less than all) of the Class A Membership Interests of the holders of the Class A Majority Interest, and the holders of the Class A Majority Interest desire to accept such offer (**"Drag-Along Sellers"**), and the other Class A Members (the **"Minority Members"**) have not collectively exercised their right of first refusal (pursuant to Section 7.2), then the Drag-Along Sellers shall also have the right to require the Minority Members to sell all, but not less than all, of their respective Class A Membership Units (the **"Co-Seller Shares"**) to the third party (the **"Drag-Along Transferee"**) at the same price per Class A Membership Interest as being offered to the Drag-Along Sellers, such Co-Seller Shares to be conveyed free and clear of all encumbrances (the **"Drag-Along Sale"**). For the avoidance of doubt, in no event shall the

42325377;3

holders of the Class A Majority Interest have drag-along rights pursuant to this Section 7.4 with respect to any Exempt Transfer or any transfer pursuant to Section 7.1.

(b) The Drag-Along Sellers shall provide notice of such Drag-Along Sale to the Minority Members (a **"Drag-Along Notice"**) no later than 15 Business Days prior to the proposed Drag-Along Sale. The Drag-Along Notice shall identify the Drag-Along Transferee, the consideration for which a Transfer is proposed to be made including the proposed price per Membership Unit and all other material terms and conditions of the Drag-Along Sale.

(c) The Drag-Along Sellers shall be required to consummate the Drag-Along Sale no later than the one hundred twenty (120) days after the date of the Drag-Along Sale Notice on the terms and conditions set forth in the Drag-Along Sale Notice. If the Drag-Along Sale shall not have been consummated during such period all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Class A Membership Interests owned by the Minority Members shall again be in effect.

(d) Concurrently with the consummation of the Transfer of Membership Units pursuant to this Section 7.4, the Drag-Along Seller shall give notice thereof to the Minority Members, shall remit to each of the Minority Members the total consideration (the cash portion of which is to be paid by wire transfer in accordance with such Minority Member's wire transfer instructions) for the Membership Units Transferred pursuant hereto and shall furnish such other evidence of the completion and time of completion of such Transfer and the terms thereof as may be reasonably requested by such Minority Members. Further, each Minority Member shall execute such documents as are required to effectuate the transfer, which documents may contain such representations, warranties, covenants and indemnities to the Minority Members interest in the Company as are customary for transactions of this type and included in the documents relating to the transfer being signed by the Drag-Along Sellers.

(e) For the avoidance of doubt, and in accordance with Section 5.2(a) and 5.2(b) of this Agreement, so long as Jeff Kwatinetz (either individually or through BEK, LLC), his spouse or his children continue to own at least ███████████████ and O'Shea Jackson, Sr., his spouse or his children continue to own at least ███████ respectively, a transaction effecting the Drag-Along provision above would require their approval and written consent. Further, a transaction effecting the Drag-Along provision shall require the consent of Sport Trinity if the enterprise valuation of the Company implied by such financing is less than ████████████████████████.

7.5 Tag-Along Rights.

In the event that any Member (a **"Tag Selling Member"**), desires to Transfer more than fifty percent (50%) of the aggregate Class A Membership Units in the Company, pursuant to a bona fide offer from a third party buyer, either in a single Transfer or cumulatively after taking into account previous Transfers to third Persons (excluding in all cases any Exempt Transfers), then such Tag Selling Member shall notify the Class A Members who are not Tag Selling Members (**"Tag-Along Members"**), in writing, of such offer and its terms and conditions (the **"Tag Transfer Notice"**) not less than 10 days prior to the date of such proposed transfer. Within

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 077

ten (10) days after receiving the Tag Transfer Notice, the Tag-Along Members shall have the right, but not the obligation, by written notice to the Tag Selling Member to elect to have their Membership Units purchased Pro Rata based on the total Membership Interests owned at the time of the Tag Transfer Notice by the third party buyer on the same terms and conditions as set forth in the Tag-Along Notice.

7.6 <u>Preemptive Right</u>.

(a) If at any time the Board proposes to cause the Company to issue equity securities of any kind (the term "equity securities" shall include for these purposes any warrants, options or other rights to acquire equity securities and debt securities expressly convertible or exchangeable into equity securities) of the Company (other than the issuance of equity securities (i) pursuant to exercise of warrants or options already outstanding, (ii) pursuant to a Qualified Initial Public Offering, or (iii) pursuant to the issuance of Class B Units to employees or other service providers of the Company or other equity securities pursuant to an employee securities option plan, securities bonus plan, securities purchase plan or other management equity program approved by the Board), then, as to each Class A Member holding more than 400,000 Class A Units (the "**Preemptive Holders**"), the Company shall: (A) give written notice setting forth in reasonable detail (1) the designation and all of the terms and provisions of the securities proposed to be issued (the "**Proposed Securities**"), (2) the price and other terms of the proposed sale of such securities, (3) the amount of such securities proposed to be issued and (4) such other information as any Preemptive Holder may reasonably request in order to evaluate the proposed issuance; and (B) offer to issue and sell to each such Preemptive Holder so long as it is an "accredited investor" (as defined in Regulation D promulgated by the Securities Exchange Commission under the Securities Act), a portion of the Proposed Securities equal to a fraction determined by dividing (x) the number of Units held by such Preemptive Holder (on a fully diluted basis) by (y) the total number of Units then held by all Preemptive Holders (on a fully diluted basis). Each Preemptive Holder must exercise its purchase right hereunder within fifteen (15) business days after receipt of such notice from the Company (the "**Preemption Period**"). The closing of any purchase by any Preemptive Holder shall be consummated concurrently with the consummation of the issuance or sale described in the written notice (such purchasers are referred to as "**Exercising Members**"). Notwithstanding the foregoing, this provision shall not apply to a transaction that brings material strategic advantages to the Company, as determined by the Board, from a party not affiliated with the Members or Managers.

(b) To the extent all of the Proposed Securities offered to the Preemptive Holders are not purchased by Preemptive Holders during the Preemption Period, then the Company shall offer the remainder of such Proposed Securities to the Preemptive Holders that purchased the entire amount of Proposed Securities available to be purchased by such Preemptive Holders under Section 7.6(a), each of which shall then be entitled to purchase a portion of the remaining Proposed Securities equal to a fraction determined by dividing (x) the number of Proposed Securities purchased by such Preemptive Holder during the Preemption Period by (y) the total number of Proposed Securities purchased by all the Preemptive Holders during the Preemptive Period under Section 7.6(a). Each such Preemptive Holder must exercise its purchase right hereunder within five (5) business days after it has been informed of such additional purchase right (the "**Final Preemption Period**").

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 078

(c) Upon expiration of the Final Preemption Period, the Company will be free to sell such Proposed Securities that have not been sold pursuant to this Section 7.6 during the one hundred twenty (120) days following such expiration on terms and conditions not more favorable and at a purchase price not less than offered to the Preemptive Holders. Any Proposed Securities offered or sold by the Company to Persons after such one hundred twenty (120) day period must be reoffered to the Preemptive Holders pursuant to this Section 7.6.

(d) Upon the issuance or sale of the Proposed Securities in accordance with this Section 7.6, the Company shall deliver to each Exercising Member certificates (if any) evidencing the Proposed Securities, which shall be issued free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof) and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such securities shall be, upon issuance thereof to the Preemptive Holders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. Each Exercising Member shall deliver to the Company the purchase price for the securities purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of the Proposed Securities shall take all other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

(e) Notwithstanding anything to the foregoing, the rights under this Section 7.6 shall terminate upon the closing of any Qualified Initial Public Offering.

7.7    Future Changes to Securities. In the event that the terms of the Class A Membership Interests or Class B Membership Interests (or future securities issued by the Company) are materially changed following their issuance, such that the terms of such securities to the existing holders change materially and adversely, the number of Class A Membership Interests or Class B Membership interests, as may be appropriate, shall be adjusted in order that each Class A Member and/or Class B Member remains in the same position he, she, or it otherwise would have been in without such changes in the securities.

## ARTICLE VIII: DISSOLUTION AND WINDING UP

8.1    The Company shall be dissolved on the first to occur of the following events, subject to the terms of Section 5.2:

(a) By the written consent of at least two-thirds of the Class A Member Interests;

(b) The sale or other disposition of substantially all of the Company assets;

(c) Entry of a decree of judicial dissolution under the Act.

8.2    On the dissolution of the Company, including pursuant to a Liquidation Transaction, it shall engage in no further business other than that necessary to wind up its business and affairs. The Managers winding up the Company's affairs shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the

31

Company whose addresses appear in the Company's records. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a) To pay the expenses of liquidation; then

(b) To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with accrued and unpaid interest, bears to the total of all those loans from Members, including all interest accrued and unpaid on those loans. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; then

(c) To the Members in accordance with Section 4.4.

Notwithstanding anything in this Section 8.2 to the contrary, no Class B Unit holder shall be entitled to receive any distributions pursuant to this Section 8.2 in respect of a Class B Unit unless and until there shall have been distributed in respect of all other Units (including Class A Units and Class B Units subject to lower Strike Prices) an aggregate amount of distributions equal to the Strike Price with respect to such Class B Unit. In furtherance of the foregoing, any calculation of a Member's Percentage Interest for purposes of this Section 8.2 shall be made by ignoring any Class B Units with respect to which the applicable Strike Price has not been met. If (x) the Company shall at any time or from time to time effect a subdivision of the outstanding Class A Units or Class B Units, or issue, or fix a record date for the determination of holders of Class A Units or Class B Units entitled to receive, a distribution payable on the Class A Units or Class B Units in additional Units, or (y) the Company undergoes a reorganization or merger which affects the outstanding Class A Units or Class B Units or obtains substantial additional equity capital or issues Units in connection with an acquisition or any other event which materially affects the capitalization of the Company, the Board shall in good faith make such adjustments to this Section 8.2 as are necessary to equitably reflect the changed circumstances and provide to the holders of Class A Units and/or Class B Units (as applicable) the economic results contemplated hereby. The intent of this provision is to ensure that any Class B Units qualify as "profits interests" under Revenue Procedures 93-27 and 2001-43, and this provision shall be interpreted and applied consistently therewith.

8.3    Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any Member, the Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

## ARTICLE IX: DISPUTES; ARBITRATION

9.1    Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Los Angeles, California before an arbitrator. The arbitration shall be administered

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 080

by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The Company will bear the costs of the arbitrator and arbitration and each interested party will pay for her, his, its, own lawyer and other costs. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction or from using the courts to enforce this arbitration provision and any decisions rendered by an arbitrator pursuant to this agreement to arbitrate. The parties hereto irrevocably submit to the jurisdiction of the United States District Court in the State of California and the state courts of the State of California for the purposes of enforcing the arbitration provisions hereof.

9.2  **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVE THEIR RIGHT TO TRIAL BY JUDGE OR JURY.**

## ARTICLE X: INDEMNIFICATION AND INSURANCE

10.1  <u>Indemnification of Agents</u>.  The Company shall defend and indemnify the Managers and may indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Manager, Officer, employee or other agent of the Company or that, being or having been such a Manager, Officer, employee or agent, he or she is or was serving at the request of the Company as a Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem appropriate in its business judgment.

10.2  <u>Insurance</u>.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## ARTICLE XI: CONFIDENTIALITY

11.1  Each of the Members hereby acknowledges that, in connection with the operation of the Company, it may have access to confidential material regarding the operations of the Company or the other Members. Each Member agrees that it shall: (i) take all reasonable steps necessary to hold and maintain such confidential information in confidence and not to disclose it to any third party, (ii) use such confidential information only for the purpose of exercising its rights as a Member hereunder or in developing and operating the Company as permitted hereby;

42325377;3

and (iii) disclose such confidential information only to its employees, advisors and agents who have a need to know such information in order to assist the Member to evaluate and/or monitor its investment in the Company, to carry out its responsibilities to the Company or to comply with any laws, rules or regulations applicable to such Member.

11.2    Each Member agrees that, upon such Member's withdrawal from the Company, the Member will return to the Company (or, at the Member's option, destroy) all confidential information of the Company then in its possession. Each Member further agrees upon request to return or destroy such portions of all other memoranda, notes, copies or other writings that contain confidential information of the other Members and/or the Company. Notwithstanding the foregoing, the Member may retain such records that include confidential information that it requires for compliance with applicable laws, including tax laws.

11.3    If any Member or the Company is requested or required by judicial or administrative process to disclose any confidential information of the other Members and/or the Company, such Person shall promptly notify such other Members and/or the Company, as applicable, of such request or requirement so that such other Members and/or the Company, as applicable, may seek an appropriate protective order or waive compliance with this Agreement. Such other Members and/or the Company, as applicable, shall be deemed to have waived compliance with this Agreement without further action if such Person has given notice in accordance with the terms hereof and such other Members and/or the Company, as applicable, had a reasonable opportunity to seek yet failed to obtain a protective order.

11.4    The provisions of this Article shall apply to each Member, regardless of the status of such Member as a Member in the Company, while such Member is a Member in the Company and for a period of two (2) years from the effective date of the termination of the applicable Member's status as a Member in the Company, or if the confidential information constitutes a trade secret, as defined under applicable law, then for the life of the trade secret. The term "confidential information" shall not include information that is publicly available (other than as a result of a breach of this Agreement by the Member who has disclosed or desires to disclose such information) or that was or becomes available to the Member who has disclosed or desires to disclose such information on a non-confidential basis from a source other than the Company or its representatives, provided that such source is not bound to a confidentiality agreement with the Company with respect to such confidential information.

**ARTICLE XII:  GENERAL PROVISIONS**

12.1    Each of Jeff Kwatinetz and O'Shea Jackson Sr. hereby agree that so long as they continue to participate in the management of the Company and for a period of two (2) years thereafter, they will not, directly or indirectly (including through any Affiliate), participate, assist or render any services or give advice, whether or not for compensation, which participation, assistance, services or advise would directly compete with the Company in the 3 on 3 basketball business. Further, the Company agrees that it will not and the Company agrees that it will take reasonable efforts to cause each of its key executives to agree not participate, assist or render any services or give advice, whether or not for compensation, which participation, assistance, services or advise would directly compete with the Company in the 3 on 3 basketball business for the period of their employment with the Company and for a period of two years thereafter.

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 082

Notwithstanding anything to the contrary in this Agreement, each such person may, directly or indirectly own, solely as an investment, securities of any Person engaged in the 3 on 3 basketball business or activities competitive with the Company which are publicly traded on a national or regional stock exchange or on the over-the-counter market if such Person (A) is not a controlling person of, or a member of a group which controls, such Person, (B) does not, directly or indirectly, consult with or advise such Person, and (C) does not, directly or indirectly, own more than 1% or more of any class of securities of such Person.

12.2    This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement and amends and restates the Prior Agreement, and replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

12.3    Subject to Section 5.2, this Agreement may be modified or amended at any time by a writing signed by Class A Members holding a majority of the Percentage Interests; provided, however, that (i) if Jeff Kwatinetz (either individually or through BEK, LLC), his spouse or his children, continue to own at least ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and/or O'Shea Jackson, Sr. (his spouse or his children) continue to own at least ▮▮▮▮▮▮▮▮▮▮▮ they must consent to such modification or amendment for it to be effective, and (ii) if a particular member is disproportionately and adversely affected by any particular modification or amendment in a way that is materially different from other members generally, such member must agree to the change in writing.

12.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed counterparts of this agreement may be delivered by facsimile transmission or by delivery of a scanned counterpart in portable document format (PDF) by e-mail, in either case with delivery confirmed. On such confirmed delivery, the signatures in the facsimile or PDF data file shall be deemed to have the same force and effect as if the manually signed counterpart had been delivered to the other party in person.

12.5    This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.  If any provision of this Agreement is determined by any court of competent jurisdiction or duly authorized arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid that invalidity, illegality, or unenforceability or, if that is not possible, the provision shall, to the extent of that invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

12.6    This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.7    Whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 083

12.8   The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.9   Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

12.10   Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

12.11   Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

12.12   The article, section, and subsection titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

12.13   Time is of the essence of every provision of this Agreement that specifies a time for performance.

12.14   This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

12.15   The Members intend the Company to be a limited liability company under the Act. No Member shall take any action inconsistent with the express intent of the parties to this agreement.

12.16   Counsel to the Company may also be counsel to any Managers or any Affiliate of a Manager. The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("**Rules**"). The Managers have selected Eisner Jaffe, PC ("**Company Counsel**") as legal counsel to the Company. The Managers can change Company counsel at any time. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Managers (or Affiliate of a Managers) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Managers (or

36

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 084

his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation. Each Member further acknowledges that while communications with Company Counsel concerning the formation of the Company, its Members and Managers may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to each other.

*[Signatures on Next Page]*

In witness whereof, the parties have executed or caused to be executed this Agreement on the dates indicated below.

**COMPANY**

BIG3 BASKETBALL, LLC


By: _____
Title: _____

**MEMBERS:**

ZIFFREN BRITTENHAM LLP

_____
By: Matt Johnson, authorized signatory

BEK, LLC

_____
By: Jeff Kwatinetz, Manager

_____
O'Shea Jackson Sr.

_____
Roger Mason Jr.

_____
Amy Trask

CUBEVISION FILM PRODUCTIONS, LLC

_____
By: Jeff Kwatinetz, Manager

38

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 086

_____
Mark Geragos


_____
Carolyn Rafaelian


_____
James Todd Smith

_____
Sam Wald


_____
Rafe Fogel


_____
Mike Kwatinetz


_____
Steve Fishman


EDEN INVESTMENT LIMITED


By: _____
Title: _____


SPORT TRINITY, LLC


BY: _____
Title: _____

42325377;3

The undersigned have agreed to serve as Managers for the Company, as of the date of the Company's formation:

_____         _____
Jeff Kwatinetz                                        O'Shea Jackson Sr.


_____
Ahmed Al-Rumaihi

# EXHIBIT A

## MEMBERS

| Member Name and Address | Capital Contribution | Class A Units | Class B Units | Percentage Interest[1] |
|---|---|---|---|---|
| BEK, LLC<br><br>c/o Fishman, Block & Diamond<br>16830 Ventura Blvd., Suite 400<br>Encino, CA 91436<br>Attn: Steven Fishman | ▆▆▆ | ▆▆▆ | ▆▆ | ▆▆▆ |
| O'Shea Jackson Sr.<br><br>c/o Fishman, Block & Diamond<br>16830 Ventura Blvd., Suite 400<br>Encino, CA 91436<br>Attn: Steven Fishman | ▆▆▆ | ▆▆ | ▆▆ | ▆▆▆ |
| Ziffren Brittenham LLP<br><br>▆▆▆ Los Angeles, CA ▆▆ | ▆ | ▆▆ | ▆▆ | ▆▆ |
| Roger Mason Jr.<br><br>▆▆▆<br>Closter, NJ ▆▆ | ▆ | ▆▆ | ▆▆ | ▆▆ |
| Amy Trask<br><br>P.O. Box 2429<br>Venice, CA 90294 | ▆ | ▆▆ | ▆▆ | ▆▆ |

---

[1] Rounded to the nearest 100th of a percent.
[2] Subject to vesting.
[3] Subject to vesting.

41

| Member Name and Address | Capital Contribution | Class A Units | Class B Units | Percentage Interest[4] |
|---|---|---|---|---|
| Mark Geragos<br><br>c/o Geragos & Geragos<br>644 S Figueroa St<br><br>Los Angeles, CA 90017 | ████ | ████ | ████ | ████ |
| Cube Vision Film Productions, LLC | ████ | ████ | ████ | ████ |
| Carolyn Rafaelian<br><br>c/o Geragos & Geragos<br>644 S Figueroa St<br><br>Los Angeles, CA 90017 | ████ | ████ | ██ | ████ |
| Eden Investment Limited<br><br>c/o Dentons Canada LLP, 1 Place Ville-Marie, Suite 3900, Montreal, Quebec, H3B 4M7, Attention: Joey Mastrogiuseppe | ████ | ████ | ████ | ████ |
| James Todd Smith<br><br>c/o Jason Sloane Sloane Offer Weber and Dern<br>9601 Wilshire Blvd., Suite 500<br><br>Beverly Hills, CA 90210 | ████ | ████ | ████ | ████ |

---

[4] Rounded to the nearest 100th of a percent.
[5] The Strike Price of the Class B Units held by Mark Geragos is ████

42325377;3

| Member Name and Address | Capital Contribution | Class A Units | Class B Units | Percentage Interest[6] |
|---|---|---|---|---|
| Samuel Wald ▮▮▮▮▮▮ | ▮▮▮▮ | ▮▮▮ | ▮▮ | ▮▮▮ |
| Mike Kwatinetz | ▮▮▮ | ▮▮ | ▮ | ▮▮▮ |
| Rafe Fogel | ▮▮▮ | ▮▮ | ▮ | ▮▮▮ |
| Steven Fishman ▮▮▮▮▮▮ Encino, CA ▮▮▮ | ▮▮▮ | ▮▮ | ▮▮▮ | ▮▮ |
| Sport Trinity, LLC c/o Philip B. Schwartz Akerman LLP 350 East Las Olas Blvd Suite 1600 Ft. Lauderdale, FL 33301 | $11,500,000 | ▮▮▮ | ▮ | 15.03% |
| TOTAL: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | |

---

[6] Rounded to the nearest 100th of a percent.

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 091

In witness whereof, the parties have executed or caused to be executed this Agreement on the dates indicated below.

**COMPANY**

BIG3 BASKETBALL, LLC

By: _JEFF KWATINETZ_
Title: _MANAGER & FOUNDER_

**MEMBERS:**

ZIFFREN BRITTENHAM LLP

_____
By: Matt Johnson, authorized signatory

BEK, LLC

_____
By: Jeff Kwatinetz, Manager

_____
O'Shea Jackson Sr.

_____
Roger Mason Jr.

_____
Amy Trask

CUBEVISION FILM PRODUCTIONS, LLC

_____
By: Jeff Kwatinetz, Manager

38

42325377;3

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 092

In witness whereof, the parties have executed or caused to be executed this Agreement on the dates indicated below.

**COMPANY**

BIG3 BASKETBALL, LLC

By: _____
Title: _____

**MEMBERS:**

ZIEFREN BRITTENHAM LLP

*Matt Johnson*
By: Matt Johnson, authorized signatory

BEK, LLC

_____
By: Jeff Kwatinetz, Manager

_____
O'Shea Jackson Sr.

_____
Roger Mason Jr.

_____
Amy Trask

CUBEVISION FILM PRODUCTIONS, LLC

_____
By: Jeff Kwatinetz, Manager

38

In witness whereof, the parties have executed or caused to be executed this Agreement the dates indicated below.

**COMPANY**

BIG3 BASKETBALL, LLC

By: _____
Title: _____

**MEMBERS**:

ZIFFREN BRITTENHAM LLP

_____
By: Matt Johnson, authorized signatory

BEK, LLC

_____
By: Jeff Kwatinetz, Manager

_____
O'Shea Jackson Sr.

_____
Roger Mason Jr.

_____
Amy Trask

CUBEVISION FILM PRODUCTIONS, LLC

_____
By: Jeff Kwatinetz, Manager

Mark J. Garagos

Mark Geragos

_____

Carolyn Rafaelian

_____

James Todd Smith

_____

Sam Wald

_____

Rafe Fogel

_____

Mike Kwatinetz

_____

Steve Fishman

EDEN INVESTMENT LIMITED

By: _____
Title: _____

SPORT TRINITY, LLC

BY: _____
Title: _____

39

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 095

_____
Mark Geragos

Carolyn Rafaelian
_____
Carolyn Rafaelian


_____
James Todd Smith

_____
Sam Wald


_____
Rafe Fogel


_____
Mike Kwatinetz


_____
Steve Fishman


EDEN INVESTMENT LIMITED

_____
By: _____
Title: _____


SPORT TRINITY, LLC

_____
BY: _____
Title: _____

_____

Mark Geragos


_____

Carolyn Rafaelian

_____

James Todd Smith


_____

Sam Wald


_____

Rafe Fogel


_____

Mike Kwatinetz


_____

Steve Fishman


**EDEN INVESTMENT LIMITED**

By: _____
Title: _____


**SPORT TRINITY, LLC**

BY: _____
Title: _____

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 097

Mark Geragos

Carolyn Rafaelian

James Todd Smith

*Samuel A Wald*
Sam Wald

Rafe Fogel

Mike Kwatinetz

Steve Fishman

EDEN INVESTMENT LIMITED

By: _____
Title: _____

SPORT TRINITY, LLC

BY: _____
Title: _____

42325377;3

Mark Geragos

Carolyn Rafaelian

James Todd Smith

Sam Wald

Rafe Fogel        _Rafael Fogel_

Mike Kwatinetz

Steve Fishman

EDEN INVESTMENT LIMITED

By: _____
Title: _____

SPORT TRINITY, LLC

BY: _Ahmed Y. Al-Rumaihi_        _Ayman Sabi_
Title: _____ _Members_

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 099

_____
Mark Geragos


_____
Carolyn Rafaelian


_____
James Todd Smith

_____
Sam Wald


_____
Rafe Fogel

DocuSigned by:

*Mike Kwatinetz*

_____
Mike Kwatinetz


_____
Steve Fishman


EDEN INVESTMENT LIMITED

_____
By: _____
Title: _____


SPORT TRINITY, LLC

_____
BY: _____
Title: _____

39

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 100

_____
Mark Geragos

_____
Carolyn Rafaelian

_____
James Todd Smith

_____
Sam Wald

_____
Rafe Fogel

_____
Mike Kwatinetz

_____
Steve Fishman

EDEN INVESTMENT LIMITED

By: _____
Title: _____

SPORT TRINITY, LLC

BY: _____
Title: _____

39

_____
Mark Geragos


_____
Carolyn Rafaelian


_____
James Todd Smith


_____
Sam Wald


_____
Rafe Fogel


_____
Mike Kwatinetz


_____
Steve Fishman

EDEN INVESTMENT LIMITED

By: _____
Title: _____

SPORT TRINITY, LLC

BY: _____
Title: _____

423/25377.3

The undersigned have agreed to serve as Managers for the Company, as of the date of the Company's formation:

_____
Jeff Kwatinetz

_____
Ahmed Al-Rumaihi

_____
O'Shea Jackson Sr.

40

EXHIBIT B TO HERSHMAN DECLARATION
PAGE 103

## PROOF OF SERVICE

I, Yolanda G. Ybuan, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 555 South Flower Street, Fiftieth Floor, Los Angeles, California 90071.2300. On April 6, 2018, I served a copy of the within document(s):

**Demand for Inspection of Books and Records of BIG3 Basketball, LLC Pursuant to Section 18-305 of the Delaware Limited Liability Company Act**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☒ by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☐ by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

### *See attached Service List*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 6, 2018, at Los Angeles, California.

