1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

MARK J. GERAGOS       SBN 108325
BEN J. MEISELAS        SBN 277412
Attorneys for Plaintiff BIG3 BASKETBALL, LLC, O'SHEA JACKSON
AKA ICE CUBE, AND JEFF KWATINETZ

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG3 LLC, a limited liability company; O'Shea Jackson a/k/a Ice Cube, an individual; and Jeff Kwatinetz, an individual;<br><br>Plaintiffs<br><br>vs.<br><br>Ahmed Al-Rumaihi, an individual; Faisal Al-Hamadi, an individual; Ayman Sabi, an individual; Sheikh Abdullah bin Mohammed bin Sau Al Thani, an individual and as CEO of Qatar Investment Authority; DOES 1-100<br><br>Defendants. | Case No. 2:18-cv-03466-DMG-SK<br><br>Assigned for all purposes to Hon. Dolly M. Gee<br><br>**DECLARATION OF JEFF KWATINETZ IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY** |

**DECLARATION OF JEFF KWATINETZ**

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    I JEFF KWATINETZ DECLARE,

2    1.    I am a familiar with and I am a percipient witness of the facts set forth herein,

3    and if called as a witness I could and would testify to the following.

4    2.    I am the Co-Chief Executive Officer of the Big3 LLC with the popular

5    entertainer O'Shea Jackson ("Ice Cube"), a 3 on 3 basketball league with its corporate

6    headquarters in Los Angeles, California.

7    3.    The Big3 LLC held its very successful first season in 2017, and played games

8    in front of many highly attended large arenas across the country, from June to August of

9    2017.

10    4.    The players in the Big3 basketball league include popular retired NBA players,

11    legends, and Hall of Famers.  The Chairman of the Board of Directors for Big3 LLC is Amy

12    Trask, the former 17-year Chief Executive Officer of the Oakland Raiders NFL football

13    team.

14    5.    The Big3 commissioner is Clyde "The Glide" Drexler, who is a Hall of Fame

15    player, and one of the undisputed top 25 players of all time.

16    6.    The Big3 motto is "Changing the Game," and we have done that by, among

17    other things, implementing a "4 Point Shot." Games are played until one team gets 50 points.

18    And the Big3 hired Nancy Lieberman as the first female coach in professional men's

19    basketball.

20    7.    In late June 2017, I was introduced to Defendants in this action, Ayman Sabi

21    and Ahmed Al-Ruhmaihi, through the Big3 LLC's former commissioner Roger Mason, who

22    stated these individuals would bring "strategic value" to the league as investors.  Defendants

23    were required to immediately fund $11.5 million for a passive minority position in the

24    company, and separately were required to pay $9 million in sponsorship commitments (First

25    Amended Complaint "FAC" ¶¶34,41)

26    8.    Defendants represented they were Board Members of the Qatar Investment

27    Authority which is the sovereign fund for Qatar along with fellow investor Defendant Faisal

28

- 2 -

DECLARATION OF JEFF KWATINETZ

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1   Al-Hamadi.  In particular, Defendants represented they were responsible for Qatar

2   Investments, an entity which was deploying billions of dollars in the United States.

3       9.      Defendants only funded $6.5 million.

4       10.    The First Amended Complaint sets out in detail the actual text messages and

5   letters from Defendants (FAC, pp 44-82), where Defendants made excuses for why they

6   could not come up with the remaining money, none involved mismanagement.

7       11.    In December 2017, Defendants made an additional $1 million payment to

8   Big3, and claimed it would promptly pay the remainder, which they never did, prompting

9   litigation.

10       12.    At no point in time prior to the Big3 filing a lawsuit against Defendants did

11   Defendants ever claim that Big3 was involved in mismanagement.  Yet, following the filing

12   of the Complaint and FAC, Defendants hired a Public Relations Firm called Kekst and

13   Company which sends out discernibly false weekly press releases about the Big3 with filings

14   before this Court, and apparently provides copies to their colleagues at the New York

15   Post.  Attached hereto as Exhibit "A" is a true and correct copy of one such press release sent

16   by Defendants.

17       13.    The statements of mismanagement have no basis in fact, as further evidenced

18   by Defendants own text messages and contemporaneous writings (FAC, ¶¶ 44-82) , their

19   course of conduct in attending virtually all of the games and telling Big3 founders how much

20   they loved the league (Id.), not making a single complaint to the Big3 ever regarding

21   mismanagement, and the conduct by Defendant Al-Rumaihi leasing or purchasing two

22   mansions in Los Angeles, California in November 2017 and December 2017, which was, in

23   his words, to make his primary residence where the Big3 is located.

24       14.    Further, the fact that a new basketball league like the Big3 could thrive, and

25   increase to a 9 figure valuation, in less than 1 year, based on conservative metrics and

26   analysis and offers, reflects nothing but unprecedented success by the management team.

27

28

15.     Prior to starting the Big3, I ran and operated a company called The Firm, Inc. which at one point was the largest music, film, and television management company in the world.

16.     Steve Bannon was previously the Chief Financial Officer of The Firm. It has been widely reported that Mr. Bannon worked with me, and although our politics were different, Mr. Bannon was and remains my friend.

17.     Mr. Bannon has nothing, and never had anything, to do with the Big3. Mr. Bannon never attended a game. Other than possibly knowing that I have a leadership role in the Big3, Mr. Bannon has no connection, no role, and no involvement with the league.

18.     After making partial payment to the Big3, there were numerous occasions during the 2017 season, where Mr. Al-Ruhmaihi would bring up Mr. Bannon's name to me and comment about Mr. Bannon's political positions, his views on the blockade, the Trump administrations position toward Qatar, and he persistently inquired about wanting to meet with Mr. Bannon.

19.     I did not engage with Mr. Al-Rumaihi on these topics and when he brought them up I tried to politely ignore him and change the subject. My focus was on running a basketball league and Mr. Bannon had nothing to do with the league.

20.     On or around November 2017, Mr. Al-Rumaihi informed me he was purchasing a home in Venice. The Venice home is two blocks from where I live. Mr. Al-Rumaihi stated he wanted to live near me, Ice Cube, and Amy Trask, which made me uncomfortable and I thought it was creepy.

21.     In December 2017, Mr. Al-Ruhmaihi informed me he was personally leasing a large Beverly Hills, California mansion where he held parties with Big3 employees and when I asked him why he needed a second home in Los Angeles, he stated in addition to having parties for the Big3 he needed space for his kids to stay when they visited him in the United States.

22.     Mr. Al-Rumaihi also stated that his longtime girlfriend, who attended Big3 games with him throughout the season, was living with him in Los Angeles.

DECLARATION OF JEFF KWATINETZ

23.     I relied on Mr. Al-Rumaihi's representation that he would be residing in Los Angeles when he paid an additional $1 million toward the money he owed the Big3 because it confirmed he did not intend to abscond.

24.     Mr. Al-Rumaihi has frequently held parties and social gatherings at the Los Angeles residence, the photographs of which have been posted on social media, which are in the First Amended Complaint (Paragraph 79). It is my understanding that Mr. Al-Rumaihi purchased or leased an $800,000 Bentley in Los Angeles, among other vehicles.

25.     From the time I knew Mr. Al-Rumaihi from June 2017 through the date when we initiated legal action in February 2018, I am unaware of Mr. Al-Rumaihi leaving the country for any period of significance, and he remained consistently in the United States and expressed his intention and desire to remain in the United States, and in particular in Los Angeles, California. Mr. Al-Rumaihi also informed me he attended High School in the United States.

26.     From my discussions with Mr. Al-Rumaihi, which continued up until the filing of our litigation in February 2018, I was led to believe by him that he resided in the United States for at least the past 2 years.

27.     During the 11 months since I met Mr. Al-Rumaihi, I know for a fact that Mr. Al-Rumaihi did not leave the country for any three month period.

28.     On or around January 2018, Mr. Al-Rumaihi invited me on a hike. I found this unusual, but I assumed we would be talking about the money that Defendants owed the Big3 since I was consistently requesting Defendants complete the funding they owed and had set a rapidly approaching deadline.

29.     This hike was after the Michael Wolff book regarding President Trump was published and it was reported that Rebekah Mercer, and the Mercer Family had pulled support from Mr. Bannon.

30.     During the hike, Mr. Al-Rumaihi stated to me that he wanted me to convey a message from the Qatari Government to Steve Bannon.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

DECLARATION OF JEFF KWATINETZ

31.     Mr. Al-Rumaihi requested I set up a meeting between him, the Qatari government, and Steven Bannon, and to tell Steve Bannon that Qatar would underwrite all of his political efforts in return for his support.

32.     I immediately let Mr. Al-Rumaihi know that I was offended by this request, that I was trying to run a basketball league and need our money paid, and I stated that neither I nor Steve Bannon would ever take, or even entertain the concept, of a bribe of any kind.  I was appalled.

33.     Mr. Al-Rumaihi laughed and then stated to me that I shouldn't be naive, that so many Washington politicians take our money, and stated "do you think [Michael] Flynn turned down our money?"

34.     Again, I flatly rejected Mr. Al-Rumaihi and stopped the conversation and told him to never offend me again by bringing this up.

35.     I did not relay the message to Mr. Bannon and never conveyed any offer of any kind, nor would I ever.

36.     Apparently, in response to the lawsuit, the Qatari Government has issued public statements distancing itself from Mr. Al-Rumaihi.  Yet, Mr. Al-Rumaihi told me that he was a relative of the royal Al-Thani family, that the Emir was "like a brother" to him, and that the Sovereign Fund was involved in funding the Big3.

37.     Recently, I have identified through a search of the United States Foreign Agent Registration Act (FARA) website that Mr. Al-Rumaihi was the only person copied on a $2.5 million Retainer Agreement with the DC lobbying group Ashcroft Law Firm LLC (run by Former US Attorney General John Ashcroft) dated June 7, 2017 "for the broad purpose of providing [The Government of Qatar] with comprehensive strategic advice." The contract stated that the Ashcroft Firm would utilize its connections within the intelligence community, the FBI, and Homeland Security, among others.  Three weeks later, out of the blue, Mr. Al-Rumaihi was introduced into my life.  I never heard of his name or partners' names before. Attached hereto as Exhibit "B" is a true and correct copy of the referenced FARA filing by Ashcroft.  Notably, Defendant Ayman Sabi who purported to be Qatari

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

- 6 -

1 | (which he is not), but represented in person and writing that he was an agent of Qatar has not
2 | registered with FARA.

