1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
geragos@geragos.com

MARK J. GERAGOS      SBN 108325
BEN J. MEISELAS       SBN 277412
DAVID A. ERIKSON     SBN 189838

Attorneys for Plaintiffs BIG3 BASKETBALL, LLC, O'SHEA JACKSON
AKA ICE CUBE, AND JEFF KWATINETZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG3 BASKETBALL, LLC, a limited liability company; O'SHEA JACKSON a/k/a ICE CUBE, an individual; and JEFF KWATINETZ, an individual;<br><br>            Plaintiff,<br><br>    vs.<br><br>Ahmed Al-Rumaihi, an individual; Ayman Sabi, an individual; DOES 1-100,<br><br>            Defendants. | **CASE NO.: 2:18-cv-03466-DMG-SK**<br><br>Assigned for all purposes to<br>Hon. Dolly M. Gee<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES:**<br><br>1. **DEFAMATION** *Per Quod* **[Civ. Code § 44]**<br>2. **DEFAMATION** *PER SE* **[Civ. Code § 46]**<br>3. **TRADE LIBEL**<br>4. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

*(sidebar, rotated text:)* GERAGOS & GERAGOS, APC  HISTORIC ENGINE CO. NO. 28  644 SOUTH FIGUEROA STREET  LOS ANGELES, CALIFORNIA 90017-3411

I.   **SUMMARY**

1.   Plaintiffs Big3 Basketball LLC ("Big3"), O'Shea Jackson a/k/a Ice Cube, and Jeff Kwatinetz (Big3, Ice Cube, and Mr. Kwatinetz collectively referenced as "Plaintiffs") bring this action against Defendants Ahmed Al-Rumaihi ("Al-Rumaihi"), Ayman Sabi ("Sabi") and DOES 1-100 for Defamation *Per Quod*, Defamation *Per Se*, Trade Libel, and Intentional Interference with Prospective Economic Relations.

2.   Big3 was the brainchild of founders and plaintiffs Ice Cube and Mr. Kwatinetz, who had worked together on the format, rules, and strategy for the league for over a year before ever discussing Big3 with anyone outside of their company.

3.   The league was to take the most popular played sport in the world, 3 on 3 basketball, from the playground to the professional setting of NBA style arenas and broadcast games on international and domestic television in a unique "festival" format. Ice Cube and Mr. Kwatinetz each deployed significant capital and resources, worked tirelessly turning down numerous other lucrative opportunities, and drew on their vast array of relationships and experiences in the live entertainment, legal, television, and other media fields to set up Big3 as a rare opportunity. It would not be an overstatement to say Big3 was the culmination of their total lives' work.

4.   Ice Cube and Mr. Kwatinetz then set up to execute their dream and began to raise additional capital and began staffing the league from Commissioner on down to ball boys. Much to their delight and to the surprise of many in the sports world, the league's initial games in June 2017 were a resounding success. Now that Ice Cube and Mr. Kwatinetz's vision was vindicated, Big3 immediately attracted many new sources of financing to expand on the league.

5.   Touting their love of basketball and familial connections and relationships with the royal Al-Thani Family in the State of Qatar, and thus access to vast resources and capital, Defendants Al-Rumaihi and Sabi were brought to the Big3 as passive investors and introduced by the league's former president and

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    commissioner, himself just hired less than a year before.

2        6.      Counter to expectations regarding these passive investors, to agreements

3    signed and promises made, and certainly an aberration from the decent behavior of

4    Big3's initial investment group, the Al-Thani "Royal" Defendants quickly started to

5    insinuate themselves into the affairs of Big3 despite failing to live up to even their

6    most basic obligation to fully fund their investment.

7        7.      Although constantly boasting of the Al Thani's and their individual

8    "massive wealth and power," Defendants' aberrant behavior continued throughout the

9    10-week season culminating in Al-Rumaihi single-handedly losing $700,000 in cash

10   gambling after the Las Vegas league finals in a mere few hours at casino tables in the

11   presence of Big3 staff, investors and players all the while Defendants still refused to

12   pay the millions of dollars they indisputably owed and admitted to owing Big3.

13       8.      These members and associates of the royal family made excuse after

14   excuse for not paying, all of which is documented in text messages and emails, where

15   the blame for their failure to fund the millions they owed BIG3 ran the gamut from

16   their **"sinuses," "hiking,"** it being a **"long day bro,"** and to bad press regarding Qatar

17   associations with alleged funding of terrorism. Also, like a simple debtor in hiding

18   from a collection agency, these Defendants with their purported links to the Qatar

19   royal family, would go into hiding, refuse to return phone calls and ignore Plaintiffs.

20       9.      Later, Defendants made their true intentions clear when they stated they

21   would only pay what they owed if they were given a substantially larger equity

22   position along with operating entitlements in Big3, instead of the small, passive,

23   minority stake they were required, but failed to fund.

24       10.     Through subsequent investigation, Plaintiffs learned that Defendants

25   were falsely bragging about "operating the league," and how they were friends with

26   Big3 celebrity investors as well as Big3 and NBA basketball stars and legends. Oddly,

27   following the season, Defendants even rented three mansions in the Los Angeles area,

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

in Venice, Malibu and Beverly Hills, so they could be near the Big3 founders and employees to further insinuate themselves into their lives.

11.     To maintain the façade of involvement with the league, and to increase their influence, Defendants targeted certain, now former, Big3 employees with gifts including trips to St. Tropez and Ibiza, parties on Yachts, expensive meals, use of their exotic cars, invitations to parties at their Los Angeles mansions, and investments in personal business projects unrelated to Big3.

12.     As it turns out, Defendants were deeply concerned with the rapidly escalating political pressure and public relations crisis facing their country, including the military blockade against Qatar by its neighbors based on purportedly supporting extremism. There was also more focus on controversy and accusations of bribes surrounding the Qatar 2022 World Cup, the firing of a head of the Qatar owned BeIN Sports, and controversy related to its purchase and operation of French soccer club PSG and the huge payment it made to sign star Neymar. Also, not brought to Plaintiffs attention by former commissioner and president was Defendants' history of scandal surrounding its basketball programs. Defendants believed their relationship with BIG3 and the celebrities, entertainers, and basketball stars associated with the league would improve the public perception of Qatar in the United States as well as its standing in the arena of sports on a global level. Unfortunately for the Al-Thani family and associates, Plaintiffs operated the league for the benefit of its players and fans and to maximize shareholder value, not to do the bidding of the needs solely of Qatar.

13.     Defendants' conduct knew no bounds when it came to their intention to wrest control of the league from its founders, players and all the other well-intentioned investors. First using non-payment to create leverage to shamelessly demand increased ownership as well as the attempted installment of Defendant Sabi as COO of the league despite no experience in sports or entertainment, then employing means of bribery and influence peddling to exert pressure on league leadership.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

14.     However, on or around February 14, 2018, after giving Defendants multiple chances to pay the millions they indisputably owed and admitted to owing, Plaintiffs moved swiftly and decisively and initiated legal action against a corporate shell operated by Defendants and removed Defendants from any connection with the league for their failure to pay. It would later be discovered the additional embarrassment such action taken on that day against the Al-Thani's would create for Defendants.

15.     Finding that their efforts to obtain operating control had failed and the humiliation Defendants felt being notified of their removal from BIG3 amidst their yearly Qatar National Sports Day in which the Al-Thani's display to the world their success and importance in sports, Defendants retaliated with a campaign of disinformation and by making outrageous defamatory statements against all Plaintiffs and interfering with Plaintiffs' existing and prospective contractual relations, to harm the league and attempt to destabilize it for one last desperate shot at control.

