Miles M. Cooley, (SBN 206783)
miles.cooley@dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:   310.595.3000
Fax:   310.595.3300

Attorneys for Specially-Appearing Defendant
H.E. AHMED AL-RUMAIHI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| BIG3 LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AHMED AL-RUMAIHI, et al., <br><br> Defendants. | Case No.  2:18-cv-3466-DMG <br><br> *[Assigned to Hon. Dolly M. Gee]* <br><br> **NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO VIENNA CONVENTION ON DIPLOMATIC RELATIONS AND DIPLOMATIC RELATIONS ACT** <br><br><br> Date:          June 21, 2019 <br> Time:          9:30 a.m. <br> Courtroom:   8C |

EAST/166409497

2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER

DLA PIPER

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 21, 2019 at 9:30 a.m., or as soon thereafter as the matter may be heard in Courtroom 8C, before the Honorable Dolly M. Gee, located at 312 North Spring Street, Los Angeles, CA 90012, Specially-Appearing Defendant H.E. Al-Rumaihi ("H.E. Al-Rumaihi" or "Specially-Appearing Defendant") will and hereby does move this Court, pursuant to the Diplomatic Relations Act, 22 U.S.C. § 254d, and the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (Apr. 18, 1961) ("Vienna Convention"), for an order dismissing this action for lack of jurisdiction.

Specially-Appearing Defendant brings this Motion on the grounds that accredited diplomatic envoys are immune from legal process and suit in the receiving state, and immune from the jurisdiction of any tribunal in the receiving state. Specially-Appearing Defendant is currently a sitting, accredited diplomat serving in Qatar's embassy in the United States. As the United States Department of State has recognized, he is therefore entitled to immunity from suit and this Court's jurisdiction pursuant to Articles 29 and 31 of the Vienna Convention. Accordingly, pursuant to the Diplomatic Relations Act, the Court must dismiss this action against him.

Specially-Appearing Defendant's Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Miles M. Cooley, the Application to Seal and declaration in support thereof, all pleadings and papers on file with the Court in this action, and upon such oral and written evidence as may be presented at the hearing of this Motion.

/////
/////
/////
/////
/////

NOTICE OF MOTION AND MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to Local Rule 7-3, counsel for Specially-Appearing Defendant met and conferred with counsel for Plaintiffs more than seven days prior to the filing of this Motion.

Dated:  May 6, 2019          **DLA PIPER LLP (US)**


By:  */s/ Miles M. Cooley*
     Miles M. Cooley
     Attorneys for Specially-Appearing
     Defendant
     H.E. AHMED AL-RUMAIHI

NOTICE OF MOTION AND MOTION TO DISMISS

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS .................................................................5

    A.   H.E. Al-Rumaihi Is A Current Qatari Diplomat Accredited By The State Department Of The United States ..........................5

    B.   H.E. Al-Rumaihi Has Divested His Ownership Interest In Sport Trinity ................................................................................6

III.  PROCEDURAL BACKGROUND ....................................................7

IV.   LEGAL STANDARD .........................................................................8

    A.   The Vienna Convention Imposes A Jurisdictional Bar Requiring Dismissal Of Any Civil Action Against A Sitting Diplomat ..................................................................................8

    B.   Diplomatic Immunity Is Critical To U.S. Foreign Policy .............9

V.    ARGUMENT .....................................................................................11

    A.   H.E. Al-Rumaihi Is A Diplomat Accredited By The United States Department of State .................................................11

    B.   The Vienna Convention's Narrow "Commercial Activity" Exception Does Not Apply Here .................................12

        1.   *The Commercial Activity Exception Only Applies To For-Profit Activities Carried Out **During** The Defendant's Tenure As A Diplomat* .........................13

        2.   *Expanding The Commercial Activity Exception To Pre-Appointment Conduct Runs Contrary To The Language And Purpose Of The Vienna Convention* ................16

        3.   *Cases Interpreting The Vienna Convention Likewise Confirm That Pre-Appointment Conduct Is Irrelevant* ..........19

VI.   CONCLUSION..................................................................................23

2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER

DLA PIPER

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*,
988 F.2d 295 (2d Cir. 1993) ............................................................. 10

*Abbott v. Abbott*,
560 U.S. 1 (2010) ............................................................................ 15

*Abdulaziz v. Metro. Dade Cty.*,
741 F.2d 1328 (11th Cir. 1984) ......................................... 20, 21, 22

*Ahmed v. Hoque*,
No. 01 CIV. 7224 (DLC), 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002) ........................................................................................... 23

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ........................................................................ 13

*Baoanan v. Baja*,
627 F. Supp. 2d 155 (S.D.N.Y. 2009) ............................................ 12

*Brzak v. United Nations*,
597 F.3d 107 (2d Cir. 2010) ............................................................. 9

*Carrera v. Carrera*,
174 F.2d 496 (D.C. Cir. 1949) ....................................................... 11

*Cornejo v. Cty. of San Diego*,
504 F.3d 853 (9th Cir. 2007) .......................................................... 10

*Doe v. Roman Catholic Diocese of Galveston–Houston*,
408 F. Supp. 2d 272 (S.D. Tex.2005) ............................................ 19

*Ex parte Hitz*,
111 U.S. 766 (1884) ....................................................................... 11

*Fun v. Pulgar*,
993 F. Supp. 2d 470 (D. N.J. 2014) ............................................... 22

2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER

DLA PIPER

NOTICE OF MOTION AND MOTION TO DISMISS

# TABLE OF AUTHORITIES

## (Cont.)

**Page(s)**

*Gonzalez Paredes v. Vila*,
 479 F. Supp. 2d 187 (D.D.C. 2007) .............................................................. 10, 15

*Hellenic Lines, Ltd. v. Moore*,
 345 F.2d 978 (D.C.Cir.1965) ............................................................................... 20

*Hilton v. Guyot*,
 159 U.S. 113 (1895) ............................................................................................ 17

*In re Baiz*,
 135 U.S. 403 (1890) ............................................................................................ 11

*Jungquist v. Nahyan*,
 940 F. Supp. 312 (D.D.C. 1996), *rev'd on other grounds*, 115 F.3d
 1020 (D.C. Cir. 1997) ......................................................................................... 11

*Klayman v. Obama*,
 125 F. Supp. 3d 67 (D.D.C. 2015) ...................................................................... 19

*Koumoin v. Ki-Moon*,
 No. 16-CV-2111 (AJN), 2016 WL 7243551 (S.D.N.Y. Dec. 14,
 2016) ..................................................................................................................... 19

*Kumar v. Republic of Sudan*,
 880 F.3d 144 (4th Cir. 2018) ................................................................................. 9

*Mazengo v. Mzengi*,
 No. CIV.A. 07-756 RMC AK, 2007 WL 8026882 (D.D.C. Dec. 20,
 2007) ..................................................................................................................... 14

*Republic of Phil. v. Marcos*,
 665 F. Supp. 793 (N.D. Cal. 1987) ............................................................. 8, 11, 22