_Yolanda G. Ybuan_
Yolanda G. Ybuan

NAI-1503588791v1

*1*

1

## SERVICE LIST

2

3 BIG3 Basketball, LLC     BIG3 Basketball, LLC
 c/o Mark Geragos       c/o Benjamin P. Smith
4 Geragos & Geragos      Morgan, Lewis & Bockius LLP
 644 South Figueroa Street    One Market
5 Los Angeles, CA 90017     Spear Street Tower
 Geragos@Geragos.com     San Francisco, CA 94105-1596
6             benjamin.smith@morganlewis.com

7 Jeff Kwatinetz
 BIG3 Basketball, LLC     O'Shea Jackson, Sr. (a/k/a Ice Cube)
8 c/o Benjamin P. Smith     BIG3 Basketball, LLC
 Morgan, Lewis & Bockius LLP   c/o Benjamin P. Smith
9 One Market        Morgan, Lewis & Bockius LLP
 Spear Street Tower      One Market
10 San Francisco, CA 94105-1596   Spear Street Tower
 benjamin.smith@morganlewis.com  San Francisco, CA 94105-1596
11             benjamin.smith@morganlewis.com

12 Amy Trask
 BIG3 Basketball, LLC     Eden Investment Ltd.
13 c/o Benjamin P. Smith     c/o Dentons Canada LLP
 Morgan, Lewis & Bockius LLP   Attn: Joey Mastrogiuseppe
14 One Market        1 Place Ville-Marie, Suite 3900
 Spear Street Tower      Montreal, Quebec
15 San Francisco, CA 94105-1596   H3B 4M7
 benjamin.smith@morganlewis.com  joey.mastrogiuseppe@dentons.com
16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 106


EXHIBIT C TO HERSHMAN DECLARATION
PAGE 106

EFiled: Apr 09 2018 01:50PM EDT
Transaction ID 61891536
Case No. 2018-0263-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROGER MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-____-___ |
| | ) | |
| BIG3 BASKETBALL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **VERIFIED COMPLAINT FOR INSPECTION OF BOOKS AND RECORDS**

Plaintiff, Roger Mason ("Mason"), by and through his undersigned counsel,

alleges his Verified Complaint for Inspection of Books and Records against

defendant BIG3 Basketball, LLC (the "Company" or "BIG3") as follows:

### **Nature of the Action**

1.      This is an action under 6 *Del. C.* § 18-305 ("Section 18-305") to

compel the Company to provide Mason certain books and records.

2.      On March 21, 2018, Mason, a member of the Company, delivered a

written demand (the "Demand") to the Company seeking to inspect certain books

and records of the Company.  Indeed, the Company did not even respond to

Mason's Demand.  A true and correct copy of the Demand is attached hereto as

Exhibit 1.

3.    The Company has failed to comply with its obligations and has refused to allow Mason to inspect the requested books and records.  Mason therefore requires this Court's assistance.

## The Parties

4.    Mason, a New Jersey resident, has been a member of the Company at all relevant times.

5.    The Company is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in California.  The Company operates a 3-on-3 basketball league, BIG3 Basketball (the "League"), from June through August, featuring numerous retired National Basketball Association ("NBA") players.

6.    Non-parties Jeffrey Kwatinetz ("Kwatinetz") and O'Shea Jackson a/k/a Ice Cube ("Jackson") serve on the Company's Board of Managers ("Board") and are co-founders and members of the Company.

## Introduction

7.    This action arises in the context of a dispute between Kwatinetz and Mason related to Kwatinetz's mismanagement of the Company and his scheme to make Mason the scapegoat for his alleged fraud on the largest investor in the

2

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 108

Company, breaches of his fiduciary duties of loyalty and care, mismanagement of the Company's operations, willful violations of the Company's operating agreement and Delaware law, intentional participation in improper related-party transactions, usurpation of the authority of the Company's carefully hired management team, and creation of a hostile work environment at the Company, as confirmed by several employees, by, among other things, using horrible racial slurs to disparage the League's African-American players and the Company's investors from the Middle East. Kwatinetz's actions have caused the departure of the Company's President, Chief Financial Officer, and Chief Creative Officer, amongst others, and are subjecting the Company to potential damages in excess of a hundred million dollars in pending and likely-to-be-filed actions, including for fraud, breach of contract and the defamation of Mason, a former NBA player and Players' Association executive, whose substantial future prospects have been materially and irrevocably injured by Kwatinetz's scheme and lies.

8. As more fully explained below, as part of that scheme Kwatinetz and his longtime lawyer Mark Geragos, himself a member of and advisor to the Company, manufactured a sham "independent investigation" to be conducted by an associate of Geragos's. Kwatinetz and Gergaos then relied on Mason's fictitious refusal to cooperate with the investigation to terminate Mason as

3

President of the Company and Commissioner of the League. In doing so,

Kwatinetz sought to make Mason the scapegoat for his own wrongdoing,

outrageously blaming Mason for jeopardizing the League's financial success and

ability to enter into professional relationships. As a result of this scurrilous,

unjustified attack, Mason, whose record as a staunch, dedicated player advocate is

well established, promptly filed an action for defamation and breach of contract

against Kwatinetz and the Company seeking in excess of one hundred million

dollars for damage to his reputation and future prospects.

9. In commencing this action, Mason seeks to enforce his rights as a

member of the Company to review the books and records appropriately demanded

pursuant to Section 18-305.

## Factual Background

10. In 2016, Mason, Kwatinetz and Jackson commenced working together

to establish the League, which had its first season in 2017.

**A.** ***League Hires Former NBA Player and Deputy Executive Director of the
NBPA, Roger Mason, Jr., as President and Commissioner to Establish
Credibility***

11. As a highly respected member of the basketball community, Mason's

involvement was critical to the establishment and development of the League.

4

12.     In addition to playing in the NBA for 11 years, he is the former Deputy Executive Director of the NBA players' union, the National Basketball Players Association ("NBPA").  Mason is the first former player to achieve such a high ranking position with the NBPA.

13.     In his capacity as Deputy Executive Director of the NBPA, Mason played an integral role in negotiations between players, owners and league executives in two collective bargaining agreements.  Among his major accomplishments in that role was securing lifetime healthcare for all retired players.

14.     As a former player and NBPA executive, Mason possessed the credibility and relationships necessary to recruit former NBA stars for the League. Indeed, Mason was instrumental in signing the players and coaches who participated in the League's inaugural season and many of the players and coaches who will be participating in the League's second season this summer.  Among the former NBA players that Mason recruited for the League's 2017 season were Allen Iverson, Charles Oakley, Rashard Lewis, Kenyon Martin, Stephen Jackson, DeShawn Stevenson, DerMarr Johnson, and Xavier Silas.  For the League's upcoming 2018 season, former NBA players successfully recruited by Mason

5

include Amar'e Stoudemire, Chris "Bird Man" Anderson, Drew Gooden, Glen "Big Baby" Davis, Carlos Boozer, Greg Oden, and Eddy Curry.

15.     In addition to recruiting numerous well-known players necessary to publicize the League, Mason also ensured a credible league by helping develop the League's official rules, organizing a combine and draft format for players to be selected by League teams, and hiring the League's Director of Referees and referees.

16.     Beyond Mason's basketball-related contributions, Mason also played a significant role in identifying investors and potential investors in the Company.

17.     In recognition of his contributions and critical role with the League, as memorialized in a written Executive Employment Agreement, dated as of November 24, 2016 (the "Employment Agreement"), Mason was hired to serve as President of the Company and Commissioner of the League, and awarded 5% of the Class "A" Units in the Company, all of which have vested.  Mason was also made a member of the League's Board.

## B.     *Kwatinetz's History of Failed Businesses and Erratic Behavior*

18.     Between 2008 and 2017, Kwatinetz ran numerous businesses that failed spectacularly and was repeatedly involved in nasty public disputes with

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 112

partners and investors in those businesses.  Among the businesses that Kwatinetz has been involved with that have been unsuccessful are The Firm, Prospect Park Networks, Overbrook Entertainment, and The Firm again.

19.     As a result of Kwatinetz's lengthy history of failed businesses, disputes with partners and public reports of erratic behavior,[1] the Company would have been unable to attract necessary investors and marketing partners without assurances that it would be operated by a professional management team subject to appropriate oversight established by a carefully designed governance structure.

---

[1] The Firm, for example, a company co-founded by Kwatinetz, failed in 2008 after executives departed *en masse*. Jeff Leeds & James Ulmer, "Departures Cool Off Agency's Hot Start," THE NEW YORK TIMES, August 11, 2005.  Following The Firm's collapse, Kwatinetz was criticized for his lack a business plan and "overly ambitious projections." *See* Michael Fleming, "Firm departure for its founder," DAILY VARIETY, November 11, 2008.  Kwatinetz then founded another company, Prospect Park.  Not long thereafter, Prospect Park filed for bankruptcy, reportedly due to a lack of funding and logistical issues.  *See* Meg James, "Prospect Park files for bankruptcy; The production firm tried to revive two canceled ABC soap operas online." LOS ANGELES TIMES, March 11, 2014; *see also* Justin Oppelaar, "Firm backs down on Sillerman suit," DAILY VARIETY, August 16, 2001 (detailing the collapse of a proposed merger involving The Firm as a result of Kwatinetz's reportedly erratic behavior); Sharon Waxman, "Firm Believer," THE WASHINGTON POST, July 8, 2002 (same).  Kwatinetz's alleged mismanagement, erratic behavior and personal troubles have been detailed in numerous published articles about his failed business ventures. *See* Sharon Waxman, "Firm Believer," THE WASHINGTON POST, July 8, 2002; Bryan Burrough, "Ovitz Agonistes," VANITY FAIR, August 2002; "Hollywood madam Michelle Braun cozies up to federal agents" NEW YORK DAILY NEWS, May 9, 2009.

7

## C. *Professional Management Team and Carefully Designed Governance Structure*

20.　Accordingly, along with Mason being hired as President and Commissioner, Amy Trask ("Trask"), the former President of the Oakland Raiders, was hired as Chief Executive Officer, Kai Henry ("Henry") as Chief Creative Officer, and Rafael Fogel ("Fogel") as Chief Financial Officer.

21.　Further, the Company's operating agreement, which was amended as additional members invested in the Company, detailed the rights and obligations of managers, officers and members.

22.　For instance, the Second Amended and Restated Operating Agreement, dated July 14, 2017 (the "Second Amended and Restated Agreement"), expressly subjects managers to the fiduciary duties of care and loyalty imposed on directors of Delaware corporations.　The Second Amended and Restated Agreement details, among other things, the authority of the Board, the process for making major decisions, the composition and election of the Board, the process for the Board to act, the process for removing members of the Board, the process for conducting Board meetings or acting by written consent, the process for appointing and removing officers, the Company's obligation to maintain

8

business records, and the requirement that any related-party transaction be approved by the disinterested members of the Board to ensure that all such transactions were at arm's length and made on terms fair to the Company.

23.     Upon information and belief, the carefully designed governance structure memorialized in the Second Amended and Restated Agreement, which was substantially similar to that in the Amended and Restated Limited Liability Company Operating Agreement, dated June 12, 2017, was necessary to convince outsiders to invest in the Company as a result of Kwatinetz's professional history.

**D.     *Kwatinetz Interferes with the Management Team's Authority***

24.     While publicly representing to prospective investors that the Company's experienced and respected management team was running the day-to-day operations of the Company and the League, Kwatinetz used his position as a co-founder, member and Board member, along with his close relationship with Jackson, to prevent the Company's management team from performing their functions as he demeaned their character and ability and usurped their authority, in an effort to assume total control over the Company.

25.     Almost from the outset of the League's operations, Kwatinetz engaged in a malicious, defamatory campaign of disparagement, which interfered with Mason's ability to effectively perform his duties and responsibilities as

9

President and Commissioner. Kwatinetz's wrongful actions have materially diminished Mason's reputation, position, status, title, authority and responsibilities as President and Commissioner.

26.     As confirmed by documentary evidence, a pattern emerged whereby Mason introduced Kwatinetz and the League to important contacts in the basketball world, including players, coaches, referees, investors and other valuable insiders, only to be cut out of those relationships by Kwatinetz. This scheme, whereby Kwatinetz told Mason to stop communicating with his own contacts because Kwatinetz had taken over the communications, is well documented. In short, Kwatinetz actively worked to usurp Mason's duties, responsibilities and relationships. Notwithstanding Kwatinetz's unprofessional actions, Mason continued to attempt to work with Kwatinetz in a professional manner in the hope of performing his duties and advancing the Company's interests.

27.     Kwatinetz's mistreatment of Mason and other Company executives, and other misconduct have confirmed that he is not fit to run the League, particularly in light of reports that he has made repeated horrible racist comments, including about African-American players in the League and Middle-Eastern investors in the Company.

10

28.     As discussed above, the reputation and relationships Mason established over the course of his career as an NBA player and Deputy Executive Director of the NBPA were critical to BIG3's success and provided the League instant credibility.  In disregard of Mason's contributions to the League and in violation of the Employment Agreement, Kwatinetz bad-mouthed and undermined Mason and his performance as President and Commissioner.

29.     In a blatant attempt to isolate Mason, Kwatinetz purposefully left him off key communications; excluded him from important meetings; and disparaged him to investors, employees and people that Mason in his role as President and Commissioner had introduced to Kwatinetz.  The enmity Kwatinetz displayed toward Mason became more pronounced in the latter part of 2017, after a successful first season, when Kwatinetz threatened without justification to arrange for the Board to terminate Mason's employment, which could have jeopardized the full vesting of Mason's contractually granted membership interest in the Company.  The emptiness of Kwatinetz's threats was revealed when Mason's Employment Agreement was renewed for a second year.

E.      ***Working with his Longtime Lawyer, Mark Geragos, Kwatinetz Manufactures a Sham "Independent Investigation"***

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 117

30.     Unfortunately, Kwatinetz's attacks on Mason continued unabated,

even after renewal of the Employment Agreement.  At the direction of Kwatinetz,

on February 22, 2018, Mason was served with a letter (the "February 22 letter")

from Sean Macias, Esq. ("Macias"), on behalf of the League, informing Mason of

a purported "independent investigation" that Macias was conducting into alleged

conflicts of interest with investors.  Macias demanded that Mason appear in

California within two weeks for a five hour interview that would be recorded by

audio and/or certified stenographer. This "independent investigation" was nothing

but a sham effort to make Mason a scapegoat for issues at the Company caused by

Kwatinetz.

31.     First, the so-called "independent investigation" was to be conducted

by Macias and his two person law firm Macias Counsel.  Yet, the numerous

connections between Macias, Kwatinetz and Mark Geragos ("Geragos") establish

that Macias could not conduct an independent investigation.  Geragos has long-

standing close relationships with both Macias and Kwatinetz.

32.     Geragos' own firm, Geragos & Geragos, represents the Company.

Macias actually worked for Geragos & Geragos.  A true and correct copy of a

docket sheet from a matter in the Eastern District of California is attached hereto

as Exhibit 2.  Geragos himself is a member of the Company, has been retained as

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 118

an advisor by the Company, and has been reputed to be a member of the Board of Managers.

33.    As to Geragos and Kwatinetz, Geragos has been Kwatinetz's personal lawyer for many years and has been hired by Kwatinetz to represent the Company in numerous matters.  Indeed, after Kwatinetz's most recent business failure, which resulted in closing The Firm for a second time, Kwatinetz publicly announced that he had joined Geragos's firm as "of counsel."

34.    Accordingly, the notion that Macias could conduct an "independent investigation" involving Geragos and Kwatinetz is not credible.

35.    Second, according to Macias Counsel's website, its areas of practice are Personal Injury, Entertainment, Intellectual Property and Civil Litigation. Neither of the two members of the law firm appear to have ever conducted a corporate investigation.  In fact, the only place that the word "investigation" appears on its website is that in personal injury cases Macias "will retain experts to assist the *investigation* and reconstruction of the incident."

36.    Neither Macias's bio nor that of the only other attorney working for him indicates that they have ever conducted or even been involved in any

RLF1 19114768v.1

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 119

"investigation."  Accordingly, the League's claim that a legitimate "investigation" had been conducted is not credible.

37.     That Kwatinetz would jeopardize the success and financial well-being of the Company and League by purporting to conduct a phony "independent investigation" to create a scapegoat for his misconduct is further proof of his poor judgment and lack of suitability to be involved in running the League.

38.     Notwithstanding the obvious intent of the sham investigation, Mason, through counsel, expressly informed Macias that he would cooperate with the purported "independent investigation" and was working to schedule an interview. However, in order to protect himself, Mason had his counsel send the League a letter on March 6, 2018 (the "March 6 Letter"), detailing Kwatinetz's conduct in violation of Mason's Employment Agreement, demanding that Kwatinetz immediately cease his malicious defamatory campaign of disparaging Mason, which was interfering with Mason's performance of his contractual responsibilities, and memorializing that Kwatinetz's wrongful actions had materially diminished Mason's position, status, title, authority and responsibilities as President and Commissioner.  A true and correct copy of the March 6 Letter is attached hereto as Exhibit 3.

14

39.     Mason's counsel's letter further questioned Kwatinetz's competence to manage BIG3, especially in light of claims by numerous former employees that Kwatinetz had made racist comments about African-American athletes and the Middle-Eastern background of representatives of the League's largest investor, Sport Trinity, LLC ("Sport Trinity").  Mason's counsel's letter also made clear that it viewed the purported "independent investigation" as harassment and an effort to imply some impropriety by Mason related to individuals and companies identified in the February 22 Letter.

40.     Notably, Mason introduced the League to Sport Trinity, Ahmed Al-Rumaihi ("Al-Rumaihi") and Ayman Sabi ("Sabi") (three of the names identified in the February 22 Letter), with Sport Trinity becoming by far the largest investor in the League.  Other than introducing a potential investor to Kwatinetz and the League, Mason had nothing to do with Sport Trinity's financial relationship with the Company as Kwatinetz insisted on personally handling all negotiations.  That Mason knew Al-Rumaihi and Sabi was fully disclosed and obvious, as evidenced by the fact that he introduced them to Kwatinetz and the Company.

41.     Rather than take legal action due to the League's breach of his Employment Agreement, counsel stated Mason's desire to constructively resolve

15

the issues involving Kwatinetz's misconduct so that the parties could focus their

attention on the League's success.

**F.    *Kwatinetz and the League Retaliate Against Mason for the March 6 Letter by Terminating Mason's Employment and Publicly Lie about the "Independent Investigation" and Mason's Alleged Refusal to Cooperate***

42.    On March 12, 2018, the Company purported to terminate Mason by

letter from Geragos to Mason's lawyer (the "March 12 Letter").

43.    That same day, the Company publicly announced that it had "fired"

Mason as President and Commissioner.  News of Mason's termination was

publicly disseminated by the Company and Kwatinetz through the media outlet

"TMZ.com."

44.    Kwatinetz also sent an e-mail from the Company to all of the players,

coaches and staff informing them of Mason's termination (the "defamatory

email").  As more fully set forth herein, the Company's manufactured grounds for

his termination were baseless, false and fraudulent.

45.    Both the March 12 Letter to Mason and its defamatory email to the

players, coaches and staff falsely stated that Mason had "refused" to cooperate in

the League's "independent investigation."  As noted above, there was no

"independent investigation" (or for that matter any actual "investigation").  Indeed,

16

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 122

as conceded by Macias, when confronted about the Company's public statement that Mason had refused to cooperate, he knew nothing about any such statement, "I have no idea what you are talking about. What statement and to what media outlet."

46.     Another fabricated basis for Mason's termination was the Company's claim that Mason had recently travelled to China without either disclosing his trip or its purpose. Kwatinetz and the Company were fully aware that Mason's Employment Agreement expressly allowed him to provide services to Vaunt, LLC ("Vaunt"), a Company in which Kwatinetz is an investor. The Employment Agreement provides:

> For the avoidance of doubt…notwithstanding [Mason] being employed full time by the Company, [Mason] may spend substantially similar time providing services to Vaunt LLC as [Mason] provides as of the date hereof.

47.     Thus, not only did Mason's trip to China related to Vaunt not violate Mason's obligations to the Company, but it was expressly permitted by the Employment Agreement, which did not require Mason to disclose where or when he provided services to Vaunt.

48.     The Company's and Kwatinetz's conduct in disseminating false reasons for Mason's termination intentionally caused numerous public reports that

17

Mason was "fired in connection with a corruption investigation by BIG3." Building on this foundation of fabricated claims, Kwatinetz sought to distract attention from his mismanagement and misconduct by falsely blaming Mason for jeopardizing the League's financial success and sponsorships.

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 124

**G.      Mason Sues Kwatinetz and the Company for Defamation and Wrongful Termination**

49.      On March 13, 2018, the day after he was unceremoniously and publicly "fired," Mason filed suit against BIG3 and Kwatinetz for wrongful termination and defamation.  Kwatinetz's and the Company's defamatory attacks on Mason have subjected the Company to substantial financial liability for damage to Mason's well-deserved, hard-earned reputation as a smart, hard-working, tireless advocate for players, who was poised to assume positions of great responsibility in valuable projects both related to and unrelated to basketball.  As a result of the wrongful termination and irreparable harm to Mason's impeccable reputation, Kwatinetz has recklessly caused the League to be exposed to potential financial liability well in excess of one-hundred million dollars.

**H.      Kwatinetz Created a Hostile Work Environment and is Reputed to Have Made Racist Statements about Black Athletes and Middle-Eastern Investors.**

50.      By criticizing Mason and other talented and dedicated officers of the Company during conversations with investors, marketing partners, potential marketing partners and others with whom the League was working or looking to

19

work, Kwatinetz injured (and has continued to injure) the Company and jeopardized (and continued to jeopardize) its future prospects.

51.    Similarly, during this same time period, Kwatinetz repeatedly criticized the performance of (and berated) Trask, Henry and Fogel, and interfered with their performance of their duties.

52.    Kwatinetz intentionally interfered with the Company's executives' abilities to perform their jobs by creating a hostile work environment.  Kwatinetz intimidated (or attempted to intimidate) the Company's officers and other employees by acting in an abusive and belligerent matter.

53.    The hostile nature of the environment created by Kwatinetz is even more dramatically illustrated by the racist comments that Kwatinetz is reported to have made to former employees about players and investors in the League.  More specifically, one of BIG3's former employees (not Kai Henry) reports that Kwatinetz referred to Black athletes as "Rich Ni****s."

54.    Further, Kwatinetz was reported by Henry, BIG3's then Chief Creative Officer, to have disparaged the representatives of Sport Trinity, BIG3's largest investor, as "terrorists" while explaining that all "Arabs" are terrorists.

20

55.     Henry, a longtime associate of Kwatinetz, resigned from BIG3 because of Kwatinetz's unprofessional and offensive actions.  As Henry, who is African-American, explained in his February 26, 2018 resignation email:

> **I became very uncomfortable when you [Kwatinetz] began using rhetoric that weaponizes the heritage of the Trinity investors in order to damage their character.  As the Co-Founder of a basketball league which is comprised predominately of minorities, that language you are using and consistent demonizing is unacceptable and undermines the integrity and viability of the organization.**
>
> **I do not understand how this type of language became acceptable but it makes me very uncomfortable.**

56.     Kwatinetz's inability to maintain an appropriate work environment and, to put it mildly, insensitivity to matters of concern to people of color and immigrants is evidenced by his repeated discussions with Company employees of his relationship with Steve Bannon ("Bannon") and his defense of Bannon's character.  Kwatinetz has even recently involved Bannon in Company business.  This occurred even as, just two months ago, Bannon gave a speech to the extremist French political party, the National Front, in which he unapologetically encouraged the National Front to continue advocating its offensive positions:  "Let them call you racists.  Let them call you xenophobes.  Let them call you nativists.  Wear it as a badge of honor."  See https://www.nytimes.com/2018/03/10/world/europe/steve-bannon-france-national-front.html.

21

57.     The March 12 Letter sent to Mason's counsel by Geragos & Geragos, as counsel for the Company, purported to terminate Mason "for cause" claiming that the Company's Board voted "unanimously" to terminate Mason's employment. As demonstrated below, that was yet another false claim by BIG3. Not surprisingly, Fogel, BIG3's Chief Financial Officer, resigned shortly thereafter.

58.     With Mason's purported termination, three-quarters of the Company's independent management (Mason, Henry and Fogel) were gone, including the only two African-American officers of the Company.

59.     Kwatinetz's reckless misconduct, wrongdoing, and incompetent management has caused droves of valuable BIG3 employees to quit their positions. His continued involvement with the League presents a clear and present danger to BIG3's success.