3 | 38. Further, as stated in the First Amended Complaint, I also recently learned of a
4 | $100 million transaction by Mr. Al-Rumaihi in New York City for a townhouse, which was
5 | cancelled 6 months after the transaction was entered into. In the resulting litigation, *1964*
6 | *Realty LLC v. Consulate of the State of Qatar (1:14-cv-06429-ER,SDNY)* the Defendant
7 | Qatar claimed that despite Mr. Al-Rumaihi holding the title of Consul General, he did not
8 | have authority to enter into the transaction (FAC, ¶¶20-21). The Plaintiff seller moved for
9 | limited jurisdictional discovery, and the Court the granted the request. Defendants filed an
10 | interlocutory appeal to prevent limited jurisdictional discovery and when the appeal was
11 | denied the case was settled. Attached hereto as Exhibit "C" is a true and correct copy of the
12 | Court's Order Granting Jurisdictional Discovery in the Southern District of New York.

13 | 39. Based on the totality of information, it is my belief that Mr. Al-Rumaihi has a
14 | role, either formal or informal with Qatari intelligence and resides and has resided in the
15 | United States. It is my belief that Mr. Al-Rumaihi and his partners had no interest in Big3 as
16 | a financial investment; rather, it now seems apparent their goal was to obtain strategic
17 | information or geopolitical influence using myself or the Big3 which I rejected.

18 | I DECLARE THE FOREGOING IS TRUE AND CORRECT UNDER PENALTY
19 | PERJURY

22 | DATED: May 7, 2018                     By:_____
23 |                                        JEFF KWATINETZ

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

# EXHIBIT "A"



# Sport Trinity Principals Detail Deception, Improper Conduct and Mismanagement Related to BIG3 Basketball In Court Filing

NEWS PROVIDED BY
**Sport Trinity LLC** →
Apr 25, 2018, 20:27 ET

WILMINGTON, Del., April 25, 2018 /PRNewswire/ -- Principals in Sport Trinity LLC, the largest investor in BIG3 Basketball, LLC, today filed a motion for the removal to the Federal Court in Los Angeles of the civil action previously brought in the California State Court by individuals Jeff Kwatinetz and O'Shea Jackson, Sr (a/k/a Ice Cube), and which also includes as a plaintiff the league itself.

EXHIBIT A

**VIEW PDF**

Attached to the motion filed with the court is a demand on behalf of Sport Trinity for inspection of the books and records of BIG3 Basketball LLC, which asserts among other wrongdoings the following:

- League co-founders, Kwatinetz and Jackson, deceived Sport Trinity from the outset of its investment, both before and after the Closing Date, about BIG3's finances, leadership and corporate governance.
- Kwatinetz and the other plaintiffs did not disclose material contracts prior to Sport Trinity's investment, which included third party transactions involving businesses operated by Kwatinetz and Ice Cube.
- Kwatinetz and Ice Cube have subsequently engaged in a public smear campaign, making unfounded and defamatory remarks about investors and departing executives, all to the detriment of the BIG3.

Among the alleged wrongdoings about which Sport Trinity is seeking information are allegations of improper conduct by Kwatinetz that is detrimental to the Company -- including allegations that Kwatinetz commingles Company funds and, without Board approval, unilaterally authorizes related-party transactions involving other companies under his control; makes use of private jets that are expensed to BIG3's accounts and Company credit cards; and has engaged in erratic behavior detrimental to BIG3.

The letter outlines a series of deceits, misrepresentations, and mismanagement by Kwatinetz leading up to and during the time that Sport Trinity has been the BIG3's largest investor.

Attached to this release is the Demand for Inspection letter, which will be addressed in a separate arbitration proceeding.

The case number is 2:18-cv-03466.

**Media Contact:**

Lyndsey Estin

Kekst and Company

917 842 1594

# EXHIBIT "B"

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

**U.S. Department of Justice**                    **Exhibit A To Registration Statement**

Washington, DC 20530                          **Pursuant to the Foreign Agents Registration Act of**
**1938, as amended**

INSTRUCTIONS. Furnish this exhibit for EACH foreign principal listed in an initial statement and for EACH additional foreign principal acquired subsequently. The filing of this document requires the payment of a filing fee as set forth in Rule (d)(1), 28 C.F.R. § 5.5(d)(1). Compliance is accomplished by filing an electronic Exhibit A form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .49 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name and Address of Registrant | 2. Registration No. |
|---|---|
| Ashcroft Law Firm, LLC | 6438 |

| 3. Name of Foreign Principal | 4. Principal Address of Foreign Principal |
|---|---|
| The Government of Qatar | Embassy of Qatar<br>2555 M Street, N.W.<br>Washington, DC  20037 |

5. Indicate whether your foreign principal is one of the following:

    ☒ Government of a foreign country [1]

    ☐ Foreign political party

    ☐ Foreign or domestic organization:  If either, check one of the following:

        ☐ Partnership        ☐ Committee

        ☐ Corporation      ☐ Voluntary group

        ☐ Association       ☐ Other *(specify)* _____

    ☐ Individual-State nationality _____

6. If the foreign principal is a foreign government, state:

    a) Branch or agency represented by the registrant

        Executive Branch

    b) Name and title of official with whom registrant deals

        Dr. Ahmad Alhammadi, Secretary General

7. If the foreign principal is a foreign political party, state:

    a) Principal address

    b) Name and title of official with whom registrant deals

    c) Principal aim

---

[1] "Government of a foreign country," as defined in Section 1(e) of the Act, includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. Such term shall include any faction or body of insurgents within a country assuming to exercise governmental authority whether such faction or body of insurgents has or has not been recognized by the United States.

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

FORM NSD-3
Revised 05/17

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

8. If the foreign principal is not a foreign government or a foreign political party:

   a) State the nature of the business or activity of this foreign principal.

   b) Is this foreign principal:

   Supervised by a foreign government, foreign political party, or other foreign principal          Yes ☐ No ☐

   Owned by a foreign government, foreign political party, or other foreign principal                Yes ☐ No ☐

   Directed by a foreign government, foreign political party, or other foreign principal              Yes ☐ No ☐

   Controlled by a foreign government, foreign political party, or other foreign principal            Yes ☐ No ☐

   Financed by a foreign government, foreign political party, or other foreign principal              Yes ☐ No ☐

   Subsidized in part by a foreign government, foreign political party, or other foreign principal    Yes ☐ No ☐

9. Explain fully all items answered "Yes" in Item 8(b).  *(If additional space is needed, a full insert page must be used.)*

10. If the foreign principal is an organization and is not owned or controlled by a foreign government, foreign political party or other
    foreign principal, state who owns and controls it.

---

**EXECUTION**

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the
information set forth in this Exhibit A to the registration statement and that he/she is familiar with the contents thereof and that such
contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit A | Name and Title | Signature |
|---|---|---|
| June 9, 2017 | Lori Sharpe Day , Managing Partner | *Lori Sharpe Day* |

Received by NSD/FARA Registration Unit 06/09/2017 1:07:06 PM

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

**U.S. Department of Justice**

Washington, DC 20530

**Exhibit B to Registration Statement**

**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

---

INSTRUCTIONS.  A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal.  Compliance is accomplished by filing an electronic Exhibit B form at https://www.fara.gov.

Privacy Act Statement.   The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure.  Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act.  Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC.  Statements are also available online at the Registration Unit's webpage: https://www.fara.gov.  One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act.  The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent.  This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden.  Public reporting burden for this collection of information is estimated to average .33 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

---

| 1.  Name of Registrant | 2.  Registration No. |
|---|---|
| Ashcroft Law Firm, LLC | 6438 |

3.  Name of Foreign Principal
Government of Qatar

---

Check Appropriate Box:

4. ☒   The agreement between the registrant and the above-named foreign principal is a formal written contract.  If this box is checked, attach a copy of the contract to this exhibit.

5. ☐   There is no formal written contract between the registrant and the foreign principal.  The agreement with the above-named foreign principal has resulted from an exchange of correspondence.  If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☐   The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties.  If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

7.  Describe fully the nature and method of performance of the above indicated agreement or understanding.

The Firm will use its extensive experience and expertise in advising domestic and international clients to evaluate, verify and as necessary, strengthen the client's anti-money laundering and counterterrorism financing ("AML/CTF") compliance programs; providing legal advice and recommendations regarding enhancing and improving such efforts.  Reporting the Firm's findings to Client.

---

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

FORM NSD-4
Revised 05/17

8. Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

In evaluating, verifying, and as necessary, strengthening the client's anti-money laundering and couterterrorism financial compliance programs and providing legal advice and recommendations to enhance and improve such efforts, the Firm will review documents, conduct interviews and engage in outreach to US government officials and other policy experts.

9. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act and in the footnote below?    Yes ☒    No ☐

If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose.

With the goal of fully evaluating the client's AML/CTF compliance programs the Firm may engage in outreach efforts to US government officials and/or communicate with the media relating to the Firm's work.

**EXECUTION**

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Exhibit B to the registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit B | Name and Title | Signature |
|---|---|---|
| June 9, 2017 | Lori Sharpe Day, Managing Partner | *Lori Sharpe Day* |

Footnote: "Political activity," as defined in Section 1(o) of the Act, means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

# ASHCROFT LAW FIRM™

June 7, 2017

**VIA EMAIL: aa@orycap.com**
c/o Ahmed Y. Al-Rumaihi

We appreciate your decision to engage the Ashcroft Law Firm, LLC (the "Firm") as legal counsel in connection with the matter set forth herein. This engagement letter expresses the Firm's understanding of the services you, the Government of Qatar (the "Client") have engaged the Firm to render on your behalf. This engagement letter also outlines costs and terms of payment associated with the Firm's work on this matter.

## Scope of Engagement

Client has retained the Firm for the broad purpose of providing the Client with comprehensive strategic advice, legal counsel, support, and representation related to confirming, educating, assessing and reporting on the Client's efforts to combat global terrorism and its support of and compliance with international financial regulations, including compliance with United States Treasury rules and regulations.