16.     The conduct by Defendants is documented in text messages, emails, photographs, letters, declarations, and other evidence which was obtained by Plaintiffs. Further, compromised employees refused to cooperate with an additional independent investigation initiated by Plaintiffs to determine the extent of the Defendants' wrongdoings. Some of that evidence is contained in and attached to this Second Amended Complaint. Additionally, the conduct by Defendants reflects a cautionary tale of doing business with affiliates and proxies sent by the Qatar Investment Authority to do business in the United States.

17.     Ironically, when Ice Cube and Jeff Kwatinetz pursued their lifelong dream of starting a basketball league from the ground up and invested their personal assets and time in doing so, the last thing on their list of plausible concerns and impediments would be the malicious and reckless conduct of foreign actors and compromised agents and actors working on their behalf. Nonetheless, Plaintiffs and

- 5 -
**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

the players of the Big3 who are heavily invested in the success of the league, have united to confront this challenge and protect their American dream.

18.    Plaintiffs, and all players in the Big3 league have been severely damaged by the conduct of Defendants. Plaintiffs collectively seek $1.2 billion in consequential damages, or approximately $20 million per player in the Big3.

## II.    INTRODUCTION

19.    This action is brought by Plaintiff BIG3, a three-on-three professional basketball league, on its behalf as a limited liability company.

20.    This action is also brought by Plaintiff O'Shea Jackson, a/k/a Ice Cube and Jeff Kwatinetz, each who suffered significant damages and reputational harm based on the wanton, willful, and malicious defamatory statements made by and/or aided and abetted by Defendants, and each of them.

21.    Defendants are individuals who reside in and/or maintain substantial contacts with the United States and who used their purported relationship with the royal family in Qatar and their control and/or influence over the Qatari Sovereign Fund to conduct business in the United States, and to engage in the tortious conduct as set forth below.

22.    As alleged below, and in the exhibits accompanying the first amended complaint, Defendants individually, and/or collectively, engaged in malicious, tortious, and/or reckless conduct causing substantial damage to all Plaintiffs.

23.    Defendants, in their individual and personal capacity, and using corporate shells including Sport Trinity LLC (currently a Respondent in a pending JAMS arbitration, *Big3LLC v. Sport Trinity, LLC)* attempted to seize operational control over Big3 LLC by, among other conduct, (1) fraudulently inducing Big3 to enter into a Unit Purchase Agreement whereby Defendants never intended to pay the millions they owed to extract more equity, (2) bribing and/or attempting to bribe former employees of the Big3 with money, gifts, and vacations to gain more influence in the league, (3)

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

1   investing and/or promising to invest in business ventures of now former employees in

2   the Big3 as a means of improper influence and control, (4) maliciously and wantonly

3   defaming Big3, Ice Cube, and Jeff Kwatinetz to players and making false

4   representations about the league and its operations to foment discord and disunity

5   against the Big3 and its founders, and (5) defaming Plaintiffs, and aiding and abetting

6   and causing others to make defamatory and malicious statements about and against

7   Plaintiffs, as retaliation for Big3 filing a lawsuit against Defendants for failing to pay

8   the money they owed.

9          24.    Plaintiffs stand united against Defendants. Plaintiffs have been severely

10   damaged and suffered reputational harm and other consequential damages from

11   Defendants' conduct, in an amount no less than $1.2 billion, accounting for

12   approximately $20 million in damages per player, in addition to other damages.

13   **III.    THE PARTIES**

14          25.    Plaintiff Big3 is a Delaware Limited Liability Company with its principal

15   place of business in Los Angeles, California. Big3 recently completed its second

16   season which started June 2018.

17          26.    Plaintiff O'Shea Jackson, aka Ice Cube, is an individual residing in Los

18   Angeles, California.

19          27.    Plaintiff Jeff Kwatinetz is an individual residing in Los Angeles,

20   California.

21          28.    Defendant Ahmed Al-Rumaihi is a citizen of Qatar, who was domiciled

22   in Los Angeles, California at the time this action was initiated. Plaintiffs are informed

23   and believe that Al-Rumaihi is currently residing in Qatar. By removing this action to

24   this Court Al-Rumaihi has acknowledged and asserted this Court's jurisdiction.

25          29.    Defendant Ayman Sabi, born in Tripoli, Libya, is a citizen of the United

26   States, resides in Miami, Florida. By removing this action to this Court Sabi has

27   acknowledged and asserted this Court's jurisdiction.

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

30.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these Defendants by such fictitious names. Defendants DOES 1 through 100 are responsible in some manner for the activities alleged herein and each was acting as an agent for the others. Plaintiffs will amend this second amended complaint to add the true names of DOES 1 through 100 once they are ascertained.

IV.     **JURISDICTION AND VENUE**

31.     The acts that caused Plaintiffs damages as alleged herein primarily occurred in the County of Los Angeles within this judicial district.

32.     Plaintiffs originally filed their complaint in this matter in the Los Angeles Superior Court, assigned as case number BC700897. Defendants removed the case to this Court on or about April 25, 2018, invoking this Court's diversity jurisdiction under 28 U.S.C. Section 1332(a).

V.     **FACTS**

A.     **Qatar Investment Authority**

33.     The State of Qatar is located on a small peninsula bordering Saudi Arabia and is backed by the world's third-largest natural gas reserves. The country has the highest per capita income in the world. Qatar is a monarchy ruled by the Al-Thani royal family. The current Emir is Sheikh Tamim bin Hamad Al Thani.

34.     The Emir's relative is Defendant Sheikh Abdullah bin Mohammed bin Sau Al Thani, who heads the Qatari sovereign fund known as the Qatar Investment Authority.

35.     Qatar has recently been placed under a military blockade from its Middle East neighbors including Egypt, Bahrain, the United Arab Emirates and Saudi Arabia because of concerns regarding financial support for terrorism, a view that Qatar disputes.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

36.     Recently, the Al-Thani Royal Family, through the Qatar Investment Authority, announced plans to invest hundreds of billions of dollars overseas, with a strong emphasis on United States investments, through an entity called "Qatar Investments." It appears to be an aim of the Al-Thani Royals to sway public opinion of U.S. citizens towards Qatar through employing this investment strategy.

37.     Defendant Al-Rumaihi, himself a member of the Qatar royal family, holds himself out as one of the heads of Qatar Investments. Defendant Al-Rumaihi is the same former diplomat who is responsible for an aborted attempt, resulting in litigation, surrounding the purchase of a $100 million townhouse at 19 E. 64th Street, New York City—in what would have been the most expensive townhouse purchase in the history of New York City at the time. Six months after agreeing to buy the property, and the day before the closing of the transaction, Qatar backed out of the deal.



*Al-Rumaihi (right) with his spurned broker, March 2014, NYC*

38.     Upon recent investigation, it has been uncovered that in the lawsuit filed against the Consulate of the State of Qatar in connection with this failed $100 million real estate transaction, *1964 Realty LLC v. Consulate of the State of Qatar (1:14-cv-06429-ER, SDNY)*, Defendant Qatar tried getting out of the deal by arguing that

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

Defendant Al-Rumaihi misrepresented his credentials and did not have authority to enter into the deal on behalf of Qatar. From the Court's Order to Deny Qatar's Motion to Dismiss:



39.     Recently, Al-Rumaihi's Wikipedia page reflects frequent edits removing negative history about this and other transactions. Under a cloud of this and other allegations, Al-Rumaihi was recalled back to Doha, Qatar. But he would soon resurface.