*Sabbithi v. Al Saleh*,
 605 F. Supp. 2d 122 (D.D.C. 2009) ............................................................. passim

*Straub v. A P Green, Inc.*,
 38 F.3d 448 (9th Cir. 1994) ................................................................................. 22

**TABLE OF AUTHORITIES**

**(Cont.)**

Page(s)

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010) ................................................................ 14, 16

*Tabion v. Mufti*,
73 F.3d 535 (4th Cir. 1996) ................................................................ 14, 18

*Tabion v. Mufti*,
877 F. Supp. 285 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996) ......... passim

*Tachiona v. Mugabe*,
169 F.Supp.2d 259 (S.D.N.Y.2001), *aff'd in part, rev'd in part, and remanded sub nom. Tachiona v. United States*, 386 F.3d 205 (2d Cir.2004) ........................................................................... 19

*Tachiona v. United States*,
386 F.3d 205 (2d Cir. 2004) ................................................................... 9

*The Schooner Exchange v. M'Faddon*,
11 U.S. (7 Cranch) 116 (1812) ............................................................... 8

*United States v. Al-Hamdi*,
356 F.3d 564 (4th Cir. 2004) ................................................................ 11

*United States v. Alvarez–Machain*,
504 U.S. 655 (1992). Application of the ................................................... 16

*United States v. Arlington*,
669 F.2d 925 (4th Cir. 1982) ................................................................ 20

*United States v. Coplon*,
84 F. Supp. 472 (S.D.N.Y. 1949) ........................................................... 11

*United States v. Enger*,
472 F. Supp. 490 (D.N.J. 1978) ..................................................... 8, 9, 17

*United States v. Khobragade*,
15 F. Supp. 3d 383 (S.D.N.Y. 2014) .................................................. 21, 22

Los Angeles, California 90067-4704

DLA PIPER

NOTICE OF MOTION AND MOTION TO DISMISS

# TABLE OF AUTHORITIES

## (Cont.)

Page(s)

*United States v. Lumumba*,
578 F. Supp. 100 (S.D.N.Y. 1983) ........................................................................ 11

*United States v. Stuart*,
489 U.S. 353 (1989) ............................................................................................... 10

*Van Aggelen v. United Nations*,
No. 06 CIV. 8240 (LBS), 2007 WL 1121744 (S.D.N.Y. Apr. 12,
2007), *aff'd*, 311 F. App'x 407 (2d Cir. 2009) ...................................................... 19

*Windsor v. State Farm Ins. Co.*,
509 F. Supp. 342 (D.D.C. 1981) .............................................................................. 9

*Zuza v. Office of the High Representative*,
857 F.3d 935 (D.C. Cir. 2017), cert. denied, 138 S. Ct. 1559 (2018) .................. 21

STATUTES

Diplomatic Relations Act, 22 U.S.C. § 254d ......................................................... 1, 9

LOS ANGELES, CALIFORNIA  90067-4704

DLA PIPER

NOTICE OF MOTION AND MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

Specially-Appearing Defendant H.E. Ahmed Al-Rumaihi ("Specially-Appearing Defendant" or "H.E. Al-Rumaihi")[1] submits the following Memorandum of Points and Authorities in support of his Motion to Dismiss pursuant to the Diplomatic Relations Act, 22 U.S.C. § 254d, and the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (Apr. 18, 1961) ("Vienna Convention") ("Motion").

## I. INTRODUCTION

In contravention of international treaty and federal law, Plaintiffs seek to impose civil liability against a sitting, accredited diplomat entitled to absolute immunity from this Court's jurisdiction. In August 2018, the State of Qatar reappointed H.E. Al-Rumaihi to its diplomatic corps. The United States has since formally recognized his diplomatic credentials by, among other things, identifying him as a diplomatic agent in its official Diplomatic Listing. That listing notes that diplomats such as H.E. Al-Rumaihi are entitled to jurisdictional immunity under the Vienna Convention, which is a self-executing treaty with the force and effect of a legislative enactment. As a result of his diplomatic status, jurisdiction simply does

---

[1] Because this Motion concerns this Court's lack of jurisdiction over H.E. Al-Rumaihi, he makes a special appearance herein for purposes of opposing jurisdiction. H.E. Al-Rumaihi files this Motion pursuant to the Court's order directing him to file a response to Plaintiffs' Second Amended Complaint. *See* Dkt. No. 77 at 4. H.E. Al-Rumaihi did not bring this Motion earlier in light of his belief that the Court's prior Order on the Anti-SLAPP Motion (Dkt. No. 57) dismissed him from all claims with prejudice. Accordingly, H.E. Al-Rumaihi believed that his dismissal rendered the issues presented by this Motion moot, and did not wish to burden the Court with unnecessary briefing. H.E. Al-Rumaihi was also concerned with bringing what he perceived to be unnecessary briefing in light of Plaintiffs' prior conduct in using filings in this action and a parallel confidential arbitration to wage a public relations campaign against H.E. Al-Rumaihi. For instance, in response to the Court's Order to Show Cause Re: Dismissal for Lack of Prosecution (Dkt. No. 42), Plaintiffs filed a highly inflammatory 12-page document that almost exclusively addressed issues that had no bearing on the OSC. Dkt. No. 43. In doing so, Plaintiffs used documents and non-public information from the parallel confidential arbitration proceeding. As the Court noted in ordering those confidential materials sealed, the information had "no apparent relevance to this action. Dkt. No. 55 at 2.

2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER

LOS ANGELES, CALIFORNIA 90067-4704

not exist to allow Plaintiffs to pursue civil claims against H.E. Al-Rumaihi, and the Second Amended Complaint ("SAC") must be dismissed as to him.

H.E. Al-Rumaihi is mindful that the Court previously suggested – in a ruling regarding Plaintiffs' summary request for entry of default – that a narrow "commercial activity" exception to H.E. Al-Rumaihi's immunity might apply. Respectfully, and consistent with the Court's ongoing obligation to verify jurisdiction at all stages of the case, that ruling should be revisited. With the benefit of full briefing on the matter, the result is clear. The narrow commercial activity exception to diplomatic immunity applies only where a currently-sitting diplomat engages in for-profit ventures *during his or her diplomatic tenure*, which is not the case here.

On August 27, 2018, H.E. Al-Rumaihi received a new diplomatic appointment as the Commercial Attaché for Investment for the State of Qatar, which carries the rank of ambassador and the title of His Excellency ("H.E."). The State Department granted H.E. Al-Rumaihi entrance to the United States for purposes of his diplomatic appointment on September 7, 2018. The State Department has formally recognized his accredited diplomatic status, issued him his Diplomatic Identification Card, and, as noted above, identified him on its official Diplomatic Listing as a diplomat entitled to the Vienna Convention's protections. As the Commercial Attache, H.E. Al-Rumaihi does not engage in any commercial business. Of particular relevance to this dispute, H.E. Al-Rumaihi has divested himself of his interest in Sport Trinity, LLC ("Sport Trinity"), an entity that was formed prior to that appointment. Because these facts are incontrovertible – and indeed undisputed – there can be no serious dispute that H.E. AL-Rumaihi enjoys diplomatic immunity.