I.     *Sport Trinity Invests and Claims to Have Been Defrauded By Kwatinetz*

60.     In the first half of 2017, Mason introduced Kwatinetz and the League to Al-Rumaihi and Sabi, representatives of Sport Trinity, a potential investor in the Company.  Al-Rumaihi and Sabi are of Middle-Eastern descent.

RLF1 19114768v.1

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 128

61.    Kwatinetz personally negotiated Sport Trinity's investment, while excluding Mason from the discussions.

62.    Nonetheless, in order to permit Sport Trinity's investment, Mason ultimately agreed to reduce his membership interest in the Company from 5% to 2.8% of the Class "A" Units.  Further, Mason effectively agreed to step down from the Board to permit Sport Trinity to designate a Board member.

63.    As memorialized in the Second Amended and Restated Agreement, Sport Trinity agreed to invest $11,500,000 in consideration for, among other things, a 15.03% membership interest in the Class "A" Units of the Company, the right to appoint a member to the Board, who was designated as Al-Rumaihi, and the right to appoint a Board observer, who was designated as Sabi.

64.    Upon information and belief, after funding the first $6,500,000 of its investment in the Company, Sport Trinity refused to fund the balance of its investment because of financial irregularities that it claims to have discovered in the financial information provided by and at the direction of Kwatinetz.  More specifically, Sport Trinity contends that the projections provided by Kwatinetz, mid-way through the League's first season, which it relied on, were knowingly false as the League's revenues through 2017 were ultimately less than 20% of the

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 129

projected revenues and the Company's loss was more than 2 ½ times the amount projected.

65.     Sport Trinity also contends that that the general ledger provided to it at Kwatinetz's direction, while it was considering its investment, was knowingly outdated and that the updated general ledger that it was provided in July 2017 was also inaccurate.

**J.      Kwatinetz Blames the Company's Former Accountant for Sport Trinity's Failure to Complete Its Investment**

66.     In October 2017, when confronted with questions concerning the Company's "unbalanced" balance sheet, Kwatinetz wrote e-mails to numerous recipients, including Geragos and Sabi, asserting that Steven Fishman ("Fishman") of Fishman, Block & Diamond, the Company's original accountant (and another member of the Company), was not entitled to have his bills paid because "he fucked up a lot of stuff" and "he cost us [$]5m from Qatar…. [Sabi] is getting it from other sources but him sending out an 'unbalanced' balance sheet and getting revenues wrong created red flags that out [sic] of the deal and its [sic] been hard to get back on track.  Its [sic] straight up malpractice."

**K.      Kwatinetz's Undisclosed, Unapproved Related-Party Transactions**

24

67.     Beyond the admittedly "unbalanced" balance sheet and the allegedly

outdated projections and general ledger, the list of related-party transactions

provided to Sport Trinity at Kwatinetz's direction was, upon information and

belief, incomplete.  Among the material related-party transactions that Sport

Trinity contends were not disclosed (and were not approved, as required, by the

Company's disinterested Board members), was an agreement for BIG3 to fully

fund a documentary about Allen Iverson, which would be produced by a company

owned by Jackson and managed by Kwatinetz, Cube Vision Film Production,

LLC.

68.     As for the related-party transactions that were disclosed to Sport

Trinity, many of the disclosed related-party transactions had not been approved by

the Company's Board as required by the Operating Agreements in affect at the

time that the related-party transactions were entered into.

69.     Notwithstanding the questions concerning the management of the

Company and the representations made by and at the behest of Kwatinetz at the

time that Sport Trinity agreed to invest in the Company, in or about November

2017, in an apparent sign of good faith, Sport Trinity invested another $1,000,000

into the Company, raising its total investment in the Company to $7,500,000.

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 131

70.     Unfortunately, Kwatinetz and Sport Trinity have been unable to resolve their dispute, which has boiled over into the commencement of an arbitration in California by the Company against Sport Trinity and a lawsuit filed in state court in California by Kwatinetz, Jackson and putatively on behalf of the Company against Sport Trinity.

**L.     *Kwatinetz Contends that Sport Trinity Possesses No Interest in BIG3***

71.     In the context of Kwatinetz's dispute with Sport Trinity, he and his representatives have claimed that Trinity possesses no interest in the Company and does not occupy a seat on the Board.

72.     No notice of the revocation, rescission or lack of effectiveness of the Second Amended and Restated Agreement was ever provided to the members of the Company, who include Mason.

73.     If, and to the extent, the Second Amended and Restated Agreement was rendered void or ineffective in some manner, the First Amended and Restated Agreement became the operative Operating Agreement and Mason's 5% interest in the Class "A" Units and position on the Board should have been restored.

26

74. Mason, who is a member of the Company, has never been advised of an election to elect, or the election of, a Board member since the Second Amended and Restated Agreement.

75. As the dispute between Kwatinetz and Sport Trinity escalated, Kwatinetz moved on to new targets to blame for the Company's challenges and Sport Trinity's claim that it was defrauded into investing in the Company.

**M.** ***Kwatinetz Lies About Mason and Falsely Holds Him Responsible for Sport Trinity's Refusal to Complete Funding its Investment***

76. Evidently recognizing that his claim of malpractice by Fishman was likely insufficient to protect him from liability for his actions related to the Company, Kwatinetz started lying about Mason and attempting to blame him for any difficulties at the Company.

**N.** ***Kwatinetz Also Sought to Justify Mason's Termination Based on a False and Hypocritical Claim of Conflict of Interest***

77. Rather than the result of an "independent investigation," Mason's termination came after his counsel sent the Company a letter defending Mason from baseless allegations of misconduct and objecting to Kwatinetz's abusive conduct.

27

78.     While Geragos wrote that the Company's Board acted unanimously on March 11, 2018 in terminating Mason, the properly constituted Board should have been comprised of either Kwatinetz, Jackson and Al-Rumahai (the Board provided for under the Second Amended and Restated Agreement) or Kwatinetz, Jackson and Mason (the Board provided for under the First Amended and Restated Agreement).  No meeting of either such Board occurred on March 11, 2018 or on any other date.  As such, the purported termination was improper under Delaware law and the terms of the then-operative Operating Agreement.

79.     Among the purported bases for Mason's termination was an alleged (but false) conflict of interest; stunning hypocrisy in light of Kwatinetz's numerous conflicts of interest.

## O.     *Kwatinetz's Own Conflicts of Interest and Unauthorized Related-Party Transactions*

80.     Kwatinetz and entities and individuals with whom he is affiliated, including The Firm, Prospect Park, Cube Vision Film Production, LLC, and Mike Kwatinetz, have, upon information and belief, entered into numerous related-party transactions with BIG3, permitting funds to be drained from BIG3 to support other projects and interests of Kwatinetz.

28

81.     Upon information and belief, Kwatinetz wasted Company assets by chartering private airplanes, first class travel and enjoying luxury accommodations while traveling.

82.     In September 2017, at a time when Kwatinetz now claims that Sport Trinity had wrongfully failed to complete funding its investment in the Company, he was actively soliciting Al-Rumaihi and Sabi to invest millions of dollars in the Michael Jackson publishing library.  A true and correct copy of an email, dated September 18, 2017, is attached hereto as Exhibit 4.

**P.     *Kwatinetz Spreads Further Lies About Mason in the Defamatory Email***

83.     Following Mason's being provided notice of termination, Kwatinetz told further lies about Mason and his alleged role in Sport Trinity's failure to pay the full amount it had agreed to invest.

84.     More specifically, in the March 12th defamatory email to BIG3's players, coaches and staff, Kwatinetz said that Mason was fired as President and Commissioner because he allegedly acted with "less than the utmost professionalism and ethical behavior."  Kwatinetz's claim was untrue.  In contrast to Kwatinetz, Mason acted with the utmost professionalism and in an ethical manner at all times.

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 135

85.    In the defamatory email, Kwatinetz went on to falsely claim that Mason stated that he "would not get in the middle" between the League and Sport Trinity, that Mason "continued to pursue separate and conflicting business interests with [Al-Rumaihi and Sabi]," and that Mason was involved in "undisclosed" transactions with the investors.  The simple fact is that Mason was never asked to assist the Company in arranging for Sport Trinity to pay the balance of its investment and the only other business opportunity that Mason discussed with Al-Rumaihi and Sabi (Vaunt LLC) was not only disclosed to the Company, but Mason was expressly permitted in the Executive Employment Agreement to continue spending "substantially similar time providing services to Vaunt LLC" as he had prior to commencing work with the Company.

86.    The disingenuousness of Kwatinetz's objection to Mason providing services to Vaunt while employed by the Company is underscored by the fact that not only did Al-Rumaihi and Sabi not invest in Vaunt, but, as noted above, Kwatinetz did.

87.    Finally, the implication that Mason received any gifts, vacations or the use of exotic cars for social events from Al-Rumaihi and Sabi was false and deliberately unsubstantiated.

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 136

88.     Upon information and belief, at or about the same time that the Defamatory email was sent, Kwatinetz arranged for it to be disseminated to TMZ.com by Sunshine Sachs Consultants ("Sunshine Sachs"), the Company's public relations consultant.

89.     The League had previously used Sunshine Sachs to arrange for the public dissemination of information by TMZ.com and other media outlets.

90.     As a result of the leak of the defamatory email, defamatory statements regarding Mason have been published by TMZ.com and other media outlets.

## Q.     The Demand for Books and Records Pursuant to Section 18-305

91.     On March 21, 2018, Mason caused the Demand, pursuant to Section 18-305, to be delivered to the Company.

92.     The Demand in all respects complied with Section 18-305 as to the form and manner of making a demand for the inspection of books and records.

93.     A copy of the Demand identified the following proper purposes for Mason's requested inspection of books and records:

> My purpose in making this demand as a member is to obtain
> information (i) concerning the Company's financial condition
> (including information with respect to its recent financial difficulties),
> (ii) to investigate the Company' compliance with the terms of the

31

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 137

current operating agreement and the requirements of Delaware law, (iii) to determine if members of the Board of Managers, including Jeff Kwatinetz, and the officers of the Company have complied with their fiduciary duties, (iv) to investigate the basis of the termination of the Company's former President and Commissioner of the League, (v) to investigate the reasons that the Company's former Chief Financial Officer and Chief Creative Officer recently chose to resign, (vi) to investigate any effort by the Company to defame or disparage former officers, and (vii) to understand whether the Company is being injured by wrongful conduct of Jeff Kwatinetz, including in allegedly making racist statements about players and members of the Company.

94.     Consistent with Section 18-305, the Demand sought production of specific books and records of the Company, which books and records are necessary and essential to Mason's proper purposes discussed above.  See Exhibit 1 hereto (Demand).

### R.     The Company's Response, or Lack of a Response, to the Demand

95.     The Company has not responded to Mason's Demand.

96.     By failing to respond to the Demand, the Company has rejected Mason's demand.

97.     The Company refuses to produce the demanded books and records. Accordingly, the Company has failed to comply with its obligations under Section 18-305.

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 138

## COUNT I
**(Inspection of Books and Records Pursuant to 6 *Del. C.* § 18-305)**

98.     Mason repeats and realleges the foregoing paragraphs as if fully set forth herein.

99.     The Demand complied with the requirements of Section 18-305 with respect to the form and manner of making a demand for the examination of the books and records of the Company.

100.    Mason's purposes for requesting access to the books and records of the Company are proper and are reasonably related to Mason's interest as a member of the Company.

101.    The books and records requested in the Demand are necessary and essential to fulfill Mason's proper purpose.

102.    Mason is entitled to inspect the books and records described in the Demand.

103.    The Company has failed to provide Mason with the books and records requested in the Demand, in violation of Section 18-305.

104.    Mason has no adequate remedy at law.

## Prayer For Relief

33

WHEREFORE, Mason respectfully requests that the Court:

(a)    enter judgment in favor of Mason and against the Company;

(b)    summarily order the Company to provide to Mason the books and records sought;

(c)    award Mason his costs and expenses incurred in bringing and prosecuting this action, including his attorneys' fees; and

(d)    award such other and further relief as may be just and equitable in the circumstances.


                */s/ Blake Rohrbacher*
                Blake Rohrbacher (#4750)
                Kevin M. Gallagher (#5337)
OF COUNSEL:          Brian F. Morris (#6235)
                John M. O'Toole (#6448)
Robert Wolf           RICHARDS, LAYTON & FINGER, P.A.
Philippe A. Zimmerman   One Rodney Square
MOSES & SINGER LLP    920 North King Street
The Chrysler Building    Wilmington, Delaware 19801
405 Lexington Avenue    (302) 651-7700
New York, NY  10174-1299
(212) 554-7800        *Attorneys for Plaintiff Roger Mason*

Dated: April 9, 2018

EXHIBIT C TO HERSHMAN DECLARATION
PAGE 140

EFiled: Apr 09 2018 01:50PM EDT
Transaction ID 61891536
Case No. 2018-0263-

# EXHIBIT 1

EXHIBIT 1 TO HERSHMAN DECLARATION
PAGE 141

ROGER MASON, JR.
166 Alpine Drive
Closter, NJ 07624


March 21, 2018

**VIA FEDEX AND E-MAIL**

BIG3 Basketball, LLC
c/o Mark Geragos, Esq.
Geragos & Geragos
644 South Figueroa Street
Los Angeles, CA 90017-3411

<div align="center">

Re: <u>Demand for Inspection of Books and Records</u>

</div>

To Whom It May Concern:

      As a member of BIG3 Basketball, LLC, a Delaware limited liability company (the "Company"), I hereby demand, under oath, pursuant to Section 18-305 of the Limited Liability Company Act of the State of Delaware, Delaware common law, and Article VI of BIG3 Basketball, LLC Second Amended and Restated Limited Liability Company Agreement, the right to inspect and to make copies or extracts from the following books and records of the Company:

1.      The Company's financial statements for each fiscal year of the Company's existence, and for the most recent practicable interim period, including, without limitation, balance sheets, income statements, statements of changes in financial condition or statements of cash flow, and statements of capital accounts, including monthly and quarterly statements, and if audited, reviewed or compiled by the Company's accounting firm, such accountant's report with respect to such financial statements;

2.      The Company's general ledger for each of the last two years and for the most recent practicable interim period, including all bank statements underlying the information in the general ledger;

3.      A detailed breakdown of all Company revenue in 2017 and 2018, including revenue for merchandise and sponsorships;

4.      A copy of the Company's most recent operating budget;

5.      The Company's tax returns for each fiscal year of the Company's operations;

6.      Copy of all operating agreements entered into between the Company and its members, including all amendments thereto and including a copy of the current operating agreement of the Company;

7.      A current list, including name and last known business, residence or mailing address, of each member of the Company;

8.      The capitalization table showing the membership interests (by class) currently owned by each member of the Company;

9.      A list of any warrants, rights, profits interests or any other instrument that grants a person the right to acquire membership interests in the Company and a list of any outstanding securities convertible into membership interests in the Company;

10.     The identity of all members of the Company's Board of Managers as of the end of 2017, as of March 12, 2018, and as of the date of this demand, including the dates on which such individuals were elected or appointed to the Board of Managers, and the business address of each such person;

11.     All documents evidencing the election or appointment of all members of the Company's Board of Managers, including without limitation all minutes of the meetings or actions by written consent with respect to such election or appointment;

12.     The identity of all officers of the Company as of the end of 2017, as of March 12, 2018, and as of the date of this demand, including the dates on which such individuals were appointed by the Board of Managers, and the business address of each such person;

13.     All documents evidencing the appointment of all officers of the Company, including without limitation all minutes of the Board of Managers or actions by written consent of the Board of Managers with respect to such election or appointment;

14.     All minutes of any meetings, including special meetings, and all actions by written consent of the Board of Managers of the Company, since inception, and notices and agendas of all such meetings;

15.     All documents relating to or evidencing related party transactions or arrangements between the Company and any person that is a member of the Company, a member of the Board of Managers of the Company, an officer of the Company or an employee or independent contractor of the Company, including, with respect to such related party arrangements any amounts paid and the nature of the services rendered.

16. All documents evidencing or related to transactions between the Company and any individuals or entities that are affiliated or have a relationship with Jeff Kwatinetz, including without limitation any of the following persons or entities:

    A.    The Firm Entertainment, Inc.;

    B.    Prospect Park;

    C.    GSO Business Management;

    D.    BEK LLC; and

    E.    Mike Kwatinetz.

17. With particularity, all documents evidencing or related to transactions between the Company and any individuals or entities that are affiliated or have a relationship with O'Shea Jackson, Sr. (a/k/a Ice Cube);

18. With particularity, all documents evidencing or related to transactions between the Company and any individuals or entities that are affiliated or have a relationship with Cubevision Film Productions, LLC, including Jeff Kwatinetz, O'Shea Jackson, Sr and/or Kelvin Wu;

19. With particularity, all documents evidencing or related to transactions between the Company and any individuals or entities that are affiliated or have a relationship with Mark Geragos, or any entity affiliated with Mark Geragos;

20. An organizational chart showing the identity of all employees of the Company (whether full or part time) and of each independent contractor of the Company, as of the end of 2017 and as of the date of this demand;

21. All documents evidencing the relationship between the Company and each such employee and independent contractor;

22. The expense reports for all officers or managers of the Company since the Company's operations commenced;

23. A detailed schedule of all compensation, loans and benefits to managers of the Company since the Company's operation commenced, whether direct or indirect (including costs associated with using or leasing private aircraft for Company business);

24. A detailed schedule of all loans to members, officers, employees or independent contractors (or entities with which any such individuals are

EXHIBIT 1 TO HERSHMAN DECLARATION
PAGE 144

associated) of the Company since the Company's operation commenced, whether direct or indirect;

25. Copies of all non-disclosure agreements or confidentiality agreements (or other agreements that are similar to such agreements) between the Company, or one of its affiliates, and any of the Company's officers, employees, independent contractors, or any other person;

26. All documents concerning the resignation of Kai Henry as the Company's Chief Creative Officer and Rafael Fogel as the Company's Chief Financial Officer, including documents identifying the reasons for their departures;

27. Evidence of any outstanding debt of the Company, including copies of all agreements relating to such debt;

28. Information about any lawsuits, including arbitrations, that the Company has been a party to since its inception;

29. All documents referring to, relating to, evidencing or identifying any properties in which the Company has an interest or had an interest;

30. All documents referring to, relating to, evidencing or identifying any disbursements to members of the Company's Board of Managers Company's officers, including any disbursements to the directors and officers of each and every subsidiary;

31. Information about all sponsorship opportunities considered by the Company or entered into by the Company with any party, since inception, including Adidas;

32. Information concerning potential opportunities (including potential joint ventures and sponsorships) in China considered by the Company, and information relating to the costs to date of exploring all such opportunities;

33. All documents related to the termination of Roger Mason ("Mason") as President and Commissioner of the League, including, without limitation, all documents concerning any investigation, evidence and/or finding of (i) any purported conflict of interest between Mason and Sports Trinity LLC and its members, (ii) purported use by Mason of company resources/instrumentalities to conduct personal business, business not related to the Company, and business adverse to the interests of the Company, (iii) purported failure by Mason to devote required time to Company, (iv) Mason purportedly permitting and encouraging false and defamatory statements to be made about the Company by Sports Trinity and its members, (v) purported failure by Mason to participate in an

investigation related to conflicts of interests, (vi) purported failure by Mason to participate in an investigation by Company into the Foreign Agents Registration Act and compliance with such act by Sports Trinity and its members, (vii) any purported use by Mason of Company resources to push investment opportunities to other ventures, (viii) purported failure by Mason to disclose a recent trip to China and the purpose of said trip, (ix) purported transmission by Mason of trade secrets and confidential information to individuals not affiliated with the Company, and (x) purported failure by Mason to competently perform his duties and

34.  All documents concerning communications related to Mason's departure and/or termination as President and Commissioner of the League, including, without limitation, communications with members of the Company, players in the League, press and/or media relations advisors or consultants, and members of the media;

35.  All documents concerning an investigation undertaken by Macias Counsel, Inc. ("Macias") or any other firm, on behalf of the Company, including the retainer agreement, the purpose of the investigation, information provided to Macias and any communications from or to Macias, including reports, whether in hard copy or electronic; and

36.  All documents concerning any evidence, and investigation of allegations, that Jeff Kwatinetz has engaged in racist behavior and/or used racist language while associated with the Company, related to African-Americans and persons of Middle Eastern descent, including, without limitation, players in the league and Ahmed Al-Ruhmaihi and Ayman Sabi.

37.  All insurance policies, including but not limited to Directors and Officers, Errors and Omissions, and General Liability.

My purpose in making this demand as a member is to obtain information (i) concerning the Company's financial condition (including information with respect to its recent financial difficulties), (ii) to investigate the Company' compliance with the terms of the current operating agreement and the requirements of Delaware law, (iii) to determine if members of the Board of Managers, including Jeff Kwatinetz, and the officers of the Company have complied with their fiduciary duties, (iv) to investigate the basis of the termination of the Company's former President and Commissioner of the League, (v) to investigate the reasons that the Company's former Chief Financial Officer and Chief Creative Officer recently chose to resign, (vi) to investigate any effort by the Company to defame or disparage former officers, and (vii) to understand whether the Company is being injured by wrongful conduct of Jeff Kwatinetz, including in allegedly making racist statements about players and members of the Company.

I will bear the reasonable costs incurred by the Company in connection with production of the requested information. I hereby appoint Moses & Singer LLP, its members and employees as my agents to conduct the inspection and copying requested herein. I reserve the right to appoint additional agents to conduct the inspection and copying, and further authorize Robert Wolf and Philippe Zimmerman, members of Moses & Singer, to appoint additional agents to act on my behalf to conduct the inspection and copying requested herein.

Please contact Mr. Wolf at (212) 554-7825 or rwolf@mosessinger.com or Mr. Zimmerman at (212) 554-7895 or pzimmerman@mosessinger.com within 5 business days to make arrangements for the inspection. If neither Mr. Wolf nor Mr. Zimmerman have heard from a representative of the Company within the statutorily prescribed time period, I will understand that you do not intend to comply with my request and I will be forced to take such further acts as I deem appropriate to protect my interests as a member.

The statements set forth herein are true under penalty of perjury under the laws of the United States.

Very truly yours,

Roger Mason, Jr.

SWORN TO AND SUBSCRIBED
Before me this 21st day of March, 2018

Shreyas Shah
Notary Public

Sworn to and subscribed before me
this 21st day of March 21st 2018
Shreyas Shah
Notary Public of Bergen County, New Jersey
License #: 2218019
Commission Expires: 9/22/2018

EXHIBIT 1 TO HERSHMAN DECLARATION
PAGE 148

# EXHIBIT 2

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 149

CIVIL

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:13-cv-00266-MCE-DB

Shelley et al v. County of San Joaquin et al.
Assigned to: Chief Judge Morrison C. England, Jr
Referred to: Magistrate Judge Deborah Barnes
Cause: 42:1983 Civil Rights Act

Date Filed: 02/11/2013
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Joan Shelley**                    represented by **Mark B. Connely**
Hall, Hieatt & Connely, LLP
1319 Marsh Street, 2nd Floor
San Luis Obispo, CA 93401
805-544-3830
Fax: 805-544-5329
Email: connely@hhc-slo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chase Wesley Martin**
Hall Hieatt and Connely, LLP
1319 Marsh Street
San Luis Obispo, CA 93401
805-544-3830
Fax: 805-544-5329
Email: martin@hhc-slo.com
*TERMINATED: 09/20/2013*

**Jay A. Hieatt**
Hall, Hieatt & Connely, Llp
1319 Marsh Street
Second Floor
San Luis Obispo, CA 93401
805-544-3830-117
Fax: 805-544-5329
Email: Hieatt@hhc-slo.com
*TERMINATED: 02/15/2018*

**Mark J. Geragos**
Geragos & Geragos, APC
644 South Figueroa Street
Los Angeles, CA 90017
213-625-3900
Fax: 213-625-1600

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 150

Email: mark@geragos.com
*TERMINATED: 07/23/2015*

**Sean Ernesto Macias**
Geragos & Geragos, PC
644 S. Figueroa Street
Los Angeles, CA 90017
213-625-3900
Fax: 213-625-1600
Email: sean@maciascounsel.com
*TERMINATED: 07/23/2015*

**Plaintiff**

**Michelle Loftis**                    represented by **Mark B. Connely**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Chase Wesley Martin**
                                       (See above for address)
                                       *TERMINATED: 09/20/2013*

                                       **Jay A. Hieatt**
                                       (See above for address)
                                       *TERMINATED: 02/15/2018*
                                       *ATTORNEY TO BE NOTICED*

                                       **Mark J. Geragos**
                                       (See above for address)
                                       *TERMINATED: 07/23/2015*

                                       **Sean Ernesto Macias**
                                       (See above for address)
                                       *TERMINATED: 07/23/2015*

**Plaintiff**

**Sandra Hoyopatubbi**                 represented by **Mark B. Connely**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Chase Wesley Martin**
                                       (See above for address)
                                       *TERMINATED: 09/20/2013*

                                       **Jay A. Hieatt**
                                       (See above for address)
                                       *TERMINATED: 02/15/2018*
                                       *ATTORNEY TO BE NOTICED*

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 151

**Mark J. Geragos**
(See above for address)
*TERMINATED: 07/23/2015*

**Sean Ernesto Macias**
(See above for address)
*TERMINATED: 07/23/2015*

V.