The engagement will be led by John D. Ashcroft, former United States Attorney General and United States Senator. General Ashcroft will enlist the support and expertise of former key government leaders, including former officials who held very senior positions within the Intelligence Community, the Federal Bureau of Investigation, the Department of the Treasury and the Department of Homeland Security as necessary, to complete the engagement in the best interest of the Client.

The Firm's work will include crisis response and management, program and system analysis, media outreach, education and advocacy regarding the Client's historical, current, and future efforts to combat global terror and its compliance goals and accomplishments. The Firm understands the urgency of this matter and need to communicate accurate information to both a broad constituency and certain domestic agencies and leaders. The Firm will advance, advocate, represent, and protect the Client's interests as necessary, including, but not limited to the development of comprehensive legal and government affairs strategy, coordination as necessary and in the interest of the Client, assessment of the pending news and certain nations claims that adversely impact the Client's reputation and pose serious risk and consequences.

## Fees and Expenses

Given the urgent need to commence work immediately and the firm's intention's to make this matter a top priority, the Firm will require a $2,500,000.00 retainer (the "Flat Fee") to immediately commence work on the above-referenced matter, payable upon execution of this engagement letter. Such Flat Fee will cover all the costs associated with the engagement during the first ninety (90) days including the fees of any vendors that the firm brings on to provide public affairs support. The Client will be separately responsible for any fees for third party principals recommended by the firm and accepted by the client. Travel related expenses will be billed

## ASHCROFT LAW FIRM™

separately. After ninety (90) days the Firm and the Client will determine if the engagement will be extended under the same terms and circumstances for an additional ninety (90) days.

The Firm's Chairman, John D. Ashcroft, will serve as lead and will supplement the Team with the necessary and recognized skill set to insure the best possible outcome for the Client in the shortest period of time.

As previously discussed, the Firm may engage the services of The Ashcroft Group, LLC ("TAG"), a non-lawyer consulting group, to gain the benefit of the expertise of individuals in that firm for this matter. Any fees associated with the work of TAG members will be directly drawn from the Flat Fee.

It is important to know that certain members of the Firm have a financial or ownership interest in TAG.

The Firm may also engage, in its sole discretion, consultants, accountants, investigators, forensic specialists, strategic advisors and other service providers or professionals who are not employees of the Firm, including but not limited to attorneys from outside law firms to provide, in the professional judgment of the Firm, necessary additional expertise in this matter (collectively, "Consultants"). Client agrees that any and all feespayable to the Consultants may be drawn from the Flat Fee. Professionals added to the Team at the direction of the Client will be billed to the Client.

Should payment not be received in accordance with the terms of this engagement letter, we reserve the right to postpone or defer providing additional services or to discontinue our representation on this matter. Client agrees to consent to the Firm's withdrawal in this matter and that the Firm's representation terminates automatically and immediately on the breach of this engagement letter by Client. Client further agrees that the failure to make current payments is a material breach that immediately terminates and voids this engagement letter and relieves the Firm of any and all obligations to Client on this matter.

We additionally reserve the right to charge interest, to the extent permitted by law and relevant state bar rules, at the Prime Rate plus 1.5% (or such lesser rate permitted by law to be charged from time to time) on amounts owed to us beyond 30 days. The term "Prime Rate" refers to the rate published periodically in *The Wall Street Journal* in its "Money Rates" section as the "prime rate" for unsecured commercial loans.

If Client has any questions about the fee arrangement or the monthly expense statements that it receives from the Firm, including but not limited to the work done or the amounts charged, please notify us promptly in writing. We will, of course, respond to all such questions or concerns in a timely manner.

***Questions and Termination***

While the Firm believes Client will be satisfied with its representation, the Firm encourages Client to inform the Firm if at any time our professional services do not meet Client's expectations. Please call me immediately if this occurs. We recognize that Client has come to this Firm and has

222 South Central Avenue • Suite 110 • St. Louis, MO 63105 • Tel: 314 863 7001 • Fax: 314 863 7008
www.AshcroftLawFirm.com
Austin • Boston • St. Louis • Washington, DC

## ASHCROFT LAW FIRM™

decided to retain us because of its desire to have the benefits of this Firm's expertise. If, during this representation, Client believes that any of this Firm's relationships or other representations may be adverse to its interests, Client agrees to inform the Firm immediately so we may discuss, and hopefully resolve, such concerns.

Both Client and the Firm have the right to end this relationship at any time, subject to Client's obligation to pay the Firm according to the terms of this engagement letter, by giving reasonable advance written notice. We will endeavor before any such termination to assist Client in retaining alternate counsel without lapse in representation.

According to the Firm's document retention policy, property and documents submitted to the Firm by a client and those created in furtherance of this engagement by the Firm belong to the client. As such, Client may request its file at any time during or at the conclusion of the representation. On termination, we will deliver original documents entrusted to us and any documents that Client has paid for that have not previously been delivered. On termination, you may obtain copies of any additional documents related to this engagement in our files on request. Finally, it is Firm policy to maintain client files for a period of ten years following termination prior to destruction.

It is my understanding that Client consents to the Firm's representation in this matter on the terms and conditions set forth above. By signing below, you acknowledge that: (1) Client has received a copy of this engagement letter; (2) Client has had an opportunity to discuss the contents with us; and (3) Client understands, accepts and agrees to abide by its terms. Please return a signed copy of this document to me by fax or email.

If you have any questions or comments regarding any of these matters, please do not hesitate to call me.

Sincerely,

Michael J. Sullivan, Esq.
Ashcroft Law Firm, LLC

222 South Central Avenue • Suite 110 • St. Louis, MO 63105 • Tel: 314 863 7001 • Fax: 314 863 7008
www.AshcroftLawFirm.com
Austin • Boston • St. Louis • Washington, DC

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

**ASHCROFT LAW FIRM**

AGREED to and ACCEPTED this ___7th___ day of ___June___, 2017.

Signature: _____

Name: ___Dr. Ahmad Alhammadi___

Title: ___Secretary - General___

222 South Central Avenue • Suite 110 • St. Louis, MO 63105 • Tel: 314 863 7001 • Fax: 314 863 7008

www.AshcroftLawFirm.com

Austin • Boston • St. Louis • Washington, DC

Received by NSD/FARA Registration Unit 06/09/2017 1:07:03 PM

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

1964 REALTY LLC,

                         Plaintiff,

      – against –

CONSULATE OF THE STATE OF QATAR-
NEW YORK,

                         Defendant,

NEW YORK LAND SERVICES INC.,

                         Stakeholder Defendant.

**OPINION AND ORDER**

14 Civ. 6429 (ER)

Ramos, D.J.:

       This dispute arises from an agreement between 1964 Realty LLC ("Plaintiff") and the

Consulate of the State of Qatar ("Defendant") to purchase a multi-million dollar piece of

Manhattan real estate ("the Property"). Plaintiff, the seller, filed the instant action after

Defendant refused to close on the Property based on its belief that Plaintiff had violated the terms

of the purchase agreement ("the Agreement"). The Complaint alleges breach of contract and

seeks a declaration that Plaintiff is entitled to the $9 million down payment made by Defendant,

which is currently being held by New York Land Services Inc. ("Stakeholder Defendant"), the

assigned escrow agent under the Agreement.

       Defendant moves to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the

Federal Rules of Civil Procedure. Defendant maintains that it enjoys sovereign immunity from

suit pursuant to the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), 28 U.S.C.

§§ 1330, 1602 *et seq*. Specifically, Defendant claims that its Consul General, who signed the

Agreement on behalf of Defendant, lacked the authority to do so and therefore could not waive sovereign immunity through his actions.  Defendant also asserts that, under New York law, the Consul General must have been authorized, in writing, to purchase the Property.  For the reasons set forth below, Defendant's motion to dismiss pursuant to Rule 12(b)(1) is DENIED and the parties are directed to take limited jurisdictional discovery.  Because the issue of subject matter jurisdiction remains unresolved, the Court cannot rule on Defendant's Rule 12(b)(6) motion.

## I.    Background[1]

Plaintiff is a New York limited liability company with only one member, Wildenstein & Co. Inc. ("Wildenstein & Co.").  The Complaint describes Defendant as "a recognized instrumentality of the State of Qatar."  Compl. ¶ 6.

On September 27, 2013, two Qatari officials, the Qatari Minister of Foreign Affairs, Dr. Khalid bin Mohammed Al-Attiyah ("Al-Attiyah"), and then New York Consul General, Ahmed Yousef Al-Rumaihi ("Al-Rumaihi"), inspected the Property along with Claudine Godts, Vice-President of Wildenstein & Co.  Godts Decl., Doc. 27 at ¶ 2.   Nearly three months later, on December 12, 2013, Defendant hosted a party at the Property, which Al-Rumaihi attended, along with Amina Al-Meer ("Al-Meer"), Vice Consul at the time, and numerous guests who "appeared to be Qatari officials and diplomats."  *Id*. ¶ 3.  The following month, Al-Meer requested approval

---

[1] The following facts, accepted as true for purposes of the instant motion, are based on the allegations in the Complaint and the documents attached thereto.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) (evaluating a Rule 12(b)(6) motion); *J.S. ex rel. N.S. v. Attica Cent. Sch*., 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)) (evaluating a Rule 12(b)(1) motion).  They also include references to affidavits submitted by the parties, which the Court is permitted to consider for the purpose of resolving Defendant's Rule 12b(b)(1) challenge.  *See Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing.") (citation omitted).

from the United States Department of State for Defendant to purchase the Property on January 2, 2014, which was granted. Schindler Decl., Doc. 26, Ex. A.

Nearly one month later, on January 16, 2014, the parties executed the Agreement, pursuant to which Defendant agreed to purchase the Property from Plaintiff for a total of $90 million. Compl. ¶¶ 1, 13. The Agreement required Defendant to pay $9 million in escrow, followed by an $81 million payment on the closing date, originally scheduled for April 30, 2014. *See id.* ¶ 16-17, 21. As relevant to the instant action, the Agreement provides:

> Purchaser is a recognized instrumentality of the State of Qatar, and has the requisite power and authority to enter into and perform the terms of this Agreement. [. . .] Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.[2]

*Id.* ¶ 15. Defendant also explicitly waived "immunity (diplomatic and otherwise) from the jurisdiction of any court (including but not limited to the courts of the United Sates or any State thereof)," along with "any claim that it is not personally subject to the jurisdiction [of this Court]." *Id.*, Ex. A at ¶¶ 27.3, 27.5.