40.     Qatar Investments claims it is capable of deploying $35-100 billion overseas in investments. However, its interactions with the Big3, which appears to be an exemplar of how it conducts business overseas, is a cautionary tale for others looking to do business with Qatar. Specifically, the Defendants did not fund their obligations to the Big3 to the sum of a mere five million dollars, delaying payments to extract control of the league. When those efforts failed, they attempted other improper and coercive means of influence peddling to achieve their goals. When that failed, and Defendants conduct was exposed, Defendants sought to defame the Big3 leadership with ludicrous charges in order to destabilize the league so that their proxies could be installed instead.

41.     Whether by design or otherwise, the Defendants' constant excuses for not paying—literally blaming their **"sinuses," "going on hikes,"** or that it had been a

**SECOND AMENDED COMPLAINT**

**"long day bro,"** in text messages—reflects an amateurish, undignified approach to business which is hard to believe is countenanced by a royal family such as the Al-Thani's. While Al-Rumaihi flaunted his resources losing over $700,000 in a few hours of gambling after the BIG3 championship in Las Vegas last August, he somehow was still unable to muster up the $5 million that at that time was already two months overdue to BIG3.

42.    At a time when Defendants boast of hosting the 2022 World Cup, their tortious and reckless conduct directed at the Big3 and the basketballs stars and legends affiliated with the league, is potentially an ominous foreshadowing of what is to come.

**B.    Ayman Sabi**

43.    Defendant Ayman Sabi is not a relative of the Qatari royal family, although he made claims to be a board member of the Qatar Investment Authority. He also bragged of being a board member of an Abu Dhabi government fund, a claim he even acknowledged as putting him in a "strange" position since that would make him an advisor and agent to two countries on opposing sides of the blockade. BIG3 former President and Commissioner, supported these claims as did Al-Rumaihi. Defendant Sabi indeed had at least a previously established business relationship with Al-Rumaihi and Al-Hamadi; two months after they were assigned to Vice Chairman and Chairman positions respectively in March 2017 of two Qatari food companies registered in Australia, they made Sabi a director.

44.    To the surprise of BIG3 executives who understood Sabi to be a Qatari national as told to them by the former BIG3 Commissioner and President, by Al-Rumaihi, and by Sabi himself, Defendant Ayman Sabi is an *American citizen* who lives in Miami. In fact, although born in Tripoli, Libya in 1963, Defendant Sabi migrated to the United States and has been a resident here since at least the early 1980's. He studied at North Carolina State University and in 1989 founded a company "Sabi International Developments Inc" in Raleigh, North Carolina which he then

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1   merged with "Medvast Inc" in 1993 and interestingly based its headquarters in

2   Cyprus.

3       45.    Mr. Sabi later became the chief executive of a barbeque restaurant chain

4   known as "Roadhouse Grill," which was the subject of a federal securities class action

5   and was forced into involuntary bankruptcy in 2002.




16      46.    Mr. Sabi claims to be connected with the rich and powerful

17  internationally, but it appears his most substantial connection was his fortuitous

18  encounter, following the bankruptcy of Roadhouse Grill, with Defendant Al-Rumaihi.

19  Although the circumstances of how Defendants met are unclear, Mr. Sabi had a

20  fellowship with Shlomy Alexander also from Miami. More interestingly, Shlomy is

21  the father of Oren and Tal Alexander, the same brokers who "sold" the $100m

22  townhouse to Defendant Al-Rumaihi in 2014.

23      47.    In another unexplained stroke of "luck," Defendant Sabi connected with

24  Big3's former President and Commissioner who would vouch for him and bring him

25  and his partners to the league as accomplished businessmen with international

26  connections, stating that their involvement with the league would be critical for the

27  Big3's expansion.

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

48.     His partners included the aforementioned Defendants Al-Rumaihi and Al-Hamadi, and they stated they also spoke for Sheikh Al Thani, half-brother of the Emir of Qatar himself, who would be able to provide capital and connections to greatly expand the Big3. While the league had just debuted successfully to an unexpectedly large audience of over 15,000 at New York's Barclay's Center and experienced more than three times the expected ratings on Fox Sports, the Qatari group made large promises including the ability to move quickly. What the former Commissioner and Mr. Sabi failed to disclose is that Mr. Sabi was in a secret, romantic relationship with the former Commissioner's sister.

49.     The former disgraced Commissioner emailed other Big3 executives following their successful debut: **"Ayman [Sabi] and his partner are seriously interested in taking the remaining equity available for BIG3. They add an incredible amount of value and would be strategic in the growth internationally."** Shortly thereafter, the Commissioner and President demanded (and received) a substantial "finder's fee" from Defendants for introducing these individuals to the league.

50.     And while Defendant Sabi boasted of his vast connections and promised he would deliver international sponsors and develop international media relationships for Big3 with a focus on the Middle East and China, he failed to deliver on any of his claims. In fact, Defendant Sabi was not even permitted to revisit China recently based on "issues" with his Visa. It has also been uncovered that despite holding himself as an agent of Qatar, Defendant Sabi is not registered under the Foreign Agents Registration Act (FARA).

51.     Instead of delivering value to the Big3, it is now clear that the Qatari group was unitarily focused on procuring influence in the United States for the Al-Thani regime through controlling a league made up of NBA stars and legends such as

**SECOND AMENDED COMPLAINT**

1    Clyde Drexler, Chauncey Billups, Corey Maggette, Jermaine O'Neal, and Dr. J among

2    many others affiliated with the Big3.

3          **C.     Sport Trinity**

4          52.    Defendant Sabi introduced his partners to the Big3, including Defendant

5    Al-Rumaihi and Al-Hamadi. Defendant Sabi explained that Defendant Al-Rumaihi,

6    Al-Hamadi, and their benefactors Sheikh Mohammed bin Sau Al Thani were members

7    of the Qatar royal family and ran Qatar Investments.

8          53.    Defendant Sabi explained that he also represented Qatar and was an

9    agent on their behalf, and that his partners were in direct discussions with Akbar Al

10   Baker and, members of the royal family, the Qatar Investment Authority, and the Emir

11   himself about their potential investment in the Big3. Defendant Sabi stated that he and

12   his partners loved basketball, especially the Emir. Defendant Sabi stated that he and

13   his partners wanted to invest in a successful sports league in its infancy, and to assist

14   with the international growth of the league.

15         54.    In truth, it turned out that Defendants involvement with the Big3 was

16   more about perceived influence in America and Defendants seeking to get positive

17   public relations for Qatar.

18         55.    During the Big3 summer season and then beyond, it became apparent that

19   Defendants were focused on improving the image of Qatar in light of the blockade and

20   the now desperate need to improve rapidly deteriorating international relations

21   beginning to create an existential threat to the small Gulf nation. They also believed

22   BIG3 could distract from Qatar's controversies surrounding it's 2022 World Cup.

23   Qatar has also experienced controversies surrounding its own basketball programs. In

24   2011 amidst charges it "imported" players resulting in FIBA Asia suspending five of

25   its players, Sheikh Saud bin Ali Al Thani was forced to resign from his post as Qatar

26   Basketball Federation (QBF) President. Defendants saw involvement in BIG3 as an

27

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

opportunity to be heroes to the Emir for restoring prestige to Qatar and the Al Thani family in the sport of basketball.