The Vienna Convention's limited commercial activity exception does not alter that conclusion. Article 42 of the Vienna Convention provides that a "***diplomatic agent*** shall not in the receiving State practice for personal profit any

Los Angeles, California 90067-4704

DLA PIPER

professional or commercial activity" (emphasis added).  That is, a currently-sitting diplomat may not engage in for-profit commercial activities *while* he or she is a diplomat.  Article 42 does not concern itself with – nor purport to place limits upon – a diplomat's pre-appointment career in the private sector.[2]

Article 31.1(c) enforces Article 42's proscription by granting immunity to "diplomatic agents" with only narrow exceptions, including for "an action relating to any profession or commercial activity exercised by the *diplomatic agent* in the receiving State outside his *official functions*."  Art. 31.1(c) (emphasis added).

By its plain terms, Article 31.1(c) speaks to commercial activity performed concurrent with a diplomat's tenure.  A private citizen, prior to his or her diplomatic appointment, is not a "diplomatic agent," has not been sent to a "receiving state," and has no "official functions."  Article 31.1(c) makes no reference to commercial conduct undertaken by a private citizen, even if that private citizen subsequently obtains the status of a diplomatic agent.  And this makes sense – the drafters of the Vienna Convention restricted for-profit ventures *during* a diplomat's tenure because such conduct is wholly inconsistent with diplomatic status and the purpose of diplomatic envoys.  No such policy reason would support such a restriction prior to a diplomat's appointment.

Numerous authorities confirm this plain reading of the Vienna Convention.  The drafting history reveals that countries were – as the Special Rapporteur for the

---

[2] The State Department instructs that diplomats "must . . . not engage in any professional or commercial activity in the United States," as doing so is "inconsistent" with the Vienna Convention.  *See* State Department, Office of Foreign Missions, Accreditation Policy Handbook (Oct. 30, 2018) at 9.  Similarly, the State Department Office of Foreign Missions instructs that "[f]or newly hired or arrived personnel to be recognized as a diplomatic agent at an embassy, and to retain such status, a person must: . . . not engage in any professional or commercial activity in the United States." *See* https://www.state.gov/ofm/accreditation/noa/index.htm.  While diplomatic accreditation from the State Department requires that the *diplomat* not engage in commercial activities, neither the Accreditation Policy Handbook nor the Office of Foreign Missions makes any mention of *prior* commercial activity while a private citizen as a reason to deny accreditation.

LOS ANGELES, CALIFORNIA 90067-4704

DLA PIPER

International Law Commission explained – concerned with diplomats engaging in business "on the side," a temporal restriction that makes clear that the issue was *concurrent* business.  Summary Records of the 476th Meeting, [1958] 1 Y.B. Int'l L. Comm'n 244 U.N. Doc. A/CN.4/SER.A/1958.  Likewise, the Executive Branch – whose interpretation of the Vienna Convention is entitled to great deference – has explained that Article 31.1(c) "works in conjunction with Article 42 to make clear that, *if a diplomat* does engage in such an activity, he does not have immunity from related civil actions."  Statement of Interest of the United States of America at 9 in *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122 (D.D.C. 2009) ("Sabbithi Statement") (emphasis added) (attached as Exhibit I to the Declaration of Miles M. Cooley). Consistent with this clear guidance, H.E. Al-Rumaihi has not identified a single court that has ever attempted to impose retroactive liability against a sitting diplomat based on their pre-appointment conduct.  As the district court in *Tabion v. Mufti* explained, the exception applies to a diplomat who "strays" from his or her current diplomatic functions.  877 F. Supp. 285 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).

The purpose of jurisdictional immunity is to allow diplomats to perform their functions efficiently and effectively, free from the disruption accompanied by litigation.  That purpose is entirely defeated – and the reciprocal immunities U.S. diplomats enjoy threatened – if a diplomat could be dragged into court based on alleged pre-appointment conduct while a private citizen.  If that were the rule, every foreign diplomat in the United States who ever held a job in the private sector could be pulled out of their diplomatic function and embroiled in civil litigation.  Foreign nations would respond by withdrawing the reciprocal protections currently afforded to U.S. diplomats.  Even politically-appointed Ambassadors could become ensnared in foreign courts – many of which do not have the same due process protections as the U.S. – on the pretext of a commercial dispute over pre-appointment business dealings.

Los Angeles, California 90067-4704

DLA PIPER

1    Accordingly, the diplomatic immunity mandated by the Vienna Convention

2    bars the exercise of jurisdiction over H.E. Al-Rumaihi and requires that this action

3    against him be dismissed with prejudice.[3]

4    **II.    STATEMENT OF FACTS**

5         **A.    H.E. Al-Rumaihi Is A Current Qatari Diplomat Accredited By The**
            **State Department Of The United States**

6

7         H.E. Al-Rumaihi is a Qatari citizen with substantial personal and professional

8    ties to the country.  For the majority of his professional career, he has served as a

9    diplomat and high ranking official for the Qatari government.  *See* Cooley Decl.

10   Exs. G-H.

11        Most recently, on August 27, 2018, the State of Qatar once again appointed

12   H.E. Al-Rumaihi to its diplomatic corps, as the Commercial Attaché for Investment

13   for the State of Qatar.  *See* Cooley Decl. Exs. A (Diplomatic Passport) & B (Letter

14   and Certified Translation from the Ministry of Foreign Affairs for the State of Qatar,

15   Department of Protocol, to the Embassy of the United States in Doha).  As part of

16   the accreditation process for H.E. Al-Rumaihi's diplomatic status, the Ministry of

17   Foreign Affairs for the State of Qatar formally requested the issuance of an A-1 visa

18   on his behalf.  *Id.*  Ex. B.  On August 30, 2018, the United States granted that

19   request and issued H.E. Al-Rumaihi an A-1 visa, thereby reflecting his appointment

20   as a diplomat.  *Id.* Ex. C (A-1 visa of H.E. Al-Rumaihi).  The United States

21   Department of State granted H.E. Al-Rumaihi entry into the United States for his

22   diplomatic appointment, affording him all privileges and immunities associated with

23   his diplomatic posting.  Cooley Dec. ¶ 8.

24   _____

25   [3] In its ruling denying Plaintiffs' Request for Entry of Default, the Court indicated
     that at least some of the allegations against H.E. Al-Rumaihi "may fall within the
26   scope of his official diplomatic functions," insofar as Plaintiffs suggest actions were
     taken at the direction of a nation-state.  Dkt. No.  77 at 3.  Because the Vienna
27   Convention and Diplomatic Relations Act mandate dismissal here, separate
     immunity doctrines need not be addressed at this juncture, but H.E. Al-Rumaihi
28   reserves the right to do so to the extent necessary in any future proceeding.