**Defendant**

**County of San Joaquin**                    represented by  **Mark Emmett Berry**
                                             Mayall Hurley
                                             2453 Grand Canal Blvd.
                                             2nd Floor
                                             Stockton, CA 95207-8253
                                             209-477-3833
                                             Email: mberry@mayallaw.com
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Derick E. Konz**
                                             Angelo Kilday & Kilduff, LLP
                                             601 University Avenue, Suite 150
                                             Sacramento, CA 95825
                                             916-564-6100-232
                                             Fax: 916-564-6263
                                             Email: dkonz@akk-law.com
                                             *TERMINATED: 08/29/2017*

**Defendant**

**Steve Moore**                              represented by  **Mark Emmett Berry**
*individually, and In his official capacity*                (See above for address)
*as Sheriff of San Joaquin County*                          *LEAD ATTORNEY*
*TERMINATED: 02/07/2014*                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2013 | 1 | CIVIL COVER SHEET by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley (Connely, Mark) (Entered: 02/11/2013) |
| 02/11/2013 | 2 | COMPLAINT against All Defendants by Sandra Hoyopatubbi, Joan Shelley, Michelle Loftis. Attorney Connely, Mark Bradley added.(Connely, Mark) (Entered: 02/11/2013) |
| 02/12/2013 | | RECEIPT number #CAE200050492 $350.00 fbo Joan Shelley et al., by Mark Bradley Connely on 2/12/2013. (Mena-Sanchez, L) (Entered: 02/12/2013) |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 152

| 02/12/2013 | 4 | SUMMONS ISSUED as to *County of San Joaquin, Steve Moore* with answer to complaint due within *21* days. Attorney *Mark Bradley Connely* *Hall, Heiatt & Connely* *1319 Marsh Street, 2nd Floor* *San Luis Obispo, CA 93401*. (Mena-Sanchez, L) (Entered: 02/12/2013) |
| 02/12/2013 | 5 | CIVIL NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent to Magistrate Judge, # 2 VDRP) (Mena-Sanchez, L) (Entered: 02/12/2013) |
| 03/20/2013 | 6 | SUMMONS RETURNED EXECUTED: All Defendants. (Connely, Mark) (Entered: 03/20/2013) |
| 04/01/2013 | 7 | MOTION to DISMISS by County of San Joaquin, Steve Moore. Attorney Berry, Mark Emmett added. Motion Hearing set for 5/2/2013 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr.. (Attachments: # 1 Points and Authorities, # 2 Declaration)(Berry, Mark) (Entered: 04/01/2013) |
| 04/25/2013 | 8 | STIPULATION and PROPOSED ORDER for Continue Motion to Dismiss by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. (Connely, Mark) (Entered: 04/25/2013) |
| 04/30/2013 | 9 | STIPULATION and ORDER signed by Chief Judge Morrison C. England, Jr. on 4/26/2013 ORDERING 8 Motion to Dismiss 7 hearing CONTINUED to 5/30/2013 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr. The deadline for the Plaintiffs to file their opposition and for the Defendants to file their reply brief is hereby CONTINUED in accordance with the new hearing date.(Reader, L) (Main Document 9 replaced on 4/30/2013) (Deutsch, S). Modified on 4/30/2013 (Deutsch, S). (Entered: 04/30/2013) |
| 05/16/2013 | 10 | OPPOSITION to 7 Motion to Dismiss by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. Attorney Martin, Chase Wesley ADDED. (Martin, Chase) Modified on 5/17/2013 (Michel, G). (Entered: 05/16/2013) |
| 05/23/2013 | 11 | REPLY by County of San Joaquin, Steve Moore to RESPONSE to 7 MOTION to DISMISS. (Berry, Mark) Modified on 5/28/2013 (Zignago, K.). (Entered: 05/23/2013) |
| 05/28/2013 | 12 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: On the court's own motion and pursuant to Local Rule 230(g), the Defendants' Motion to Dismiss 7 , scheduled for hearing on 5/30/2013, is submitted without oral argument. The hearing date of 5/30/2013 is vacated. If the court determines that oral argument is needed, it will be scheduled at a later date. (Deutsch, S) (Entered: 05/28/2013) |
| 06/27/2013 | 13 | MEMORANDUM AND ORDER signed by Chief Judge Morrison C. England, Jr. on 6/27/2013 GRANTING, without leave to amend, 7 Motion to Dismiss Plaintiffs' § 1983 claims against Sheriff Moore individually; GRANTING, with leave to amend, 7 Motion to Dismiss Plaintiffs' § 1983 claims against Sheriff Moore in his official capacity and the County of San Joaquin; GRANTING, with leave to amend, 7 Motion to Dismiss Plaintiff's state claims. (Michel, G) (Entered: 06/27/2013) |
| 08/06/2013 | 14 | FIRST AMENDED COMPLAINT against All Defendants by Joan Shelley. (Connely, Mark) Modified on 8/7/2013 (Michel, G). (Entered: 08/06/2013) |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 153

| 08/27/2013 | 15 | MOTION to DISMISS by County of San Joaquin, Steve Moore. Motion Hearing set for 10/3/2013 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr. (Attachments: # 1 Request for Judicial Notice, # 2 Memorandum Points and Authorities)(Berry, Mark) (Entered: 08/27/2013) |
|---|---|---|
| 09/06/2013 | 16 | STIPULATION and PROPOSED ORDER continuing the Motion Hearing as to 15 Motion to Dismiss set for 10/3/2013 by Joan Shelley. (Connely, Mark) Modified on 9/9/2013 (Michel, G). (Entered: 09/06/2013) |
| 09/16/2013 | 17 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: The court is in receipt of the Stipulation and Proposed Order to Continue the Motion Hearing (ECF No. 16). Pursuant to Local Rules 101 and 131(c), the filing as submitted is deficient and accordingly, denied without prejudice. Counsel may file an amended Stipulation and Proposed Order for the court's consideration. (S. Deutsch) (Entered: 09/16/2013) |
| 09/19/2013 | 18 | MINUTE ORDER (Text Only) issued by CRD A. Shaddox-Waldrop for Chief Judge Morrison C. England, Jr on 09/19/2013: On the Court's own motion, the Defendant's 15 Motion to Dismiss currently set for hearing on 10/03/2013 is CONTINUED to 10/17/2013 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England, Jr. (Shaddox-Waldrop, A) (Entered: 09/19/2013) |
| 09/19/2013 | 19 | AMENDED STIPULATION and PROPOSED ORDER to Continue 15 Motion to Dismiss by Joan Shelley. (Connely, Mark) Modified on 9/20/2013 (Zignago, K.). (Entered: 09/19/2013) |
| 09/20/2013 | 20 | DESIGNATION of COUNSEL FOR SERVICE: Attorney Chase Wesley Martin TERMINATED. (Connely, Mark) Modified on 9/24/2013 (Michel, G). (Entered: 09/20/2013) |
| 09/27/2013 | 21 | AMENDED STIPULATION and ORDER signed by Chief Judge Morrison C. England, Jr on 9/26/13: HEARING as to 15 Motion to Dismiss RESET for 11/14/2013 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr.. (Kaminski, H) (Entered: 09/27/2013) |
| 10/31/2013 | 22 | OPPOSITION by Joan Shelley to 15 Motion to Dismiss. (Connely, Mark) (Entered: 10/31/2013) |
| 11/07/2013 | 23 | REPLY by County of San Joaquin, Steve Moore re 22 Opposition to Motion. (Berry, Mark) (Entered: 11/07/2013) |
| 11/08/2013 | 24 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: On the Courts own motion, the 11/14/2013 Defendant's Motion to Dismiss (ECF No. 15) is vacated and continued for oral argument on 11/18/2013 at 10:00 a.m. in Courtroom 7. The personal appearances of counsel are required and oral argument for each side is limited to fifteen (15) minutes. (Deutsch, S) (Entered: 11/08/2013) |
| 11/13/2013 | 25 | STIPULATION and PROPOSED ORDER continuing the motion hearing as to 15 Motion to Dismiss by Joan Shelley. (Connely, Mark) Modified on 11/14/2013 (Michel, G). (Entered: 11/13/2013) |
| 11/13/2013 | 26 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: The Stipulation and Request to Continue (ECF |

| | | |
|---|---|---|
| | | No. 25) is granted. The 11/18/2013 Defendant's Motion to Dismiss (ECF No. 15) is vacated and continued to 12/5/2013 at 2:00 p.m. in courtroom 7. Counsel will be allowed fifteen (15) minutes per side for argument and the personal appearances of counsel are required. (Deutsch, S) (Entered: 11/13/2013) |
| 12/03/2013 | 27 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: On the Court's own motion the 12/5/2013 Defendant's Motion to Dismiss (ECF No. 15) is vacated and continued for oral argument on 12/19/2013 at 2:00 p.m. in Courtroom 7. Counsel will be allowed fifteen (15) minutes per side for argument and the personal appearances of counsel are required.(Deutsch, S) (Entered: 12/03/2013) |
| 12/17/2013 | 28 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: On the Court's own motion the 12/19/2013 Defendant's Motion to Dismiss (ECF No. 15) is vacated and continued for oral argument on 1/9/2014 at 2:00 p.m. in Courtroom 7. Counsel will be allowed fifteen (15) minutes per side for argument and the personal appearances of counsel are required.(Deutsch, S) (Entered: 12/17/2013) |
| 01/09/2014 | 29 | MINUTES (Text Only) for proceedings held before Chief Judge Morrison C. England, Jr.: MOTION HEARING held on 1/9/2014. The Court heard argument from the parties and deferred ruling on the Defendant's Motion to Dismiss (ECF No. 15). Defense counsel was ordered to notify the Court as to the status of the related criminal investigation not later than January 21, 2014. Plaintiffs' Counsel Mark Connely, present. Defendants' Counsel Mark Berry, present. Court Reporter: Kimberly Bennett. Interpreter None present. (Deutsch, S) (Entered: 01/09/2014) |
| 01/21/2014 | 30 | SUPPLEMENT by County of San Joaquin, Steve Moore re 15 Motion to Dismiss. (Berry, Mark) (Entered: 01/21/2014) |
| 01/29/2014 | 31 | ORDER signed by Chief Judge Morrison C. England, Jr on 1/24/14 ORDERING that the document, Declaration of Sergeant Chanda Bassett Re: Status of Criminal Investigation, shall be filed under seal. (Mena-Sanchez, L) (Entered: 01/29/2014) |
| 02/07/2014 | 32 | ORDER signed by Chief Judge Morrison C. England, Jr on 2/6/14 ORDERING that Defendant Sheriff Moore is DISMISSED as a defendant as redundantly pled; Defendants' motion to dismiss Plaintiffs' procedural due process § 1983 claim against the County of San Joaquin, 15 is GRANTED WITHOUT LEAVE TO AMEND; Defendants' motion to dismiss Plaintiffs' substantive due process § 1983 claim, 15 is DENIED; Defendants' motion to dismiss Plaintiffs' § 1983 Monell claim, 15 is DENIED. (Becknal, R) (Entered: 02/07/2014) |
| 02/27/2014 | 33 | ANSWER to First 14 Amended Complaint with Jury Demand by County of San Joaquin.(Berry, Mark) Modified on 2/28/2014 (Reader, L). (Entered: 02/27/2014) |
| 09/12/2014 | 34 | STIPULATION for Protective Order by defendant. (Berry, Mark) Modified on 9/15/2014 (Marciel, M) (Entered: 09/12/2014) |
| 09/12/2014 | 35 | REQUEST for Pre-Trial Scheduling Conference by defendant. (Berry, Mark) Modified on 9/15/2014 (Marciel, M) (Entered: 09/12/2014) |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 155

| 09/17/2014 | 36 | STIPULATION *and PROTECTIVE ORDER* by County of San Joaquin, Steve Moore. (Berry, Mark) (Entered: 09/17/2014) |
| 09/23/2014 | 37 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: The Court is in receipt of the parties' joint Request for a Pretrial Scheduling Conference (ECF No. 35). Pursuant to the Court's 2/12/13 Order Requiring Joint Status Report (ECF No. 5), a Joint Status Report was due within sixty (60) days of service of the complaint on any party. A summons was returned executed on 3/20/2013 (ECF No. 6) and an Answer was filed on 02/27/2014 (ECF No. 33), however, a review of the docket shows the Joint Status Report is not on file. Accordingly, not later than twenty (20) days following the docketing of this Minute Order, a Joint Status Report shall be filed with all parties participating. The parties are reminded that failure to file a Joint Status Report timely may result in the imposition of sanctions, an order to show cause, and/or dismissal of the action. Upon receipt of the Joint Status Report, the Court will issue a Pretrial Scheduling Order.(Deutsch, S) (Entered: 09/23/2014) |
| 09/25/2014 | 38 | STIPULATED PROTECTIVE ORDER signed by Magistrate Judge Dale A. Drozd on 9/24/2014. (Michel, G) (Entered: 09/25/2014) |
| 10/14/2014 | 39 | JOINT STATUS REPORT by Joan Shelley. (Connely, Mark) (Entered: 10/14/2014) |
| 01/15/2015 | 41 | PRETRIAL SCHEDULING ORDER signed by Chief Judge Morrison C. England, Jr on 1/13/15: Discovery due by 8/20/2015. Designation of Expert Witnesses due by 10/20/2015. Non-Dispositive Motions filed by 4/7/2016. Dispositive Motions filed by 2/18/2016. Settlement Conference set for 6/25/2015 at 09:00 AM in Courtroom 26 (AC) before Magistrate Judge Allison Claire. Joint Pretrial Conference Statement due by 4/7/16. Final Pretrial Conference set for 4/28/2016 at 02:00 PM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr. Trial Briefs due by 4/14/16. Jury Trial set for 6/20/2016 at 09:00 AM in Courtroom 7 (MCE) before Chief Judge Morrison C. England Jr. Objections due within 7 days. (Manzer, C) (Entered: 01/15/2015) |
| 03/05/2015 | 42 | NOTICE *OF ASSOCIATION OF COUNSEL* by All Plaintiffs. (Connely, Mark) (Entered: 03/05/2015) |
| 03/05/2015 | 43 | NOTICE *OF ASSOCIATION OF COUNSEL* by All Plaintiffs. (Connely, Mark) (Entered: 03/05/2015) |
| 03/09/2015 | 44 | MOTION TO VACATE the 38 Stipulated Protective Order by Joan Shelley. Motion Hearing SET for 4/17/2015 at 10:00 AM in Courtroom 27 (DAD) before Magistrate Judge Dale A. Drozd. (Attachments: # 1 Proposed Order) (Macias, Sean) Modified on 3/13/2015 (Michel, G.). (Entered: 03/09/2015) |
| 03/13/2015 | 45 | NOTICE of APPEARANCE by Derick E. Konz on behalf of County of San Joaquin. Attorney Konz, Derick E. added. (Konz, Derick) (Entered: 03/13/2015) |
| 03/13/2015 | 46 | MOTION to QUASH *Subpoenas* by County of San Joaquin. Motion Hearing set for 5/8/2015 at 10:00 AM in Courtroom 27 (DAD) before Magistrate Judge Dale A. Drozd. (Berry, Mark) (Entered: 03/13/2015) |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 156

| 04/08/2015 | <u>47</u> | JOINT STATEMENT re Discovery Disagreement for Motion to Vacate the Stipulated Protective Order by Plaintiff Joan Shelley re <u>44</u> Motion to Vacate. (Attachments: # <u>1</u> Declaration of Mark Connely, Esq., # <u>2</u> Declaration of Sen. Cathleen Galgiani, # <u>3</u> Declaration of Allan Fox, # <u>4</u> Declaration of Kevin Atkins, # <u>5</u> Declaration of Mark Berry, Esq.)(Macias, Sean) Modified on 4/9/2015 (Zignago, K.). (Entered: 04/08/2015) |
| 04/17/2015 | <u>48</u> | SEALED EVENT (Donati, J) (Entered: 04/17/2015) |
| 04/17/2015 | 49 | MINUTES (Text Only) for proceedings before Magistrate Judge Dale A. Drozd: MOTION HEARING held on 4/17/2015 re <u>44</u> Motion to Vacate filed by Joan Shelley. After hearing of extensive arguments from plaintiffs' and defendants' counsel, for reasons stated on the record in open court, plaintiffs' <u>44</u> Motion to Vacate Stipulated Protective Order submitted. Court to issue written order. Plaintiffs Counsel Mark Geragos, Sean Macias, Mark Connely present. Defendants Counsel Mark Berry, Matthew Dacey present. Court Reporter/CD Number: Jonathan Anderson/1. (Buzo, P) (Entered: 04/21/2015) |
| 04/27/2015 | 50 | MINUTE ORDER: (TEXT ONLY) by Crd P. Buzo for Magistrate Judge Dale A. Drozd on 4/27/2015. IT IS HEREBY ORDERED: Due to the court's unavailability, Defendant's <u>46</u> MOTION to QUASH *Subpoenas* scheduled for hearing on 5/8/2015, is continued to 5/15/2015 at 10:00 AM in Courtroom 27 (DAD) before Magistrate Judge Dale A. Drozd. Parties may appear at the hearing telephonically. To arrange telephonic appearance, the parties shall contact the undersigned at (916) 930-4128, at least forty-eight hours prior to the hearing and provide a land line number. I HEREBY CERTIFY that the foregoing is a true and correct statement of an order made in the above-captioned case. (Buzo, P) (Entered: 04/27/2015) |
| 05/04/2015 | <u>51</u> | ORDER signed by Magistrate Judge Dale A. Drozd on 5/1/15 ORDERING that plaintiff's <u>44</u> motion to vacate the parties' stipulated protective order is DENIED without prejudice to the filing of a new motion. (Kastilahn, A) (Entered: 05/04/2015) |
| 05/04/2015 | <u>52</u> | STIPULATION and PROPOSED ORDER to Continue <u>46</u> Motion to Quash Subpoenas by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. (Connely, Mark) Modified on 5/5/2015 (Zignago, K.). (Entered: 05/04/2015) |
| 05/04/2015 | 53 | MINUTE ORDER (Text Only) issued by CRD A. Shaddox-Waldrop for Magistrate Judge Dale A. Drozd on 5/4/2015: GRANTING the Stipulation and Proposed Order <u>52</u> . Defendant's Motion to Quash is RESET for 5/22/2015 at 10:00 AM in Courtroom 27 (DAD) before Magistrate Judge Dale A. Drozd. I HEREBY CERTIFY that the foregoing is a true and correct statement of an order made in the above-captioned case. (Shaddox-Waldrop, A) (Entered: 05/04/2015) |
| 05/12/2015 | <u>54</u> | TRANSCRIPT of Plaintiffs' Motion to Vacate Stipulated Protective Order Proceedings held on 04/17/2015, before Magistrate Judge Dale A. Drozd. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 157

| | | Request due 6/4/2015. Redacted Transcript Deadline set for 6/12/2015. Release of Transcript Restriction set for 8/10/2015 filed by ECRO Jonathan Anderson, Phone number 916-930-4072 E-mail janderson@caed.uscourts.gov. (Anderson, J) (Entered: 05/12/2015) |
|---|---|---|
| 05/15/2015 | 55 | JOINT STATEMENT re 46 Motion to Quash Deposition Subpoenas by Defendant County of San Joaquin. (Attachments: # 1 Declaration of Derick E. Konz, # 2 Declaration of Mark B. Connely)(Konz, Derick) Modified on 5/26/2015 (Zignago, K.). (Entered: 05/15/2015) |
| 05/22/2015 | 56 | MINUTES (Text Only) for proceedings before Magistrate Judge Dale A. Drozd: MOTION HEARING held on 5/22/2015 re 46 MOTION to QUASH *Subpoenas* filed by County of San Joaquin. After hearing of extensive arguments, for reasons stated on the record, dft's 46 Motion to Quash Subpoena submitted. Court to issue written order. Plaintiffs Counsel Mark Connely present. Defendants Counsel Mark Berry, Matthew Dacey present. Court Reporter/CD Number: Jonathan Anderson/1. (Buzo, P) (Entered: 05/22/2015) |
| 06/03/2015 | 57 | ORDER denying Defendant's 46 Motion to Quash, signed by Magistrate Judge Dale A. Drozd on 6/2/15. (Kastilahn, A) (Entered: 06/03/2015) |
| 06/17/2015 | 58 | STIPULATION and PROPOSED ORDER for Vacate the June 25, 2015 Settlement Conference and Reset the Settlement Conference for March 10, 2016 by County of San Joaquin. (Berry, Mark) (Entered: 06/17/2015) |
| 06/17/2015 | 59 | STIPULATION and ORDER signed by Magistrate Judge Allison Claire on 6/17/15. Settlement Conference reset for 3/10/2016 at 09:00 AM in Courtroom 26 (AC) before Magistrate Judge Allison Claire. (Manzer, C) (Entered: 06/17/2015) |
| 07/23/2015 | 60 | NOTICE *of Disassociation of Counsel* by All Plaintiffs. (Geragos, Mark) (Entered: 07/23/2015) |
| 10/19/2015 | 61 | STIPULATION *to Continue Date of Designation of Expert Withness* by Joan Shelley. Attorney Hieatt, Jay A. added. (Hieatt, Jay) (Entered: 10/19/2015) |
| 10/20/2015 | 62 | DESIGNATION/DISCLOSURE of EXPERT WITNESS by County of San Joaquin. (Berry, Mark) (Entered: 10/20/2015) |
| 10/22/2015 | 63 | PROPOSED ORDER re Continuation of Expert Witness Designation Date re 61 Stipulation by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. Attorney Hieatt, Jay A. added. (Hieatt, Jay) (Entered: 10/22/2015) |
| 10/23/2015 | 64 | ORDER signed by Chief Judge Morrison C. England, Jr. on 10/22/15 ORDERING that the date for Designation of Expert Witnesses is EXTENDED to 10/30/2015.(Benson, A) (Entered: 10/23/2015) |
| 10/30/2015 | 65 | DISCLOSURE OF EXPERT TESTIMONY by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. (Hieatt, Jay) Modified on 11/2/2015 (Michel, G.). (Entered: 10/30/2015) |
| 11/06/2015 | 66 | ORDER REASSIGNING CASE by Chief Judge Morrison C. England, Jr.: Due to the elevation of Magistrate Judge Dale A. Drozd to the position of District |

| | | |
|---|---|---|
| | | Judge, this action is temporarily assigned to *Magistrate Judge Edmund F. Brennan*. (Zignago, K.) (Entered: 11/06/2015) |
| 11/20/2015 | 67 | STIPULATION and PROPOSED ORDER to modify 41 Scheduling Order filed by County of San Joaquin. (Berry, Mark) Modified on 11/23/2015 (Zignago, K.). (Entered: 11/20/2015) |
| 12/02/2015 | 68 | MINUTE ORDER (Text Only) issued by courtroom deputy for Chief District Judge, Morrison C. England, Jr.: Having reviewed the Parties' Stipulation to Modify Scheduling, Order 67 in this case, and good cause appearing, the dates will be extended as proposed by counsel, contingent on the Court's availability for the Final Pretrial Conference and for the jury trial. An amended Scheduling Order setting forth all new dates will be issued shortly.(Deutsch, S) (Entered: 12/02/2015) |
| 01/15/2016 | 69 | AMENDED 41 SCHEDULING ORDER signed by Chief Judge Morrison C. England, Jr. on 1/14/2016: The last day to hear Dispositive Motions shall be 7/14/2016. Final Pretrial Conference set for 9/22/2016 at 2:00 PM and Jury Trial set for 11/14/2016 at 9:00 AM in Courtroom 7 (MCE). Parties shall file their Joint Final Pretrial Conference Statement no later than 9/1/2016. Any Evidentiary or Procedural Motions to be filed by 9/1/2016. Oppositions must be filed by 9/8/2016 and any Reply must be filed by 9/15/2016. Motions will be heard by Court at same time as Final Pretrial Conference. Settlement Conference set for 8/18/2016 at 9:00 AM in Courtroom 26 (AC) before Magistrate Judge Allison Claire. Confidential Settlement Conference Statement shall be submitted no later than 8/11/2016. Pretrial Scheduling Order will become final unless Objections are filed within 7 court days of service of this Order. (Marciel, M) (Entered: 01/15/2016) |
| 04/29/2016 | 70 | APPLICATION FOR LEAVE to file an initial brief in support of their motion for summary judgment that exceeds 20 page limitation by County of San Joaquin. (Attachments: # 1 Declaration of Mark E. Berry, # 2 Proposed Order) (Berry, Mark) Modified on 5/2/2016 (Benson, A). (Entered: 04/29/2016) |
| 05/05/2016 | 71 | ORDER signed by District Judge Morrison C. England, Jr. on 5/4/16 GRANTING 70 Application for Leave to File a Motion for Summary Judgment that Exceeds 20 Pages. A 35 page limit shall also be imposed on Plaintiff's opposition to the motion and a 20 page limit imposed on defendants' reply brief in support of the motion. (Jackson, T) (Entered: 05/05/2016) |
| 05/19/2016 | 72 | MOTION for SUMMARY JUDGMENT by County of San Joaquin. Motion Hearing set for 7/14/2016 at 02:00 PM in Courtroom 7 (MCE) before District Judge Morrison C. England Jr.. (Attachments: # 1 Points and Authorities, # 2 Statement of Undisputed Material Facts, # 3 Declaration of Mark E. Berry, # 4 Declaration of Chanda Bassett, # 5 Declaration of David Drum, # 6 Declaration of Les Garcia, # 7 Declaration of Daniel O'Connell, # 8 Declaration of Dr. Elizabeth Miller, # 9 Declaration of Dr. Bradley Coleman)(Berry, Mark) (Entered: 05/19/2016) |
| 06/10/2016 | 73 | STIPULATION and PROPOSED ORDER for Continuance of Motion for Summary Judgment by Sandra Hoyopatubbi, Michelle Loftis, Joan Shelley. (Hieatt, Jay) (Entered: 06/10/2016) |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 159