For its part, Plaintiff attested that "[n]one of Seller or, to Seller's actual knowledge, its affiliates is in violation of any laws relating to . . . money laundering." *Id.* ¶ 22. The Agreement further provides that any claim by the purchaser that the seller breached one of its representations

---

[2] Defendant reasons that this representation simply means that the Consulate of the State of Qatar had the capacity to enter into the Agreement and does not speak to whether the Consul General himself had the authority to do so. Def.'s Mem. L. Supp. Mot. Dismiss, Doc. 22 at 11-12. However, since Al-Rumaihi signed the Agreement on behalf of the Consulate, the two issues are inextricably intertwined.

Defendant also maintains that the Agreement inaccurately refers to the Consulate General "as an "instrumentality of the State of Qatar," which should instead be deemed synonymous with the foreign state itself. Doc. 22 at 11 n.2. Although the Agreement may have contemplated a different meaning, for the purposes of the FSIA, an instrumentality is defined, in part, as "a separate legal person" which is "an organ of a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b). Indeed, a "foreign state" is defined as encompassing *both* "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a).

Case 2:18-cv-03466-DMG-E   Document 10-32   Filed 05/07/18   Page 25 of 50   Page
ID #:846
Case 1:14-cv-06429-ER   Document 32   Filed 05/04/15   Page 4 of 29

or warranties must be made by written notice promptly after it learned of such a breach and that

"TIME SHALL BE OF THE ESSENCE" with respect to the purchaser's obligation to deliver

such a notice to the seller.  *Id.* ¶ 23 (emphasis in original).  Moreover, in the event that the

purchaser defaults, the Agreement provides that the seller is entitled to retain the down payment.

*Id.* ¶ 19.  However, if the purchaser objects, the title company—the Stakeholder Defendant—

cannot release the down payment funds to the seller until it receives either a written notice signed

by both the parties stating who is entitled to the down payment, or a final court order directing

disbursement.  *Id.* ¶ 22.

The Agreement was signed by Al-Rumaihi, on behalf of Defendant, and Guy Wildenstein

("Wildenstein"), on behalf of Plaintiff.[3]  *Id.*, Ex. A at 32.  Following the execution of the

Agreement on January 16, 2014, delegations from Defendant and the Qatari Embassy—

including the Ambassador from Qatar's United Nations Mission—visited the Property to plan for

Defendant's move.  Godts Decl., Doc. 27 at ¶ 4.  Defendant also deposited the $9 million down

payment with the Stakeholder Defendant pursuant to the Agreement.[4]  Compl. ¶ 16.

The day before the originally scheduled closing date of April 29, 2014, Defendant's

counsel sent Plaintiff's counsel a letter claiming that Plaintiff had misrepresented its affiliate's

compliance with money laundering laws.  *Id.* ¶ 21.   Specifically, Defendant communicated that

it was exercising its right to terminate the Agreement because Wildenstein was violating money

laundering laws.  *Id.*  The Complaint acknowledges that France had commenced an investigation

into Wildenstein for tax fraud and money laundering in 2011; however, it contends that

Defendant could have learned about the proceedings "in any number of mainstream newspapers"

---

[3] Wildenstein signed the Agreement as "manager" of 1964 Realty LLC.

[4] The Complaint does not specify who authorized the $9 million down payment on behalf of Defendant or when it
was made.

through "reasonable diligence" years before it chose to enter into and terminate the Agreement. *Id.* ¶¶ 24, 29. As of the filing of the Complaint, France had yet to find Wildenstein to be "in violation" of any money laundering laws. *Id.* ¶ 29.

The Complaint speculates that Defendant's allegations against Wildenstein are "pretextual" and that, when the purchase of the Property came under review in Doha they decided to back out of the deal. *Id.* ¶ 30. It bases this inference on the publication of two articles at the end of January 2014 in the *Wall Street Journal* and *The Real Deal Blog*, respectively, discussing the plans to purchase the Property, along with the $90 million purchase price. *Id.* Plaintiff claims that there was an "internal shake-up" after these articles were published, which included the recall of Al-Rumaihi back to Doha. *Id.*

The parties rescheduled a closing date for June 25, 2014. *Id.* ¶ 31. Defendant's counsel attended the closing, informing Plaintiff's counsel that it had no intention of closing, but that it attended merely to "observe the show." *Id.* ¶ 32. Although Plaintiff asserts that it had satisfied all of its obligations under the Agreement, Defendant refused to close. *See id.* ¶ 33-34. Later in the day, Plaintiff delivered a formal notice of default to Defendant, along with a time of the essence notice of a second closing date, July 28, 2014. *Id.* ¶ 34. After the close of business, Defendant responded via letter repeating its allegations against Wildenstein, confirming that it would not close, and stating that it was entitled to return of the down payment. *Id.* ¶ 35.

On July 28, 2014, Defendant again refused to close on the Agreement. Plaintiff sent Defendant a notice of default later that day, and a demand for a release of the down payment to the Stakeholder Defendant. *Id.* ¶ 38. On August 8, 2014—the last day Defendant could object to the release of the down payment funds under the Agreement—it objected to the release of the

Case 2:18-cv-03466-DMG-E Document 10-32 Filed 05/07/18 Page 27 of 50 Page
Case 3:14-cv-06426-EP Document 32 Filed 05/04/15 Page 6 of 29 Page
ID #:848

down payment to Plaintiff.  *Id.* ¶ 39.  On August 12, 2014, Plaintiff filed the instant action.  *See*
Doc. 1.

## II.    Legal Standard

### A.    Rule 12(b)(1) Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of
subject matter jurisdiction when the district court lacks the statutory or constitutional power to
adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction
carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists.
*Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v.
United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the
district court's subject matter jurisdiction, evidence outside of the pleadings may be considered
by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle E. Constr. Co. v.
Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (internal citation omitted); *see also
Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to
dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in
the complaint as true but does not necessarily draw inferences from the complaint favorable to the
plaintiff.  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing
*Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must
consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820
F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012) (internal citations
omitted), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and
therefore, an exercise of jurisdiction."  *Chambers v. Wright,* No. 05 Civ. 9915 (WHP), 2007 WL

6

4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau Cnty. Med. Ctr.,* 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)).

### B. Rule 12(b)(6) Motions to Dismiss

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (internal citation omitted). The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of

a claim for relief without resolving a contest regarding its substantive merits,'" and without

regard for the weight of the evidence that might be offered in support of Plaintiff's claims.

*Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v.

City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

## III.   Discussion

### A.   Subject Matter Jurisdiction Under Rule 12(b)(1)

*i.    The Foreign Sovereign Immunities Act*

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the

courts of this country."[5]  *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012)

(quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989))

(internal quotation marks omitted).  The Act defines a "foreign state" as including its

"agenc[ies]" and "instrumentalit[ies]."  28 U.S.C. § 1603(a).  Under the FSIA, "a foreign state

shall be immune from the jurisdiction of the courts of the United States and of the States."  *Id.*

§ 1604.  However, this broad conferral of immunity is subject to certain exceptions, *see id.*, two

of which are at issue here.  First, a foreign state may itself waive immunity, "either explicitly or

by implication."  *Id.* § 1605(a)(1).  Second, the commercial activity exception provides that

foreign states will not enjoy immunity in any case "based upon a commercial activity carried on

in the United States by the foreign state."  *Id.* § 1605(a)(2).

---

[5] The Complaint incorrectly states that the Court also has subject matter jurisdiction over the matter pursuant to 28
U.S.C. § 1332.  However, the diversity jurisdiction statute only grants subject matter jurisdiction over disputes
between "a foreign state . . . *as plaintiff* and citizens of a State or of different States," and is therefore inapplicable.
28 U.S.C. § 1332(a)(4) (emphasis added).

Plaintiff maintains that it "has done what the law requires," specifically, "it pled that the Consul General . . . signed the Agreement on behalf of Defendant; that the Agreement was legally binding, constituted a commercial transaction, and explicitly waived sovereign immunity; and that Defendant breached the Agreement to Plaintiff's detriment." Pl.'s Mem. L. Opp., Doc. 25 at 1. In turn, Defendant argues that: (1) Al-Rumaihi lacked the authority to enter into the Agreement on behalf of the foreign state of Qatar; and (2) since Al-Rumaihi was neither authorized to engage in the commercial transaction of purchasing the Property or waive sovereign immunity by signing the Agreement, neither exception applies. Def.'s Mem. L. Supp. Mot. Dismiss, Doc. 22 at 9-11.

The parties do not dispute that Defendant is a foreign state under the Act. Consequently, Plaintiff bears the burden of "going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Rogers*, 673 F.3d at 136 (internal quotation marks and citation omitted). Nonetheless, the ultimate burden of persuasion of demonstrating that an FSIA exception does not apply lies with Defendant. *Id.* (internal citation omitted). In other words, "a district court must review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (internal citation omitted).

The Second Circuit has further instructed that "if material issues of fact are in dispute, 'it is essential for the district court [to] afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction.'" *Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 246 F. Supp. 2d 273, 277 (S.D.N.Y.), *as amended* (Feb. 25, 2003),

Case 2:18-cv-03466-DMG-SK   Document 10-2   Filed 05/07/18   Page 31 of 50   Page
Case 3:15-cv-06425-ER   Document 32   Filed 09/04/15   Page 10 of 25
ID #:852

*supplemented*, 246 F. Supp. 2d 285 (S.D.N.Y. 2003) (quoting *Reiss v. Societe Centrale Du
Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000)); *see also Fir Tree Capital
Opportunity Master Fund, LP v. Anglo Irish Bank Corp*., No. 11 Civ. 0955 (PGG), 2011 WL
6187077, at *1 (S.D.N.Y. Nov. 28, 2011) (noting that the court held an evidentiary hearing and
oral argument before deciding whether to apply the commercial activity exception to sovereign
immunity); *Human Rights in China v. Bank of China*, No. 02 Civ. 4361(NRB), 2003 WL
22170648, at *6 (S.D.N.Y. Sept. 18, 2003) (ordering discovery to clarify certain "jurisdictional
facts" and "legal principles" before deciding the issue of sovereign immunity).  In other words,
"the parties should be given 'a fair opportunity' to engage in jurisdictional discovery and submit
to the Court the evidence needed to resolve that issue."  *Mateo v. Perez*, No. 98 Civ. 7426 (SAS),
1999 WL 216651, at *3 (S.D.N.Y. Apr. 13, 1999) (quoting *Foremost-McKesson, Inc. v. Islamic
Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)).