56.     Going back to on or around July 7, 2017, Defendant Sabi sent the Big3 a term sheet for the purchase of equity in the company and requested a 30 percent stake in the Big3. The Big3 rejected, out of hand, the request for 30 percent of the company, but ultimately agreed to a much smaller, passive, minority stake in the company. Thereafter, Defendants formed Sport Trinity LLC in Delaware, and entered into a Unit Purchase Agreement on or around July 14, 2017. The terms of the Unit Purchase Agreement were simple. Sport Trinity was to pay Big3 $11.5 million upon the signing of the Agreement. Separately, Sport Trinity was to pay the Big3 an additional $9 million in sponsorship money over three years which Sport Trinity claimed it could easily obtain from sources such as airlines and media owned and controlled by the Al-Thani family. Specifically, Defendant Sabi and Al-Rumaihi stated that Akbar Al Baker, as CEO of Qatar Airways, and in his personal capacity, was a source of funding for Sport Trinity and was involved in its decisions. Further, Defendant Sabi and Al-Rumaihi had the Big3 prepare investment material, including an "investor deck" which Defendants stated was needed to lock in the Qatar Airways sponsorship they promised. Defendants stated that Mr. Al Baker had personally requested the investment material. Here is the front page of the deck that Mr. Al Baker requested:



**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

57.    Instead of paying the full $11.5 million, Sport Trinity only paid $6.5 million and an additional $1 million in December 2017 and claimed that the rest of the money was "on its way" but was delayed due to certain transfer restrictions on Qatar.

58.    Big3 has since learned that Defendants intentionally failed to fully fund the Big3 as a part of a business strategy it deploys wherein it partially funds a company, withholds the remaining funds to deprive the company of critical operational support, and demands larger equity stakes and operational control in exchange for money it already owes—all the while seeking influence within the company by attempting to lavish others with gifts and bribes. Alternatively, it is quite possible the wealth Defendants boast of is a mere facade.

**D.    The Big3 Season**

59.    The inaugural BIG3 season took place June 2017 through August 2017. Games were held across the United States. Upon entering into the Unit Purchase Agreement, Defendants began attending games and demanded courtside seats for themselves, relatives, and friends. As seen below, Defendants Al-Rumaihi and Defendant Sabi were frequently photographed courtside and invited the Big3 staff and players to party with them after games.



1   60.    Over time, the BIG3 investors and founders became uncomfortable with

2   the assertive and in-your-face presence of these small minority stakeholders at games

3   and at the hotels where players and staff stayed. Yet, efforts were made by Plaintiffs

4   to do their best, at first, to be accommodating and cordial in the interest of maintaining

5   a positive relationship with individuals originally perceived as legitimate investors.

6   61.    Following the season, in another bizarre turn of events, Defendant Al-

7   Rumaihi moved his residence to Los Angeles, California and rented two mansions—

8   one in Venice that was peculiarly close (just blocks away) from where the founders of

9   BIG3 lived—and one in Beverly Hills where Al-Rumaihi would host parties for

10  employees of BIG3 along with imploring the founders to attend "out of respect." (The

11  founders rejected invitations to Defendant Al-Rumaihi's Beverly Hills mansion,

12  although other employees including the former Commissioner frequently attended).

13  Defendant Sabi also rented a Malibu residence where he and his girlfriend, Adrienne

14  Mason (sibling and affiliate of former BIG3 commissioner) also took up residence.

15  **E.   Collection Efforts and Failure to Pay**

16  62.    During the season, and immediately thereafter, consistent and persistent

17  efforts were made by Big3 founder and Plaintiff Jeff Kwatinetz to collect on the

18  remaining millions of dollars owed. Mr. Kwatinetz attempted to balance being polite

19  to Defendants and to avoid the implication that the royal family could not afford to

20  pay, with the need to protect Big3 and its investors who all fully funded their

21  obligations.

22  63.    By way of just one, of many, examples of emails sent by Plaintiff

23  Kwatinetz, on or around August 30, 2017, Plaintiff Kwatinetz emailed Defendant Al-

24  Rumaihi that he was **"getting a little nervous"** that Defendants had not fully funded

25  their contractual commitment.

26

27

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

64.     Throughout the Fall 2017, Defendant Al-Rumaihi and Defendant Sabi continued to make excuses why they couldn't pay. Defendant Al-Rumaihi repeatedly blamed Defendant Sabi for the failure to pay; Defendant Sabi repeatedly blamed political issues affecting the Qatar Investment Authority for not being able to get access to the money.

65.     At all times, Defendants continued their flattery, congratulating the Big3 founders in emails and text messages about the remarkable success of the league. Defendants sent nothing but positive emails and messages about the leadership of the league.

66.     On or around November 2017, Defendant Al-Rumaihi made a final personal appeal to Plaintiff Kwatinetz to pay if Defendant Sabi couldn't: **"Look me in the eyes. I swear on my children's lives I will pay you personally by mid to end of January if Ayman [Sabi] doesn't pay."**

67.     In fact, Defendant Al-Rumaihi claimed that he would get the money directly from the Qatar royal family and Qatar Investments if Defendant Sabi and

Sport Trinity were unable to pay. However, Defendant Sabi did not pay and Defendant Al-Rumaihi did not keep his word, despite his bizarre and gratuitous appeal on the lives of his children.

68.     Instead, Plaintiff Kwatinetz had to continue chasing down Defendants for payment until Plaintiffs simply had enough and refused to be victims of what was clearly a premeditated scam, or frankly, an inability of the Defendants to afford the share purchases or to make good on the $9 million in sponsorship money.

69.     Defendant Al-Rumaihi also began to demand that, despite the short window for planning such a major event, that BIG3 arrange for the 12-15 best BIG3 players to play exhibition games in Doha, Qatar specifically in mid-February. Plaintiffs explained that players would not all be available and ready in training and to play but he would attempt to make it happen if a written offer was made, but also explained holding a one-off event would be a huge financial risk and that with more time several other locations could be secured making it financially worthwhile and logistically viable for the player and coaches. It was painfully clear that Defendants had no understanding of the logistics such an event would require. To no surprise given that Defendants still owed millions to BIG3 and had exhibited a clear pattern of lies to get what they wanted, no such written offer ever came.

70.     Plaintiff Kwatinetz and Defendant Al-Rumaihi continued exchanging a series of text messages which show the varying, and at times peculiar and embarrassing, excuses made by Defendant Rumaihi (a purported member of the Qatar royal family) to avoid paying the BIG3. Notably, in the text messages, Defendant Al-Rumaihi concedes that he owed the BIG3 money since July 2017, that he clearly remembers his discussions promising to pay, but instead makes excuse after excuse.

71.     Specifically, on or around December 10 and 11, 2017, Mr. Kwatinetz attempted to set up a meeting with Defendant Al-Rumaihi who instead of

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

substantively responding sent a picture of his teeth being worked on, apparently to
conjure sympathy.




72. Further, instead of paying what he owed, Defendant Al-Rumaihi would
send Mr. Kwatinetz news articles regarding political issues facing Qatar and would
respond to important meeting requests by saying, "**long day bro. . .**"




GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

73.     In addition to these excuses, Defendant Al-Rumaihi also frequently boasted of his friendship to Senator John McCain and throughout these months blamed not being able to have time to get the funds because he was purportedly busy visiting Senator McCain in the hospital.