On September 7, 2018, the Qatari Embassy formally notified the United States Department of State of H.E. Al-Rumaihi's diplomatic posting via a Notification of Appointment through the Office of Foreign Mission e-Gov system. *Id*. Ex. D.  Shortly thereafter, the United States Department of State recognized and accredited his diplomatic status, and issued H.E. Al-Rumaihi his Diplomatic Identification Card.  *Id.* Ex. E.  As directed by the United States Department of State, and expressly reflected on H.E. Al-Rumaihi's Diplomatic Card:

> This person has been duly notified to the Department of State and under international law enjoys immunity from criminal jurisdiction.  The bearer shall not be liable to any form of arrest or detention, but may be given a notice of violation.
>
> The bearer shall be treated with due respect and all appropriate steps shall be taken to prevent any attack on the bearer's person, freedom, or dignity.

*See* Cooley Decl. Ex. E; *see also* United States Department of State Guidance for Law Enforcement and Judicial Authorities, at 17 (explaining that this identity card is an authoritative identity document issued by the State Department confirming a diplomat's status and immunity, and that law enforcement can and should rely on that card if presented to them).[4]

**B.    H.E. Al-Rumaihi Has Divested His Ownership Interest In Sport Trinity**

To be accredited as a diplomatic agent, the United States Department of State requires, among other things, that the individual satisfy several prerequisites, including that he or she "perform diplomatic functions on an essentially full-time basis (at least 35 hours per week)," and "not engage in any professional or commercial activity in the United States."  *See* United States Department of State,

---

[4] https://www.state.gov/documents/organization/150546.pdf at 17.

Los Angeles, California 90067-4704

DLA PIPER

*Office of Foreign Missions, Accreditation*.[5]  To satisfy these requirements, H.E. Al-Rumaihi transferred all of his interest in Sport Trinity to an irrevocable trust, which is managed by an independent trustee, and for which he is not a beneficiary.  In fact, among other things, the trust restricts H.E. Al-Rumaihi's ability to communicate with the trustee, and confers the trustee with sole discretion to sell, exchange, or otherwise dispose of the property.  Cooley Decl. ¶ 14 & Ex. J.  H.E. Al-Rumaihi thus holds no ownership in Sport Trinity, cannot share in the profits of Sport Trinity, and maintains no role or involvement in the operations or management of the entity.  That is, consistent with his accreditation, H.E. Al-Rumaihi is not currently engaging in any commercial activity outside of his diplomatic functions.

## III. <u>PROCEDURAL BACKGROUND</u>

Plaintiffs filed their original Complaint and then a First Amended Complaint ("FAC") in Los Angeles County Superior Court.  ECF No. 1.  The case was then removed to federal court on diversity grounds.  *Id.*  A motion to strike the FAC under the California Anti-SLAPP statute was filed by Defendants.  ECF No. 8.  Plaintiffs moved for leave to take jurisdictional discovery and to lift a discovery stay.  ECF No. 10.

In its November 29, 2018 order, this Court denied Plaintiffs' motions, and granted the motion to strike to the extent of striking all of Plaintiffs' claims in the FAC except a single libel claim against Defendant Ayman Sabi arising out of his alleged repetition of a statement that Plaintiff Kwatinetz had made a racial slur.  ECF No. 57 at 11.  The Court granted Plaintiffs leave to file an amended complaint "solely for the purpose of remedying the deficiencies identified in this Order."  *Id.* at 13.

On December 20, 2018, Plaintiffs filed their SAC (ECF No. 59), which largely repeats the claims of the FAC.  On March 21, 2019, following three

---

[5] https://www.state.gov/ofm/accreditation/noa/index.htm.

LOS ANGELES, CALIFORNIA  90067-4704

Los Angeles, California 90067-4704

1  stipulated continuances entered for the purpose of facilitating settlement discussions,

2  Mr. Sabi filed a Motion to Compel Arbitration.  After Mr. Sabi and Plaintiffs

3  completed briefing on the Motion to Compel Arbitration, Plaintiffs suddenly sought

4  the entry of a default judgment against H.E. Al-Rumaihi.  ECF Nos. 71, 74.  H.E.

5  Al-Rumaihi, specially appearing, submitted objections to Plaintiffs' request.  ECF

6  No. 75.  On April 15, 2019, the Court denied Plaintiffs' request to enter default and

7  directed H.E. Al-Rumaihi to respond within twenty-one days of the order.  ECF No.

8  77.

9  **IV.   LEGAL STANDARD**

10      **A.    The Vienna Convention Imposes A Jurisdictional Bar Requiring
             Dismissal Of Any Civil Action Against A Sitting Diplomat**

11

12      The international recognition of diplomatic immunity enjoys a longstanding

13  and "rich jurisprudential and statutory history."  *Republic of Phil. v. Marcos*, 665 F.

14  Supp. 793, 798 (N.D. Cal. 1987).  It has played a critical role in the United States'

15  foreign policy for more than two centuries.  *See, e.g., The Schooner Exchange v.

16  M'Faddon*, 11 U.S. (7 Cranch) 116, 143 (1812) ("[I]t is impossible to conceive . . .

17  that a Prince who sends an ambassador or any other minister can have any intention

18  of subjecting him to the authority of a foreign power . . . .") (quoting Emmerich de

19  Vattel).

20      The practice of immunizing diplomats from the civil jurisdiction of the

21  receiving state was officially codified in 1961 with the adoption of the Vienna

22  Convention, Apr. 18, 1961, United States accession, Dec. 13, 1972, 23 U.S.T. 3227

23  T.I.A.S. No. 7502, 500 U.N.T.S. 95.  The Vienna Convention is self-executing, and

24  "[t]hus, upon entry into force, it at once became operative as domestic law of the

25  United States."  *United States v. Enger*, 472 F. Supp. 490, 542 (D.N.J. 1978).

26  Further, the Diplomatic Relations Act of 1978 established the Vienna Convention

27  "as the sole United States law on the subject."  *Republic of Phil.*, 665 F. Supp. at

28  /////

Los Angeles, California 90067-4704

DLA PIPER

798 (quoting S.Rep. No. 958, 95th Cong., 2d Sess. 1, reprinted in 1978 U.S.Code Cong. & Admin.News 1935).

Under the Diplomatic Relations Act, "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . *shall* be dismissed."  22 U.S.C. § 254d (emphasis added).  The Diplomatic Relations Act thus "continues the long-standing concept of diplomatic immunity by providing for the dismissal of any action or proceedings brought against an individual entitled to such protection."  *Windsor v. State Farm Ins. Co.*, 509 F. Supp. 342, 344 (D.D.C. 1981); *see also Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010) (the Diplomatic Relations Act "makes pellucid that American courts *must* dismiss a suit against anyone who is entitled to immunity under either [the Vienna Convention] or other laws extending diplomatic privileges and immunities") (emphasis added).  The Vienna Convention and Diplomatic Relations Act thus deprive a U.S. tribunal of jurisdiction or compulsory process over diplomats.  *See Tachiona v. United States*, 386 F.3d 205, 215 (2d Cir. 2004) (holding that the Vienna Convention "broadly immunizes diplomatic representatives from the civil jurisdiction of the United States courts"); *Enger*, 472 F. Supp. at 504 ("Diplomatic immunity in its contemporary aspect may be broadly defined as the freedom from local jurisdiction accorded under principles of international law by the receiving state to the duly accredited diplomatic representatives of other states.").