| 06/14/2016 | 74 | STIPULATION and ORDER signed by District Judge Morrison C. England, Jr on 6/14/16 ORDERING that the 72 Motion for Summary Judgment hearing date is continued from 7/14/16 to 8/11/16. (Becknal, R) (Entered: 06/14/2016) |
| 07/07/2016 | 75 | OPPOSITION by Joan Shelley to 72 MOTION for SUMMARY JUDGMENT. (Attachments: # 1 Responsive Separate Statement of Accepted or Disputed Material Facts, # 2 Declaration of Mark Connely, # 3 Declaration of Joan Shelley, # 4 Declaration of Eric Bartelink, # 5 Declaration of Jeffrey Rinek) (Connely, Mark) Modified on 7/11/2016 (Kastilahn, A). (Entered: 07/07/2016) |
| 07/20/2016 | 76 | NOTICE of SETTLEMENT as to Plaintiffs Michelle Loftis and Sandra Hoyopatubbi by County of San Joaquin. (Berry, Mark) Modified on 7/21/2016 (Kaminski, H). (Entered: 07/20/2016) |
| 07/20/2016 | 77 | DECLARATION of Joan Shelley in OPPOSITION TO 72 MOTION for SUMMARY JUDGMENT. (Connely, Mark) (Entered: 07/20/2016) |
| 07/21/2016 | 78 | REPLY by County of San Joaquin re 75 Opposition to Motion, 72 MOTION for SUMMARY JUDGMENT. (Attachments: # 1 Reply to Responsive Separate Statement Of Accepted Or Disputed Material Facts, # 2 Objections to Evidence In Support of Separate Statement Of Facts, # 3 Objection To The Declaration Of Eric Bartelink, Ph.D., # 4 Objection To The Declaration Of Jeff Rinek, # 5 Declaration Of Mark E. Berry)(Berry, Mark) Modified on 7/22/2016 (Kaminski, H). (Entered: 07/21/2016) |
| 08/02/2016 | 79 | ORDER REASSIGNING CASE by Chief Judge Lawrence J. O'Neill: Due to the appointment of *Magistrate Judge Deborah Barnes* to the bench of the Eastern District of California, this action is reassigned from *Magistrate Judge Edmund F. Brennan* to Magistrate Judge Deborah Barnes for all further proceedings. (Jackson, T) (Entered: 08/02/2016) |
| 08/05/2016 | 80 | MINUTE ORDER (Text Only) issued by Relief Courtroom Deputy J. Streeter for District Judge, Morrison C. England, Jr.on 8/5/2016: On the Court's own motion and pursuant to Local Rule 230(g), the Plaintiff's Motion For Summary Judgment (ECF No. 72 ), scheduled for hearing on 8/11/2016, is submitted without oral argument and the hearing is vacated. If the Court determines that oral argument is needed it will be scheduled at a later date. (Streeter, J) (Entered: 08/05/2016) |
| 08/11/2016 | 81 | NOTICE OF SUBMISSION of Confidential Settlement Conference Statement by Defendant County of San Joaquin. (Berry, Mark) Modified on 8/12/2016 (Jackson, T). (Entered: 08/11/2016) |
| 08/11/2016 | 82 | NOTICE OF SUBMISSION OF CONFIDENTIAL SETTLEMENT CONFERENCE STATEMENT by Joan Shelley. (Connely, Mark) (Entered: 08/11/2016) |
| 08/15/2016 | 83 | *AMENDED MINUTE ORDER (Text Only) issued by courtroom deputy for District Judge, Morrison C. England, Jr.: On the Court's own motion and in light of the Plaintiff's submitted Motion for Summary Judgment (ECF No. 72), the September 22, 2016 Final Pretrial Conference and November 14, 2016 Jury Trial dates are vacated. *All dues dates set forth in the Court's Amended Scheduling Order (ECF No. 69) are VACATED. The parties are ordered to file a |

| | | |
|---|---|---|
| | | Joint Notice of Trial Readiness not later than thirty (30) days after receiving this Court's ruling(s) on the last filed dispositive motion(s). The parties are to set forth in their Notice of Trial Readiness, the appropriateness of special procedures, whether this case is related to any other case(s) on file in the Eastern District of California, the prospect for settlement, their estimated trial length, any request for a jury, and their availability for trial. After review of the parties' Joint Notice of Trial Readiness, the Court will issue an order that sets forth new dates for a final pretrial conference and trial. (Deutsch, S) Modified on 8/15/2016 (Deutsch, S). (Entered: 08/15/2016) |
| 08/29/2017 | 84 | NOTICE of Change in Counsel by County of San Joaquin. (Berry, Mark) (Entered: 08/29/2017) |
| 10/12/2017 | 85 | MEMORANDUM AND ORDER signed by District Judge Morrison C. England, Jr on 10/11/17 DENYING Defendant County of San Joaquin's 72 Motion for Summary Judgment. (Becknal, R) (Entered: 10/12/2017) |
| 11/09/2017 | 86 | JOINT NOTICE OF TRIAL READINESS filed by plaintiff(s) and defendant(s). (Berry, Mark) (Entered: 11/09/2017) |
| 11/28/2017 | 87 | SUPPLEMENTAL PRETRIAL SCHEDULING ORDER signed by District Judge Morrison C. England, Jr. on 11/27/17 ORDERING that a Final Pretrial Conference is set for 2/7/2019 at 02:00 PM in Courtroom 7 (MCE) before District Judge Morrison C. England, Jr. with a joint final pretrial conference statement due 01/10/19; trial briefs are due 01/10/19; any evidentiary or procedural motions are to be filed by 01/10/19 with oppositions due 01/24/19, any reply due 01/31/19 and heard at the same time as the Final Pretrial Conference; Jury Trial set for 4/8/2019 at 09:00 AM in Courtroom 7 (MCE) before District Judge Morrison C. England, Jr. Within 14 days, counsel shall contact Magistrate Judge Kendall J. Newman's clerk to schedule a settlement conference. Objections due within 7 court days (cc: KJN). (Benson, A.) Modified on 11/28/2017 (Benson, A.). (Entered: 11/28/2017) |
| 02/14/2018 | 88 | MINUTE ORDER issued by Courtroom A. Waldrop for Magistrate Judge Kendall J. Newman on 2/14/2018: Pursuant to the parties' communication with the court, this matter is set for Settlement Conference on 7/18/2018 at 09:00 AM in Courtroom 25 (KJN) before Magistrate Judge Kendall J. Newman. The parties are instructed to have a principal with full settlement authority present for the settlement conference or to be fully authorized to settle the matter on any terms. The individual with full settlement authority to settle must also have unfettered discretion and authority to change the settlement position of the party, if appropriate. The purpose behind requiring attendance of a person with full settlement authority is that the parties view of the case may be altered during the face to face conference. An authorization to settle for a limited dollar amount or sum certain can be found not to comply with the requirement of full authority to settle. The parties are directed to exchange non-confidential settlement conference statements seven days prior to the settlement conference. These statements shall be simultaneously delivered to the Court using the following email address: kjnorders@caed.uscourts.gov. These statements should not be filed on the case docket. If a party desires to share additional confidential information with the Court, they may do so pursuant to the provisions of Local |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 161

| | | Rule 270(d) and (e). (TEXT ONLY ENTRY) (Waldrop, A) (Entered: 02/14/2018) |
|---|---|---|
| 02/15/2018 | 89 | DESIGNATION of COUNSEL FOR SERVICE., attorney Jay A. Hieatt terminated (Connely, Mark) (Entered: 02/15/2018) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/09/2018 09:17:34 | | | |
| **PACER Login:** | lex.Moses:2602962:0 | **Client Code:** | 099999-0010-0929 |
| **Description:** | Docket Report | **Search Criteria:** | 2:13-cv-00266-MCE-DB |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

EXHIBIT 2 TO HERSHMAN DECLARATION
PAGE 162

# EXHIBIT 3

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 163



MOSES & SINGER LLP

The Chrysler Building
405 Lexington Avenue, NY, NY 10174-1299
Tel: 212.554.7800    Fax: 212.554.7700
www.mosessinger.com

Robert S. Wolf
Direct: 212.554.7825 Fax: 917-206-4325
rwolf@mosessinger.com

March 6, 2018

BIG3 Basketball, LLC
c/o Fishman, Block & Diamond
16830 Ventura Boulevard
302 West Colorado Blvd,
Encino, CA  91436
Att: Steven Fishman, Esq,

        Re:    **BIG3 Basketball /Roger Mason**

Gentleman:

        We represent Roger Mason and write in connection with the breach by BIG3 Basketball, LLC's ("BIG3" or the "Company") of its employment agreement, dated November 24, 2016, with Mr. Mason (the "Agreement").  Specifically, BIG3's co-founder, Jeffrey Kwatinetz, has continuously engaged in a malicious, defamatory campaign of disparaging Mr. Mason intended to prevent him from the performance of his contractual duties and responsibilities.  Mr. Kwatinetz's wrongful actions have also materially diminished Mr. Mason's position, status, title, authority and responsibilities as President and Commissioner of BIG3.  His unfounded attacks on Mr. Mason's integrity, character, and leadership must immediately cease.  The liability for damage to Mr. Mason's impressive, hard–earned, impeccable reputation falls on BIG3 and Mr. Kwatinetz, personally.  It further calls into question Mr. Kwatinetz's competence to actively run BIG3, especially in light of information that he has allegedly made racist comments about Black athletes as well as BIG3's Arab investors at least one of whom is a Board Member of the company.  Finally, the BIG3's failure to properly observe corporate formalities, may result in the financial liability of both of its co-founders O'Shea Jackson and Mr. Kwatinetz.

        Mr. Mason is highly respected in the basketball community.  In addition to playing in the NBA for 11-years, he was Deputy Executive Director of the National Basketball Players Association (NBPA), the first former player to ever accomplish such a high ranking position.  As the Deputy Executive Director he played an integral role in negotiations

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 164

BIG3 Basketball, LLC
March 6, 2018
Page 2


with players, team owners and league executives in the successful achievement of two Collective Bargaining Agreements. Among his major accomplishments in that role was the securing of lifetime healthcare for all retired NBA players, which has positively impacted all of the BIG3 players and coaches and earned him their tremendous recognition, respect and trust. Mr. Mason's experience, respect, background and established long-term relationships have been instrumental in signing all of the players and coaches to the BIG3, including stars like Allen Iverson, Rashard Lewis, Kenyon Martin and Charles Oakley. Countless players have praised Mr. Mason and have made clear to him that his involvement with BIG3 legitimizes the league.

Mr. Mason took BIG3 when it was merely a concept and transformed it into a legitimate basketball organization. He helped create the official game rules for the BIG3 and created a combine and draft format from which additional players were selected. As a result, the BIG3 was able to successfully recruit and draft eligible players, as well as plan and execute the combine and the draft. He was also responsible for the hiring of all referees and the referee director.

The credibility, reputation and relationships Mr. Mason established over the course of his career as an NBA player and Deputy Executive Director of the NBPA have been critical to BIG3's success to date and have given the organization instant credibility. Despite this, Mr. Kwatinetz, in utter disregard of Mr. Mason's contributions to the Company – and in violation of the Agreement – has (and continues to) bad-mouth and alienate Mr. Mason in his role as President and Commissioner of BIG3.

Pursuant to section 8 (d) of the Agreement, there is a non-disparagement provision which provides:

> *During the Employment Term* and for a period of five (5) years thereafter, the [Company/Executive] agrees, to the fullest extent permissible by law, not intentionally to make, directly or indirectly, any *public or private statements*, gestures, signs, signals or other verbal or nonverbal, direct or indirect communications *that are or could be harmful to or reflect negatively on [Mr. Mason].*

In addition, pursuant to Paragraph 14(f), Mr. Mason may resign for "Good Reason" for, *inter alia*, the following reasons:

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 165

(ii) any material diminution in Executive's position, status, title, authority or responsibilities…, (iv) the Company's material breach of this Agreement, (v) any material prevention by the Company of Executive's carrying out his duties or responsibilities under this Agreement…

Mr. Kwatinetz has created a hostile work environment in his dealings with Mr. Mason, much of which is reflected in numerous email communications. In a blatant attempt to isolate Mr. Mason, Mr. Kwatinetz purposefully leaves him off key communications; excludes him from important meetings; and disparages him to investors, employees and people that Mr. Mason introduced to Mr. Kwatinetz in his role as President and Commissioner. The enmity Mr. Kwatinetz displays toward Mr. Mason became pronounced in the latter part of 2017, after a successful first season when Mr. Kwatinetz began attacking Mr. Mason based on false allegations, ultimately threatening not to renew the Agreement. Despite Mr. Kwatinetz's threats to go to the Board and terminate his employment, Mr. Mason's employment agreement was renewed for a second year and his equity in BIG3 vested.

Nevertheless, Mr. Kwatinetz has continued to criticize, undermine and marginalize Mr. Mason's position and authority. As further supported by the documentary and other evidence, a pattern has emerged whereby Mr. Mason introduces Mr. Kwatinetz to various people in the industry, including players, coaches, referees, investors and other valuable insiders, only to be cut out of those interactions by Mr. Kwatinetz. This pattern, whereby Mr. Kwatinetz tells Mr. Mason to stop communicating with his contacts because Mr. Kwatinetz is now handling the communications, is also well documented. In short, Mr. Mason's duties and responsibilities have been usurped by Mr. Kwatinetz.

Mr. Mason, on the other hand, has remained respectful toward and attempted to work with Mr. Kwatinetz despite the adversity. Unfortunately, Mr. Kwatinetz's behavior, makes continuation of the status quo unattainable.

As a further affront and show of disrespect, Mr. Mason was served with a letter on behalf of BIG3, informing him of a purported investigation into alleged conflicts of interest with investors. Under this pretext, Mr. Mason is expected to fly out to California and subject himself to a five hour recorded interview. Such actions, in addition to being harassing, imply some impropriety on the part of our client in connection with the

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 166

individuals and companies listed in the letter. Ironically, Mr. Mason introduced the Company to Ahmed Al-Rumaihi and Ayman Sabi (two names on the list), both of whom became significant investors in BIG3. Other than making a very lucrative introduction for the Company, Mr. Mason has had nothing to do with Mr. Al-Rumahi's and Mr. Sabi's financial relationship with BIG3, as Mr. Kwatinetz insisted on personally handling all negotiations. Accordingly, we view any attempt to intimate wrongdoing by our client in connection with any of the people or entities listed in the Macias correspondence to be a further breach of the Agreement. Moreover, we will consider any attempt to interfere with Mr. Mason's relationship with the investors, whose relationships predate BIG3, to be tortious interference with his business relationships. BIG3 is well aware of the propriety of any relationships that Mr. Mason has with the entities and individuals listed in the correspondence, one of whom is his sister.

Although it is our desire to constructively resolve the issues raised herein so that the parties can focus their attention on BIG3's success, should we be unable to reach a resolution, this letter reminds you of your obligation to inform your client(s) of their preservation obligations. In that regard, notice is hereby given that BIG3 and its co-founders Jeffrey Kwatinetz, individually, co-founder O'Shea Jackson individually and its and their agents (collectively referred to as "You" or "Your") are obligated not to destroy, conceal, wipe clean, overwrite, reformat or otherwise alter or spoliate any data, media, computer, drive, paper or other electronic file, generated, stored, rented or otherwise used or in Your possession, custody or control, that pertains to or contains any information that is or may be related to the above referenced claims or the issues therein (the "Potential Litigation"). Please forward a copy of this letter to all persons and entities, wherever located, with custodial responsibility for the items referred to in this letter, including, but not limited to, any other owners, founders of the Big 3, Board members and the management of the BIG3.

The kinds of documents that must be preserved include all tangible and electronic things, not just paper documents. Thus, this request includes, but is not limited to: all email and other electronic communications; word processing documents; programs; originals and non-identical copies of electronic and paper documents and files, spreadsheets; databases; calendars; telephone logs; text messages; contact manager information; Internet usage files; offline storage and/or information stored on removal media; and all other information contained in any media, files, cabinets, or in other storage, and/or on computers, laptops and/or other electronic storage devices or media.

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 167

Although we may, if appropriate, seek court intervention for an order preserving documents and other data from destruction or alteration, under the applicable rules and case law, Your obligation to preserve documents and other data for discovery in this case arises independently from any order on such motion.

Electronic documents and the storage media on which they reside may contain relevant and discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, You should preserve, and we may seek, all documents in their "hard copy" and electronic or native form, along with metadata or information about those documents contained on the media. Similarly, relevant data may be found in unallocated areas of hard drives and other media, or on "the cloud", and You are put on notice that such must be preserved.

The laws and rules prohibiting destruction of evidence apply to electronically-stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified or corrupted. Accordingly, You and all those with access to Your files, records, computers and/or electronic storage devices, and all other persons acting on their behalf, directly or otherwise, should take and must continue to take every reasonable step to preserve this material and information until the final resolution of the Potential Litigation, or until the preservation obligations are otherwise addressed by the Court. This may include, but would not be limited to, an obligation to immediately discontinue all data destruction and backup tape recycling policies or creating a forensic copy of any or all media on which such evidence may reside. Further, a copy of this letter or its contents should be given to all individuals who are responsible for any of the items referred to in this letter.

With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence should not be destroyed and You should take the appropriate steps required to avoid destruction, by anyone, of such evidence. These directions should be given to all persons and entities, wherever located, with custodial responsibility for the items referred to in this letter.

Failure to abide by this request may result in a claim for damages against anyone involved, directly or otherwise and could form the basis of legal claims for spoliation.

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 168

BIG3 Basketball, LLC
March 6, 2018
Page 6


This letter is without prejudice to any of our client's rights or remedies, all of which are expressly reserved herein.

Govern yourself accordingly.

Very truly yours,

Robert S. Wolf

EXHIBIT 3 TO HERSHMAN DECLARATION
PAGE 169

# EXHIBIT 4

EXHIBIT 4 TO HERSHMAN DECLARATION
PAGE 170

--------- Forwarded message ---------
From: **Kwatinetz, Jeff** ██████████
Date: Mon, Sep 18, 2017 at 9:45 PM
Subject: Fwd: confidential
To: Ayman Sabi ████████████

Jeff Kwatinetz

THE FIRM █

Begin forwarded message:

**From:** "Kwatinetz, Jeff" ████████
**Date:** September 18, 2017 at 9:06:27 PM PDT
**To:** "David Dunn ████████████
**Cc:** "Kwatinetz, Jeff" ██████, ""RAFAEL FOGEL ██████, ""John Branca ████████

**Subject: confidential**

David:

¹

EXHIBIT 4 TO HERSHMAN DECLARATION
PAGE 171

Thanks for sending the Revenue one pager. We have been doing significant work and modeling on it and are confident we can make an offer that is compelling. At the same ▇ profit split I am preparing an offer at ▇ We also have been making significant progress on a superior marketing and promotion component that would enable us to greatly enhance value of the MJJ catalog far beyond what anyone else can even approach.

At this stage I need some additional diligence to finalize our offer. Firstly, we need to reconcile some discrepancies in the numbers. When we totaled the numbers provided, we came up with different revenue amounts that indicate that you may have underreported the revenue. See the following:

**MJJ spreadsheet Delta:**



**All Revenue By Territory**

Total Estimated Gross Revenue (including synch)

Total Estimated Gross Revenue (including synch)

**2. Estimated Revenue By Source**

These numbers tie to the spreadsheet sent

**3. Estimated Revenue By Album**

**Album Title**

Total Estimated Gross Revenue

Total Estimated Gross Revenue

2

EXHIBIT 4 TO HERSHMAN DECLARATION
PAGE 172

In addition, we would need the following typical diligence that I imagine has already been prepared. (To expedite, if there exists a "data room" could we have access). Let us know if the following could be provided:

1. Full track list of all song titles in the Catalog and the percentage MJJ owns along with names of other owners.

2. Copies of all historical royalty statements for the last five years for the Catalog, as provided by record labels and/or other distributors. We assume the following would be included

    a.   Statement Date

    b.   Song Title and/or Album

    c.   Territory

    d.   Sales Period Begin and End

    e.   Sales Type (e.g., Physical, Download, Streaming)

    f.   Royalty Description (e.g., Mechanical, Performance, Synch)

    g.   Royalty Source (e.g., Spotify, iTunes)

    h.   Units Sold/Streamed

    i.   Gross and Net Royalty Amounts (with currency denomination)

    j.   Admin Fee

    k.   Distribution and Other Costs (as available)

    l.   Artist's Share (if below 100%)

3. Copies of any significant historical royalty statements received over the past five years from any other source not already identified above, including SoundExchange and other PROs.

4. Copies of all ongoing and recently expired contracts between MJJ and each record label/distributor or other party responsible for the exploitation of the Catalog's sound recordings (for all territories and all income streams).

3

EXHIBIT 4 TO HERSHMAN DECLARATION
PAGE 173

5. Similar copies of publishing agreements (so we know what the true publishing costs are)

6. Copies of any other significant contracts associated with the ongoing exploitation of the Catalog, including licensing and synchronization rights clearance agreements.

7. Comprehensive listing of all inbound synchronization requests during the last 5 years.

8. For each song title sold or assigned a partial or full share of any royalty stream, a description of the transaction and the ownership percentage sold/assigned.

9. Summaries of all litigation or threatened litigation which may have a material impact in the future.

10. Are there any outstanding Advances?

11. Are there any other encumbrances not listed?

12. Who has approval rights on synchs or other licensing offers?

13. Can you provide all audits of SONY and any other distributors?

14. Are there any forward projections that have been prepared for the Catalog?

15. Is there any agreement such as a right of first refusal or matching right?

I appreciate it and we are moving at lightning speed.

4

EXHIBIT 4 TO HERSHMAN DECLARATION
PAGE 174

# EXHIBIT D



# Checkmate: Ice Cube Calls Out Trump & Qatar Big3 Investors In Full-Page Ad

 **Sports** Desire Thompson  **@desire_renee** | April 11, 2018 - 11:53 am 

EMAIL  SHARE  TWEET  REDDIT



CREDIT: Getty Images





This article has been updated to include a statement from the Qatar Investment Authority.

—

History and a little movie called *Straight Outta Compton* has reminded us that Ice Cube doesn't play around when it comes to his money. After it was revealed he and other members of his Big3 basketball league sued Qatari investors who tried to push them out his own league, Cube took things up a notch.

On Tuesday (Apr. 10), an full-page ad appeared in the *New York Times* about President Donald Trump and the Emir of Qatar with a quip about the scandal. "When you meet today with Putin's new friend, Emir of Qatar, please tell him not to threaten the Big3 and American athletes!," it reads. Trump met with Emir of Qatar at the White House Tuesday.

The suit filed by Cube and Big3 co-founder Jeff Kwatinetz alleged a group called Sport Trinity and investors Ahmed Al-Rumaihi, Faisal Al-Hamadi, who previously worked for the Qatar Investment Authority; and Ayman Sabi used unlawful practices to etch them out their company and refused to deliver on plans to invest in the company. The investors promised to bring in $20.5 million but only provided a third of the amount. Cube's Big3 league consists of legendary basketball players who play three-on-three basketball tournaments. The league's inaugural games were a hit on Fox Sports in 2017, bringing in over 400,000 viewers.

In a statement to *VIBE,* Qatar Investment Authority said they have no ties to Ice Cube or the Big3 League. "Neither the Qatar Investment Authority nor its CEO are investors in, nor have they had any involvement with, Big3," they said. A Qatar government spokesman also conformed with *The Washington Post* that the Sport Trinity Group has no ties to the Qatar Investment Authority.

The investors named in the lawsuit promised to bring in $20.5 million but only provided a third of the amount. Cube's Big3 league consists of legendary basketball players who play three-on-three basketball tournaments. The league's inaugural games were a hit on Fox Sports in 2017, bringing in over 400,000 viewers.

"These members and associates of the royal family made excuse after excuse for not paying, all of which is documented in text messages and emails," the suit reads."The blame for their failure to fund the millions they owed the BIG3 ran the gamut from their 'sinuses,' 'hiking,' it being a 'long day bro,' and to bad press regarding Qatar associations with alleged funding of terrorism."

The billion-dollar lawsuit also claimed that the investors made racial remarks about the players in the league. The group denied any wrongdoing. "Mr. Kwatinetz may think this resort to racial animosity and religious paranoia serves his personal interest, but it certainly is not in the best interest of Big3 or its investors," the group said to *The Washington Post* last week.

> This very bizarre Ice cube – Qatar scandal keeps getting better and better. Today's NYT …..
> https://t.co/gWJsvcMC56 pic.twitter.com/PN3I6pcoMQ

<blockquote>
— Yousef Al Naimi (@YousefAlNaimi) April 10, 2018
</blockquote>

Cube also tweeted the ad, with a message to Trump. Emir of Qatar hasn't responded to the full-page ad.

<blockquote>
America first? Okay Mr. President, tell 'em to stop fuckin wit @thebig3. pic.twitter.com/UwumJtcUeZ

— Ice Cube (@icecube) April 10, 2018
</blockquote>

**TAGS:** Big3, Ice Cube

☐

---

## RECOMMENDED FOR YOU



Ice Cube Wants Big3 League Investors To Run Him His Money In New Lawsuit



Lebron James Texts JAY-Z & Ice Cube Rolls Through His Classics On 'Carpool Karaoke' Finale



N.W.A. Forever: MC Ren Making New Tunes With Ice Cube, DJ Premier



Top 5 Moments Of Mayweather vs. McGregor's Fight Weekend In Las Vegas



LaVar Ball And Ice Cube Face-Off In A Four-Point Basketball Challenge



Ice Cube, Will Smith, & More Can't Stop Grooving On Latest 'Carpool Karaoke' Trailer

---

Available at Amazon

Ads by Amazon 

## FEATURED STORIES

   

 

NEWS    MUSIC    FEATURES    STYLE    VIXEN    LISTS    VIVA    CONTACT US

Vibe.com is a member of Billboard Music, a division of Billboard-Hollywood Reporter Media Group.