  *ii. The Consul General's Actual Authority*

   "Under New York law, an agent has actual authority if the principal has granted the agent
the power to enter into contracts on the principal's behalf, subject to whatever limitations the
principal places on this power, either explicitly or implicitly."  *Highland Capital Mgmt. LP v.
Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (citing *Ford v. Unity Hosp*., 32 N.Y.2d 464, 472,
299 N.E.2d 659, 664 (1973)).  Actual authority "exists only where the agent may reasonably
infer from the words or conduct of the principal that the principal has consented to the agent's
performance of a particular act," although it may be express or implied.  *Minskoff v. Am. Exp.
Travel Related Servs. Co*., 98 F.3d 703, 708 (2d Cir. 1996) (internal citation omitted).  Thus,
"[t]he existence of actual authority depends upon the actual interaction between the putative
principal and agent, not on any perception a third party may have of the relationship."  *Merrill*

*Lynch Capital Servs., Inc. v. UISA Fin.*, No. 09 Civ. 2324 (RJS), 2012 WL 1202034, at \*6
(S.D.N.Y. Apr. 10, 2012) *aff'd*, 531 F. App'x 141 (2d Cir. 2013) (internal citation and quotation
marks omitted) (alternation in original). The Court must interpret the agent's actual authority "in
the light of all circumstances attending these manifestations, including the customs of business,
the subject matter, any formal agreement between the parties, and the facts of which both parties
are aware." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (internal
citation omitted).

In their papers, both parties applied New York agency law to the question of whether Al-
Rumaihi possessed actual authority to enter into the Agreement. *See* Doc. 22 at 11; Doc. 25 at 8.
Although Defendant states that the Court may refer to international law to resolve the issue of
whether a waiver of sovereign immunity was effected by someone who had the authority to do
so, it primarily invokes principles of New York agency law.[6] Doc. 22 at 12 n.3. Neither party
acknowledges the possibility that Qatari law may ultimately govern the question of whether
Defendant can be held liable for the acts of Al-Rumaihi under an agency theory.

However, "courts in this district have consistently applied the laws of foreign states to
evaluate claims of actual authority." *Themis Capital, LLC v. Democratic Republic of Congo*,
881 F. Supp. 2d 508, 521 (S.D.N.Y. 2012) (listing cases). "If the law of more than one
jurisdiction is potentially applicable to a contract dispute, New York courts undertake [a]
'grouping of contacts' analysis to determine the governing law." *Int'l Bus. Machines Corp. v.
Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citing *Zurich Ins. Co. v. Shearson*

---

[6] Specifically, Defendant refers to the Vienna Convention on Consular Relations to argue that Al-Rumaihi's acts are
not among those contemplated as "consular functions" under the Convention. *See* Doc. 22 at 12. Defendant does
not attempt to identify any general international *agency* law principles.

Case 2:18-cv-03466-DMG-SK   Document 10-2   Filed 05/07/18   Page 33 of 50   Page
ID #:854
Case 3:16-cv-06425-ER   Document 32   Filed 09/04/18   Page 12 of 29

*Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317, 642 N.E.2d 1065, 1068 (1994)).  Under this analysis,

the law of the jurisdiction with the "most significant relationship to the transaction and parties"

must be applied.  *Id.* (quoting *Zurich*, 84 N.Y.2d at 317, 642 N.E.2d at 1068) (internal quotation

marks omitted).  In *Themis*, the court found that the law of the Democratic Republic of Congo

("DRC") was applicable because the country had "the most significant relationship with the

transaction at issue."[7]  *Themis*, 881 F. Supp. at 521.  Specifically, the plaintiffs' claims exposed

the DRC to nearly $80 million in liabilities.  *Id.*  The amount in controversy in the instant action,

which is limited to the $9 million down payment, is significantly less.  Nonetheless, given that

the parties did not address the potential applicability of Qatari law in their briefing, the Court

will not decide the choice of law question at this juncture.[8]

Not only is the applicable law potentially in dispute; several pertinent factual issues must

also be resolved before the Court can make any determination as to actual authority, even under

New York law.  Without citing the source of Al-Rumaihi's powers, Plaintiff argues that he was

necessarily authorized to waive sovereign immunity and purchase the Property by virtue of his

position as the highest ranking officer of Defendant, the Consulate of the State of Qatar in New

York.[9]  Defendant counters that the relevant inquiry is whether the Consul General had actual

---

[7] The facts in *Themis* involved two documents.  In the first agreement, the Democratic Republic of Congo, formerly the Republic of Zaire, explicitly waived sovereign immunity.  *Themis*, 881 F. Supp. 2d at 516-517.  The second agreement consisted of a letter acknowledging and confirming the debt obligation encompassed by the original credit agreement, signed by the Democratic Republic of Congo's interim Minister of Finance and Budget and the Central Bank's Governor.  *Id.* at 513-514.

[8] In a footnote, Plaintiff states that "Qatari agency law is not relevant" because Defendant has not alleged that it is and because the Agreement contains a choice of law provision.  Doc. 25 at 10 n.4.  Simply because Defendant neglected to consider the potential applicability of Qatari law does not necessarily imply that it is irrelevant.  Furthermore, given that Defendant challenges the validity of the Agreement itself, the contract does not necessarily dictate whether New York law applies.

[9] Plaintiff also cites several FSIA cases involving consuls general who entered into real estate transactions on behalf of their consulates.  *See* Doc. 25 at 12 (citing *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018 (9th Cir. 1987); *Berdakin v. Consulado de la Republica de El Salvador*, 912 F. Supp. 458 (C.D. Cal. 1995); *Miles Mgmt.*

authority to act on behalf of Qatar itself.  Def.'s Reply Mem. L., Doc. 29 at 3.  Yet, regardless of whether Al-Rumaihi is viewed as the "highest ranking agent" of the consulate, Doc. 25 at 9, or as a lower level official within the Qatari government as a whole, neither party has clearly identified the bounds of Al-Rumaihi's actual authority, nor alleged specific facts which show that he acted within or outside those parameters.

Defendant merely alleges that Al-Rumaihi's actions do not directly correspond with the "consular functions" listed in the Vienna Convention on Consular Relations ("Vienna Convention").[10]  Doc. 29 at 4.  Indeed, there is no provision in the Vienna Convention that expressly addresses the authority of consular officials to enter into the type of real estate transaction at issue here.  *See* Vienna Convention on Consular Relations art. 5, April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (entered into force for United States Dec. 14, 1969). Nonetheless, the Vienna Convention does indicate that consular functions include "performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving

---

*Corp. v. Republic of S. Africa*, No. 94 Civ. 1318, 1994 WL 714584, at *1 (N.D. Ill. Dec. 19, 1994)).  While these cases are, to varying degrees, relevant, they are not on point because none of those sovereign defendants disputed that its officials lacked the authority to enter into the transactions for the purposes of challenging jurisdiction under the FSIA.

[10] Plaintiff argues that the Vienna Convention is inapplicable because it governs claims against consular officers. Doc. 25 at 10.  Indeed, Article 43 of the Vienna Convention provides immunity to consulate officials when the alleged actions were performed in the exercise of consular duties set forth in Article 5.  *See Mateo v. Perez*, No. 98 Civ. 7426 (SAS), 1999 WL 216651, at *5 (S.D.N.Y. Apr. 13, 1999).  "The doctrine of sovereign immunity is applicable only to states and their instrumentalities . . . [while] [t]he doctrine of consular immunity is applicable only to consular officials and employees."  *Id.* at *4 (quoting *Joseph*, 830 F.2d at 1021) (alterations in original); *see also Berdakin v. Consulado de la Republica de El Salvador*, 912 F. Supp. 458, 460-61 (C.D. Cal. 1995) ("[T]he FSIA applies only to states and their instrumentalities, and not to the Consul himself, and concomitantly . . . the Vienna Convention's consular immunity doctrine applies only to the Consul himself, and not to the Consulate."). Nonetheless, while the Vienna Convention is not traditionally invoked in the sovereign immunity context, the fact that Defendant points to Article 5 as a potential source of actual authority renders it relevant to the Court's inquiry. *See* Doc. 29 at 4.

Case 2:18-cv-03466-DMG-SK   Document 10-2   Filed 05/07/18   Page 35 of 50   Page
ID #:856
Case 3:16-cv-06425-ER   Document 32   Filed 09/04/15   Page 14 of 29

State[.]"  *Id*. art. 5(m).  Defendant counters that "reliance on this provision necessarily begs the

question of whether Qatar granted such authority in the first place."  Doc. 29 at 4.  Neither party

adequately answers the question, and most likely cannot do so in the absence of discovery.[11]

"[C]ourts generally require that plaintiffs be given an opportunity to conduct discovery

on these jurisdictional facts [on which jurisdiction rests], at least where the facts, for which

discovery is sought, are peculiarly within the knowledge of the opposing party."  *Gualandi v.*

*Adams*, 385 F.3d 236, 244 (2d Cir. 2004) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006,

1011 (2d Cir. 1986)).  Plaintiff asks the Court not to dismiss the case under Rule 12(b)(1)

without allowing the parties to engage in limited discovery concerning Al-Rumaihi's authority to

execute the Agreement.  Doc. 25 at 19.  Defendant objects to any discovery, citing *EM Ltd. v.*

*Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) for the proposition that "in the FSIA

context, discovery should be ordered circumspectly and only to verify allegations of specific

facts crucial to an immunity determination."  *See* Doc. 29 at 10 (internal quotation marks

omitted).  However, in *Republic of Argentina*, it was evident that the FSIA's exception to

immunity from attachment was inapplicable based on the facts before the court.  *Republic of*

*Argentina*, 473 F.3d at 486.  Thus, the plaintiff was clearly unable to assert "a reasonable basis

for assuming jurisdiction."  *Id*.  (internal citation and quotation marks omitted).  That is not the

case here.