74.     Further, on or around February 2, 2018, when Plaintiff Kwatinetz confronted Defendant Al-Rumaihi about how "disappointed" he was over Defendants failure to pay and how Plaintiff Kwatinetz **"was made to look really stupid with all the others as I gave my word to everyone [because] you gave me your word . . . and you and Ayman just disappeared,"** Defendant Al-Rumaihi responded *at 2:36 PM in the afternoon*, **"Literally just woke up. My sinuses are so bad. . ."**



75.     Again, on or around February 3, 2018, when Mr. Kwatinetz explained, **"I need to hear from you immediately or I am assuming that we are not resolving this. . ."** Defendant Al-Rumaihi emphasized that he was **"hiking,"** and that he was

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    going to get ready for the memorial for the death of BIG3 player Rasual Butler he

2    knew Mr. Kwatinetz was attending so they could speak there. Defendant Al-Rumaihi

3    responded, "**When we last spoke I told you we were resolving this.**"



GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

20        76.    Mr. Al-Rumaihi did not enter the memorial but instead waited in his

21   Bentley until it was over and Mr. Kwatinetz and the other grieving attendees began to

22   exit. Mr. Al-Rumaihi exited the car and approached Mr. Kwatinetz on the sidewalk in

23   view of grieving friends and relatives to inform him all "would be worked out."

24   When Mr. Kwatinetz asked if the remaining millions would be wired in to the BIG3

25   account by the following Monday as outlined in the legal correspondence, Mr. Al-

26   Rumaihi said no and that he needed 25% of the league and Ayman to be COO and that

27   Mr. Kwatinetz should show him "respect as a royal family member."  Mr. Kwatinetz

28

informed him that respect came with paying monies owed now over six months and refraining from constant lies. Al-Rumaihi became incensed and loudly screamed at Mr. Kwatinetz and threatened his life and his family noting "You don't know who I know in LA and what they're capable of. You should think of your safety and the safety of you and your family." Kai Henry intervened as many mourners started glaring at Mr. Al-Rumaihi, although Kai claimed to others not to have heard the content of the threats. Mr. Kwatinetz immediately left and drove home employee Angelica Cobb who he immediately told of the threats. Mr. Kwatinetz then called his wife as well as Ice Cube to inform them of the threats on his and his families lives. His wife was especially nervous at home with a newborn as Mr. Al-Rumaihi had maintained a residence a mere two blocks away from them. Mr. Kwatinetz hired security to protect himself, his family and his employees. He later learned that Mr. Rumaihi started to employ the services of numerous armed "security" who were seen on the premises of his Beverly Hills estate.

77.     In short, Defendant Al-Rumaihi never fulfilled his promise and contractual obligations. Defendant Sabi's communications with Plaintiff Kwatinetz are similar.

78.     Up until the BIG3 filed Arbitration and initiated its independent corruption investigation into the conduct by Defendants, Defendant Sabi's emails and text messages all included over-the-top, indulgent, praise about much he "loved" and "admired" Plaintiff Kwatinetz and Ice Cube.

79.     Defendant Sabi would frequently ask Plaintiff Kwatinetz how "daddyhood" was going as Plaintiff Kwatinetz's wife recently had a baby.

80.     Defendant Sabi would also tell Plaintiff Kwatinetz that he was going to Qatar, or as he called it "Q," to meet with his "best friends" from the royal family where he would get the money they owed the BIG3 and where and when he would also get sponsors for the BIG3—neither of which actually ever took place.

**SECOND AMENDED COMPLAINT**

81.     For example, in text messages from November 1, 2017, Mr. Sabi stated in reference to his trip to Qatar: **"I'm heading to Q to wrap all shit up. From all indications that should be done with all this coming week."**



82.     After exchanging pleasantries during Christmas 2017, Defendant Sabi then took the approach of ignoring phone calls and avoiding meetings and encounters with Plaintiff Kwatinetz.

83.     Between January 17, 2018, and February 1, 2018, Defendant Sabi ignored repeated phone calls from Plaintiff Kwatinetz to avoid paying what he owed the Big3.

84.     On or around February 1, 2018, when Plaintiff Kwatinetz expressed his frustration for being childishly ignored, Defendant Sabi responded with **"Hola Bro . . . Sorry for the delay, I have had overseas guests and family all this week. I will call you soon."**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

85.     After Plaintiff Kwatinetz stated that this was **"starting to get to a bad place,"** Defendant Sabi did not respond further. The following exchange took place:



**F.     Big3 Initiates Legal Action Against Sport Trinity**

86.     To protect their legal rights under the Unit Purchase Agreement, and to protect the rights of Big3's other investors who fully funded and conducted themselves professionally and with dignity, Plaintiffs retained the services of a law firm which sent a demand letter to Defendants on February 2, 2018.

87.     Despite being repeatedly lied to, Plaintiffs in their February 2, 2018 letter still gave Defendants the opportunity to cure their breach and make the payment they owed since July 2017. Plaintiffs provided wiring instructions to Defendants. A true and correct copy of the letter was filed as Exhibit "A" to the first amended complaint in this matter.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

88.     Defendants, through their attorneys responded by letter on February 5, 2018, and brazenly requested a further extension of time, claiming that Defendants were in discussions with individuals at Big3. A true and correct copy of the letter was filed as Exhibit "B" to the first amended complaint in this matter.

89.     On February 11, 2018, Plaintiff responded through counsel, providing the history of nonpayment by Defendants, stating that the BIG3 was not in fact in communication with Defendants, and that Plaintiffs were now compelled to file legal action against Defendants. A true and correct copy of the letter was filed as Exhibit "C" to the first amended complaint in this matter.

90.     On or around February 14, 2018, Big3 commenced an Arbitration in JAMS against Sport Trinity LLC, *In the Matter of Big3 LLC v. Sport Trinity LLC*, JAMS Case No. 1100089671.

### G.     Investigation of Defendants

91.     After commencing Arbitration, the founders of BIG3 reached out to its then commissioner to inform him about the Arbitration and the indisputable evidence supporting it. The since fired Commissioner stated he was "friends" with Defendant Sabi and Defendant Al-Rumaihi and thus "did not want to get in the middle of it."

92.     This statement by an employee getting the highest salary in the league plus stock was unsettling and raised significant alarm at the league offices, as the commissioner and highest paid employee of the BIG3 should not have had a conflicted allegiance when Defendants were refusing to pay and attempting to shakedown the league which, among other things, paid the commissioner's salary.

93.     Worse yet, with knowledge that BIG3 was in Arbitration against Defendants, the since fired Commissioner took to Instagram in February and March 2018 to post images of himself with Defendants at the Beverly Hills Mansion they recently rented and to post selfies at the mansion, with hashtags such as **"More life less stress," "#family,"** and **"#makingmoneymoves"**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

94.     Here are just some of the photos posted on Instagram:



95.     As a result of the Arbitration filed by the BIG3 against Sport Trinity, the photographs posted on social media after the Arbitration, and the statements made by the BIG3's former commissioner, the BIG3 initiated an independent investigation.

96.     The purpose of the independent investigation was so that the BIG3 could gather facts and provide staff and employees a fair process to explain and discuss their conduct and relationship with Defendants and the State of Qatar.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

97.    On or around February 22, 2018, the investigator sent the following letter to various executives and employees, including former Commissioner:



M A C I A S
C O U N S E L
I N C.

MC

February 22, 2018

**VIA ELECTRONIC MAIL**
masonjr8@gmail.com

Mr. Roger Mason
166 Alpine Drive
Closter, New Jersey, 07624

Re:    Independent Investigation

Dear Mr. Mason:

    Macias Counsel, Inc. has been recently retained by Big3 LLC (the "Company") to conduct an independent investigation into potential conflicts of interest by and between certain employees and affiliates of the Company and certain outside entities and individuals with interests adverse to the Company. Based on your relationship with the Company, it is your obligation to provide complete and expeditious cooperation as we conduct our investigation. We will be conducting interviews in the next two weeks in Los Angeles, California. Please provide me with preferred dates and times so that we may schedule an interview with you. The interviews will be recorded by audio and/or by a certified stenographer. We estimate that the interview will take no more than five (5) hours to conclude.