**B.     Diplomatic Immunity Is Critical To U.S. Foreign Policy**

In adjudicating threshold jurisdictional issues implicated by diplomatic immunity, courts must bear in mind that diplomatic immunity is rooted in international sensitivities of the highest order.  *See Kumar v. Republic of Sudan*, 880 F.3d 144, 157 (4th Cir. 2018) ("the Court properly considers the diplomatic interests of the United States when construing the Vienna Convention").  As the Second Circuit has observed:

NOTICE OF MOTION AND MOTION TO DISMISS

> The risk in creating an exception to mission inviolability in this country is of course that American missions abroad would be exposed to incursions that are legal under a foreign state's law.  Foreign law might be vastly different from our own, and might provide few, if any, substantive or procedural protections for American diplomatic personnel.  Were the United States to adopt exceptions to the inviolability of foreign missions here, it would be stripped of its most powerful defense, that is, that international law precludes the nonconsensual entry of its missions abroad.

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 300-01 (2d Cir. 1993).  Thus, "[t]o protect United States diplomats from criminal and civil prosecution in foreign lands with differing cultural and legal norms as well as fluctuating political climates, the United States has bargained to offer that same protection to diplomats visiting this country." *Tabion v. Mufti*, 877 F. Supp. 285, 292-93 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).  Indeed, "because diplomats are particularly vulnerable to exploitation for political purposes, immunity for American diplomats abroad is essential.  And, understandably, reciprocity is the price paid for that immunity."  *Id.*; *Cornejo v. Cty. of San Diego*, 504 F.3d 853, 863 (9th Cir. 2007) ("It is important to the United States that its treaty obligations be fulfilled, otherwise reciprocity is jeopardized.").

Similarly, the United States Government – whose interpretation of the Vienna Convention is entitled to "great weight"[6] – has explained that "any failure to respect the privileges and immunities accorded to diplomats under the Vienna Convention would contravene the United States' established obligations to its treaty partners and jeopardize the protections reciprocally extended by other nations to United States diplomats stationed abroad."  Sabbithi Statement at 1-2.  Accordingly, the "privileges and immunities accorded to diplomats under the Vienna Convention are

---

[6] *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 193 (D.D.C. 2007) (citing *United States v. Stuart*, 489 U.S. 353, 369 (1989)).

Los Angeles, California  90067-4704

DLA PIPER

1   vital to the conduct of peaceful international relations and must be respected." *Id.* at

2   24-25.

3   **V.     ARGUMENT**

4       **A.     H.E. Al-Rumaihi Is A Diplomat Accredited By The United States
                 Department of State**

5

6       Determining whether a foreign citizen is protected by diplomatic immunity is

7   a question entrusted to the Executive Branch of the federal government. *In re Baiz*,

8   135 U.S. 403, 432 (1890); *Ex parte Hitz*, 111 U.S. 766 (1884); *United States v. Al-*

9   *Hamdi*, 356 F.3d 564, 571 (4th Cir. 2004); *Republic of Phil. v. Marcos*, 665 F. Supp.

10  793, 799-800 (N.D. Cal. 1987); *United States v. Coplon*, 84 F. Supp. 472, 475

11  (S.D.N.Y. 1949). The status of a diplomat turns upon the receiving state's decision

12  to accept the designations from the head of the sending state's mission. *United*

13  *States v. Lumumba*, 578 F. Supp. 100, 103 (S.D.N.Y. 1983). Therefore, diplomatic

14  immunity is resolved by the Executive Branch, acting through the Department of

15  State. *Jungquist v. Nahyan*, 940 F. Supp. 312, 321-22 (D.D.C. 1996) ("[T]he

16  determination of a diplomat's status as such is made by the State Department, not

17  the Court."), *rev'd on other grounds*, 115 F.3d 1020 (D.C. Cir. 1997).

18      To demonstrate to a court the Executive Branch's conclusive determination

19  on diplomatic immunity, "[i]t is enough that [the diplomat] has requested immunity,

20  that the State Department has recognized that the person for whom it was requested

21  is entitled to it, and that the Department's recognition has been communicated to the

22  court." *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949). H.E. Al-Rumaihi

23  has done so here. It cannot be disputed that H.E. Al-Rumaihi is currently the

24  Commercial Attaché for Investment for the State of Qatar with a rank of

25  ambassador, and that his diplomatic credentials have been formally recognized by

26  the United States.

27      First, H.E. Al-Rumaihi's diplomatic status is unambiguously reflected by the

28  State Department's Fall 2018 Diplomatic List, which identifies H.E. Al-Rumaihi as

LOS ANGELES, CALIFORNIA 90067-4704

DLA PIPER

LOS ANGELES, CALIFORNIA  90067-4704

a diplomat.  *See* Cooley Decl. Ex. F[7].  The Listing explains that "[t]hese persons . . . enjoy full immunity under provisions of the Vienna Convention on Diplomatic Relations" including Articles 29 and 31.  Second, in response to a formal written request from the Ministry of Foreign Affairs for the State of Qatar, the State Department issued H.E. Al-Rumaihi an A-1 visa, thereby reflecting his appointment as a diplomatic agent.  *See* Cooley Decl. Ex. C.  The State Department thereafter granted H.E. Al-Rumaihi entry into the United States to carry out his diplomatic appointment.  *Id.* ¶ 6.  Third, following his entry into the United States, the State Department further issued H.E. Al-Rumaihi his Diplomatic Identification Card, confirming his appointment and entitlement to immunity.  *Id.*  Ex. E.  Only mission members with diplomatic rank are issued such cards and, as the State Department notes, such officers "enjoy[] the highest degree of immunity" and "have immunity from civil suits except in four very limited circumstances," none of which are applicable here."  Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities p 8 https://www.state.gov/documents/organization/150546.pdf.

In short, the United States has formally recognized and accredited H.E. Al-Rumaihi's diplomatic status, ranking, and privileges.  This recognition of H.E. Al-Rumaihi's diplomatic status is conclusive.

### B.    The Vienna Convention's Narrow "Commercial Activity" Exception Does Not Apply Here

Article 31.1 immunizes diplomatic agents from claims brought in almost any civil, administrative, or criminal proceeding.  *See*, *e.g.*, *Baoanan v. Baja*, 627 F. Supp. 2d 155, 160 (S.D.N.Y. 2009) (under Vienna Convention, "a current diplomatic agent enjoys near-absolute immunity from civil jurisdiction").  H.E. Al-

---

[7] The Diplomatic List is also available on the State Department's website at https://www.state.gov/documents/organization/287365.pdf.

Rumaihi is mindful of the Court's observation regarding the possible applicability of the commercial activity exception in this case, issued in the context of denying Plaintiffs' request for entry of default.   Respectfully, the ruling on commercial activity should be revisited, consistent with the duty of federal courts, at all times, to confirm jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  The "commercial activity" exception only applies to for-profit conduct of a "diplomatic agent" – that is, conduct that occurs concurrent with the diplomatic posting. Because H.E. Al-Rumaihi is not currently engaged in any commercial activity, the commercial activity exception does not apply to obviate his immunity.