Privacy Policy    AdChoices    Copyright

Billboard | The Hollywood Reporter | SPIN | VIBE | Stereogum

# EXHIBIT E

Your web browser (Internet Explorer 10) is out of date. Update your browser for more security, speed and the best experience on this site.

Update browser   Ignore



GOT A TIP?   EMAIL OR CALL (888) 847-9869

NEWS    SPORTS    VIDEOS

PHOTOS    CELEBS    TOURS    WATCH TMZ



**Pete Rose Drives Rolls-Royce Despite $1 Million IRS Debt**



**Ball Family Returns From Lithuania, Lots Of Long Faces**



**Tom Brady Praises Bill Belichick, 'Greatest Coach of All Time'**



**Dennis Rodman Gave Kim Jong-un These Donald Trump Books**



**Babe Ruth Game-Used Bat Pulls In 6-Figures at Auction**

Ice Cube Stunts on Rich Qataris He's Suing for $1B, 'Stay Out of American Sports'

# ICE CUBE
# STUNTS ON RICH QATARIS HE'S SUING
## 'Stay Out of American Sports'



*4/17/2018 12:02 PM PDT*

**EXCLUSIVE**

[Ice Cube has a mes]sage for the Qatari investors he's suing for over $1 BILLION ... after they allegedly went back on their agreement with the BIG3.

"We gon' win. Stay out of American sports if you don't wanna do the right thing," Cube said on his way into Power 106 in L.A. to promote VH1 "Hip Hop Squares," which premieres Wednesday night.

ADVERTISEMENT

**PHOTO GALLERY**

2018 NFL Draft Fashion Photos



VIEW GALLERY »

FROM OUR PARTNERS

EXHIBIT E TO HERSHMAN DECLARATION
PAGE 181

**TMZ Sports** broke the story -- Cube and his BIG3 partner, **Jeff Kwatinetz**, are suing a bunch of Qatari investors who were supposed to invest $5 mil in Cube's pro hoops league.

In fact, they recently added the CEO of Qatar Airways to the list of defendants.

Cube says the Qataris **made up every excuse** in the book to avoid ponying up -- and now him and Jeff are seeking $1.2 BILLION in damages.

Clearly, Cube's confident these billionaire dudes are gonna get schooled in the courtroom -- and he ain't afraid to let 'em know.

The BIG3 founder also told us why fans should be hyped for Season 2 -- and we would be too with all **the big names** comin' in.

## UPDATE

**2:46 PM PT** -- The investment group named in the lawsuit, Sport Trinity, has issued a statement saying:

"The Sport Trinity investors have to date contributed more than 3.5x any other investor in the BIG3, putting in close to half of all funds invested in the BIG3 and multiples of what Ice Cube and Jeff Kwatinetz themselves invested."

"The smear campaign against these investors, one of whom is a Qatari citizen, and against others from Qatar who have nothing to do with Sport Trinity, is as bizarre as it is offensive."




SHARE ON FACEBOOK

TWEET THIS

## RELATED ARTICLES


Ice Cube and BIG3 Sue Qatari Investors for $1 Billion!!!


Ice Cube Rips Emir of Qatar, Don't Threaten BIG3 Players!

TMZ SPORTS  ICE CUBE  EXCLUSIVE  BASKETBALL  MUSIC

CELEBRITY JUSTICE ™  FIGHTS & FEUDS


**Joel Embiid Takes Shot At TD Garden Crowd After Game 1 Loss To Celtics**
NESN


**Watch Will Smith's Star-Studded Hype Video For Sixers-Celtics Series**
NESN


**Tom Brady Gives Cryptic Answer Regarding Current Level Of Happiness**
NESN



# COMMENTS

### CLICK TO VIEW

**AROUND THE WEB**

Powered By ZergNet

**Celebrities Who Are Only Famous Because of a Relative**
*NickiSwift.com*

**The Sad Way Avicii Committed Suicide, Revealed**
*Pagesix.com*

**Malia and Sasha's Stunning Fashion Since Leaving the White House**
*TheList.com*

**The Real Reason You Don't Hear About Caitlyn Jenner Anymore**
*NickiSwift.com*

**Matt Lauer in 'Bad Shape' As Divorce Moves Forward**
*Etonline.com*

**The Truth About Malia Obama's Incredibly Rich Boyfriend**
*TheList.com*

ADVERTISEMENT

**MORE FROM**





**TMZ SPORTS**



BALL FAMILY
**RETURNS FROM LITHUANIA ... Lots Of Long Faces**

LaVar, Lonzo, LaMelo and LiAngelo are officially back in L.A. from Lithuania -- but it ain't exactly the triumphant return they envisioned when they left in the first place. As we…

CLICK TO VIEW »





## AROUND THE WEB

**ZergNet**

## SPORTS CLIPS



Hulk Hogan: 'You Better Vote For Kane,' He's A Smart Dude



Jerry Hairston Jr. Says Team Can Win World Series Without Corey Seager



ATL Falcons Going To Super Bowl With Calvin Ridley, Says T.I.



Josh Rosen Will Be Best QB From 2018
Draft, Says Curt Menefee

## MOST POPULAR



Kanye West
Stirs Up TMZ Newsroom
Over Trump, Slavery, Free Thought



Avicii
Suicide By Broken Glass ...



Kanye West
The 'Taylor Swift Moment'
Helped Trigger My Breakdown



Daz Dillinger
In The Crosshairs Of Cops ...
After Crips Threat Against Kanye



Daz Dillinger
I Want The Crips To 'F*** Up' Kanye!!!



Prince Harry
Old Habits Die Hard ...
But Meghan's Even Harder On Him!

## AROUND THE WEB



**ABOUT TMZ**

About TMZ.com

Privacy Policy

Terms of Use

AdChoices

TMZ Mobile Alerts

**CONTACT TMZ**

Contact Us

Send a Hot Tip

Careers

Advertising Inquiries

Media Inquiries

**SUBSCRIBE**

▶

By clicking "Sign me up!", you agree to the Privacy Policy and Terms of Use.

**FOLLOW**

**TMZ APPS**

© 2018 EHM PRODUCTIONS,INC. ALL RIGHTS RESERVED

THIRTY MILE ZONE

# EXHIBIT F



PRIME ORIGINAL
NFL FILMS PRESENTS
ALL OR NOTHING
THE DALLAS COWBOYS



Movies, TV & Showtimes | Celebs, Events & Photos | News & Community

All | IMDbPro ▾ | Help  

Watchlist | Sign in with Facebook | Other Sign in options



## Ice Cube
# Biography

Edit

Showing all 36 items

Jump to: Overview (4) | Mini Bio (1) | Spouse (1) | Trade Mark (2) | Trivia (24) | Personal Quotes (4)

### Overview (4)

| | |
|---|---|
| Born | June 15, 1969 in Los Angeles, California, USA |
| Birth Name | O'Shea Jackson |
| Nickname | Cube |
| Height | 5' 8" (1.73 m) |

### Mini Bio (1)

Ice Cube was born in South Central Los Angeles, to Doris (Benjamin), a custodian and hospital clerk, and Hosea Jackson, a UCLA groundskeeper. He first came to public notice as a singer and songwriter with the controversial and influential band N.W.A. His compositions with that group included many of the classic cuts from their debut LP "Straight Outta Compton" (Ruthless/Priority, 1989), including the title track, "Gangsta Gangsta" and "Express Yourself". He quit the band over business differences in 1990 and began a still-growing series of commercially and critically acclaimed solo albums, starting with "AmeriKKKa's Most Wanted" (Priority, 1990). His second solo album, "Death Certificate" (Priority, 1991), a concept album about the fall and rise of the Black man, sold two million copies, and his subsequent solo output (six albums to date total) has sold over ten million copies. He has also discovered Yoyo, Del, K-Dee and Mack 10. He has also produced, written, toured and recorded with Public Enemy, The Red Hot Chili Peppers, George Clinton, The D.O.C., Michel'e, Big Daddy Kane, WC & The Madd Circle (which spawned the solo career of Coolio), former N.W.A. bandmate Dr. Dre and Cypress Hill. He has also recorded with two post-N.W.A. side-project bands, Da Lench Mob ("Guerillas In Tha Mist", Street Knowledge/East-West, 1991) and Westside Connection ("Bow Down", Priority, 1996). His movie career has been no less stellar. Ice Cube's debut in Boyz n the Hood (1991) led to more roles in such films as Trespass (1992), Dangerous Ground (1997) and Anaconda (1997). He also appeared as himself in the comedy CB4 (1993). He is also no stranger to the other side of the camera, directing videos for himself as well as Prince and Color Me Badd, as well as co-writing his screenwriting debut, Friday (1995).

- IMDb Mini Biography By: CJ Marsicano <irieduck@ptd.net>

### Spouse (1)

PRIME ORIGINAL
ALL OR NOTHING THE DALLAS COWBOYS
STREAM NOW
ad feedback


Ice Cube

Personal Details
Biography
Other Works
Publicity Listings
Official Sites
Contact Info (IMDbPro)

Explore More

Share this page:   

Editorial Lists
Related lists from IMDb editors


Top 50 Highest-Grossing 1990s Horror Films
a list of 50 images updated 6 months ago


Our Favorite '90s Movie Soundtracks
a list of 69 images updated 11 months ago


IMDb Picks: Editors' Picks for February
a list of 14 images updated 17 Feb 2017

| Kimberly Woodruff | (28 November 1992 - present) ( 4 children) |

### Trade Mark (2)

Dark menacing scowling eyes

More often than not sports a beard

### Trivia (24)

Rapper/actor, and ex-N.W.A. member.

Education: Phoenix Institute of Technology.

Children: O'Shea Jackson Jr. (B. February 24, 1991) Darryl Jackson (B. December 29, 1992) Kereema Jackson (B. February 17, 1994) and Shareef Jackson (B. November 17, 1995).

Began Cubevison production Company.

Cousin of rapper Del.

Legally changed his name to Ice Cube.

Graduated from William Howard Taft High school in Woodland Hills, California.

Was listed as a potential nominee on the 2006 Razzie Award nominating ballot. He was listed as a suggestion in the Worst Actor category for his performance in the film xXx: State of the Union (2005). He failed to receive a nomination, however.

Appeared on Forbes' "Hip Hop Cash Kings" list with $13 million in earnings. [2007]

Said (08.07.08) during an interview with Mark S. Allen on the GoodDay Sacramento morning show that his favorite movie is Jaws. He mentioned that someone added Pretty Woman down as his favorite on IMDb as a joke.

Owns and operates his own record label, Lench Mob Records; and production company, Cube Vision.

Was considered for the role of Max in Collateral (2004).

His favorite films are The Godfather (1972), Citizen Kane (1941), Trading Places (1983), Star Wars: Episode IV - A New Hope (1977), and Jaws (1975).

Supporter of the Oakland Raiders American Football team. Additionally he performed their anthem 'Come and get it'.

He was born four months and four days after fellow Los Angeles native Jennifer Aniston.

He is mentioned in The Offspring's "Pretty Fly (For A White Guy.").

Endorses Coors Light beer and St. Ides malt liquor.

His estimated net worth is $140 million.

Has appeared in at least six different sequels.

Attended William Howard Taft High School alongside fellow rapper Danny Boy O'Connor of House of Pain.

First ever album he bought was Run-D.M.C.'s 1984 release.

Friends with Ice-T, and Kevin Hart.

Simply the best at everything he ever thinks of. He thinks that's a Donald Trump quote.


**IMDb's 2017 Winter Movie Guide**
a list of 32 images
updated 01 Feb 2017


**Box Office Success Stories of 2014**
a list of 10 images
updated 02 Dec 2014

### User Lists

Create a list »

Related lists from IMDb users


**1-1-4 زانتهيهنلشبجم**
a list of 34 people
created 4 months ago


**Favorite Actors**
a list of 24 people
created 8 months ago


**These Actors suck**
a list of 40 people
created 26 Jul 2014


**Singers who occasionally act in movies :)**
a list of 29 people
created 19 May 2014


**Super Mario Bros.**
a list of 27 people
created 7 months ago

See all related lists »



His favorite movie is Jaws (1975).

Personal Quotes (4)

I'm not the type of actor who is trying to do a whole bunch of different shit, you know what I mean?

I think reading is important in any form. I think a person who's trying to learn to like reading should start off reading about a topic they are interested in, or a person they are interested in.

If you think about stuff that happened when you were young, it stays with you forever. South Central is just who I am. Even though I have a nice house, nice family, the rest of my generation is still in South Central L.A. My cousins, my brothers, my sisters, they don't wanna move out. They don't want to and they don't have the means to sustain it. That's where my heart is and that's what I think about all the time.

[on hip-hop] The Beastie Boys broke all the walls for me. They were the introduction of "rap is for everybody." You know, it's not just a black thing. When we came out, it was already a foregone conclusion that all types of life listen to rap. All cultures. But we never knew that "Straight Outta Compton" would blow up like it did.

## See also

Other Works | Publicity Listings | Official Sites | Contact Info

## Contribute to This Page

Getting Started | Contributor Zone »

Edit page

Recently Viewed

Clear your history

IMDb Everywhere





Find showtimes, watch trailers, browse photos, track your Watchlist and rate your favorite movies and TV shows on your phone or tablet!

IMDb Mobile site »

Follow IMDb on





Home
Top Rated Movies
Box Office
TV
Coming Soon
Site Index
Search
In Theaters

Contact Us
Register
News

Press Room
Advertising
Jobs

IMDbPro
Box Office Mojo
Withoutabox

Conditions of Use
Privacy Policy
Interest-Based Ads

An amazon.com company.

Copyright © 1990-2018 IMDb.com, Inc.

Amazon Affiliates

Amazon Video
Watch Movies &
TV Online

Prime Video
Unlimited Streaming
of Movies & TV

Amazon Germany
Buy Movies on
DVD & Blu-ray

Amazon Italy
Buy Movies on
DVD & Blu-ray

Amazon France
Buy Movies on
DVD & Blu-ray

Amazon India
Buy Movie and
TV Show DVDs

DPReview
Digital
Photography

Audible
Download
Audio Books

# EXHIBIT G

 

 Have an account? Log in ▾

Home    Moments

Search Twitter



| Tweets | Following | Followers | Likes |
|--------|-----------|-----------|-------|
| 3,792 | 110 | 4.68M | 755 |

Follow

**Ice Cube** ✔
@icecube

West Coast Warlord

◉ Los Angeles, CA

🔗 shop.icecube.com

🗓 Joined January 2009

🎈 Born on June 15

🖼 1,753 Photos and videos

  
  

Tweets    Tweets & replies    Media

Ice Cube ✔ @icecube · Apr 28

Didn't know one of my heroes @dickgregory2011 went to @SIUSalukis. I'm really gonna rock shit tonight in his honor. Rest In Preach...




💬 35    🔁 101     621

Ice Cube ✔ @icecube · Apr 28

I expect everybody in the surrounding area to come to SIU. Less than 3 hours drive from Nashville, Memphis, and St. Louis! m.facebook.com/story.php?stor...

💬 35    🔁 44     347

Ice Cube ✔ @icecube · Apr 28

Come check out ya homie at SIU tonight. Rockin with Fat Joe

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 189



17        ⟲ 71        426

Ice Cube ✔ @icecube · Apr 27                                              ⌄
Don't let Cubehead hack your device. Get your @theBIG3 tickets now!
big3.com/tickets

🗨 33      ⟲ 154      759

Ice Cube ✔ @icecube · Apr 26                                              ⌄
BIG3 is fun for the family all summer long! Get tickets to see the @theBIG3 in
your city here: big3.com/tickets

🗨 11      ⟲ 47      245

Ice Cube ✔ @icecube · Apr 25                                              ⌄
Another great episode of #HipHopSquares! Tune in next week for new episodes
only on @VH1.

🗨 15      ⟲ 35      202

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 190

Ice Cube ✔ @icecube · Apr 25
Tic Tac Toe @daveeast gets all the dough #HipHopSquares

💬 12          ⟲ 35          185

Ice Cube ✔ @icecube · Apr 25
Say what?! #HipHopSquares

💬 18          ⟲ 33          247

Ice Cube ✔ @icecube · Apr 25
.@dcyoungfly what the hell you doin? #HipHopSquares

💬 8           ⟲ 21          196

Ice Cube ✔ @icecube · Apr 25
Get ready for Battle of the Youngins @daveeast vs @nipseyhussle! Only on @VH1.

💬 11          ⟲ 75          275

Ice Cube ✔ @icecube · Apr 25
Get ready for the next episode of #HipHopSquares.

💬 9           ⟲ 24          175

Ice Cube ✔ @icecube · Apr 25
.@Liljon wins this round. What's your favorite moment of #HipHopSquares so far

💬 8           ⟲ 22          118

Ice Cube ✔ @icecube · Apr 25
Hell naw @michaelblackson #HipHopSquares

💬 5           ⟲ 12          103

Ice Cube ✔ @icecube · Apr 25
Check this out...

Tom Brady , You Can Do Better Than Promoting Qatar
Tom Brady has been very careful with what he chooses to promote. Which is why, after his trip to Qatar, one SI writer asks, "Tom, what the hell are yo...
si.com

💬 37          ⟲ 125         427

Ice Cube ✔ @icecube · Apr 25
Battle of the biggest Lil's- @liljon vs @LilMama. Keep it locked on #HipHopSquares starting right the hell now on @VH1

💬 5           ⟲ 28          147

Ice Cube ✔ @icecube · Apr 25

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 345

The party continues with @HipHopSquares on @vh1 tonight at 10/9c!

💬 15    🔁 51        277

Ice Cube ✓ @icecube · Apr 23
This year the competition is bigger and badder.  Get your tickets to see @thebig3 in your city now: bit.ly/BIG3_Tix

💬 16    🔁 58        269

Ice Cube ✓ @icecube · Apr 23
Thanks for the love OG

LLCOOLJ. ✓ @llcoolj
💪🏾🎤 twitter.com/thebig3/status...

💬 20    🔁 62        672

Ice Cube ✓ @icecube · Apr 20
We lighting up the @ThomasAndMack in Vegas tonight.  Tag who you're rollin up with.

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 496



💬 42     ⟲ 71     425

 Ice Cube ✔ @icecube · Apr 20     ⌄

Don't miss your chance to be in the building when @thebig3 comes to your city. Tickets on sale now: BIG3.com/tickets



💬 19     ⟲ 71     359

 Ice Cube ✔ @icecube · Apr 20     ⌄

Where you smokin' tonight? I know where I'mma be...

EXHIBIT G TO HERSHMAN DECLARATION

PAGE 547



Ice Cube ✔ @icecube
Spending 4/20 in Vegas with Cypress Hill and Bone Thugz.
Get tickets here: bit.ly/IceCube-Vegas

💬 35    ⟲ 102     750

⟲ Ice Cube Retweeted



BIG3 ✔ @thebig3 · Apr 20     ⌄
🚨 BIG3 Season 2 tickets are on sale NOW! The names you know playing the
game you know: big3.com/tickets 🚨



💬 3    ⟲ 60     170



Ice Cube ✔ @icecube · Apr 18     ⌄
Who's ready to party? #HipHopSquares goin down TONIGHT on @VH1. Tune in
at 10pm est.



💬 32    ⟲ 98     582

⟲ Ice Cube Retweeted



The Late Late Show with James Corden ✔ @latelateshow · Apr 17     ⌄
Great show tonight with @icecube, Jason Sudeikis and music from @falloutboy.
Don't miss it! 12:37/11:37c on CBS.



EXHIBIT G TO HERSHMAN DECLARATION
PAGE 198



💬 10      🔁 71          554

🔁 Ice Cube Retweeted

**KIM K'S #1 F AN** ✔ @JCRUZ106 · Apr 17      ⌄

Waking you up with those West Coast vibes! @icecube is on #TheCruzShow tomorrow morning at 6:30 AM !

Listen on power106.com
@Power106LA

💬 7      🔁 34          135

🔁 Ice Cube Retweeted

**The Lat e Lat e Show with J ames Cor den** ✔ @latelateshow · Apr 17      ⌄

.@icecube is back tonight! Things got HEATED last time he was here. Hopefully they can squash their beef...

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 749

💬 17     🔁 107     697

**Show this thread**

---

Ice Cube ✓ @icecube · Apr 17     ⌄

4/20 in Vegas only a few days away.  Get your tickets here: bit.ly/IceCube-Vegas

💬 19     🔁 59     325

---

Ice Cube ✓ @icecube · Apr 17     ⌄

10 cities, 48 players, Hall of Fame Coaches, 4 Games for the price of 1. Tickets on sale 4/20...



💬 49     🔁 380     1.1K

---

🔁 Ice Cube Retweeted

Jeff K watinetz  @JeffKwatinetz · Apr 16     ⌄

💬 1     🔁 7     48

---

Ice Cube ✓ @icecube · Apr 16     ⌄

The fight continues

EXHIBIT G TO HERSHMAN DECLARATION

Rick Maese ✔ @RickMaese
Ice Cube aiming high with Big3's $1.2 billion lawsuit against group of Qatari
investors. CEO of Qatar Airways has been added to list of defendants that
Big3 says swindled league last year

💬 42          ♺ 106              646

Ice Cube ✔ @icecube · Apr 16                                              ⌄
Check the full recap of the @thebig3 draft and be sure to get your tickets,
available April 20th.

| | BIG3: Season 2 Draft Recap | Ice Cube |
|---|---|
| | Ice Cube and the BIG3 team took over FS1 live last week to host the league's second annual draft. Check the full recap after the jump to see who made the cut. |
| | icecube.com |

💬 9          ♺ 41              178

Ice Cube ✔ @icecube · Apr 15                                              ⌄
Get ready for @thebig3, coming to you LIVE starting this summer every Friday
Night on @FS1.



💬 16          ♺ 106              504

Ice Cube ✔ @icecube · Apr 14                                              ⌄
Draft was lit. Tickets on sale April 20th.

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 291

9          38                    205

Ice Cube ✔ @icecube · Apr 14                           ∨
Draft was lit. Tickets on sale April 20th.

10         60                    389

Ice Cube ✔ @icecube · Apr 13                           ∨
Congrats to all the players who were selected in last night's @thebig3 Draft. See
them back on the court this summer starting June 22 in Houston.



19         96                    439

⟲ Ice Cube Retweeted
USA TODAY Sports ✔ @usatodaysports · Apr 12            ∨
Before @thebig3 draft, @icecube agreed to a fast-break Q&A about the state of
the 3-on-3 league.

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 202

💬 2     🔁 37     195

⤴ Ice Cube Retweeted

FS1 ✔ @FS1 · Apr 12        ⌄

The #Big3Draft is in the books.

LET'S HOOP



BIG3

💬 9     🔁 11     69

⤴ Ice Cube Retweeted

FS1 ✔ @FS1 · Apr 12        ⌄

Recapping the 2nd round of the #Big3Draft

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 203



7    CORLEY EDWARDS

8    JASON MAXIELL

9    RYAN HOLLINS

10   QUENTIN RICHARDSON

11   SALIM STOUDAMIRE

12   ROBERT HITE

BIG3

💬 7        ⟲ 6              50

Ice Cube Retweeted

FS1 ✓ @FS1 · Apr 12
With the No. 1 pick of the #Big3Draft, Ball Hogs select Andre Owens.

*ball hogs*
ANDRE OWENS
NO. 1 OVERALL PICK
BALL HOGS
COMPANY

BIG3

💬 10       ⟲ 19             68

Ice Cube Retweeted

FS1 ✓ @FS1 · Apr 12
.@thebig3 Draft starts NOW on FS1

💬 5        ⟲ 21             78

Ice Cube ✓ @icecube · Apr 12
T-minus 1 hour until @thebig3 Draft airs LIVE on @fs1. Be sure to tune in starting at 8pm EST.

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 204



💬 21     ♻ 100      382

Ice Cube ✔ @icecube · Apr 12
Don't miss @thebig3 Draft LIVE tonight @ 8pm EST, only on @FS1.

💬 8     ♻ 44      237

 Ice Cube ✔ @icecube · Apr 12
Turn back the clock and @thebig3 Coaches could beat any of these 2018 NBA playoff teams for the chip... Watch the BIG3 Draft LIVE tonight at 8pm eastern on @FS1



EXHIBIT C TO FRISHMAN DECLARATION
PAGE 205



27　　128　　　550

Ice Cube ✓ @icecube · Apr 12

Check the #BIG3Combine Recap and tune in to watch the Draft LIVE tonight @ 8pm EST, only on @FS1.

BIG3 Combine R ecap

14　　88　　　351

Ice Cube ✓ @icecube · Apr 10

America first? Okay Mr. President, tell 'em to stop fuckin wit @thebig3.

Advertisement

**Hey President Trump,**
When you meet today with Putin's new friend, the Emir of Qatar, please tell him not to threaten the BIG3 and American athletes!

March 26, 2018 - Moscow Russia

**ON SALE APRIL 20, 2018**
We're changing the game.

Sincerely, Ice Cube, Jeff Kwatinetz, Clyde "The Glide" Drexler and the Players and Coaches of the BIG3

BIG3.com

39　　172　　　491

Ice Cube ✓ @icecube · Apr 9

Yep, Friday nights on FS1...

Erik XIII  @erikthe13th
Replying to @icecube

Cube are the games gonna be aired  live this year??