---

[11] Throughout its papers, Defendant repeatedly suggests that the Complaint fails to allege that Al-Rumaihi possessed
the requisite authority.  Doc. 22 at 11; Doc. 29 at 4.  However, Defendant only challenges Al-Rumaihi's authority to
enter into the Agreement to argue that the Court lacks subject matter jurisdiction under Rule 12(b)(1).  Defendant
erroneously cites *Attica Central Schools*, 386 F.3d at 110 for the proposition that the Court "is constrained to
analyzing the pleaded allegations."  *See* Doc. 29 at 4 n.3.  On the contrary, the case states that courts "may consider
affidavits and other materials beyond the pleadings" on Rule 12(b)(1) motions.  *Attica Cent. Sch.*, 386 F.3d at 110.

Case 1:16-cv-06425-ER   Document 32   Filed 09/04/18   Page 15 of 25

The instant Complaint provides at least a "reasonable basis" to believe that Al-Rumaihi possessed the authority to execute the Agreement based on his position, the initial involvement of the Qatari Minister of Foreign Affairs, the representations made in the Agreement, and the deposit of a significant down payment that is at the heart of the dispute. That said, the Complaint leaves several questions unanswered that are potentially dispositive of the agency issue. For example, it is unclear who authorized Defendant's $9 million escrow payment. In addition, beyond Plaintiff's speculation that Al-Rumaihi was recalled because of this transaction, neither party provides any details as to the circumstances surrounding his recall back to Doha. *See id.* ¶ 30. And, of course, Plaintiff can provide no insight into what specific authority Al-Rumaihi was given by Defendant. The answers to these questions are "peculiarly within the knowledge" of Defendant, s*ee Gualandi*, 385 F.3d at 244 (internal citation omitted), and are "crucial to an immunity determination." *See Republic of Argentina*, 473 F.3d at 486. Therefore, limited jurisdictional discovery as to these factual issues, along with additional briefing as to the applicable law, is necessary before the Court can make any determination as to actual authority.

iii.     *Availability of the Apparent Authority Doctrine*

Even if Al-Rumaihi lacked actual authority, he may yet be able to bind Defendant under the doctrine of apparent authority. Under New York law, an agent may "bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists."[12] *Highland Capital Mgmt. LP v.*

---

[12] The Second Circuit has not squarely addressed the issue of which law applies in determining whether apparent authority exists. However, in *First Fidelity*, it "assume[d] without deciding" that New York law governed its inquiry as to whether Antigua's ambassador possessed apparent authority. *First Fidelity Bank, N.A. v. Gov't of Antigua*, 877 F.2d 189, 194 n.3 (2d Cir. 1989). Furthermore, lower courts within the Second Circuit have applied New York agency law. *See e.g. Themis*, 881 F. Supp. 2d at 522; *Anglo-Iberia Underwriting Mgmt. Co. v. PT Jamsostek*, No. 97 Civ. 5116 (HB), 1998 WL 289711, at *3 n.2 (S.D.N.Y. June 4, 1998) *aff'd in part, vacated in part on separate grounds, remanded sub nom. Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 F. App'x 776 (2d Cir. 2007); *Storr v. Nat'l Defence Sec. Council of Republic of Indonesia-Jakarta*, No. 95 Civ. 9663 (AGS),

Case 2:18-cv-03466-DMG-SK Document 10-2 Filed 05/07/18 Page 37 of 50 Page
Case 3:16-cv-06426-ER Document 32 Filed 09/04/18 Page 16 of 29
ID #:858

*Schneider*, 607 F.3d 322, 328 (2d Cir. 2010). Apparent authority is triggered when "a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Id.* (internal citation and quotation marks omitted) (alteration in original). However, the doctrine is not without limits. "A party cannot claim that an agent acted with apparent authority when it knew, or should have known, that [the agent] was exceeding the scope of its authority." *Id.* (internal citation and quotation marks omitted) (alteration in original).

The leading case in the Second Circuit on apparent authority in the sovereign immunity context is *First Fidelity Bank, N.A. v. Gov't of Antigua*, 877 F.2d 189 (2d Cir. 1989). In *First Fidelity*, Antigua's ambassador to the United Nations signed for a loan that was purportedly intended to pay for the renovation of Antigua's Permanent Mission to the United Nations in New York. *Id.* at 191. When Antigua ceased making loan payments, the lender attempted to levy upon Antigua's bank accounts, which culminated in a settlement and consent order between the parties. *Id.* The consent order, signed by the same ambassador, included a complete waiver of sovereign immunity. *Id.* Antigua later moved to vacate the consent order, claiming that it retained its sovereign immunity because its United Nations ambassador lacked the authority to both borrow the money and sign the consent order. *Id.* The Second Circuit determined that Antigua could indeed be bound by the ambassador's actions if he had apparent authority to take them and remanded the case for further findings of fact. *Id.* at 195-196 ("[T]he parties must proceed to discovery and possibly to trial before a court can rule on either substance or jurisdiction").

---

1997 WL 633405, at *3 (S.D.N.Y. Oct. 14, 1997) *aff'd sub nom. Storr v. Nat'l Def. Sec. Council*, 164 F.3d 619 (2d Cir. 1998).

16

Defendant asks the Court not to apply the doctrine of apparent authority, arguing that the Second Circuit is the only court of appeals to hold that apparent authority may bind a sovereign. Doc. 22 at 13-15. As another district court within the Second Circuit observed, "[t]o be sure, other federal courts of appeals have taken varying positions on whether—and if so, when—a foreign government may be bound on a theory of apparent authority." *Themis*, 881 F. Supp. 2d at 523 (listing Fourth, Fifth, Ninth, and Eleventh Circuit cases). However, regardless of how other courts have ruled, this Court is bound by the Second Circuit's case law and is thus required to apply the doctrine of apparent authority as the Circuit has instructed.

Courts within this circuit have routinely conducted the apparent authority analysis to determine the applicability of a sovereign immunity exception.[13] *See Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 F. App'x 776, 780 (2d Cir. 2007) (affirming the lower court's Rule 12(b)(1) dismissal of the plaintiffs' breach of contract claims, which was based on a finding that a former employee of an Indonesian state-owned entity lacked actual and apparent authority to execute the reinsurance agreement); *Republic of Benin v. Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270, at *6-7 (S.D.N.Y. Sept. 9, 2010) (while noting that apparent authority is generally insufficient in dealing with federal governments, finding that the former Director of Administration of the Republic of Benin's Ministry of Foreign Affairs did not meet the doctrine's requirements); *Storr v. Nat'l Defence Sec. Council of Republic of Indonesia-Jakarta*, No. 95 Civ. 9663 (AGS), 1997 WL 633405, at *3 (S.D.N.Y. Oct. 14, 1997) *aff'd sub nom. Storr v. Nat'l Def. Sec. Council*, 164 F.3d 619 (2d Cir. 1998) (finding that a sovereign immunity

---

[13] Meanwhile, Defendant does not cite a single case within this Circuit in which a court wholly rejected the applicability of the apparent authority doctrine in the sovereign immunity context, nor was the Court able to identify one.

exception did not apply because members of the National Defence Security Council of the Republic of Indonesia lacked apparent authority to issue promissory notes).

Only one court within this district has attempted to reconcile the conflicting circuit case law. In *Themis*, the court synthesized the outcomes of numerous cases involving apparent authority in the foreign sovereign context and reached the following conclusion:

> [T]he outcomes in these cases appear to turn on whether the specific legal commitment made by a government official on apparent behalf of the foreign government was (1) a public act, in which case apparent authority has generally been held unavailable, except in the discrete context presented by waivers of sovereign immunity by ambassadors; or (2) a private act, in which case apparent authority has generally been held available.

*Themis*, 881 F. Supp. 2d at 523. The court went on to define private acts as "only those powers that can also be exercised by private citizens," and public acts as "those powers peculiar to sovereigns." *Id*. at 524 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)) (internal quotation marks omitted).

As noted, the *Themis* court specifically carved out of its analysis an *ambassador's* jurisdictional acts, as compared to lower government officials. *See Themis*, 881 F. Supp. 2d at 524-525. Specifically, it concluded that ambassadors may possess both actual and apparent authority to bind their principals. *Id*. (citing *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc*., 179 F.3d 1279, 1299 (11th Cir. 1999) ("[U]nder the FSIA, courts should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it 'obvious' that he or she does not."); *Jota v. Texaco, Inc*., 157 F.3d 153, 163 (2d Cir. 1998) (denying Ecuador's motion to intervene based, in part, on the determination that the Ecuadoran ambassador "enjoyed apparent authority" and the defendant

Case 2:18-cv-03466-DMG-SK   Document 10-2   Filed 05/07/18   Page 40 of 50   Page
ID #:861
Case 1:16-cv-06425-ER   Document 32   Filed 09/04/15   Page 19 of 25

and the District Court were "entitled to rely on his representations unless they were actually

aware that he lacked such authority")).

Since the waiver of sovereign immunity is undoubtedly a public act and Al-Rumaihi was

not an ambassador, *Themis* would imply that the doctrine of apparent authority is inapplicable to

the instant action, at least insofar as Al-Rumaihi is alleged to have waived Qatar's sovereign

immunity.[14]  However, *Themis* is currently on appeal, with the defendants asking the Second

Circuit to join other circuits that have concluded that apparent authority is an insufficient basis

upon which to bind foreign sovereigns and the plaintiffs asking the Second Circuit to uphold

*First Fidelity*.[15]  *See* Corrected Brief for Appellants at 29-31, Themis Capital, LLC v.

Democratic Republic of Congo, No. 14-4016 (2d Cir. filed March 9, 2015); *see also* Corrected

Brief for Appellees at 37-41, Themis Capital, LLC v. Democratic Republic of Congo, No. 14-

4016 (2d Cir. filed April 9, 2015).  While this Court finds *Themis* to be persuasive, it notes that

in *First Fidelity* the Second Circuit made no distinction between "public" or "private" acts.  Nor

did it suggest, as Defendant urges here, that that the doctrine of apparent authority only applied

to ambassador-level personnel.  Specifically, it stated that "agency law is flexible enough so that

the fact that a person is an ambassador can be given its appropriate weight in determining the

*extent* of his apparent authority."  *First Fidelity*, 877 F.2d at 194 (emphasis added).  It did not

---

[14] The question before the *Themis* court was whether the interim Finance Minister and Central Bank official could
revive the foreign state's credit obligations absent actual authority.  *Themis*, 881 F. Supp. 2d at 519, 522-526.
Unlike the case at hand, the court was not assessing whether the DRC's agents possessed actual authority to waive
sovereign immunity.  Therefore, it determined that the "the governmental act in question is quintessentially private."
*Id*. at 526.