    We additionally request that you preserve all email communication, text message communication, social media communication, and any other form of communication by and between yourself and the following: (1)Sport Trinity LLC, (2) Qatar Investment Authority,(3) Ahmed Al-Rumaihi, (4) Ayman Sabi, (5) Faisal Al Hamadi, (6) Ali Al-Thawadi, (7) Khalifa Al-Jaidah, and (8) Adrienne Mason. I look forward to meeting with you soon.

Very truly yours,

**MACIAS COUNSEL INC.**

Sean E. Macias, Esq.

302 West Colorado Blvd., Pasadena, California 91105
Voice (626) 844-7707  Fax (626) 844-7717
www.maciascounsel.com

98.    Although certain individuals declined interviews including Roger Mason and Kai Henry, it  was later learned that Defendants sought improper influence in the league by (1) investing and attempted to invest in personal projects of now former employees, (2) sought to bribe former employees, (3) providing former employees with gifts including trips to St. Tropez and Ibiza, (4) providing the use of their $800,000 Bentley, (5) and using their Beverly Hill mansions for lavish parties.

**H.     Defamation and Trade Libel Against Big3 and Its Founders**

99.     Following Big3's filing of the Arbitration and initiating an independent investigation, Defendants were removed from all rights and privileges in the league. Regardless, Defendants continued to communicate with the now former employees, and sought to use these individuals (wittingly or unwittingly) to undermine the existing leadership in the league.

100.    Through its own investigation, BIG3 obtained email records reflecting efforts to undermine the league. During the week the independent investigator was intending on conducting interviews, it was learned that the former Commissioner took a trip to China for business that was not related to BIG3. He did not inform any of the executives at BIG3, some of who had spoken to him while he was in China, of his whereabouts. While in China, he was in close communication with Defendant Sabi.

101.    BIG3 also came to learn that a player in the league named Jerome Williams was also in China. At that time, Jerome Williams was an informal leader among BIG3 players and communicated on behalf of the interests of players to management. Unlike the former Commissioner, Mr. Williams had no formal management role with the BIG3. Mr. Williams considered himself to be a good friend of the Commissioner at that time.

102.    On around March 7, 2018, while in China, the former Commissioner set up a phone call between Jerome Williams and Defendant Sabi.

103.    On the call, Defendant Sabi falsely claimed (1) he and his partners were the lead investors in Big3, (2) he and his partners had already paid $21.5 million to the Big3, (3) he and his partners wanted to give millions of dollars more to BIG3 and to charities affiliated with players, but that BIG3 and Jeff Kwatinetz and Ice Cube were preventing this from happening, (4) they had offered BIG3 $1.5 in additional funds for free to help promote the league during the All-Star weekend, and (5) he and his partners were now forced to sue Big3 which could destroy the league. Defendant Sabi

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    did not disclose that he and his partners actually owed BIG3 millions of dollars and

2    that, in fact, BIG3 had already filed an Arbitration based on the nonpayment against

3    Defendant Sabi and his partners.

4        104.    In addition, Defendant Sabi (and, upon information and belief, with the

5    support of his co-conspirator Defendants) having found himself with no influence in

6    the league other than his connection to former Commissioner and other employees

7    who were given gifts, sought to retaliate against BIG3.

8        105.    Specifically, Defendant Sabi aided and abetted in the former

9    Commissioner making the false allegation that Plaintiff Kwatinetz referred to African

10   American players in the league *according to a former employee* as "Rich Nigg*s."

11   Defendant Sabi and former Commissioner recognized that such a statement was

12   clearly false and defamatory, and thus they claimed that although *they never heard*

13   *such a statement*, a "former employee" did.

14       106.    The former employee they credited with hearing this was Kai Henry, who

15   was plied with gifts and vacations by Defendants, rode around in Defendant's

16   Bentley, and was a frequent visitor to Defendants Beverly Hills mansion. Further,

17   after being terminated, former Commissioner and President repeated the allegation in

18   a widely distributed press release where he claimed a "former employee" heard the

19   statement.

20       107.    After his call with Defendant Sabi, Jerome Williams was instructed by

21   former Commissioner that they needed to call Chauncey Billups, a very influential

22   retired NBA player who plays in the BIG3.

23       108.    Like Mr. Williams, Mr. Billups had an important informal role in

24   communicating concerns between players and management in the BIG3. The purpose

25   of this call was to communicate to Mr. Billups the false and defamatory information

26   that Defendant Sabi had just told Jerome Williams, with the intent by Defendant Sabi

27   to remove Plaintiff Kwatinetz and Ice Cube from their leadership roles.

28

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

109.   Because Mr. Billups was busy, he requested that Jerome Williams send him an email of what Defendant Sabi had stated. Former Commissioner asked that he be blind-copied on the email to confirm what was stated was true, which he subsequently confirmed (falsely) to Jerome Williams after the email was sent.

110.   Plaintiffs obtained a copy of the email during their investigation. Plaintiffs also obtained a declaration from Jerome Williams stating why he wrote that email and what former Commissioner and Mr. Sabi told him. A true and correct copy of the declaration of Jerome Williams, confirming the defamatory statement made to him by Defendants was filed as Exhibit "D" to the first amended complaint in this matter.

111.   Previously filed as Exhibit "E" to the first amended complaint in this matter is a second declaration from Jerome Williams, wherein Mr. Williams—a friend of former Commissioner—confirms that he told him in China that **Kai Henry** was the "former employee" who heard Plaintiff Kwatinetz call the BIG3 players "Rich Nigg*s."

112.   Plaintiff Kwatinetz never had and never would make such a statement; he is married to a woman who is half black, and he has devoted his life to civil rights and equal rights for all. Further, Mr. Kwatinetz has been a manager and trusted advisor to Ice Cube for decades who would not tolerate any form of intolerance. Indeed, Defendant Sabi intended for the false allegations to do maximum damage and create a leadership vacuum in the league.

113.   However, in addition to the sheer absurdity of the allegations to everyone in the league and everyone who knows Plaintiff Kwatinetz, apparently Defendants and the former commisioner were not aware that Kai Henry denied he heard Mr. Kwatinetz make this statement.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

114.   In fact, in text messages obtained between Kai Henry and Ice Cube, Kai Henry states, **"I never said that!!!"** Here is the text message exchange between Ice Cube and Mr. Henry:



115.   Kai Henry did indeed have a conversation with Mr. Kwatinetz defending Mr. Al-Rumaihi and saying he was a "good guy" and that he was simply being lied to repeatedly by his partner Defendant Sabi so it wasn't Defendant Al-Rumaihi's fault. At this time, not knowing Mr. Henry had been compromised by Defendants, Mr. Kwatinetz couldn't understand why a marketing employee not involved in BIG3 investor dealings would be inserting himself in to the conflict and asked him why Mr. Henry was doing so.

116.   Mr. Henry replied that Al-Rumaihi thought he had been pushed out because he was an Arab. Mr. Kwatinetz explained that was absurd, that he had nothing against people of Arabic background (or any for that matter) and that in fact other investors in the BIG3 were of Arabic heritage and that Mr. Kwatinetz constantly defended one of his well-known friends, Roger Waters, for his pro-Arabic views and

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

negative ones regarding Israel because he supported people's rights to have diverse views of all kinds.

117.    Mr. Kwatinetz did say to Mr. Henry that Defendants were "bad people" but only because they failed to pay the millions they owed Big3, harmed players and the league, and then lied about paying on the lives of their children.