> 1.   *The Commercial Activity Exception Only Applies To For-Profit Activities Carried Out **During** The Defendant's Tenure As A Diplomat*

The Court observed that "[a]t least some of the claims asserted against Al-Rumaihi in the SAC arise out of misconduct that allegedly: (a) occurred prior to August 27, 2018, and (b) relate[s] to the parties' commercial dealings."  ECF No. 77 at 2.  But the immunity exception identified in Article 31.1(c) of the Vienna Convention applies only when diplomats engage in commercial activity for personal profit ***during*** their diplomatic tenure.  The contrary interpretation, which eliminates immunity for any commercial conduct *at any time*, would effectively eliminate the immunity entirely for any diplomat who had engaged in *any* commercial dealings in the United States prior to their posting.  Such an outcome would not only be inconsistent with the Vienna Convention and implementing case law, but it would throw the United States' diplomacy into disarray.

As the district court in *Tabion* confirmed, the commercial activity exception is implicated by an accredited diplomat "stray[ing]" from her current diplomatic functions:

> Article 31(1)(c) was intended to reach those rare instances where a diplomatic agent ignores the restraints of his office and, contrary to Article 42, engages in such activity in the receiving State.  Accordingly, a diplomat who strays from

LOS ANGELES, CALIFORNIA  90067-4704

DLA PIPER

1

2

3

> his diplomatic functions and runs a car business or becomes a tailor in the receiving State cannot then shelter himself behind diplomatic immunity when disputes arise out of that activity.

4

5

6

7

8

9

10

11

12

*Id*. at 291; *see also Talbion*, 73 F.3d at 538 (affirming district court's decision as "well-reasoned"); *Swarna v. Al-Awadi*, 622 F.3d 123, 139 (2d Cir. 2010) ("*Tabion* articulates the scope of acts as they relate to the term 'commercial activity' under Article 31(1)(c) for ***sitting diplomats***.") (emphasis added); *cf. Mazengo v. Mzengi*, No. CIV.A. 07-756 RMC AK, 2007 WL 8026882, at *2 (D.D.C. Dec. 20, 2007) (where diplomat and his wife operated catering business in U.S. ***at same time*** as diplomatic posting, theorizing that "it is arguable that [they] would not be immune from civil jurisdiction in an action that relates to [his spouse's] work for the catering company.").[8]

13

The Executive Branch has embraced this interpretation as well, explaining:

14

15

16

17

18

19

20

21

22

23

> Consistent with the Vienna Convention's purposes, the term "commercial activity" as used in Article 31(1)(c) focuses on the pursuit of trade or business activity unrelated to diplomatic work. Such commercial activity is normally undertaken for profit or remuneration and, if engaged in by the diplomat himself (as opposed to a member of his family), is undertaken in contravention of Article 42, which provides that a "diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity." Indeed, Article 31(1)(c) works in conjunction with Article 42 to make clear that, if a diplomat does engage in such an activity, he does not have immunity from related civil actions.

24

Sabbithi Statement at 9. Even if there were a viable alternative reading to the

25

26

27

[8] The question in *Sabbithi*, on which this Court relied in holding that the commercial activity exception may apply, was whether ***admittedly concurrent conduct*** was commercial.

28

Los Angeles, California  90067-4704

DLA PIPER

1   Vienna Convention – and there is not – the Court should defer to the Executive

2   Branch's reasonable interpretation.  *See Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It

3   is well settled that the Executive Branch's interpretation of a treaty is entitled to

4   great weight." (internal citation and quotation marks omitted)).[9]

5         Thus, in evaluating whether the commercial activity exception applies, it is

6   irrelevant whether H.E. Al-Rumaihi engaged in private business ventures ***prior*** to

7   his appointment.  The exception only addresses those "rare instances" in which a

8   ***currently***-sitting accredited diplomat engages in for profit ventures while he or she

9   is supposed to be performing diplomatic functions.  *See Tabion*, 877 F. Supp. at 291.

10  For the exception to apply, the diplomat must affirmatively "ignore[] the restraints

11  of his office and, contrary to Article 42, engage[] in such activity in the receiving

12  State."  *Id.*

13        As discussed above, H.E. Al-Rumaihi is no longer a member of Sport Trinity.

14  He has transferred all interest in the entity into an irrevocable trust, managed by an

15  independent trustee, for which H.E. Al-Rumaihi is not a beneficiary.  As a result, he

16  has no role in any operations of the business, and cannot share in the profits.  He

17  conducts no other private commercial business in the United States.  Therefore, as a

18  current sitting and accredited diplomat, he engages in no "commercial activity."

19  Because the commercial activity exception is designed to enforce Article 42's

20  prohibition against conducting business ***while*** a diplomat, it is wholly irrelevant to

21  an individual's alleged conduct ***prior*** to becoming a diplomat – and therefore has no

22  applicability here.

23

24  _____

25  [9] To the extent the Court is inclined to adopt a different interpretation of the Vienna
    Convention, it should first permit the Executive Branch to weigh in by submitting a
26  Statement of Interest.  *See Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 127 (D.D.C.
    2009) (adopting interpretation set forth in Statement of Interest of the United States
27  regarding Vienna Convention's commercial activity exception); *Gonzalez Paredes
    v. Vila*, 479 F. Supp. 2d 187, 193 (D.D.C. 2007) (same).
28

Los Angeles, California  90067-4704

DLA PIPER

Los Angeles, California  90067-4704

DLA PIPER

2.      *Expanding The Commercial Activity Exception To Pre-Appointment Conduct Runs Contrary To The Language And Purpose Of The Vienna Convention*

When interpreting a treaty, courts "first look to its terms to determine its meaning." *United States v. Alvarez–Machain*, 504 U.S. 655, 663 (1992). Application of the commercial activity exception to a diplomat's pre-appointment conduct contravenes both the plain language of the Vienna Convention and its drafting history.

Article 31 states that a diplomat "***shall*** . . . enjoy immunity from [the receiving state's] civil and administrative jurisdiction."   The plain language of this provision makes diplomats immune from suit based on their current diplomatic status, regardless of when the acts in question occurred.  Article 42 – which sets forth the proscription against commercial activity – is likewise concerned only with for-profit activities during the diplomat's tenure: "[a] ***diplomatic agent*** shall not, in the receiving state, practice for personal profit any professional or commercial activity."  Article 42's phrasing is consistent with Article 31.1(c), which only addresses the individual's ***present*** conduct as a currently-serving diplomat – "any professional or commercial activity exercised by the diplomatic agent in the receiving State ***outside his official functions***."  Article 31.1(c) (emphasis added).

A private citizen is not a diplomat and therefore has no "official functions." Therefore, he or she cannot possibly run afoul of the commercial activity exception by engaging in for-profit activities.