💬 10          🔁 34              307

Ice Cube ✔ @icecube · Apr 9                    ⌄
April 18th on VH1

TRILL FL AVA    @BigDawgLaFlare
Replying to @icecube

Cube what's good are you going to bring back Hip Hop Square?

💬 18          🔁 40              342

Ice Cube ✔ @icecube · Apr 9                    ⌄
Season 2 will be all the way LIVE...



BIG3 ✔ @thebig3
Who do you think will make the cut for Season 2? Find out
Thursday on the #BIG3Season2 Draft, live on @fs1.

💬 19          🔁 62              318

Ice Cube ✔ @icecube · Apr 9                    ⌄
Don't get me wrong, I think flagrant fouls are a necessary evil of the game, Smart
guy....

800GMB  @saneofdisobay
Replying to @icecube

Wrong.. Flagrant fouls were implemented in 1990-91 cuz MJ and Pippen
cried to David Stern

💬 18          🔁 28              276

Ice Cube ✔ @icecube · Apr 9                    ⌄
Basketball in the 80s & 90s was a different sport. No flagrant fouls and no layups
in the playoffs...

Jeff K watinetz  @JeffKwatinetz
Watch this video and tell me MJ wasn't the best.  No one gave anyone a pass
in the old NBA... twitter.com/bballvines/sta...

💬 78          🔁 486              1.9K

🔁 Ice Cube Retweeted
X Games ✔ @XGames · Apr 8                    ⌄
.@icecube ❌ #XGames Minneapolis 2018

Tickets on sale now at XGames.com/Tickets!



Ice Cube, U.S. Bank Stadium. Meet Minneapolis and 6 others

💬 9        🔁 44            274

Ice Cube ✔ @icecube · Apr 8                                           ⌄
Receive your true blessings, pray to the Father (and the Mother).

💬 67       🔁 505           2.3K

Ice Cube ✔ @icecube · Apr 6                                           ⌄
Always have fun stoppin by @theellenshow.  And no, I'm not running for office.
Check the full recap here:

💬 36       🔁 83            579

Ice Cube ✔ @icecube · Apr 5                                           ⌄
We bringin' back the party this April with Season 2 of #HipHopSquares. Tune in
Wednesdays starting 4/18 at 10pm est, only on @VH1.

💬 24       🔁 91            486

Ice Cube ✔ @icecube · Apr 3                                           ⌄
MY A-DIDAS!!!

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 208

This is a match made in Basketball Heaven.



💬 43    🔁 126    642

🔁 Ice Cube Retweeted

**UNDISPUTED** ✔ @undisputed · Apr 3 ⌄
"Friday is my day, so to be live Friday nights, it's incredible."

@icecube on @thebig3 airing live, starting June 22nd, on @FS1 & @FOXSports

Undisputed with Skip Bayless, Shannon Sharpe and Joy Taylor on FS1
Weekdays. 9:30 AM ET/6:30 AM PT

💬 7    🔁 81    304

🔁 Ice Cube Retweeted

**FOX Sports** ✔ @FOXSports · Apr 3 ⌄
"We've got @nate_robinson, @Amareisreal, @BaronDavis, @DrewGooden, Metta
World Peace, @iambigbaby11, Greg Oden, Birdman. So we've got some great
personalities, great ballers, coming to @thebig3." — @icecube

The BIG3 draft is April 12, and the season tips off June 22 on @FS1!

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 249

3　　　⟲ 72　　　　　233

⟲ Ice Cube Retweeted

BIG3 ✔ @thebig3 · Apr 3
Tune in now to @FS1, the lottery is ➡ !

FS1 ✔ @FS1
.@thebig3 Draft lottery reveal... soon 👀

0:14

💬 6　　　⟲ 48　　　　　202

Ice Cube ✔ @icecube · Apr 2
Check me out tomorrow on @undisputed tomorrow morning. Revealing @thebig3 Draft order.



💬 26　　　⟲ 90　　　　　429

Ice Cube ✔ @icecube · Apr 2
B-Boys stand up!

LLCOOLJ. ✔ @llcoolj
#ForTheculture  #StrictlyforOGs #RockTheBellsSXM
twitter.com/siriusxmcanada...

💬 26　　　⟲ 111　　　　651

Ice Cube ✔ @icecube · Apr 2
.@BIG3 draft lottery

EXHIBIT G TO HERSHMAN DECLARATION
PAGE 240

to change the game.



UNDISPUTED ✔ @undisputed
Season 2 is changing the game.

Join us for @thebig3 draft lottery reveal on Tuesday to find out who gets that No. 1 pick.

💬 8      🔁 108      428

Ice Cube ✔ @icecube · Mar 29
Ain't no party like a #HipHopSquares party ❌⭕ Catch the return to the ⬛s WED APRIL 18 at 10/9c on @VH1!

Hip Hop Squar es Season 2 - Apr il 18

💬 29      🔁 148      702

Ice Cube ✔ @icecube · Mar 29
Big pimpin... Uncle Sam thinks we're all his hoes!

The Sour ce Magazine ✔ @TheSource
DMX Sentenced to One Year in Prison for Tax Fraud
ow.ly/Rcy730jdwyT

💬 121      🔁 686      2.6K

Ice Cube ✔ @icecube · Mar 28
Proud of the homie LL, making boss moves as usual...
Follow and support the movement!! @LLCOOLJ #RocktheBellsSXM #RTBcertified #StrictlyforOGs



EXHIBIT C TO HERSHMAN DECLARATION
PAGE 241

💬 53    🔁 246    1.2K

**Ice Cube** ✓ @icecube · Mar 28     ⌄
Support the homie...

> **Mike Epps** ✓ @TheRealMikeEpps
> Brooklyn! Come out and see me tonight at Bookmark
> Shoppe, I'll be signing copies of #UnsuccessfulThug – 7:00
> PM -8415 3rd AVE, Brooklyn, NY
> buff.ly/2IVZ23F

💬 17    🔁 103    479

**Ice Cube** ✓ @icecube · Mar 28     ⌄
Will they give the dope dealers that severed him the death penalty?

> **The Source Magazine** ✓ @TheSource
> A toxicology report details the contents in Prince's system
> before his passing. #SIP 🙏 ow.ly/LFAb30jbBkh

💬 134    🔁 602    2.3K

🔁 Ice Cube Retweeted

**BIG3** ✓ @thebig3 · Mar 27     ⌄
BIG3🏀--->NBA 🏀 congrats @XavierSilas 💯💯!

> **Bleacher Report** ✓ @BleacherReport
> Xavier Silas, Celtics agree to a contract. He is the first
> player to be signed to an NBA contract from the BIG3
> ble.ac/2Gbg7Zy

💬 4    🔁 98    513

**Ice Cube** ✓ @icecube · Mar 26     ⌄
One of the reasons me and @JeffKwatinetz founded @thebig3. Another proud
moment for the league.
celticswire.usatoday.com/2018/03/26/rep...



💬 20    🔁 55

EXHIBIT G TO HERSHMAN DECLARATION

Email or Phone | Password | Log In
Forgot account?



## Ice Cube
@IceCube

- Home
- About
- Shop
- Tour Dates
- Ice Cube / Cubevision
- Photos
- Events
- Videos
- Notes
- Community

Create a Page



Like | Share | Suggest Edits | Shop Now | Send Message

### Shop



Half Face T-Shirt (V intage) $25.00
Gangsta Rap Made Me … $20.00
Swords Logo T -Shirt (Gr … $20.00

See All

### Photos



Search for posts on this Page

Musician/Band

**Community** — See All
👍 12,422,927 people like this
📶 12,089,472 people follow this

**About** — See All
🌐 www.icecube.com
✉️ Musician/Band

**People**
12,422,927 likes

**Pages Liked by This Page**


Barbershop
BIG3
Ride Along

See more of Ice Cube on Facebook

Log In or Create New Account

English (US) · Español · Português (Brasil) ·
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices      ·
Cookies · More
Facebook © 2018

1.1K        82

BIG3 - Fan Experience                    Hip Hop Squares

376        20                                545        27

See All

Posts

See More

See more of Ice Cube on Facebook

or

# EXHIBIT H

# DEADLINE | HOLLYWOOD

HOME | FILM | TV | AWARDSLINE | BOX OFFICE | BUSINESS | INTL | VIDEO | JOBS | GOT A TIP?

**BREAKING NEWS**
## TWC Auction Not Over Yet? Broadway Producer Submits Bid



**FILM**
Cannes Pic '355': Chastain, Cruz, Cotillard, Nyong'o, Fan



Tony Noms: Full List, Snubs, The Boss, Analysis, Reaction



**TV**
Amazon Eyes Hayek Comedy Series From Feig & Imagine



'Infinity War': More Records; Kimmel & Deadpool Weigh In

# 'Straight Outta Compton' Producer Ice Cube On Making Of An Unlikely Oscar Contender

by Matt Grobar
December 14, 2015 7:29pm

    

ADVERTISEMENT

## What's Hot on Deadline

**1** 'Avengers: Infinity War' Zooms To $726M Global Box Office; $1B Eyed...

**2** 'Our Cartoon President' Imagines White House Correspondents Dinner With...

**3** Seth Meyers Agrees With Donald Trump: Michelle Wolf Is "So Filthy!"

**4** 'Avengers: Infinity War's Record Global Bow Rockets To $641M; Overseas...

**5** Michelle Wolf: Sanders Had It Coming When She Declined To Stand For...

**6** 'Avengers: Infinity War' Posts April Monday Record With $25M+



| DIALOGUE |
| DRAMA |
| OSCARS |
| F. GARY GRAY |
| ICE CUBE |
| OSCAR BEST PICTURE CATEGORY |
| STRAIGHT OUTTA COMPTON |

*Straight Outta Compton* has been the runaway sensation of the year. A sprawling two-and-a-half-hour cultural time capsule made for a $29 million budget, the film has gone on to gross over $200 million worldwide. F. Gary Gray's biopic of the seminal rap group N.W.A. is at once very specific in its focus and very broad in its appeal, covering universal themes of friendship, loss and triumph over extreme adversity. One of the original members of N.W.A. and an iconic figure of American music, Ice Cube—real name O'Shea Jackson—was a producer on the film, shepherding the project to make sure the resulting film was worthy of those whose story it brought to life. Below, Ice Cube elaborates on the origins of the project, his role as a producer, his pride in his son O'Shea Jackson Jr.'s work in the film, and his current thoughts on the state of race, politics and filmmaking in the United States.

**7** Tony Award Nominations: 'Mean Girls,' 'SpongeBob' And 'Harry Potter' Lead...

**8** Donald Trump Clutches His Pearls Over Leak Of Potential Mueller Probe...

**9** Tony Awards Nominations Live Stream - Watch

**10** Hot Cannes Package '355': Jessica Chastain, Marion Cotillard, Penelope...

## Marketplace

## Featured Jobs

Creative Development Coordinator
Triptyk Studios, New York, New York

Account/Project Coordinator (Ad Agency)
Petrol Advertising, Burbank, California

Media Specialist
Bridgewater Associates, Westport, Connecticut

Executive Director, Aspen Film
Company Confidential, Aspen, Colorado

Associate Director, YouTuber & Gamer Partnerships
Save the Children, Fairfield, Connecticut

SEE MORE JOBS

 Related    Deadline's The Contenders: F. Gary Gray Talks 'Straight Outta Compton' And The Risky Business Of...

**You're one of the members of N.W.A. who was pushing this project forward. Was there ever any reluctance on your part, and why did you decide to produce this film?**

This was a dream-come-true project and I felt like N.W.A.'s story is more than what people know. It's an American story in every which way, from five guys pulling themselves out of the situation we were in through creative means. You can find your way in America if you have something people want. So that story's in there, and so many others that, to me, were what movies are made of. I knew my story, personally, is what movies are made of, and with N.W.A. it was the same feeling because it's triumph and tragedy. It's break-up to make-up. It's brotherhood. It's death. It's everything.

**You came up with director F. Gary Gray—he directed many of your music videos and other projects. Were you involved with shepherding him into the director's chair and what made him the right one for the project?**

Yeah, I was involved in picking the director. We had a very short list of people that wanted to do the movie. I was hoping Gary would take on the challenge because I wanted a director that I didn't have to teach what N.W.A. was, and what N.W.A. means to pop culture. I wanted a director to know that, feel that, and feel like he was not only telling our story but he was telling his own story, because he grew up during that time. Gary knew all of us during that time, so he was right there in the mix. It's incredible that he was able to hone in on his skills to help put together such a great movie.

**How did you decide what your role would be as a producer on the film?**

My thing was to protect the project, support the director, and I think that's my main job as a producer. Being a producer is like being a G.M. on the football team, and the director's your coach. The studio is the owner, but you have to make sure everything gets done, not just the filming of it, but how to proceed, put together, market it. So in doing the movie my main job was making sure the integrity of the story stayed intact —make sure that we were paying attention to detail and to hold the project together, because it wanted to unravel at many different times.

**The film's scope is sprawling and incredible for its relatively small budget. Was it difficult to secure the funds for the film, even though Universal ultimately stepped in?**

Yeah, it's never easy. You never have as much money as you need and I believe it's the studio's job to know how much money they want to spend on the movie. They were set on a number, and we did everything to make that number but also make sure that the movie felt bigger than that number. So that was our job—just to make it big.

**The film has been a huge commercial and critical success, and it's unusual for any film released earlier in the year to stick around in the awards conversation like *Straight Outta Compton* has. Did you ever have concerns that the film wouldn't play successfully to a mass audience?**

I was never concerned that it wouldn't play because we were doing everything that great filmmakers do to try to make sure a project is interesting to all audiences. We knew that we were dealing with a niche subject matter when it comes to the music, but we had a thousand universal stories that anybody can relate to. As long as we kept the universal stories in the foreground, and music as the backdrop, we knew we'd be fine.

**Your son, O'Shea Jackson, Jr., portrays you in the film, and despite his striking resemblance to you, he still had to audition for the role.**

We wanted the best actor for the job. Watching him, I felt he was the best guy for the job, as he brought up his acting chops to where they needed to be. He had to work extremely hard in a short amount of time to be able to be up to speed enough to take on the role. It's funny because for my daughter's 16th birthday, he and his friends jumped up on stage as N.W.A. and did a little routine. It was fun and cool, but I never thought in a million years that five years later or so, we'd actually have him going for the part. What's cool about the whole process is that I didn't have the last word. It wasn't just my decision. I first had to convince Gary, and I told him the idea because he looked at me, and said, "Man, what kind of movie we trying to make?" I was like, "Man, we're trying to make a great movie, and he's going to be a great actor in the movie." We then had to convince the Universal top brass, and that, to me, made me feel that much more proud for him and of him, because he went through the basic chain of command that every actor in the movie went through.

**Were all the recordings of your tracks in the film recreations, or did you use some of the originals?**

We had to recreate a lot of it from scratch because some of the masters were misplaced. Those guys did have to record the whole record. It was a mixture because when he had to go live, it was (Jackson Jr.'s) voice. You see him early in the club, when he had to go live. After we made the record in the movie, then some of the recordings were a mixture of original recordings and then sometimes we had to go with their voices. It's stunning.

**The film is honorable in that it seems to go for the truth, inconvenient as it may be. You're not always portrayed in the most flattering light, though you were shown to be the first group member to call out manager Jerry Heller for his abuse.**

I think that was really our job, to make it authentic, you know—the good, the bad and the ugly. We weren't able to show all of our blemishes; it's hard to get everything in a 10-year span in two-and-a-half hours. So, of course, a few things were left out. But, you know, that was our vow: "We got to let it all hang out. Why are we the ones putting this together?" So that's what we did to an extent, and you also have to show a comprehensive story, which is a hard thing to do, to do a true story with the scope that we tried. We didn't want to just do a movie about N.W.A. We wanted to do a slice of American history from one point of view, right here in South Los Angeles. It wasn't easy to get in everything, but we didn't mind whatever we got in.

**The film was a tribute to Eazy-E, who dies of HIV at the end of the film, at the height of the AIDS crisis. What do you think he would think of the film?**

I think he would love it. Of course, he wouldn't like the ending. (Laughs.) But he wouldn't want us to hold back. What's cool about the movie is that we were living our dream. With all the controversy and with all the this, that and the other, we were having fun. We never thought we were going to achieve these heights in hip-hop. It's like, only New York rappers were professional rappers. Everybody else were amateurs until Ice-T and N.W.A. came along. We were living our dreams but at the same time, we had to grow up real fast and deal with major, controversial, First Amendment, front-line shit, and that just made us defend more what we believed in, which was, "This is real, and you're lucky we making records and not doing this shit in the streets today." That was our look at it, like, "Y'all lucky we just making records today."

**You were certainly thrust into a position of responsibility very quickly. In the Detroit concert scene and in others, you took on the police very directly. Was that boldness always a part of who you all were?**

I just think it's the neighborhoods we come out of—you just got to be down for yours, you know? You got to be down for what you believe in, and that's how we was bred in the streets of Compton and South Central Los Angeles and Long Beach. Sometimes it's the gang. Sometimes it's your family. Sometimes it's your point of view, but it's better, to me, to face the consequences of the world than to face the consequences of the man in the mirror when you can't live up to who you believe you should be.

**It seems like this film will be looked back upon as a time capsule of a culture and a way of life.**

Yeah, that was the whole purpose, to show people what it was like back then, how it felt, and to really take people back who were there and try to be as accurate as Oliver Stone tried to be doing *Platoon*. I was like, "You want people to feel it, smell it, and feel the danger. Feel the danger that's around every corner in the 'hood." That was the whole purpose: to be a "sign of the times" movie.

**In some ways, it seems like the world has moved forward since the time in which the film takes place—the late '80s and early '90s—yet in some ways, it seems like nothing has changed at all. What do you think of the way race is handled today versus back then?**

To me, it's just kind of shuffling the deck—not changing anything, just coming with the same excuses, asking the same questions that we know the answer to. It's just this forever examination of the situation but never a proper solution, because nobody really wants to deal with the root of the problem, because the root of the problem is very overwhelming.

**Along those lines, what do you think of the current state of African American-driven cinema, and the ways in which the black community is advancing, or not, in the filmmaking world?**

It's a constant struggle to get the budgets. We really need to tell our stories, and not just the sensationalized, funny stories that get the big laughs or fit into a propaganda, but also average, ordinary stories that are interesting to the world and deserve to be told. And period pieces, you know? These are the kinds of things that we still got to fight to be able to do—to tell those ordinary stories not just the super sensationalized ones.

**You have a number of projects coming down the pipeline as a producer**

**and actor. What's happening for you at the moment?**

We got *Ride Along 2* coming in January. *Barbershop 3*, which will be April 16th. I just did a movie with Charlie Day called *Fist Fight*. That's funny, great, and then we got a couple of other things that we're trying to work on and ain't really nothing to speak on because you know, they can either stay or go away. You never know in Hollywood until you get it in lights.

For a behind-the-scenes commentary featuring the members of NWA, click the link below:



*Subscribe to* Deadline Breaking News Alerts *and keep your inbox happy*



ADVERTISEMENT

Loading comments...



Latino Stars Turn Out to Celebrate Rare Representation at...

TVLine Items: Busy Philipps Talk Show, Strange Angel Trailer and...

Jessica Biel declares 'The Sinner' was a 'huge, terrifying...

'Champs Vs. Stars': Hennessy Flips Out & Threatens To Leave The...

Apple isn't very good at hiding its 5G modem development plan

About Us    Advertise    Terms of Use    Privacy Policy    Your Privacy Rights    Google+

PMC
The Power of Content

Copyright © 2018 Penske Business Media, LLC. All rights reserved.

HOLLYWOOD™ & Design © 2018 Hollywood Chamber of Commerce. The Hollywood Sign is a trademark and intellectual property of Hollywood Chamber of Commerce. All Rights Reserved.

Powered by WordPress.com VIP

EXHIBIT H TO HERSHMAN DECLARATION
PAGE 221

# EXHIBIT I





# 'Straight Outta Compton' Tops $200 Million in Worldwide Box Office

*By* Dave McNary



CREDIT: COURTESY OF UNIVERSAL

Universal-Legendary's "Straight Outta Compton" has reached $200 million at the worldwide box office, the seventh Universal title to reach the milestone this year.

The current domestic gross is $161.1 million and international gross will be $38.9 million by the end of Monday.

"Straight Outta Compton" posted the biggest R-rated August opening ever and held the top spot at the domestic box office for three weeks in a row. It's also the highest-grossing music biopic of all time, topping the record held by "Walk the Line."

The movie, directed by F. Gary Gray, is also highest-grossing film from a black director.

"Straight Outta Compton" posted its top international take in the U.K. with $12.2 million, followed by Australia with $7.3 million. It has four international territories still to release including Russia on Nov. 12 and Spain on Nov. 13.



2 LEAVE A REPLY

F. GARY GRAY     STRAIGHT OUTTA COMPTON     UNIVERSAL

**Want to read more articles like this one?**   Subscribe to Variety Today.

# EXHIBIT J



☐ MENU

☐ 04 20, 2018

# BIG3: SEASON 2 TICKETS ON-SALE

Tickets are on-sale now for BIG3 season 2 games, starting June 22nd in Houston. Get your tickets to the game in your city after the jump and catch the games live every Friday this summer on FS1.

**CONTINUE**



☐ 04 19, 2018

# WATCH: ICE CUBE ON THE LATE LATE SHOW WITH JAMES CORDEN

Ice Cube stops by The Late Late Show with James Corden. Watch him chat with Jason Sudeikis and play a

☐ 04 12, 2018

# BIG3: SEASON 2 DRAFT RECAP

Ice Cube and the BIG3 team took over FS1 live last week to host the league's second annual draft. Check the full recap after the jump to see who made the cut.

☐ 04 06, 2018

# WATCH: ICE CUBE VISITS THE ELLEN SHOW

Ice Cube stops by Ellen to talk new music and The BIG3, then joins Kobe for a quick 2-on-2. Watch more after the jump.

game show about something neither
contestant knows anything about.

CONTINUE

CONTINUE

CONTINUE



 12 05, 2017

## ICE CUBE – KINGS OF THE WEST RECAP

Ice Cube performed at Kings Of The
West with Snoop Dogg and Cypress
Hill in Los Angeles at the Microsoft
Theater. Check the photo recap after
the jump.

CONTINUE

 10 20, 2017

## WATCH: ICE CUBE ON KG'S AREA 21

Ice Cube stopped by Snoop Dogg's
Boss Lady Entertainment Compound
for the premiere of KG's Area 21.
Watch the video recap after the jump.

CONTINUE



 10 12, 2017

## ICE CUBE – ACL FESTIVAL RECAP

Ice Cube performed at weekend 1 of Austin City Limits Music Festival in Texas. Check the photo recap after the jump. Photos by @RobertReddPhoto (Instagram)

**CONTINUE**



 08 28, 2017

## BIG3: CHAMPIONSHIP RECAP – LAS VEGAS, NV

Trilogy and 3 Headed Monsters battled for the BIG3 Championship at the MGM Grand Garden Arena in Las Vegas, Nevada. Watch the recap after the jump.

**CONTINUE**

 08 23, 2017

## WATCH: ICE CUBE VISITS CONAN O'BRIEN

Ice Cube visits Conan to talk the BIG3 Championship in Vegas. Watch the clip after the jump.

**CONTINUE**

 08 23, 2017

## BIG3: PLAYOFFS RECAP – SEATTLE, WA

Ice Cube and the top four teams from the BIG3 played at the KeyArena in Seattle, Washington for the semifinals. Catch the recap after the jump.

**CONTINUE**



🗓 **08 14, 2017**

## BIG3: WEEK 8 RECAP – LOS ANGELES, CA

Ice Cube and the BIG3 came home for week 8 of the season at the Staples Center, in Los Angeles. Check the recap after the jump.

**CONTINUE**



🗓 **08 08, 2017**

## BIG3: WEEK 7 RECAP – LEXINGTON, KY

Ice Cube and The BIG3 showed out at the Rupp Arena in Lexington, Kentucky for week 7 of the 2017 season. Check the recap after the jump.

**CONTINUE**



🗓 **08 04, 2017**

## WATCH: ICE CUBE VISITS JIMMY FALLON

Ice Cube visited Jimmy Fallon to talk about his performance at Dave Chappelle's show at Radio City, BIG3, and his most recent album. Watch after the jump.

**CONTINUE**



🗓 **08 01, 2017**

## BIG3: WEEK 6 RECAP



🗓 **07 25, 2017**

## BIG3: WEEK 5 RECAP



🗓 **07 17, 2017**

## BIG3: WEEK 4 RECAP

### – DALLAS, TX

Ice Cube and the BIG3 did it big in Dallas for Week 6 of the season. Check the recap after the jump.

**CONTINUE**

### – CHICAGO, IL

Ice Cube and the BIG3 brought their talents to Chicago to the UIC Pavilion for Week 5 of the season. Check the recap after the jump.

**CONTINUE**

### – PHILADELPHIA, PA

Ice Cube and the BIG3 brought back Philadelphia legends, The Answer and Dr. J, to the Wells Fargo Center for Week 4 of the season. Check the recap after the jump.

**CONTINUE**







🗓 07 10, 2017

### BIG3: WEEK 3 RECAP – TULSA, OK

Ice Cube and the BIG3 stopped by the BOK Center in Tulsa, OK for week 3 of the 2017 season. Check the full recap after the jump.

**CONTINUE**

🗓 07 04, 2017

### BIG3: WEEK 2 RECAP – CHARLOTTE, NC

BIG3 made it's second stop at the Spectrum Center in Charlotte, NC for week 2 of the season. Check the full recap after the jump.

**CONTINUE**

🗓 06 26, 2017

### BIG3: WEEK 1 RECAP – BROOKLYN, NY

Ice Cube and the BIG3 took over the Barclays Center for game 1 of the inaugural season. Check the photo recap after the jump.