[15] The *Themis* court initially held that, although the doctrine of apparent authority was available, it could not decide
the issue without targeted discovery.  *Themis*, 881 F. Supp. 2d at 528, 531.  After the parties conducted discovery,
the court later found that the agents possessed apparent authority.  *Themis Capital v. Democratic Republic of Congo*,
35 F.Supp.3d 457, 478-481 (S.D.N.Y. 2014), *appeal docketed*, No. 14-4016 (2d Cir. Oct. 27, 2014).  The defendants
also appealed this finding.

Case 2:18-cv-03466-DMG-SK   Document 102   Filed 05/07/18   Page 41 of 50   Page
Case 3:14-cv-06425-ER   Document 32   Filed 09/04/15   Page 20 of 25
ID #:862

state that the fact that a person is an ambassador determines whether he or she is eligible to

exercise apparent authority at all.[16]  Accordingly, the Court declines to follow *Themis* until a

decision by the Second Circuit is rendered.

Ultimately, it may be that Al-Rumaihi's position as a lower level foreign official weighs

heavily against a finding of apparent authority.  *See Themis*, 881 F. Supp. 2d at 527 ("[F]or a

principal to be held liable on an agent's acts under an apparent authority theory, the principal

must be responsible for the appearance of authority in the agent . . . and a principal can,

explicitly or implicitly, create the appearance of an agent's authority, and of limitations on that

authority, through the particular position held by the agent.") (internal quotation marks and

citation omitted).  As the law in the Second Circuit presently stands, Plaintiff may at least

attempt to establish that Al-Rumaihi possessed apparent authority to enter into the Agreement

and waive sovereign immunity.[17]

---

[16] The Court also notes that neither the Fourth, Fifth, nor Ninth Circuits distinguished their holdings from the
Second Circuit along the lines drawn by *Themis*.  Rather, the Ninth Circuit adopted a textual reading of the FSIA,
and concluded that, "[i]f the foreign state has not empowered its agent to act, the agent's unauthorized act cannot be
attributed to the foreign state; there is no 'activity of the foreign state'" under the FSIA's commercial activity
exception.  *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307, 308 (9th Cir. 1997).  It went on to note that its
conclusion *directly contradicts* the Second Circuit's holding in *First Fidelity*.  *Id*. at n.4.  The Fourth and Fifth
Circuits adopted the Ninth Circuit's reasoning in *Phaneuf*, with the Fourth Circuit acknowledging that the Second
Circuit has "taken a different view."  *See Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 400 (4th Cir. 2004); *Dale v.
Colagiovanni*, 443 F.3d 425, 428-429 (5th Cir. 2006).

Moreover, the Ninth Circuit explicitly rejected the lower court's holding that sovereign immunity only applies to
public acts, stating "[r]equiring a foreign state to prove a public act conflicts with the plain language of the [FSIA]: a
foreign state is immune from suit unless one of the enumerated exceptions applies."  *Phaneuf*, 106 F.3d at 306.
While the reasoning in *Themis* is concerned with contrasting public and private acts to determine whether apparent
authority may bind a sovereign, the Ninth Circuit's unequivocal rejection of the lower court's line of inquiry casts
doubt on the notion that its own holding on apparent authority was grounded in such a distinction.

[17] For the reasons set forth below, this Court will not make a final determination as to the existence of apparent
authority until limited discovery is taken.  Thus, there is a distinct possibility that the Second Circuit will issue an
opinion that requires the Court to reconsider its position on the availability of apparent authority in deciding the
merits of Plaintiff's claim.

Case 2:18-cv-03466-DMG-SK Document 10-2 Filed 05/07/18 Page 42 of 50 Page
Case 3:16-cv-06425-ER Document 32 Filed 09/04/18 Page 21 of 29 Page
ID #:863

*iv. Application of the Apparent Authority Doctrine*

In *First Fidelity*, the Second Circuit explained that "a principal causes his agent to have

apparent authority by conduct which, reasonably interpreted, causes third persons to believe that

the principal consents to have an act done on his behalf." *First Fidelity*, 877 F.2d at 193 (citing

Restatement (Second) of Agency § 27 (1958)). Additionally, "the circumstances of the

transaction must be examined to determine whether the person relying on the apparent authority

fulfilled his duty of inquiry." *Id*. at 194 (internal citations and quotation marks omitted). "The

explicit and implicit representations made by foreign states as to the level and scope of the

authority to bind the state of the official in question are, therefore, important components of the

apparent authority inquiry." *Themis*, 881 F. Supp. 2d at 527; *see also Seetransport*, 123 F. Supp.

2d at 190 (finding that the Romanian Minister of Finance had apparent authority to enter into a

settlement agreement on behalf of the foreign state based on explicit representations made by

senior Romanian officials in letters and discussions with the plaintiffs); *Storr*, 1997 WL 633405,

at *3 (no apparent authority where plaintiff failed to allege specific conduct on the part of the

foreign state "which would lead third persons to believe that the signatories of the notes had the

authority to issue them"). Thus, a determination of whether apparent authority exists "requires a

factual inquiry into the principal's manifestations to third persons." *Id*. at 526 (internal citation

and quotation marks omitted).

Plaintiff points to three facts which show that Al-Rumaihi was clothed with apparent

authority to execute the Agreement.[18] First, it notes that Al-Attiyah, Qatar's Minister of Foreign

---

[18] Defendant repeatedly asserts that Plaintiff should not be permitted to allege new facts that are not contained in the
Complaint. Doc. 22 at 17, 21; Doc 29. At 8. In support of this argument, Defendant cites a case which dealt entirely
with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See id*. at 17 (citing *K.D. ex rel. Duncan v.
White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013)). The apparent authority analysis relates to the
issue of subject matter jurisdiction, which Defendant challenged under Rule 12(b)(1). As previously stated, the

Affairs, visited and inspected the Property with Al-Rumaihi on September 27, 2013.  Doc. 25 at

14.  Second, prior to signing the agreement, the Defendant's Vice Counsel, Al-Meer, requested

approval from the United States State Department to purchase the Property.[19]  Doc. 25 at 14-15.

Third, Plaintiff references a December 12, 2013 social gathering that Defendant hosted at the

Property, which "numerous Qatari officials and diplomats" attended.  *Id*. at 15.  Plaintiff's

recitation of these three events lacks sufficient factual detail to definitively establish apparent

authority.  It is not at all obvious that by merely inspecting the property several months prior, the

Minister of Foreign Affairs implicitly represented that Al-Rumaihi was authorized to execute the

Agreement.  Moreover, the fact that Al-Meer, who ranked below even Al-Rumaihi, requested

and received permission from the United States to purchase the Property does not necessarily

constitute a representation on behalf of the foreign state of Qatar as to Al-Rumaihi's authority.

Furthermore, the mere fact that several Qatari officials attended a party hosted by Defendant at

the Property, without more information as to the circumstances surrounding the social event—

including who specifically attended and their knowledge of any plans to purchase the Property—

also does not by itself establish apparent authority.  Thus, while these facts are certainly

probative, they are not sufficiently developed to warrant a finding of apparent authority.

Another open question is whether Al-Rumaihi's execution of the Agreement purportedly

binding Qatar to purchase the Property is the type of commitment that consuls general normally

---

Court may consider evidence outside of the pleadings to resolve disputed issues of jurisdictional fact.  *See Zappia*,
215 F.3d at 253.

[19] Defendant claims that the State Department did not approve the purchase until *after* Plaintiff entered into the
Agreement, which therefore implies that the Agreement was contrary to United States law.  Doc. 29 at 7 n.8.
Defendant relies on an email from Plaintiff's counsel stating that it had signed the Agreement on January 15, 2014.
*See* Taub Decl., Doc. 30, Ex. C.  However, the email states that the Agreement *would not be deemed binding* until
Plaintiff's counsel received a fully executed copy of the Agreement and confirmation that the $9 million had been
deposited.  *See id.*

have the authority to make. Defendant argues that the Court should give Al-Rumaihi's position as Consul General little, if any, consideration.[20] Doc. 22 at 26. However, in *First Fidelity*, the Second Circuit explicitly stated that "[t]he appointment of a person to a position with generally recognized duties *may* create apparent authority." *First Fidelity*, 877 F.2d at 193 (citing Restatement (Second) of Agency § 27 cmt. a (1958)) (emphasis added); *see also Themis*, 881 F. Supp. 2d at 527 ("These decisions [in this district involving non-ambassador officials] hold that such officials have apparent authority to bind foreign sovereigns when the obligation to which by [sic] the official committed is of the sort of commitment that such an official ordinarily has the authority to make."). Neither of the parties have presented the Court with any description as to what a consul general's logistical duties are, and how the execution of the Agreement corresponds to them.

As to Plaintiff's duty to inquire, it is limited to instances in which "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *Republic of Benin*, 2010 WL 3564270, at *7 (quoting *F.D.I.C. v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997)) (internal quotation marks omitted). Put differently, it "amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal." *Providence Coll.*, 115 F.3d at 141 (internal citation and quotation marks omitted). Defendant argues that Plaintiff had a duty to inquire given that it was dealing with a foreign sovereign, which therefore required a higher level of scrutiny.

---

[20] Defendant attached a diagram outlining the organization of a mission to its papers. *See* Taub Decl., Doc. 30, Ex. B. However, the diagram merely describes how the *United States* Department of State is organized; it does not necessarily have any bearing on the structure of Qatar's diplomatic missions or the authority it bestows on its representatives.

Case 2:18-cv-03466-DMG-SK   Document 10-2   Filed 05/07/18   Page 45 of 50   Page
ID #:866
Case 1:16-cv-06425-ER   Document 32   Filed 09/04/18   Page 24 of 25

Doc. 22 at 22.  Plaintiff counters that "there were no red flags or markers that this transaction

was extraordinary or tainted by fraud."  Doc. 25 at 18.

Since the factual record is not sufficiently developed, the Court cannot determine whether

Plaintiff's reliance was reasonable.  Ultimately, the Second Circuit has stressed that "reasonable

reliance is often a question of fact for the jury rather than a question of law for the court."