118.    Mr. Henry blamed the non-payment on lies perpetuated by Mr. Sabi, but Mr. Kwatinetz then ended the conversation letting Mr. Henry know they expected to find out the truth as an independent investigation had just been opened and everyone would be questioned on their relationships with the Defendants.

119.    The very next day, Mr. Henry suddenly and suspiciously quit, blaming anti-Arab sentiments (falsely) of Mr. Kwatinetz. Mr. Henry informed the independent investigator he would not be answering any questions.

120.    Mr. Henry was not only a 12-year friend, but had worked with, and around, Mr. Kwatinetz during that time. Mr. Henry had always been complimentary and positive about Mr. Kwatinetz and attended Mr. Kwatinetz's wedding where Mr. Henry witnessed Mr. Kwatinetz's wife being walked down the aisle by her black father, and Mr. Henry had witnessed Mr. Kwatinetz fight on behalf of minorities for over a decade.

121.    In any event, Mr. Henry and Mr. Mason were so compromised, they could not even get their story straight about which absurd and defamatory remark to make, without realizing the paper trail undermining the defamatory claims that was created.

122.    The defamatory statements not only damaged Plaintiff Kwatinetz, but were intended to and did in fact, cause severe and substantial damages to Ice Cube and all players of the league who were also referred to as being racist and hostile, which was sadly repeated in the media. Thus, each Plaintiff maintains claims against all Defendants for defamation.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

123.   In connection with the commercial activities described herein, and in furtherance of Defendants' conspiracy to disrupt Big3's operations and destabilize Big3's leadership, Defendants Al-Rumaihi and Sabi made defamatory statements about Plaintiffs Ice Cube and Kwatinetz to numerous people including Mohammed Al-Rafi, an influential international businessman and Big3 investor. More specifically, in or about the fall of 2017, Defendant Sabi, acting on behalf of all Defendants, traveled to Dubai and undertook to interfere with the relationships between Plaintiffs and their investors and potential investors in the Middle East. Plaintiffs had an ongoing relationship with Mr. Al-Rafi. Plaintiffs' relationship with Mr. Al-Rafi was valuable as both an investor in Big3, and as someone who could help the league in the future with further individual investment and by introducing the league and its co-founders to other potential investors, sponsors, and partners.

124.   Defendant Sabi was aware of the relationship between Plaintiffs and Mr. Al-Rafi. Acting in furtherance of the conspiracy with the other Defendants, Sabi met with Mr. Al-Rafi in Dubai and relayed the same false and disparaging remarks about Big3, Ice Cube and Kwatinetz that Defendants had made to others. Sabi told Mr. Al-Rafi that Mr. Kwatinetz and Ice Cube were engaging in serious financial misconduct and self-dealing as regarding Big3, and were usurping Big3 funds, assets and opportunities. Sabi's statements to Mr. Al-Rafi regarding Plaintiffs were false. Sabi knew the statements were false at the time he made them and Sabi intended the statements to harm Plaintiffs. Following Sabi's false statements and disparagement of Plaintiffs, Mr. Al-Rafi declined further investment in Big3.

125.   Defendants published their defamatory remarks to others as well, including an influential global consultant who was a significant liaison between Big3 and prospective investors, sponsors, and strategic partners. Defendant Al-Rumaihi told this consultant and others that both Kwatinetz and Ice Cube were misusing and misappropriating (i.e. stealing) Big3 assets to fund lavish personal lifestyles, including

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1
2
3
4

by travelling by private jet at Big3's expense and personally retaining bonuses the players were entitled to. These statements were false. Al-Rumaihi knew the statements were false at the time he made them and Al-Rumaihi intended the statements to harm Plaintiffs.

5
6
7
8
9

126.   Al-Rumaihi made almost identical false statements about Ice Cube, including to Mr. Kwatinetz. Specifically, Al-Rumaihi tried to convince Kwatinetz that Ice Cube was living off league funds. These statements were false. Al-Rumaihi knew the statements were false at the time he made them and Al-Rumaihi intended the statements to harm Plaintiffs.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

127.   As noted, including as alleged in paragraphs 98-104 above, Defendants' wrongful conduct was coordinated and the result of a conspiracy to harm Plaintiffs— the motive behind Defendants' maligning and malicious misstatements regarding Plaintiffs was to interfere with and disrupt Big3's operations and relationships, and to cause harm to Plaintiffs in their business dealings and reputations. Defendants Al-Rumaihi and Sabi were acting in concert with each other and with yet to be identified DOE defendants in making the disparaging statements as set out herein, asserting that Mr. Kwatinetz and Ice Cube were committing grave financial misconduct and engaging in self-dealing as to Big3. Al-Rumaihi, Sabi, and the other Defendants collectively and affirmatively agreed with each other to act in concert to make disparaging and false remarks about Plaintiffs at every opportunity and to as many Big3 players, investors, sponsors and partners as possible. The goal of Defendants' disparagement and false statements regarding Big3, its founders, and its management and operations was to destabilize Big3 and interfere with and destroy the company's operations and activity.

25
26
27

128.   On information and belief, Defendants made similar false representations—i.e. that both Mr. Kwatinetz and Ice Cube were self-dealing and breaching fiduciary duties by misappropriating league funds for personal benefit,

28

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

1    including by travelling via expensive private jets—to almost any player or league

2    insider who would listen. There is a likelihood this allegation will have evidentiary

3    support after a reasonable opportunity for further investigation or discovery.

4    Plaintiffs' information and belief is based on Defendants' false statements as

5    described above, Defendants' manifest hostility towards Plaintiffs and the league, and

6    manifest goal to destabilize Ice Cube's and Kwatinetz's leadership of the league.

7        129.   The false statements alleged herein harmed Plaintiffs because such

8    statements dissuaded partners, associates and consultants from brokering deals with

9    prospective investors, sponsors, and strategic partners for Big3. The defamatory

10   statements also directly harmed Mr. Kwatinetz and Ice Cube individually by

11   portraying them as dishonest and as engaged in theft from the league, which tended to

12   drive away actual and potential players, investors, sponsors and strategic partners.

13   Defendants' statements were made with the purpose and intent of harming Plaintiffs

14   and furthering the conspiracy to foment distrust among Big3 players, investors and

15   other insiders regarding the operations and management of Big3 and the reliability and

16   ethics of Big3's founders Mr. Kwatinetz and Ice Cube.

17                              **First Claim for Relief**

18      **(For Defamation *Per Quod* by each Plaintiff against All Defendants)**

19       130.   Plaintiffs repeat, reallege, and incorporate herein by reference as though

20   fully set forth, the allegations contained in the preceding paragraphs of this second

21   amended complaint.

22       131.   As set out above, Defendants harmed Plaintiffs by making damaging and

23   false statements to Big3's investors, consultants, and sponsors and to multiple Big3

24   players and league insiders, that plaintiffs Ice Cube and Jeff Kwatinetz were misusing

25   and misappropriating Big3 monies, assets, and materials to fund lavish lifestyles at the

26   expense of and detriment to Big3 and its investors, sponsors, and partners.

27

28

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

132.   Defendants Al-Rumaihi and Sabi were acting in concert with each other and with the other defendants and in furtherance of that conspiracy in making the disparaging statements as set out herein including to Mr. Mohammed Al-Rafi, asserting Mr. Kwatinetz and Ice Cube were committing grave financial misconduct and engaging in self-dealing as to Big3. Defendants made these false and disparaging statements to numerous existing and prospective investors, sponsors, players, consultants and partners.