To interpret the Vienna Convention otherwise would eliminate diplomatic immunity for any diplomat who ever held a job or ran a business before his or her appointment, for any legal proceeding even ostensibly relating to that job or business.  That is not the law.  "Sitting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government." *Swarna v. Al-Awadi*, 622 F.3d 123, 137 (2d Cir. 2010).  As the preamble to the Vienna Convention explains, diplomatic immunities are

16

afforded "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  Thus, as the United States has explained, "[j]urisdictional immunities ensure the ability of diplomats to function effectively by insulating them from the disruptions that would accompany litigation in such an environment."  Sabbithi Statement at 8.

Applying the commercial activity exception to alleged conduct predating a diplomat's appointment runs contrary to this purpose. Not only would it expose virtually every diplomat in the United States to civil suits arising out of their pre-diplomatic careers; it would expose U.S. diplomats abroad to the same danger. "[I]nternational law is founded upon mutuality and reciprocity." *Hilton v. Guyot*, 159 U.S. 113, 228 (1895).  Thus, any interpretation extending the "commercial activity" exception "would create the spectre of foreign states around the world following the ruling." *Tabion*, 74 F.3d at 539 n.9.  "[S]hort of breaking diplomatic relations, [reciprocity] is the only means the Executive has of protecting our diplomats in foreign nations." *Enger*, 472 F. Supp. at 545 (quoting briefing from United States).  Even politically-appointed Ambassadors – who have often had lengthy private sector careers – could become ensnared in civil litigation and subject to discovery in foreign jurisdictions on the pretext of a business dispute predating his or her diplomatic tenure.  The ability of the U.S. to carry out sensitive foreign policy objectives through its Ambassadors and other diplomats would be jeopardized.  The drafting history for the Vienna Convention confirms that the commercial activity exception is limited to conduct during a diplomat's tenure.  As the Special Rapporteur for the International Law Commission explained during a drafting session, "Paragraph 1(c) . . . applied to cases where a diplomatic agent conducted a regular course of business '***on the side***.'"  Summary Records of the 476th Meeting, [1958] 1 Y.B. Int'l L. Comm'n 244 U.N. Doc. A/CN.4/SER.A/1958 (emphasis added) (as quoted in Sabithi Statement at 10).  The Department of State thus agreed with the insertion of the commercial activity exception because

Los Angeles, California  90067-4704

American diplomatic officers were not permitted to engage in commercial activities. As such, sending states that do permit their diplomatic agents "to engage in commercial or professional activities of a nondiplomatic nature" should bear the risk of their agents being subject to lawsuit.  7 Digest of Int'l Law 406-07 (Whiteman 1970); *see also* Sabbithi Statement at 12-13 (noting that Colombia and Italy proposed deletion of Article 31.1(c)'s commercial activity exception as superfluous in light of Article 42, but withdrew their objection after several delegates explained that Article 31.1(c) was designed to enforce Article 42's proscription against diplomats engaging concurrently in prohibited activities).

Review of the leading treatises on diplomatic immunity likewise confirms this this interpretation.  *See* Denza, *Diplomatic Law:  Commentary On The Vienna Convention On Diplomatic Relations*, p 398 (noting that 31.1(c) is necessary when the receiving state agrees to overlook Article 42's prohibition because the diplomat is unwilling to give up his business activities "but is accepted as being unusually well qualified to hold a particular diplomatic post" or when the diplomat simply continues to engage in business activities in defiance of Article 42); *Satow's Guide to Diplomatic Practice* 126 (Lord Gore–Booth ed. 5th ed. 1978) (stating that Article 31.1(c) pertains to those instances where a diplomat engages in professional or commercial activities in disregard of Article 42 or where a family member, who is not bound by Article 42 but enjoys similar immunity, engages in such activities).

The Vienna Convention's prohibition on concurrent commercial activity is premised on "international standards of conduct" that a diplomat's "engaging in professional or commercial activity for profit in the receiving state" is "undiplomatic." *Tabion v. Mufti*, 73 F.3d 535, 538 (4th Cir. 1996); Denza, *Diplomatic Law:  Commentary On The Vienna Convention On Diplomatic Relations*, p 453 ("It was at least from the nineteenth century onwards regarded as somewhat improper and incompatible with his status for a diplomat to engage in /////

LOS ANGELES, CALIFORNIA  90067-4704

DLA PIPER

Los Angeles, California 90067-4704

DLA PIPER

trading in the receiving State.").  There is nothing undiplomatic about a private citizen engaging in commercial activity.

   3.    *Cases Interpreting The Vienna Convention Likewise Confirm That Pre-Appointment Conduct Is Irrelevant*

   Significantly, no court has ever applied the commercial activity exception to pre-appointment conduct.  To the contrary, courts analyze the exception only in situations where the alleged commercial activity ran ***concurrent*** with the diplomat's tenure.  *See, e.g., Klayman v. Obama*, 125 F. Supp. 3d 67, 94 (D.D.C. 2015) (evaluating whether commercial activity exception applied to diplomat's conduct in operating resources of U.N.); *Koumoin v. Ki-Moon*, No. 16-CV-2111 (AJN), 2016 WL 7243551, at *6 (S.D.N.Y. Dec. 14, 2016) (analyzing whether employment discrimination claims arising out of employment for diplomat during diplomatic posting fall within the "commercial activity" exception); *Van Aggelen v. United Nations*, No. 06 CIV. 8240 (LBS), 2007 WL 1121744, at *2 (S.D.N.Y. Apr. 12, 2007), *aff'd*, 311 F. App'x 407 (2d Cir. 2009) (same); *Sabbithi*, 605 F. Supp. 2d at 128 (evaluating whether commercial activity exception applied in suit arising out of plaintiff's employment as domestic worker for defendant during diplomatic tour).

   Nor has any court ever exercised jurisdiction over a currently-sitting diplomat based on that diplomat's pre-appointment conduct as a private citizen.  The case law is clear that diplomatic status – even when acquired mid-litigation – acts as a jurisdictional bar, even as to lawsuits predating the diplomat's appointment.  *See Doe v. Roman Catholic Diocese of Galveston–Houston*, 408 F. Supp. 2d 272, 281 (S.D. Tex.2005) (noting that courts have "applied the related doctrines of diplomatic immunity and foreign-sovereign immunity in cases in which the individual or entity did not have sovereign status at the time the plaintiff filed suit"); *Tachiona v. Mugabe*, 169 F.Supp.2d 259, 297 n.171 (S.D.N.Y.2001), *aff'd in part, rev'd in part, and remanded sub nom. Tachiona v. United States*, 386 F.3d 205, (2d Cir.2004) (noting that "the State Department may certify foreign diplomatic agents even after

1    the official has entered the country . . . [and] the agents are entitled to immunity at

2    the moment of notification to the appropriate authorities of the receiving state, even

3    if they have already entered the territory").