**CONTINUE**



☐ **06 21, 2017**

WATCH: ICE CUBE ON
THE LATE SHOW
WITH STEPHEN
COLBERT

Ice Cube stopped by The Late Show
with Stephen Colbert to talk about the
upcoming BIG3 season and music off
the new album. Watch the clip after
the jump.

**CONTINUE**

<div style="border:1px solid red; padding:10px; text-align:center;">

**LOAD MORE**

</div>

☐ ☐ ☐ ☐ ☐ ☐ ☐



SUBSCRIBE TO CUBEVISION / ICE CUBE

☐

© 2018 ICE CUBE. ALL RIGHTS RESERVED.
**TERMS & CONDITIONS** | **PRIVACY POLICY**

# EXHIBIT K



ACMs 2018    Festivals    Hot 100    Billboard 200    Latin    Podcasts    Pop    R&B/Hip-Hop    Cha

# Jason Sudeikis & Ice Cube Hang on 'Corden,' 30 Years After N.W.A. Landed the Actor in Detention

4/18/2018 by Gil Kaufman





Terence Patrick/CBS

Ice Cube and Jason Sudeikis on *The Late Late Show with James Corden* on April 17, 2018 on the CBS Television

Network.

James Corden may have stumbled on the next great on-screen odd couple. On Tuesday night's (Apr. 17) *Late Late Show*, he welcomed Big 3 league boss and rap legend Ice Cube and *Kodachrome* star Jason Sudeikis to the couch and the unlikely pair easily bonded over embarrassing high school stories and their mutual feelings of "nope" for the host's super corny nautical-themed game show.

Sudeikis got the mutual admiration started when he revealed that as a huge N.W.A. fan in his youth and first got onto the pioneering rap crew when he scored the *Straight Outta Compton* cassette from a friend's older brother. "That was a big deal. I'm from Kansas. So when *Compton* was brought to our doorstep that was thrilling," said Sudeikis about the legendary rap group's smash 1988 debut. In fact, the actor loved the album so much he would write out all the lyrics by hand, color-coding each MC's verses.

In sixth grade, Sudeikis copied down the words to "Gangsta Gangsta" -- busting out a few lyrics for Corden -- brought his cheat sheet to class and, of course, got busted by his teacher, who angrily confiscated the note. Needless to say, MC Jace ended up in the principal's office, where a detention was handed out after the administrator thought the lyrics were Jason's disturbingly original poetry. "That's a beautiful story," beamed Cube.



The rapper shared his own memory from his school daze, revealing to Corden that his mom made him take his ex-girlfriend to prom to teach him a lesson. "That sucked," he said. "The lesson is don't break up with your girlfriend three days before the prom. Because she had already bought her dress."



Perhaps the highlight of the night, though, was when Corden seriously misread Cube and Sudeikis' interest in sailing and forced them to play his unnecessarily elaborate boat-themed game show, "Ships Ahoy." Spoiler alert: Cube was not having it. Check out the waterlogged results below.



SHARE THIS:



© 2018 Billboard. All Rights Reserved.

Terms of Use     Privacy Policy     About Our Ads     Advertising

Billboard.com is a member of Billboard Music, a division of Billboard-Hollywood Reporter Media Group

EXHIBIT K TO HERSHMAN DECLARATION

# EXHIBIT L

EXHIBIT L TO HERSHMAN DECLARATION
PAGE 238

| Baguette Bakery & Cafe Riverside, CA | Market Restaurant Los Angeles, CA | My Taco Guy Los Angeles, CA | The Pita House Alexandria, VA | The Capri Los Angeles, CA | Franco on Melrose Los Angeles, CA |





news - sportsnation

Ice Cube ex cited for BIG3' s second season    BIG3 founder Ice Cube joins SportsNation to discuss his expectations for the second season of the BIG3.

12d



You may also like



5:19 — SAS: NBA moving in right direction on tanking

1:38 — T-Mac encourages Bledsoe to learn who Rozier is

0:58 — Kane notches goal No. 27 to make it 2-0 Spurs

The Latest



0:23 — Russell cracks RBI single for Cubs' first run

1:56 — Raptors trying to get over LeBron hurdle

EXHIBIT L TO HERSHMAN DECLARATION PAGE 239



Seager to undergo Tommy John surgery, miss rest of season

EXHIBIT L TO HERSHMAN DECLARATION
PAGE 240

# EXHIBIT M



SECTIONS

Ad Choices

TRENDING NOW    Jersey Shore    NSYNC    Victoria Beckham    Claire Foy

# Ice Cube Talks New Music, Says He Would Never Run For Ofce On 'Ellen'

By MARTIN HOLMES. 6 Apr 2018 8:53 AM





Photo: Michael Rozman/Warner Bros.

Ice Cube appeared on "The Ellen DeGeneres Show" on Friday to talk about working on new music, getting his sar on the Hollywood Walk of Fame, and whether or not he is interested in running for ofce.

Advertisement





*MOST POPULAR STORIES*

EXHIBIT M TO HERSHMAN DECLARATION
PAGE 242

After joking about hiring fans to keep his Hollywood sar in top condition, the hip-hop legend confrmed that he has been in the sudio recording new music, which he hopes to release this summer.

Knowing her gues' s hisory with politically motivated rap, DeGeneres asked if his new music would be any diferent due to the current adminisration. "It seems like it. Everybody's fred up, so it' s time for music," Cube said.

RELATED: Bill Maher Apologizes For Using The N-Word, But Ice Cube Had Something To Say


Rob Schneider Says 'SNL' Was More Fun When 'You Never Knew Which Way They Leaned Politically'


Kim Kardashian Reveals Meaning Behind Daughter Chicago's Name, Talks Anniversary Plans In Tell-All 'Ellen' Interview


Miley Cyrus Takes Back Her 2008 Apology For Nearly-Nude Vanity Fair Photo


Miranda Lambert's Ex Accuses Both Her And 'S.O.B' Blake Shelton Of Cheating In Relationships

## LATEST *VIDEOS*


Jane Fonda, Don Johnson Talk 'Book Club'


Kimye Weekend

2018 Daytime Emmys

Sticking on the subject of politics, DeGeneres asked the 48-year-old rapper if he'd ever run for ofce. "Oh no," he said, shaking his head. "I use my music. I use my entertainment. I'm an artis. I'd rather paint what I'm feeling than sit up and try to deal with Congress and them crazies out there. They're more crazy than the rap game, so I'll sick with rap. W e're safe."

Cube also talked about launching his own professional basketball league, the Big 3, featuring retired NBA sars like Kobe Bryant. "I saw Kobe Bryant score 60 points in

his las game and I'm like, *Why is this his las game if he can score 60 points?* Obviously, people sill want to see guys like that play."

RELATED: Krisen Bell Reveals Breaking 'Frozen 2' News On 'Ellen'




Humboldt Broncos Tribute Concert


Katy Perry And Orlando Bloom Romance

Bryant himself then turned up to join Cube in a game of 2-on-2 basketball agains DeGeneres and college basketball champ Arike Ogunbowale.

Watch the interview in the videos above.



Advertisement



TOPICS: Arike Ogunbowale | Ellen DeGeneres | Ice Cube |
Kobe Bryant | Music | The Ellen DeGeneres Show | TV

## *RELATED*



Honorary U Of S
Degree,
Saskatoon
Walkway
Renamed For
Musician
Joni Mitchell



Kanye Wes
Wants 'To
Forgive And Stop
Hating' Doctor
Who Performed
His Mom's
Final Surgery



Miley Cyrus Falls
For Another One
Of Liam
Hemsworth's
Pranks

## *COMMENTS*



WEEKNIGHTS

7:30 ET

# HOME  VIDEO  PHOTOS  CELEBS
# MOVIES  MUSIC  TV  STYLE

About Us | Privacy Policy | Copyright | Corus Entertainment | Advertise | Terms of Use | Advertising Standard Terms | Notifications | Corus Television

 © Corus Entertainment Inc., 2018 All rights reserved.

Powered by **WordPress.com VIP**

# EXHIBIT N

Early Lead

# Ice Cube has a grand wish list for the Big3 next year: Kobe Bryant

By **Marissa Payne**   August 10, 2017   ☐ Email the author



Kobe Bryant to play three-on-three? Maybe. But don't count on it. (Michael Goulding/Orange County Register via AP)

Pigs flying. Hell freezing over. Kobe Bryant joining Ice Cube's three-on-three basketball league.

EXHIBIT N TO HERSHMAN DECLARATION
PAGE 248

Yeah, none of those things are probably ever going to happen. But the rapper, who owns the Big3 league, is free to keep dreaming, as he did on KTLA Morning News on Thursday.

"I hope so, one day [Bryant will join the Big3]," Ice Cube said. "I hope his competitive juices get to itching him and he wants to come into the league and score 50 and win the game. We hope he'll play one day."

No surprise, Bryant, who routinely ranked on Forbes's top 10 list of best-paid athletes until he retired in 2016, has not said one word publicly about embarking on a new career in the Big3.

[Allen Iverson skipped his Big3 game, so the league suspended him for another]

If Ice Cube really wants a former Los Angles Laker, he would seemingly have a much better chance with Lamar Odom, who has reportedly cleaned up following a tumultuous few years that saw him lose his life to drug addiction.

On Thursday, Odom's former coach at Rhode Island said the ex-NBA star is open to joining the Big3.

He told me before that he didn't want to play anymore, but this three-on-three [league] has got him excited," Jim Harrick told TMZ Sports on Thursday. "And Dion Glover played with him at URI and he's [the Big3's] third-leading scorer."

Harrick added, however, that before Odom competes again, he needs to start working out.

"He's got to get in shape," he said. "If he gets in shape he can play with anybody. He's a big-time player."

**Read more:**

[Cardinals scratch out win, feline fine after purr-fectly timed rally cat storms the field](#)

[World Chess wants to hook up grandmasters to heart monitors to make matches 'more exciting'](#)

[A meme is born: Norwegian sprinter has amazing reaction to win at worlds, sports viking helmet](#)

[Ronda Rousey reportedly training for pro wrestling career](#)

---



Marissa Payne writes for The Early Lead, where she focuses on what she calls the "cultural anthropological" side of sports, a.k.a. "mostly the fun stuff." ☐ Follow @marissapayne

---

EXHIBIT O



ESPN

NFL    NBA    MLB    NCAAF    Soccer    NHL                    ESPN+    Watch    Listen    Fantasy

ESPN Radio    Shows ☐    Podcasts    Schedule    Contests    Station Locator    Listen Live

1-800-flowers.com    Starting at $29.99    SHOP NOW

🔊 **ESPN Audio**

**On Demand**    [ESPN RADIO LIVE 🔊]    [PODCAST DIRECTORY ▼]

pod Center

### Ice Cube On Big 3

Rapper Ice Cube chats with Terrika Foster-Brasby about Big 3, a 3-On-3 professional basketball league for former NBA players.

Download »    Archive »    Apple Podcasts »

1-800-flowers.com

**Mother's Day**
**Flowers & Gifts**
Starting at
**$29.99**

SHOP NOW

f    t

Popular Searches:    first take    stephen a smith    matthew berry    picks    fantasy football

**Recommended for You**    [                    ] 🔍

**Drama In The Playoffs; Omar Epps**
Kayla Johnson, Justin Tinsley, Tesfaye Negussie & Terrika Foster-Brasby weigh in on the NBA playoff drama, predict who goes No. 1 in the NFL draft, share their thoughts on Adrien Broner's comments and more. Plus, actor Omar Epps joins the show!
Apr 25, 2018

≡ **On Demand Playlist**    Help »

Sign In to create a playlist.

+ Add to Playlist

**SportsCenter on Demand**

SC    ESPN Radio SportsCenter updates every hour. Listen »

FILTER BY:

Golic & Wingo ▼    Sorry, there was a problem getting audio from this show.

Tue. 8/2

Fri. 2/5

Tue. 2/2

Wed. 9/9

Tue. 9/8

The Will Cain Show ▶

FILTER BY:

Get Your Audio

**STATION LOCATOR**

Tune-in to your favorite shows on ESPN Radio.

**MOBILE**

Listen LIVE to ESPN Radio on your iPhone or Android with the ESPN app.

**PODCENTER**

We have over 40 audio and video podcasts available to choose from.

**ESPN.com:** Help | Press | Advertise on ESPN.com | Sales Media Kit | Interest-Based Ads | Report a Bug | Corrections | Contact Us | Site Map | Jobs at ESPN

© 2018 ESPN Internet Ventures. Terms of Use, Privacy Policy, Your California Privacy Rights, Children's Online Privacy Policy and Interest-Based Ads are applicable to you. All rights reserved.

# EXHIBIT P

ACMs 2018     Festivals     Hot 100     Billboard 200     Latin     Podcasts     Pop     R&B/Hip-Hop






# Ice Cube Talks BIG3, 'Death Certificate' Turning 25 & Kanye's 'Jesus Walks' Being 'One of the Most Radical Songs in Hip Hop'

6/22/2017 by Carl Lamarre





AVG/ssisan/Invision/AP    Hot 100    Billboard 200    Latin    Podcasts    Pop    R&B/Hip-Hop

Ice Cube photographed in New York City on June 20, 2017 to promote the 25th anniversary re-release of his 1991 solo album, *Death Certificate*.

Get Ready for Chic Rooms & Amazing Views

HYATT CENTRIC™
SOUTH BEACH
MIAMI

BOOK DIRECT & SAVE

For Ice Cube, the month of June has been a busy one.

First, the 48-year-old born O'Shea Jackson netted a new deal with Interscope Records. Then, he re-released his hip hop opus *Death Certificate* for its 25th anniversary. Later, Cube schooled Bill Maher on the usage of the N-word, after the controversial host carelessly spatted it out on live TV. Lastly, he announced that he's working on the fourth installment from his cult classic *Friday* series on *The Late Late Show*.

Oh, not to mention, he celebrated his birthday last Thursday, and recently received a Star on the Hollywood Walk of Fame, as well.

Juggling a slew of responsibilities -- most notably his BIG3 basketball league, which kicks off June 25 -- Cube continues to push through each task effortlessly, even at 8:30 in the morning. Sitting at the center of a conference room in New York City's Conrad Hotel on Wednesday, the prolific wordsmith sat down with *Billboard* to discuss the debut of his BIG3 basketball league, his favorite studio session from *Death Certificate*, if he has any regrets about releasing his infamous "No Vaseline" dis track, and why Kanye West's "Jesus Walks" is the most radical song of the new generation.

READ MORE

> Ice Cube: Mobb Deep & Prodigy Represented 'Resurgence of New York Claiming the Streets Back' in Hip Hop

ACMs 2018      Festivals      Hot 100      Billboard 200      Latin      Podcasts      Pop      R&B/Hip-Hop

**June 25 will mark the debut of your BIG3 basketball league. How excited are you?**

I can't wait, man. It's exciting. It's a big deal. Everything has kind of fallen into place with the BIG3. Not easily, but things like getting Brooklyn for our first game here in New York is a good omen to me, because not only has Brooklyn and Barclays [Center] been phenomenal in just helping us out in every way, but this is our first game *ever*. We haven't gotten this down to a science yet, but it's close, and we got some great people that's helping us with the jump off. So we couldn't be happier to be here in Brooklyn, man.

**Be honest. What were some of the most nerve-wracking moments you dealt with from when you made the announcement of the BIG3 in March up until now?**

S--t, man, seeing if we were gonna get a TV deal. Most first-year leagues don't get a deal, so it wasn't like an automatic guarantee. We were behind the 8 ball a little bit, because of time. We launched in January and [*sighs*], we planned six months later. Most leagues take a year at least after they've launched to even think about coming out. We just called some stations and they were like, "Yo, our programming for the summers are already booked. We want it, but we don't have any room for it this year. Do y'all want to do it next year?"

We felt like, "Nah." If we wait, we felt like this idea was so good that somebody was gonna jump us and steal it. It could have even been the NBA. Once we started to contact players and get players signed, our debt was out there about what the league was about. So anybody could have obtained that and beat us to the punch. We couldn't wait. Getting the TV deal was a nerve-wracking thing.

Then, dealing with sponsors, we felt like we gotta play it smart, because a lot of sponsors want to be down, but they want give us first-year bulls--t deals, or sign us for so many years that we'd be kicking ourselves in year three still signed to this five-year contract, when the league [already] went from here to wherever. So we decided to not sign to anyone throwing out deals. The sponsors were running through the same

things -- they were like, "Yo. Y'all late to us. Our money is already spent up for the summer. Next year, we'd be down." So we're like, "Come talk to us next year."

ACMs 2018    Festivals    Hot 100    Billboard 200    Latin    Podcasts    Pop    R&B/Hip-Hop

So this year, we're really dealing with a few sponsors who really came to the table with what we thought was reasonable -- even though we're a first-year league that's never played a game. [*Laughs.*] We still feel like the value of what we have is worth a better look from a lot of sponsors, but some came to the table with the look. So that was a little bit frustrating, because, you know, time was our only enemy. If we would have had a year, all of that stuff would have been smoothed out.

**You challenged LaVar Ball to make a 4-point shot and in exchange, you would buy 10 pairs of his Big Baller Brand shoes. Did he ever make that call to accept the challenge?**

Nah, I haven't talked to him yet. He accepted the challenge, but we haven't been able to get together to really do it. I know I'm too busy right now, so I'm just gonna end up buying the shoes for his AAU kids. So it's cool.

I kind of wanted to.. I wouldn't say *relieve* the pressure, but I know he was getting a lot of flack for his decision, with his son and their shoes. So I just wanted to make it fun, and support, because whether you like what he's doing or not, the man is supporting his son. It's cool just to see a black man really, really supporting his son like that. It's very cool. He got his ways, but I like that. So I wanna support what he's doing.

> READ MORE
> Ice Cube Teams up With Allen Iverson & Julius Irving for 'BIG3' Promo

**Two weeks ago marked the 25th anniversary of your sophomore album *Death Certificate*. What was your favorite studio session from that project?**

The studio sessions that always pop in my head is two days, and I don't know if they were the best days, but these were the days that pop in my head. It was the day that we were making "Steady Mobbin'." We were at Paramount Studios in Hollywood. It was me and DJ Pooh there. Jinx was there. I remember everybody kind of coming in and out that day.

We were there and it was one of those long sessions and I remember falling asleep on the couch, waking up, and Pooh saying, "Look at this s--t that I added onto the

song." It was dope and I was like 'Damn, I like the 'oop. I wanna add an intro to it.' So he fell asleep, and when he woke up, I had an intro for the song. He was frowning at first, but when the beat dropped, he just went crazy. So I just remember that session. I remember [DJ] Bobcat coming in, loving the song, and everybody kind of adding little pieces to that song to make it good. That was "Steady Mobbin'."

Then, I remember recording "No Vaseline." I just remember the looks on everybody's faces when I came out the booth, because I didn't tell anybody the rap. When I got in the studio, I told them, "I need to go in the booth right now." I went straight in the booth and just started rapping. When I came out, they were like, "*Shhhh!*" It was kind of quiet, like something just happened. I don't know who asked me, but somebody said, "You're gonna put that out?" I said, "Yeah, I'm putting that s--t out."



Ice Cube - No Vaseline (N.W.A Diss)

**Do you have any regrets about dropping "No Vaseline" today?**

I wouldn't say regrets, because I look at music like time capsules. It is what it is, to a certain extent. It's hard to listen to, because I like them dudes. I love Dre, Ren, Yella, and Eazy, and their families and s--t, so it's hard that they gotta hear that s--t. But it is what it is. We can't take it back.

EXHIBIT P TO HERSHMAN DECLARATION

**Because *Death Certificate* is a stand-alone classic, do you feel there's an album today that mirrors that project and its message?**

Ah, man, that's hard to say. I think *Death Certificate* was coming at the end of an era. After '93, you're not getting too many records like that. Probably the next Public Enemy record that was released after *Death Certificate*, [which was] *Muse Sick-n-Hour Mess Age*, but you didn't get records like that after that. They weren't as politically charged. They were moreso really dealing with escapism, drinking, smoking, partying, cars, women, drugs, or whatever. [Music] is still kind of in that era. We haven't came out of that.

I think still one of the most radical songs out of this new era of hip-hop is "Jesus Walks" by Kanye West [*Laughs*] That's the only record that seems totally outside the box of what's the norm for hip hop now.

> READ MORE
> Ice Cube & NBA Greats Introduce BIG3 Basketball League in New York City

**I thought your new song "Good Cop, Bad Cop" sounded like a record that could have been blended in with *Death Certificate* back in '92.**

That's why I put it on the record [reissue]. All those three records ["Good Cop, Bad Cop," "Only One Me" and "Dominate the Weak"] feel like they could have been done back then, which is good. That's good for me, I guess, because most people feel like new records are never as good as the old ones. Period. No matter what you do. So just to have records that even sonically fit that era in a way, but are still new, was the aim. That's the reason why those three songs made it and three other songs didn't make it.

**What's your thoughts on Tupac's *All Eyez on Me* biopic?**

I still haven't seen it yet.

**Did you have any positive expectations based off the trailers, or were you a little bit unsure of the direction?**

You're always unsure, because you never know how [artists'] movies are going to be handled. I've been unsure about every movie, except *Straight Outta Compton*

because I knew what I did was [spot-on]. I was unsure about *Ray*. You never know how good they're going to be or how much they're going to put into it. I was super hyped about James Brown's [*Get on Up*] and I love the movie, but I just didn't like how it started. The jump-off wasn't right. It made the whole movie feel like it wasn't right.

So you know, it's hard, man, to be honest. It's just hard to satisfy people when it comes to somebody in that iconic status who people have their own memories of, or views of what Tupac's life was. So when you start showing them stuff that they don't know and it ain't really working with what they think it should be, then you start to lose people. So I can't say anything about the movie, 'cause I haven't seen it, but with the trailers I was curious. Then, I saw longer pieces on making the movie, and it made me more interested in seeing it. Now, I just really wanna see it based on pure curiosity.

> READ MORE
> Ice Cube Inks Overall Deal With 20th Century Fox TV & Fox 21

**It's been two years since *Straight Outta Compton* dropped. Looking back on it now, are there any changes you would make to the film?**

Of course, there's things you would add that we ended up shaving off because of time. I think it could have used five minutes of breathing room in certain places -- but that's because I already know what's not there. I think we shaved some things just trying to get time down, and I don't think you make a movie like that. I think you let a movie flow and go how it's supposed to go, and not shave it because you're trying to keep it under a certain time limit. It's a trip, because that same exec [who said to edit it originally] told me [later] that we should have just left it alone. We should have let y'all do what y'all wanted to do. It wouldn't have mattered. [*Laughs*]

**Being a veteran in hip hop, which three rappers today would have survived in the '90s?**

I don't wanna use "survive," because dudes are hot. It reminds me of Golden State versus Showtime Lakers. It's like, these dudes are good because they were able to watch us, anyway. So like, [Lil'] Wayne, Kanye [West] and Kendrick [Lamar]. All the dudes that are doing it now would have been able to do it back then.

**Same style and all?**

EXHIBIT P TO HERSHMAN DECLARATION
PAGE 261

I think so. I think some of their styles were refreshing at the time. I remember when Kanye and 50 had the contest on who was going to sell the most records. That's when I think people realized how many normal people we got in the world who wasn't trying to be a gangsta -- because at the time, when that little contest came out, people thought everybody wanted to be a gangsta. I think Kanye showed that some of these college kids, or kids that didn't stay in colleg,e wanna make it and still do it without going all the way gangsta.

It was kind of cool to see that hip-hop wasn't stuck in just a mold, which I had thought it was. I thought it was stuck in this gangsta mold that it couldn't get out of, but Kanye let us out.

READ MORE
Dr. Dre & Ice Cube Cleared From Wrongful Death Lawsuit Involving Suge Knight

**When we last spoke in March, we touched on Chris Tucker's reluctance to take part in another _Friday_ movie. Have you spoken to Chris about joining the crew since then?**

We've spoken. I don't wanna put words in Chris's mouth, but we have spoken about it. That's all I'm going to tell you.

**Was he at least receptive to the idea?**

We spoken about it! [_Laughs_.] That's all I can really say, because I just know we gotta do something that he likes. That's really on us to do that.

**Do you cater to him, or everybody else that comes back?**

We cater to _Friday_. We cater to the franchise, the movie, and what we think it should be. I'm not saying that this is the last one. I'm just saying we're doing _Last Friday_. You never know. We might get back on a roll again. We just gotta make this one good. That's all I care about. Making it good and making the fans happy. I hope at the same time, that we can make Chris happy but my dedication has always been to the fans of the franchise.

READ MORE

Ice Cube Explains Origin of His Rap Name, Gives Stephen Colbert a Hip-Hop Handle: Watch

ACMs 2018    Festivals    Hot 100    Billboard 200    Latin    Podcasts    Pop    R&B/Hip-Hop

**With last week being your birthday, if you could title this chapter of your life, what would it be and why?**

I would call it "Building Blocks."

**Why "Building Blocks"?**

Because that's what I'm doing. I'm building blocks. It's like I'm building a foundation for more entertainment. So it's just part of what I plan to do until I die -- it's to keep creating cool stuff that'll hopefully be here when I'm gone. You gotta make your mark on the world and let them know that you were here. So I'm always going to be in this phase. Hopefully, I'll be celebrating something that I built, while I'm building something new.

SHARE THIS:

## From the Web

Powered by ZergNet



Janelle Monae Comes Out as 'Pansexual'

AoI.com



Avicii's Ex-Girlfriend Emily Goldberg Reacts to His Death

AoI.com



15 Celebs Who Vanished And Are Still Missing Today

Grunge.com