*Themis*, 881 F. Supp. 2d at 528 (quoting *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA)*

*LLC*, 648 F.3d 68, 81 (2d Cir. 2011)) (internal quotation marks omitted).  While Defendant's

status as a foreign state may be a factor the Court considers in determining whether Plaintiff's

reliance was reasonable, none of the cases Defendant cites suggest that it is determinative.

Given the lack of clarity as to Defendant's representations leading up to the execution of

the Agreement and Al-Rumaihi's general duties, the Court believes additional discovery is

necessary in order to resolve the issue of apparent authority.  *See Themis*, 881 F. Supp. 2d at 526-

531 (ordering limited discovery as to whether government officials had apparent authority and

whether the plaintiffs were obligated to inquire into the scope of their authority).  Specifically,

discovery on this matter should be conducted on the issues of what a third party would

reasonably believe was the scope of Al-Rumaihi's authority based on *Defendant's* implicit or

explicit representations, as well as facts concerning Plaintiff's duty to inquire, including the

novel or extraordinary nature of the transaction, and any potential red flags.

*v.    Ratification*

In a footnote, Plaintiff briefly raises the argument that Defendant's conduct following the

execution of the Agreement effectively ratified Al-Rumaihi's authority to enter into it.  The

doctrine of ratification holds that:

> Even in the absence of actual or apparent authority, a person may
> still be liable as a principal if he affirms or ratifies an act done by

> one who purports to be acting for the ratifier.  Under New York law,
> it is possible to imply ratification if the principal retains the benefit
> of an unauthorized transaction with knowledge of the material facts.
> Thus, ratification is a form of retroactive activity that occurs when
> the principal, having knowledge of the material facts, accepts the
> benefits of the agent's action already made on his behalf.

*Precedo Capital Grp. Inc. v. Twitter Inc*., 33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014), *appeal dismissed* (Aug. 14, 2014) (internal citation and quotation marks omitted).  A principal's intent, either express or implied, to affirm or adopt the acts of another is a touchstone of the ratification inquiry.  *Id*. (citing *Orix Credit Alliance v. Phillips-Mahnen, Inc*., No. 89 Civ. 8376 (THK), 1993 WL 183766, at *5 (S.D.N.Y. May 26, 1993)).  A principal cannot ratify an agent's act without "full and complete knowledge of all the material facts of the transaction."  *Id*. (quoting *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1213 (S.D.N.Y. 1994) *aff'd*, 57 F.3d 146 (2d Cir. 1995)) (internal quotation marks omitted).  "The intent can be implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence[.]"  *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland*, 835 F.2d 32, 36 (2d Cir. 1987) (internal quotation marks and citation omitted).  At least one Court within this Circuit has recognized the concept of ratification in the sovereign immunity context.  *See Reiss*, 246 F. Supp. 2d at 283 (finding that since the plaintiff came forward with sufficient evidence to require a factual determination as to the existence of subject matter jurisdiction, the defendants must convince the court that they never ratified the plaintiff's employment).

Defendant counters that Plaintiff's own pleadings contradict any assertion that Defendant ratified the Agreement, when all of the facts suggest that Defendant repudiated it.  Doc. 29 at 8-9.  However, that is not what the Complaint alleges.  Plaintiff claims that Defendant explicitly and repeatedly relied on the terms of the Agreement to justify its refusal to close on the Property.

Compl. ¶ 21.  Specifically, on April 29, 2014, Defendant's "newly hired counsel" informed Plaintiff that Wildenstein was in violation of laws relating to money laundering, which constitutes a breach of the Agreement, and that it was "exercising its right to terminate the Agreement under Section 10.31. [sic] of the Agreement."  *Id*.  The Complaint goes on to allege that the parties rescheduled the closing "by mutual agreement."  *Id*. ¶ 31.  The Friday before the rescheduled closing was supposed to occur, on July 25, 2014, Defendant's counsel once again sent Plaintiff's counsel a letter stating that it would not close on the Property because Plaintiff had breached ¶ 7.1.8 of the Agreement.  *Id*. ¶ 35.  On August 8, 2014, Defendant objected to any release of the down payment to Plaintiff under ¶ 23.1.3 of the Agreement.  *Id.* ¶ 39.  Thus, on the facts alleged, it is clear that at no time prior to the filing of this lawsuit did Defendant object to closing on the basis that Al-Rumaihi lacked authority to enter into the Agreement.  Less clear is whether the decision to invoke the breach provision can be attributed directly to the foreign state, or if it was taken by Defendant's agent, Al-Rumaihi, without the foreign state's knowledge or consent.[21]

Defendant also highlights the fact that Al-Rumaihi was recalled back to Doha and that when the purchase of the Property came under review in Doha, "there was a reluctance to be seen as profligate."  *See* Doc. 29 at 8, *see also* Compl. ¶ 30.  Defendant uses these facts to argue that "the Complaint directly alleges Qatar dissented upon learning of the Agreement."  *Id*.  Yet, while these allegations certainly raise serious questions about Al-Rumaihi's judgment, they do not necessarily bear on his authority to execute the Agreement.  There is no indication that

---

[21] The Complaint alleges that, after the publication of news articles highlighting Defendant's plans to purchase the Property in January 2014, Al-Rumaihi was recalled back to Doha.  *Id*. ¶ 30.  Furthermore, the law firm that had been representing Defendant and had a relationship with the outgoing Consul General was abruptly fired and replaced with new counsel.  *Id*.  However, although the Complaint indicates that Defendant had hired a new law firm by the time the parties were supposed to close on the Property, it does not specify when Al-Rumaihi left his post.

Defendant communicated its belief that the Agreement was invalid to Plaintiff.  Therefore, two critical questions arise:  (1) why Al-Rumaihi was recalled to Doha; and (2) whether Defendant communicated the circumstances surrounding his recall to Plaintiff, to the extent he was recalled for overstepping his authority.  Along those lines, another allegation requiring factual development is Plaintiff's claim that, after the parties executed the Agreement, delegations from Defendant and the Qatari Embassy—including the country's United Nations ambassador— visited the Property "on several occasions to plan for Defendant's move to the property."  Godts Decl., Doc. 27 at ¶ 4.  Once more, additional facts concerning whom these delegations consisted of and whether they knew of and intentionally condoned the Agreement on behalf of the principal are important.

Given that Plaintiff's ratification argument was limited to a footnote, the issue requires additional briefing.  Moreover, the facts supporting Plaintiff's ratification argument must be developed more fully before the Court can decide its merits.  Therefore, the Court authorizes limited jurisdictional discovery as to the actions and communications that followed the execution of the Agreement on January 16, 2014 that weigh on the question of whether Defendant ratified the contract.

### B.  Scope of Limited Discovery

In sum, the Court finds that there are substantial issues related to the question of whether Defendant is entitled to sovereign immunity that require further factual development.  The Court seeks additional information to assess the open issues in this case, particularly:  (1) whether Al-Rumaihi possessed actual authority to execute the Agreement on behalf of Defendant; (2) whether Al-Rumaihi possessed apparent authority to execute the Agreement; (3) whether a

Case 2:18-cv-03466-DMG-SK Document 10-2 Filed 05/07/18 Page 49 of 50 Page
Case 1:16-cv-06425-ER Document 32 Filed 09/04/15 Page 28 of 29
ID #:870

duty to inquire about the scope of Al-Rumaihi's authority was triggered on behalf of Plaintiff;
and (4) whether Defendant ultimately ratified the Agreement through its subsequent actions.

First, the parties should pursue discovery on all relevant non-privileged communications
leading up to and following the execution of the Agreement on January 16, 2014 between:
(1) consulate officials in New York, including Al-Rumaihi, and any other representatives of
Qatar; and (2) Qatari officials and Plaintiff's representatives. The parties should also pursue
discovery on non-privileged internal communications within the Qatari government concerning
the purchase of the Property.

Second, discovery should be taken that bears on the general duties of consuls general,
relevant chains of command, and any Qatari customs, practices, or policies regarding the
purchase of real estate in foreign countries.

Third, to the extent either of the parties argue Qatari law is applicable to any portion of
the analysis, the Court wishes to receive a translated excerpt of the relevant law, along with any
documents and expert opinions which will assist its interpretation.

At present, there is no basis to dismiss Plaintiff's action; limited discovery is required.
Defendant's Rule 12(b)(1) motion is therefore denied, without prejudice to renew after the
conclusion of limited discovery. At the close of this discovery, Defendant may reassert its
challenges to the Court's jurisdiction.

## C. Sufficiency of the Pleadings Under Rule 12(b)(6)

Because the Court is unable to resolve the 12(b)(1) motion at this juncture, it cannot
undertake the jurisdictional exercise of deciding the 12(b)(6) motion, which is based solely on a
failure to comply with the Statute of Frauds. *See* Doc. 22 at 23-24. However, to the extent it

may be helpful to the parties at some later point, the Court notes that this case is simply not one

in which the pleadings make clear that the Statute of Frauds cannot be satisfied.  While the

Complaint does not specifically allege that a written authorization of Al-Rumaihi's power to

execute the Agreement existed, it does not eliminate the possibility that one did.  Without

commenting on their applicability, the Court also notes that there are multiple exceptions to the

Statute of Frauds, including waiver and partial performance.  *See Blue Ridge Investments, LLC v.*

*Anderson-Tully Co*., No. 04 Civ. 3777 (HB) (FM), 2005 WL 44382, at *5-8 (S.D.N.Y. Jan. 10,

2005); *Sea Trade Co. v. FleetBoston Fin. Corp*., No. 03 Civ. 10254 (JFK), 2004 WL 2029399, at

*4-6 (S.D.N.Y. Sept. 9, 2004).

## IV.    Conclusion

For the reasons set forth above, Defendant's Rule 12(b)(1) challenge is DENIED without

prejudice to refile upon the completion of limited jurisdictional discovery.  The Court withholds

judgment on Defendant's motion to dismiss pursuant to Rule 12(b)(6) until the jurisdictional

issue is resolved.  The parties shall meet and confer regarding the appropriate scope of discovery,

and are directed to submit a proposed scheduling order to the Court by Monday, September 14,

2015.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 21.


It is SO ORDERED.

Dated:    September 4, 2015
          New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.