133.   Defendants also harmed Plaintiffs by making damaging and offensive statements that the leadership and operating personnel of Big3 were "racist," and "hostile," and that plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what was owed under the Unit Purchase Agreement.

134.   The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were fraudsters, illegally using Big3 funds for improper purposes and were racist, hostile, and used racial slurs.

135.   Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and Big3, in that Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities. The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

136.   Defendants' conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

damages. Plaintiff Kwatinetz specifically has represented minorities and diverse clients for his entire life and such defamation was intended to harm his ability to continue to do so.

**Second Claim for Relief**

**(For Defamation *Per Se* by each Plaintiff against All Defendants)**

137.   Plaintiffs repeat, reallege, and incorporate herein by reference as though fully set forth, the allegations contained in the preceding paragraphs of this second amended complaint.

138.   Plaintiffs claim that Defendants harmed Plaintiffs by accusing Mr. Kwatinetz and Ice Cube as set out herein of criminal financial mismanagement and self-dealing in connection with Big3's operations and activities and that Big3 was a poorly run company on the verge of financial collapse due to its founders' wrongful acts. Defendants made these false and disparaging statements to Mr. Mohammed Al-Rafi and numerous existing and prospective investors, sponsors, players, consultants and partners.

139.   Plaintiffs claim that Defendants also harmed Plaintiffs by making harmful and offensive statements that Plaintiffs were "racist," "hostile," and that Plaintiff Kwatinetz used the term "Rich Nig*as" to a former employee Kai Henry on several occasions. The statement was published by Defendants to numerous individuals as stated above, and through a press release and defamatory public relations efforts designed to "change the narrative" from the Defendants' failure to pay Big3 what it owed under the Unit Purchase Agreement.

140.   The individuals and public who received and heard the defamatory publications understood said publications to be about Plaintiffs, and to mean that Plaintiffs were engaging in criminal financial misdealing as to Big3, and were racist, hostile, and use racial slurs.

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

141.   Defendants made such statements with malice, in that they knew said statements to be false, and intended the statements to cause grievous harm to Plaintiffs and the Big3, in that the Big3 was founded on principles of diversity, inclusion, and equal opportunity, and has a Board of Directors, staff, and employees composed primarily of African Americans, females, and minorities. The statements by Defendants were intended to create disunity and disruption in and to the league, and to investors and potential sponsors.

142.   Defendants' conduct constitutes "Defamation *Per Se*," in that the defamatory statements related to matters incompatible with the business, trade, profession, or office of Plaintiffs. Defendants conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

### Third Claim for Relief

### (For Trade Libel by Plaintiff Big3 against All Defendants)

143.   Plaintiffs repeat, reallege, and incorporate herein by reference as though fully set forth, the allegations contained in the preceding paragraphs of this second amended complaint.

144.   Plaintiffs claim that Defendants' defamatory statements, as alleged above, would be clearly and necessarily understood to disparage Big3 and the services and products associated with the league.

145.   Specifically, Defendants and each of them, in the effort to undermine the current Big3 leadership, falsely and absurdly told players and third-parties that the league was not being managed properly and not accepting their money, which is belied by the contemporaneous messages and records.

146.   In further pursuing Defendants' conspiracy to disrupt and destabilize Big3's operations and ability to continue as an ongoing commercial enterprise, defendants Al-Rumaihi and Sabi in connection with their commercial activities and

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1    investments, made damaging and false statements to influential international

2    businessmen and businesswomen including Mohammed Al-Rafi, and on information

3    and belief, to multiple Big3 players and league insiders, as alleged above, that

4    plaintiffs Ice Cube and Jeff Kwatinetz were misusing and misappropriating Big3

5    monies, assets, and materials to fund lavish lifestyles at the expense of and detriment

6    to Big3 and its investors, sponsors, and partners.

7         147.   Defendants published said defamatory statements to individuals and for

8    mass consumption with a coordinated defamatory public relations campaign.

9         148.   Defendants intended to cause and did in fact cause financial harm with

10   respect to Plaintiff Big3's business relationships with third-parties.

11        149.   Defendants knew the statements they made and caused to be made were

12   false and defamatory.

13        150.   Defendants' conduct was malicious, fraudulent, oppressive, and/or done

14   with a reckless disregard for the right of all Plaintiffs, thus giving rise to punitive

15   damages.

16   **Fourth Claim for Relief**

17   **(For Intentional Interference with Prospective Economic Relations by each**

18   **Plaintiff against All Defendants)**

19        151.   Plaintiffs repeat, reallege, and incorporate herein by reference as though

20   fully set forth, the allegations contained in the preceding paragraphs of this second

21   amended complaint.

22        152.   Defendants were aware of numerous contractual relationships Plaintiffs

23   entered and/or intended to enter, including contracts with plaintiff Big3's former

24   commissioner, investors, media contracts, and sponsorship opportunities with third-

25   parties.

26        153.   As described in the "defamations and trade libel" background allegations

27   section set out at paragraphs 98-128 above, Defendants made or aided and abetted in

28

**SECOND AMENDED COMPLAINT**

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

the making of defamatory statements of and concerning Plaintiffs with the intent of interfering and causing disruption with existing and prospective contracts entered by Plaintiffs, to which Defendants knew that disruption in the contractual relations was certain or substantially certain to occur.

154.   In furtherance of Defendants' conspiracy to disrupt and interfere with Big3's operations and destabilize Big3's leadership, defendants Al-Rumaihi and Sabi made defamatory statements about plaintiffs Ice Cube and Mr. Kwatinetz to highly influential businessmen and businesswomen, whom Defendants knew had ongoing economic relations with Big3, including Mr. Mohammed Al-Rafi. Al-Rumaihi and Sabi told Plaintiffs' investors, sponsors and partners that both Mr. Kwatinetz and Ice Cube were misusing and misappropriating (i.e. stealing) Big3 assets to fund lavish personal lifestyles, including by travelling by private planes at Big3's expense. These statements were false. Al-Rumaihi and Sabi knew the statements were false at the time they made them and intended the statements to harm Plaintiffs. The false statements Defendants made dissuaded Mr. Al-Rafi from further investment in Big3.

155.   Plaintiffs were damaged in the disruption of their contractual relationships including by losing potential investors, sponsors and partners and not being offered opportunities that would otherwise have been available to Plaintiffs but for Defendants' wrongful interference, defamatory publications and acts in furtherance of Defendants' conspiracy to destabilize Big3 and damage and destroy Plaintiffs' reputations.

156.   Defendants were a substantial factor in causing Plaintiffs' harm.

157.   Defendants' conduct was malicious, fraudulent, oppressive, and/or done with a reckless disregard for the rights of all Plaintiffs, thus giving rise to punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.      For general damages in an amount to be determined by proof at trial;

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**

2.     For special damages in an amount to be determined by proof at trial;

3.     For punitive and exemplary damages against the defendants;

4.     For pre- and post-judgment interest according to proof;

5.     For costs of suit, including reasonable attorneys' fees, statutory fees, and costs  as provided by statute;

6.     Injunctive relief;

7.     For all other relief as this Court may deem just and proper.


A TRIAL BY JURY PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38 AND CONSTITUTIONAL AMENDMENT SEVEN IS HEREBY DEMANDED.


DATED: December 20, 2018        GERAGOS & GERAGOS, APC


By: /s/ Ben Meiselas_____


MARK J. GERAGOS

BEN J. MEISELAS

DAVID A. ERIKSON

Attorneys for Plaintiffs

GERAGOS&GERAGOS, APC
HISTORIC ENGINE CO. No. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**SECOND AMENDED COMPLAINT**