4       In *Abdulaziz v. Metro. Dade Cty.*, 741 F.2d 1328, 1330 (11th Cir. 1984), the

5    Eleventh Circuit addressed the question of "whether a certificate of diplomatic

6    status granted after the commencement of a suit supports dismissal of the suit based

7    on diplomatic immunity . . . ." *Id*. at 1329.  It answered that question in the

8    affirmative: "We hold that once the United States Department of State has regularly

9    certified a visitor to this country as having diplomatic status, the courts are bound to

10   accept that determination, and that the diplomatic immunity flowing from that status

11   serves as a defense to suits already commenced." *Id*. at 1330.  While the Court

12   noted that *Abdulaziz* "had no occasion to apply the commercial activity exception,"

13   there is no reason to believe that its holding – that diplomatic accreditation "serves

14   as a defense to suits already commenced" – applies only selectively.  The Eleventh

15   Circuit stressed that "diplomatic immunity serves the needs of the foreign

16   sovereign," and that the "purposes of such immunity are to 'contribute to the

17   development of friendly relations among nations.'" *Abdulaziz*, 741 F.2d at 1330

18   (quoting *Hellenic Lines, Ltd. v. Moore*, 345 F.2d 978, 980 (D.C.Cir.1965) and citing

19   *United States v. Arlington*, 669 F.2d 925, 930 (4th Cir. 1982).

20       Those sovereignty concerns – which are integral to the United States'

21   diplomatic relations and are the province of the Executive Branch – are equally

22   present in cases where a diplomat, while a private citizen, may have engaged in

23   commercial conduct.  That sovereignty would be severely undermined were a court

24   to allow a sitting diplomat to be held civilly liable for alleged conduct pre-dating his

25   appointment as a private citizen.  As the United States has pointed out, a deviation

26   from the international consensus on the broad scope of diplomatic immunity from

27   the jurisdiction of United States courts "would create an acute risk of reciprocation

28   /////

1  by other States, potentially subjecting U.S. diplomats to controversial litigation in

2  foreign jurisdictions."  Sabbithi Statement at 21.

3      Thus, a plaintiff cannot collapse the Vienna Convention's protections based

4  on the diplomat's pre-appointment conduct.  As the D.C. Circuit reaffirmed in 2017,

5  immunities imposed by international treaty require dismissal of civil actions, even

6  when those immunities are acquired mid-litigation. *See Zuza v. Office of the High*

7  *Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017), cert. denied, 138 S. Ct. 1559

8  (2018) (holding that immunity under related International Organizations Immunities

9  Act "does not operate only at a lawsuit's outset; it compels prompt dismissal even

10  when it attaches mid-litigation" and citing *Abdulaziz* for the proposition that "Courts

11  have found that other forms of immunity acquired *pendente lite* mandate dismissal

12  of a validly commenced lawsuit").

13      The Southern District of New York expressly confirmed this reading of the

14  Vienna Convention in 2014, holding that diplomatic immunity acquired mid-

15  litigation "destroys jurisdiction" of suits "validly commenced" based on the

16  diplomat's pre-appointment conduct.  *See United States v. Khobragade*, 15 F. Supp.

17  3d 383, 387 (S.D.N.Y. 2014).  As this Court pointed out in its Order, ECF No. 77, at

18  2, *Khobragade* involved a criminal prosecution, not a civil action.  Nonetheless,

19  *Khobragade* remains persuasive in this context, as the court there made clear that,

20  with respect to the Vienna Convention, the standard for dismissal of both civil and

21  criminal actions "is the same:"

22          The Court notes that *Abdulaziz* involved civil claims rather
            than criminal charges. . . . *Abdulaziz* is persuasive
23          precedent given that ***the standard for dismissing criminal***
            ***and civil cases based on diplomatic immunity is the same.***
24          Furthermore, because diplomatic immunity is a
            jurisdictional bar, it is logical to dismiss proceedings the
25          moment immunity is acquired.  Even if Khobragade had
            no immunity at the time of her arrest and has none now,
26          her acquisition of immunity during the pendency of

27

28

Los Angeles, California 90067-4704

DLA PIPER

Los Angeles, California  90067-4704

DLA PIPER

1    proceedings mandates dismissal.

2

3    *Id*. at 388 (emphasis added).  Indeed, the court expressly observed that other district

4    courts – including in civil actions –  "cited and followed *Abdulaziz* in the absence of

5    binding case law in other circuits."  *Id*. at 387 n.28 (collecting cases).

6          Consistent with *Khobragade*'s pronouncement that "the standard for

7    dismissing criminal and civil cases based on diplomatic immunity is the same,"

8    other federal cases have held that diplomatic immunity and analogous immunities

9    serve as a defense to suits already commenced, even in civil actions.  *See Fun v.*

10   *Pulgar*, 993 F. Supp. 2d 470, 474 (D. N.J. 2014)(in action asserting breach of

11   contract, citing *Abdulaziz* for the proposition that "diplomatic immunity serves as a

12   valid defense for the duration of suits already commenced"); *Republic of Phil. by*

13   *Cent. Bank of Phil. v. Marcos*, 665 F. Supp. 793, 799 (N.D. Cal. 1987) (in action

14   seeking return of gold and currency held by nation's former president, granting

15   motion to quash subpoena even though movant was only certified as diplomatic

16   agent after subpoena had been served); *Straub v. A P Green, Inc.*, 38 F.3d 448, 451

17   (9th Cir. 1994) (in suit against instrumentality of Quebec arising out of alleged

18   exposure to asbestos from commercial products, holding that under related doctrine

19   of sovereign immunity, immunity "applies when a party is a foreign state at the time

20   the lawsuit is filed, even if that party was not a foreign state at the time of the

21   alleged wrongdoing").

22         As these cases demonstrate, regardless of the fact that H.E. Al-Rumaihi

23   received his diplomatic appointment after these proceedings commenced, he is still

24   entitled to full diplomatic immunity.  While diplomatic immunity may have harsh

25   implications, "Congress . . . is the appropriate body for plaintiffs to present their

26   concerns that the effectiveness of enforcing [litigant's rights] in the United States is

27   compromised by diplomatic immunity."  *Sabbithi*, 605 F. Supp. 2d at 130.

28   /////

In sum, there is no authority to suggest that allegations of activity predating a diplomat's appointment – much less those involving run-of-the mill common law tort claims – "trump[] the applicability of diplomatic immunity, a doctrine created not solely by congressional enactment, but formed largely from international treaty obligations entered into by the executive branch with the consent of Congress and from the executive's power generally to conduct foreign relations." *Ahmed v. Hoque*, No. 01 CIV. 7224 (DLC), 2002 WL 1964806, at *7 (S.D.N.Y. Aug. 23, 2002).

## VI.  **CONCLUSION**

For the foregoing reasons, H.E. Al-Rumaihi respectfully requests that this Court grant this Motion and dismiss this action against him for lack of jurisdiction.

Dated:  May 6, 2019

**DLA PIPER LLP (US)**


By: _/s/ Miles M. Cooley_

Miles M. Cooley
Attorneys for Specially-Appearing
Defendant
H.E. AHMED AL-RUMAIHI

Los Angeles, California  90067-4704

NOTICE OF MOTION AND MOTION TO DISMISS